# UPDATED TABLE OF EXHIBITS.

~~aA:   MoCo. Sup. Ct Denial Order for habeas corpus writ No. HC-5267~~   pp. 1   - 9

~~bA:   Attorney Generals reply Informal Response to Gnd. # 2~~   pp. 1   - 3

~~cA:   Petitioner's Rebuttal to the Informal Response~~   pp. 1   - 7

~~dA:   MoCo Superior Courts Denial Order of Informal Response~~   pp. 1   - 3

A:   2005 BPH Parole Hearing Transcripts   pp. 1   - 14

B:   2005 BPH Denial Transcripts   pp. 15 - 20

C:   Detective Sonne's Letter dated March 06, 1991   pp. 1   - 7

D:   Probation Officers Report (POR)   pp. 1   - 7

E:   Trial Court Sentencing Transcripts   pp. 1   - 6.

F:   2002 BPT Denial Transcripts   pp. 33 - 37

G:   Monterey County District Attorney § 3042 reply letter   pp.   1

H:   2003 BPT Denial Transcripts   pp. 62 - 70

I:   Dr. Lewis's Life Prisoner Psychological Report   pp. 1   - 5

J:   Dr. Bencichs's Life Prisoner Psychological Report   pp. 1   - 3

K:   BPH Waiver Forms (#1001A Rev. 10/89) for 2005 parole hearing   pp. 1   - 8

L:   New York Times article dated Oct. 02, 2005 Internet download   pp. 1   - 9

M:   California Supreme Court Denial Order No. S117967 Apr. 21, 2004   pp. 1

N:   Correctional Counselor Life Prisoner Evaluation Report   pp. 1   - 8

O:   Alcoholism excerpted from 'Life Extensions" ISBN: o-446-37683-3   pp. 1

P:   Article of the CCPOA an Internet Download   pp. 1   - 4

Q:   CDC&R form RFI sent to C&PR at San Quentin   pp. 1

R:   602 Administrative Appeal filed by petitioner on Mar. 14, 2005   pp. 1   - 4

S:   BPH Life Prisoner Parole Consideration Worksheet of 2005 hearing   pp. 1   - 5

**T:**  BPH memo's detailing whom received a Penal Code § 3042 notice pp. 1 - 4

**U:**  BPH memo stating that a § 3042 notice was not sent to petitioner's trial attorney because the Board of Prison terms does not know his name or address.

V:  Sixth Appellate District Court of California Summery Denial of writ of habeas corpus HO30652 (Monterey County Supr. Ct. No. HC5267) See Ground 8 of herein petition.

X:  Superior Court of Monterey County Case No 5267 Summarily Denial dated Jul 21, 2006.

Y:  California Supreme Court Summarily Denial Order Dated: May 16, 2007

Z:  Original MC-275 California State Habeas Corpus Petition.

# EXHIBIT A:

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )
Hearing of:               )        CDC Number C-79199
                          )
EMIL EKDAHL               )
                          )
_____ )

**INMATE COPY**

CALIFORNIA STATE PRISON

SAN QUENTIN, CALIFORNIA

JULY 1, 2005

TIME NOT DICTATED

PANEL PRESENT:

Mr. Stephen Lee, Presiding Commissioner
Ms. Noreen Blonien, Deputy Commissioner

OTHERS PRESENT:

Mr. Emil Ekdahl, Inmate (Preliminary Hearing Only)
Mr. Ed Albord, Attorney for Inmate (Preliminary
Hearing Only)

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____  No      See Review of Hearing
_____  Yes     Transcript Memorandum

**Kathryn Kenyon, Peters Shorthand Reporting**

ii

## INDEX

| | PAGE |
|---|---|
| Preliminary Hearing | 1 |
| Proceedings | 5 |
| Case Factors | 6 |
| Pre-Commitment Factors | 7 |
| Post-Commitment Factors | 8 |
| Parole Plans | 12 |
| Recess | 14 |
| Decision | 15 |
| Adjournment | 20 |
| Transcriber Certification | 21 |

--oOo--

1

1    P R E L I M I N A R Y   H E A R I N G

2    **PRESIDING COMMISSIONER LEE:**    Mr. Ekdahl,

3    Jerry, Emil, C-79199.    (Indiscernible) this is a

4    preliminary hearing prior to his actual Board

5    hearing.    And this is necessary because of the

6    information that I have in the file.    At this

7    point in time what I would usually

8    (indiscernible).    My name is Stephen Lee,

9    Commissioner Presiding.    We'll go to my right

10   and when it reaches your turn, sir, please give

11   us your CDC number as well.

12       **DEPUTY COMMISSIONER BLONIEN:**    I'm Noreen

13   Blonien, B-L-O-N-I-E-N.    I'm the Deputy

14   Commissioner.

15       **INMATE EKDAHL:**    Ekdahl, E-K-D-A-H-L, C-

16   79199.

17       **ATTORNEY ALBORD:**    Ed Albord, A-L-B-O-R-

18   D.

19       **PRESIDING COMMISSIONER LEE:**    We are all

20   here because I have a document that indicates

21   that Mr. Ekdahl wishes to waive attorney and

22   waive his presence.    Generally, that is

23   absolutely right.    He can do whatever he chooses

24   to do.    However, I can do so only if he is able

25   to waive his rights.    Counsel, you've had an

26   opportunity to speak with Mr. Ekdahl.    Do you

27   believe that Mr. Ekdahl can waive his rights in

2

1  regards to this hearing and his representation

2  by counsel?

3      **ATTORNEY ALBORD:**    I read his file.  I

4  attempted to discuss with Mr. Ekdahl and we

5  spoke (indiscernible) and then did not want the

6  participation.  He did convey to me that he

7  wanted to waive (indiscernible).

8      **PRESIDING COMMISSIONER LEE:**    Mr. Ekdahl,

9  let's talk.  You know your rights.

10      **INMATE EKDAHL:**    Yes, sir.

11      **PRESIDING COMMISSIONER LEE:**    That I'm

12  quite sure of.  And my problem is this, is that

13  you're (indiscernible), you had psychotropic

14  medication, you had certain bouts of depression.

15      **INMATE EKDAHL:**    Okay.  But you seem to

16  be like stereotyping or something there.  I have

17  triple CMS for depression.

18      **PRESIDING COMMISSIONER LEE:**    Oh, no, no,

19  no.

20      **INMATE EKDAHL:**    It doesn't make me

21  mentally ill, doesn't mean I'm stupid, doesn't

22  mean I don't know my right, and I ask to waive

23  this parole hearing.

24      **PRESIDING COMMISSIONER LEE:**    All right

25  (indiscernible).  The law requires me that

26  (indiscernible) EOP.  I can't even allow you to

27  waive (indiscernible), so now you're up to CMS

3

1  so I have to make that determination.  So

2  believe me, I'm not insulting you in any way.

3  In fact, I don't even think -- I wasn't even

4  thinking along those lines (indiscernible).  I

5  just wanted to make sure that this was a

6  situation that you were doing it -- of that you

7  are fully understanding of what you were going

8  to do, so I will not violate your rights.  If

9  you wish to waive your hearing, you absolutely

10  have that right to waive your attorney.  I just

11  want to verify on the record that you know what

12  you're doing, that this is (indiscernible).  So

13  at this time, sir, understand that all the

14  reasons (indiscernible) 115 and at this point in

15  time you don't want to sit through this and that

16  you don't want an attorney to represent you; is

17  that correct?

18        INMATE EKDAHL:   It isn't because of a

19  115, but, yes, I do want to waive my right --

20  waive my right to attend a hearing.  I want to

21  waive my right to a attorney.

22        PRESIDING COMMISSIONER LEE:   Would you

23  like to tell me the reason?  You don't have to.

24        INMATE EKDAHL:   I don't think I have to

25  respond to you.

26        PRESIDING COMMISSIONER LEE:   No, you

27  don't.

4

1        **INMATE EKDAHL:**    I've exercised my
2   rights.
3        **PRESIDING COMMISSIONER LEE:**    You don't
4   want to?
5        **INMATE EKDAHL:**    I don't want to.
6        **PRESIDING COMMISSIONER LEE:**    All right.
7   At this point in time I'm going to make a
8   determination that (indiscernible) the ability
9   to waive (indiscernible) to waive that
10   (indiscernible) up.    Counsel, make sure you
11   (indiscernible).
12                       --oOo--
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

5

1              P R O C E E D I N G S

2          DEPUTY COMMISSIONER BLONIEN:     We're on

3    record.

4          PRESIDING COMMISSIONER LEE:     All right.

5    This is the subsequent parole consideration for

6    Emil Ekdahl, E-K-D-A-H-L, CDC Number C-79199.

7    We are currently located at San Quentin State

8    Prison.   The date is June -- no, July the 1st,

9    2005.   Inmate was received on January 16, 1984,

10   out of the County of Monterey, Case Number CR

11   9938.   The offense was murder in the second

12   degree.   The term was set at 15 years to life.

13   Minimum eligibility for parole, June the 7th,

14   1992.   We had a previous hearing and at that

15   particular hearing we determined that Mr.

16   Ekdahl, though he is triple CMS, has voluntarily

17   waived his attorney as well as his presence at

18   this hearing.   Mr. Ekdahl actually appeared

19   before the Commissioners, and we believe that

20   Mr. Ekdahl has the ability to waive his

21   appearance as well as his attorney and he has

22   the ability to represent himself and he did so.

23         DEPUTY COMMISSIONER BLONIEN:     Mr. Lee, I

24   just wanted to point out that we documented that

25   on tape and we have it at the beginning of this

26   hearing.

27         PRESIDING COMMISSIONER LEE:     Okay.

6

1    Thank you. At this point in time, we found no
2    ADA issues. We had an attorney speak with Mr.
3    Ekdahl and he indicated that at that point in
4    time as far as he knew that there were no ADA
5    issues. The purpose of today's hearing was to
6    consider suitability for parole. Since the
7    inmate has waived his appearance, I don't
8    believe it's necessary at this point in time to
9    go through the procedural aspects of the
10   hearing. This is not his first hearing. I
11   believe that he understands what would have
12   occurred during the hearing. The inmate still
13   has his administrative decision, grievance
14   procedure pursuant to 0401. At this time
15   (indiscernible) the fact that the inmate is not
16   here, we will go to the facts of the case. The
17   facts of the case are being taken from the June
18   2005 report. On this summary, in October 18th,
19   1981, at approximately 10:50 p.m., Soledad
20   relief officers responded to Pete's Shell on
21   South Front Street regarding an armed robbery.
22   Mr. Sandoval was located behind the station face
23   down in a pool of blood. There was no pulse.
24   Victim's (indiscernible) Sal Montoya stated that
25   two subjects with ski masks entered the store,
26   ordered them to lay on the floor, took $13 from
27   the cash register, and ran from the store. A

7

1    short time later, they heard two shots.  Autopsy

2    report indicates that Arthur Sandoval died from

3    gunshot wounds to the head.  Inmate was in fact

4    convicted of this offense and I will now go into

5    his juvenile record.  The report seems to

6    indicate that inmate has no juvenile

7    convictions.  Adult convictions.  Inmate at this

8    time appears to have a 470 forgery from a

9    computer, as well as a grand theft pursuant to

10   Penal Code Section 487 and a criminal conspiracy

11   to Penal Code Section 182.  All these charges

12   were dismissed on November 9th, 1983, by the

13   Sacramento County Municipal Court.  Inmate was

14   arrested for this case on September 17th, 1983.

15   Personal factors.  Inmate was born to parents

16   Emil Ekdahl, Sr., and Norma Christopher on March

17   29th, 1963.  He is an only child born to this

18   relationship.  Ekdahl never knew his father and

19   he was raised by his mother and stepfather,

20   George Christopher, in northern California.  He

21   has two brothers, Jamie and his twin

22   Christopher, and two sisters (indiscernible)

23   Sylvia Montgomery who live in California.

24   Ekdahl attended school until the ninth grade.

25   He later earned a GED.  Ekdahl was

26   (indiscernible) married Darleen Duketar in 1982.

27   He found out later the marriage was not legal

8

1   (indiscernible) common-law relationship, Ekdahl

2   has no children.  Military records indicate

3   Ekdahl served in the United States Army for nine

4   months in 1982 and did not adapt well to

5   military life.  He was granted an early

6   discharge and at the time of his arrest, the

7   inmate had been in for six months as an

8   apprenticeship -- excuse me, as an apprentice

9   for a Sacramento (indiscernible).  At this point

10  in time, I'll turn it over to Deputy

11  Commissioner to speak in regards to the inmate's

12  parole -- excuse me, programming while

13  incarcerated and his psychological reports.

14        **DEPUTY COMMISSIONER BLONIEN:**   This is

15  Mr. Ekdahl's seventh subsequent hearing.  His

16  last appearance before the Board was February

17  27, 2002, and the decision was for a one-year

18  denial.  The Panel recommended that Mr. Ekdahl

19  remain disciplinary-free and participate in

20  self-help and therapy if available.  Mr. Ekdahl

21  is currently a medium A custody level.  His

22  classification score is 19.  In order to do this

23  report, I have read the counselor's report of M.

24  Garcia dated June 2005, the psychiatric report

25  by Dr. L. Francis, F-R-A-N-C-I-S, dated 2/25/03,

26  and the doctor psych report of 2/24/99 by Dr.

27  Les Carr, C-A-R-R, PhD.  I also have done a

9

1    review of Mr. Ekdahl's C file.  Mr. Ekdahl has
2    received five 115s, the last one being on
3    4/29/04 for refusal to report to work.  He has
4    received 18 128s, and since his last hearing
5    he's received five 128s which are included in
6    the 18: July 17, 2003; April 5th, 2004;
7    4/28/2004; June 3rd, 2004; and January 14th,
8    2005 all relating to his failure to report to
9    the work assignment.  Those five 115s
10   culminating -- five 128s culminated with the 115
11   issued on 4/29/04, refusal to report to work.
12   Mr. Ekdahl has been involved in Alcoholics
13   Anonymous, alternatives to violence project
14   workshop, an anger management group.  He's
15   participated in -- he had an 11th grade
16   education, but he got his GED and he has been in
17   the Chapman College in San Quentin College
18   program.  He's received vocational training in
19   auto shop and vocational mechanics, machines,
20   and he attended the (indiscernible) men's
21   retreat held in the year 2000.  On his
22   counselor's summary, he notes that,
23   "Unfortunately, Mr. Ekdahl has been facing
24   severe medical issues which has affected his
25   progress to parole.  Due to the current
26   medication Ekdahl has been receiving, he's been
27   unable to participate in self-help therapy or

10

1    attend his current job at a regular basis.  Mr.

2    Ekdahl does have hepatitis B.  Mr. Ekdahl

3    understands the expectations of the Board and

4    knows his lack of participation will possibly

5    affect his ability to parole."  In terms of the

6    psych report, the doctor -- started with Dr.

7    Carr in 1999 who noted that Mr. Ekdahl does

8    not -- did not -- have at that point any mental

9    health issues and took him out of the triple CMS

10    program.  Mr. Ekdahl has been attempting to

11    change his name, and in May of 2004 he went on a

12    hunger strike for three days when the California

13    Superior Court decided he would not be allowed

14    to change his name.  This was a trigger of

15    depression and he continues to suffer from

16    depression, reports that the Prozac he is taking

17    helps alleviate the symptoms to a great deal.

18    The inmates taking this medication are triple

19    CMS.  So that's why the designation of triple

20    CMS is because of the depression.  Under

21    clinical diagnosis and level of functioning, GAF

22    score Axis I, a diagnosis of major depressive

23    disorder, single episode moderate polysubstance

24    (indiscernible) full sustained institutional

25    remission.  Axis II notes the history of adult

26    antisocial behavior.  Axis III denotes the

27    hepatitis C and current global assessment

11

1    functioning level of 65.  He -- in terms of

2    treatment activities, he attends weekly group

3    therapy, stress management, contact with a case

4    manager every 90 days and contact with a

5    psychiatrist as needed for the depression.  Dr.

6    Bencich, B-E-N-C-I-C-H in his 6/29/04 report

7    notes that Mr. Ekdahl as recent of May 2004 had

8    a refusing to work 115 following a personality

9    conflict with his supervisor.  The discipline

10   therapy action prior to this one was in 1997.

11   He is very proud of his ability to remain free

12   of drugs and alcohol since 1986.  The doctor

13   believes his violence risk potential would be

14   lower than that of the average lifer.

15   (Indiscernible) of control substance is a major

16   risk factor.  Beyond this, it's difficult to

17   know what other factors may provoke violence in

18   this individual since he is not inclined to

19   discuss feelings about the life crime.  Given

20   the fact that Mr. Ekdahl received the 115

21   disciplinary last month, Mr. Ekdahl is both

22   depressed and very pessimistic about the outcome

23   of this upcoming Board hearing.  As a result, he

24   is unmotivated to try to develop any alternative

25   parole plans.  He is confident that he could do

26   so quickly if the future felt more promising.

27   And with that, I'll return to the Chair.

12

1    **PRESIDING COMMISSIONER LEE:**    Prior to

2    Mr. Ekdahl's depression over his last 115, his

3    future plans were as follows.    The file

4    indicates that he is going to reapply for the

5    Genesis Residential Center in Seaside,

6    California, for placement in their drug and

7    alcohol residential program.    He has no response

8    at this time.    Employment, he indicates that he

9    will attempt to find work as a machinist in auto

10    mechanics or sheet metal.    I will now go to the

11    notices.    Notices pursuant to 3042 are notices

12    that are sent out to individuals as well as

13    parties who have special interest in the

14    inmate's case.    In this particular case, we do

15    have a response.    The response is from the

16    District Attorney of Monterey County that is

17    indicated June the 18th, year 2004.    Beginning

18    on the fourth paragraph, the district attorney's

19    letter indicates, "Inmate Ekdahl has always

20    maintained the robbery and the murder was

21    committed under duress from one of the

22    codefendants.    Inmate Ekdahl (indiscernible)

23    duress as one single statement from the crime

24    partner, Mark Horning," H-O-R-N-I-N-G.    "'Get

25    out and go with Steve to do the job or I'll kick

26    your ass.'    This simple statement was apparently

27    the only peer pressure needed to induce inmate

13

1    Ekdahl to commit robbery and murder.  Inmate

2    Ekdahl had never come forward to express remorse

3    or to assist in bringing his accomplices to

4    justice.  Instead he kept his silence long after

5    the killing.  The crime remained unsolved for

6    almost two years before Mark Horning's ex-wife

7    came forward and provided information leading to

8    Ekdahl's arrest.  In those two years, Ekdahl was

9    arrested for new offenses in Sacramento.  He

10   also became addicted to controlled substances.

11   Regardless of progress the inmate has made in

12   prison, the fact remains that an adequate

13   punishment must be met out to admit himself for

14   this crime.  Setting a parole date at this time

15   would not adequately punish inmate Ekdahl to

16   protect society.  Sincerely, Dean Flippo, F-L-I-

17   P-P-O, by Rick Storms, Deputy District Attorney

18   for Monterey County."  At this time I've gone

19   over the parole plans as well as the letters.

20   All right.  The fact that he has no attorney,

21   there are no questions to ask the inmate.  There

22   are no statements, the statements that we have

23   are (indiscernible) district attorney's office.

24   And I indicate there is yet a more recent letter

25   from the district attorney's office.  This

26   letter is written by Michael Greeden, Monterey

27   County Deputy District Attorney, and basically

14

1  the last paragraph corroborates the initial

2  letter that was sent and indicates, "I see that

3  Mr. Ekdahl, when asked to comment upon his crime

4  said, 'I am factually innocent.  I don't discuss

5  the case.'  He appears to be -- still be a

6  substantial risk to the community.  For the

7  above-cited reasons, the Monterey County

8  District Attorney's Office respectfully request

9  that the Board deny parole at this time for Mr.

10  Ekdahl."  At this time this hearing is

11  concluded.  We will recess, deliberate, and come

12  back with a decision.

13                  R E C E S S

14                  --oOo--

15

16

17

18

19

20

21

22

23

24

25

26

27

# EXHIBIT B:

15

1          CALIFORNIA BOARD OF PAROLE HEARINGS

2                    D E C I S I O N

3    DEPUTY COMMISSIONER BLONIEN:    Okay.  We're back

4    on the record.

5          PRESIDING COMMISSIONER LEE:    The Panel

6    has reviewed all information received from the

7    public and relied on the following circumstances

8    in concluding prisoner is not suitable for

9    parole and would pose an unreasonable risk to

10   danger to society and a threat to public safety

11   if released from prison.  The offense was

12   carried out in a cruel and callous manner.

13   Multiple victims were robbed and one person

14   killed.  Offense was carried out in a

15   dispassionate manner or that the crime was

16   inexplicable and very trivial in relationship to

17   the offense.  Even if we were to take the

18   inmate's (indiscernible) that he was a willing

19   participant in the robbery, but that was based

20   upon that he was threatened, we have an

21   individual who was killed, two other individuals

22   robbed.  There's a (indiscernible) occasion that

23   the inmate actually got worse after the

24   incident, never turned anyone in.  This theory

25   indicates that maybe he had more participation

26   in the crime than he alleges.  The bigger issue,

27   EMIL EKDAHL  C-79199  DECISION PAGE 1  7/1/05

16

1   of course, is the killing of the victim and

2   there seems to be no reason why the victim had

3   to be killed.  This was not a situation where

4   the victim was attempting to fight off the

5   robbers with guns or (indiscernible) anything

6   like that.  The other reason for the denial at

7   this point in time is his institutional

8   behavior.  Prior programming has only been

9   limited while incarcerated.  He has not

10  sufficiently participated in the programs.  He

11  has failed to demonstrate evidence of positive

12  change.  Misconduct while incarcerated include

13  recently a 115, April 29th, year 2004 as well as

14  five recent 128s, starting with chrono 2003

15  which is his last parole date.  He had a 115 on

16  July 2000 -- excuse me, a 128 of July 2003;

17  April of 2004; another one in April 2004; in

18  June 2004 128 and finally a recent January 2005.

19  The psychological report from a Dr. Louis PhD

20  indicates that there are concerns.  One of the

21  major concerns that the doctor had was in

22  regards to his AA 12-step program.  Basically

23  the doctor indicates that under impressions,

24  assessment of (indiscernible) 2003 details a

25  risk and return to dangerousness.  Under Dr.

26  Bencichs, B-E-N-C-I-C-H-S, reports, "If the

27  EMIL EKDAHL  C-79199  DECISION PAGE 2   7/1/05

17

1    state absolutely asks for drug and alcohol

2    (indiscernible) finds potential compared to

3    average lifer.  However, his capacity

4    (indiscernible) social status were he released

5    is compromised since he is no longer availing

6    himself for (indiscernible) of weekly support of

7    12-step meeting.  This makes it more likely that

8    he will relapse.  (Indiscernible) meeting.

9    Therefore, (indiscernible) he be paroled."

10   Another reason for the denial is the 3042

11   response.  Inmate has read the letters from the

12   District Attorney's Office from Monterey County

13   indicating their opposition to the inmate's

14   release.  Remarks.  The Panel makes the

15   following findings.  The prisoner continues to

16   need therapy programming and self-help in order

17   (indiscernible) discuss the (indiscernible) cope

18   and stress in a nondestructive manner as well as

19   to gather greater insight into the crime.  In

20   review of the prisoner's social history and lack

21   of program participation, there's no occasion

22   that the prisoner would behave differently if

23   paroled.  Prisoner should be commended for the

24   fact that he is attempting -- prisoner is

25   commended by the Commission to the fact that he

26   realized that he was unsuitable and has not

27   EMIL EKDAHL   C-79199   DECISION PAGE 3   7/1/05

18

1   attempted to mitigate his numerous violations
2   while incarcerated, and for that reason, we will
3   take that into account during the deliberations
4   regarding the amount of denial.  These factors,
5   however, do not outweigh the factors of
6   unsuitability.  Mr. Ekdahl, I suspect very
7   strongly that you will read this particular
8   transcript and I will address my comments to you
9   directly.  Sir, I know how frustrated you must
10  feel.  It appears that based upon the reports
11  that I have that indicate that you have received
12  a setback in your attempt to be free.  However,
13  I will indicate to you that that is -- that is a
14  sign of how you will react.  In society, once
15  you are released -- I'm glad that you did not
16  come into the hearing to try to excuse your 115s
17  and 128.  The Panel appreciates that.  However,
18  your therapy as well as your 12 steps are very
19  important to the Panel as all recommendations
20  are, and the fact that you have not followed the
21  recommendations causes us great concern.  So in
22  a separate decision, the Panel finds that it is
23  not reasonable to expect that parole will be
24  granted in the next three years.  Though the
25  115s and 128s suggest that you are deteriorating
26  in your programming while incarcerated, I don't,
27  EMIL EKDAHL   C-79199  DECISION PAGE 4   7/1/05

19

1  nor does the Deputy Commissioner, feel that five

2  'years is warranted in this particular case.  In

3  (indiscernible) excuses, you realize that you

4  have a problem and you realize that you have to

5  put your 115s and 128s as far behind you as

6  possible.  (Indiscernible) argue and suggested

7  that the prisoner needs to look at what 115s and

8  128s in a rear-view mirror that (indiscernible)

9  that they are still a problem.  The reason why

10  we did not go to four years is because of the

11  fact that the next three years you will

12  hopefully get back to your previous ways

13  (indiscernible) continue your therapy and 12

14  steps and all the other suggestions made by

15  previous Panels.  The reason for this denial

16  also is because multiple victims were robbed and

17  one killed.  The offense was carried out in a

18  dispassionate and calculated manner.  It is

19  clear that the (indiscernible) robbery.  The

20  psychological report clearly indicates concern

21  in regards to inmate's failure to continue in

22  his 12 steps.  The prisoner recently has

23  committed a serious disciplinary violation by

24  way of (indiscernible) 115 as well as five 128s

25  since the last hearing of 19 -- excuse me 2003.

26  For these reasons, a longer period of

27  EMIL EKDAHL   C-79199   DECISION PAGE 5   7/1/05

20

1  observation and evaluation of the prisoner is

2  required before the Board should find this

3  prisoner suitable for parole.  At this time,

4  Deputy Commissioner, is there anything further?

5        **DEPUTY COMMISSIONER BLONIEN:**    Yeah.    I

6  just wanted to say -- advise the inmate to

7  resolve his work issues through the proper

8  channels and work with medical staff to address

9  his medical and psych issues in a positive

10 manner which would allow his progress and to

11 return to his self-help and, again, reiterating

12 to more 115s or 128s and you're back on the road

13 again.  So good luck to you, sir.

14        **PRESIDING COMMISSIONER LEE:**    This

15 hearing is adjourned.

16                    --o0o--

17

18

19

20

21

22

23 PAROLE DENIED THREE YEARS

24 THIS DECISION WILL BE FINAL ON: _____

25 YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT

26 DATE, THE DECISION IS MODIFIED.

27 EMIL EKDAHL   C-79199   DECISION PAGE 6   7/1/05

21

CERTIFICATE AND
DECLARATION OF TRANSCRIBER

I, KATHRYN KENYON, a duly designated

transcriber, PETERS SHORTHAND REPORTING, do hereby

declare and certify under penalty of perjury that I

have transcribed tape(s) which total one in number and

cover a total of pages numbered 1 - 20, and which

recording was duly recorded at CALIFORNIA STATE

PRISON, SAN QUENTIN, CALIFORNIA, in the matter of the

SUBSEQUENT PAROLE CONSIDERATION HEARING OF EMIL

EKDAHL, CDC NO. C-79199, ON JULY 1, 2005, and that the

foregoing pages constitute a true, complete, and

accurate transcription of the aforementioned tape to

the best of my ability.

I hereby certify that I am a disinterested

party in the above-mentioned matter and have no

interest in the outcome of the hearing.

Dated JULY 20, 2005, at Sacramento, California.


KATHRYN KENYON
TRANSCRIBER
**PETERS SHORTHAND REPORTING**

# EXHIBIT C:

3-6-91

wk of 4-15

LIFE HEARING COORDINATOR

SIR:

I INVESTIGATED THIS CASE SEVERAL YEARS AGO. SUBSEQUENTLY, ERDAHL, AND A JUVENILE NAMED STEVEN HORNING WERE SENT TO PRISON/CYA. A DANNY HORNING WAS ALREADY IN PRISON & A THIRD BROTHER (MARK HORNING) WAS INVOLVED, HOWEVER DID NO SUBSTANCIAL TIME. ALL BUT ERDAHL HAVE LONG SINCE DISCHARGED FROM PRISON

SAN JOAQUINE CO. S.O. PRESENTLY HAVE DANNY & STEVE HORNING AS 187 P.C. SUSPECT. IN A RECENT CASE. THERE IS A MURDER WARRANT OUTSTANDING FOR DANNY AT THI TIME. AS I UNDERSTAND IT STEVEN IS MOST LIKELY GOING TO BE CHARGED BEFORE ITS OVE

ONE THING WAS ALWAYS CLEAR IN THE ERDAHL CASE. HE WAS A FOLLOWER & THE HORNING "GANG" (LEAD BY MARK) USED HIM. GRANTED, HE WAS SOUND OF MIND, WAS DIRECTLY INVOLVED & I'M NOT MAKING EXCUSES FOR HIM. BUT WHERE IS THE JUSTICE BY HE BEING THE ONLY ONE REMAINING IN PRISON, WHEN THE HORNINGS ARE FREE?

THE POINT BEING THAT IF ANY OF THE FOUR INVOLVED STOOD ANY CHANCE AT ALL OF EVER BECOMING A USEFUL, PRODUCTIVE CITIZEN & MEMBER OF OUR SOCIETY, ERDAHL DOES. YET THE HORNING ARE FREE TO KILL AGAIN AND AGAIN IF "ALLOWED" ON THE STREETS.

I HAVEN'T TALKED TO ERDAHL IN MANY YEARS AND I THEREFORE DON'T KNOW WHAT, IF ANY PROGRESS HE'S MADE IN PRISON. BUT IF HE HAS ANY CHANCE AT ALL OR SHOWS ANY SIGN OF REMORSE ETC, AND IS DEEMED FIT TO RE-ENTER LIFE OUTSIDE THE WALLS, HE SHOULD

AT LEAST BE CONSIDERED.

SOME PEOPLE CHANGE SOME DON'T. ONLY ERDAHL & PERHAPS PRISON STAFF KNOW FOR SURE IF HE HAS. IF I EVER TALKED WITH HIM AGAIN, PERHAPS I COULD GET A BETTER IDEA OF WHERE HE'S AT ON THE "ROAD TO REHABILITATION."

I WOULD IMAGINE THAT PRISON LIFE HAS BEEN VERY HARD ON ERDAHL AS HE WAS BASICALLY JUST A "SKINNY KID" WHEN HE WENT TO PRISON. PERHAPS HE'S PAID IN MORE WAYS THAN WE IMAGINE, MAYBE NOT.

ON THE OTHER SIDE OF THE COIN

IS THE FAMILY OF THE VICTIM. I HAVE

NO IDEA HOW THEY FEEL ABOUT THE

POSIBILITY OF PAROLE. MAY THEY SHOULD

HAVE SOME INPUT, AS IT WAS THEIR SON,

BROTHER WHO WAS KILLED THAT NIGHT.

   I HAVE SENT MANY, MANY PEOPLE

TO PRISON IN THE PAST 20 YEARS, BUT

NEVER FELT QUITE THIS UNSETTLED ABOUT

THE POSSIBILITY OF A MAN SPENDING

THE REST OF HIS LIFE BEHIND BARS,

WHEN OTHERS, PERHAPS MORE GUILTY, ARE

FREE.

   I COULD GO ON & ON BUT WON'T

TAKE ANY MORE OF YOUR TIME. IF YOU

NEED FURTHER FROM ME, DON'T HES-
ITATE TO WRITE, CALL OR REQUEST
ME TO ATTEND ANY OF YOUR HEARINGS,
ETC. GOOD LUCK, BECAUSE YOURS IS
A TASK I DON'T ENVY. I TRUST YOU'LL
MAKE THE RIGHT DECISION BASED ON
ALL THE INFORMATION, REPORTS, EVALUATION
RECORDS & INSIGHT THAT YOU ARE PRIVY
TO. FOR WHAT ITS WORTH, TELL JOE
ERDAHL THAT I'VE THOUGHT OF HIM
MANY TIMES OVER THE YEARS, AND I
WISH HIM PEACE OF MIND AND PERHAPS
SOMEDAY FREEDOM.

SINCERELY!
Gordon Sonne-

# EXHIBIT D:

SUPERIOR COURT OF CALIFORNIA, COUNTY OF MONTEREY

Jan 3 4 10 24 '84

ERNEST J. HAGGINS
MONTEREY COUNTY CLERK

DEPUTY

STATE OF CALIFORNIA
vs.

DEPT. (Silver (1-5-84)

ACTION NO. CR 9338

EMIL JOSEPH EKDAHL
DEFENDANT

PROBATION OFFICER'S REPORT

CASE DATA

CONTROLLED
DOCUMENT

DATE OFFENSE COMMITTED ___ October 13, 1981

DATE OF ARREST ___ September 17, 1933

INFORMATION FILED ___ October 24, 1983

DATE OF REFERRAL ___ December 14, 1983

REPORT FILED ___

ORIGINAL OFFENSE ___ Count I:  Section 187 P.C.
Count II:  Section 211 P.C.

Count III:  Section 211 P.C.

Count IV:  Section 245 (b) P.C.

Count V:  Section 245 (b) P.C.

CONVICTED OFFENSE ___ Defendant found guilty by Court of murder and two counts of Armed

Robbery. Arguments for degree of murder pursuant to People vs.

Dillon to be heard at sentencing.

DAYS IN CUSTODY ___ Actual: 111    Good time: 56    Total: 167

LEGAL COUNSEL ___ James Newhouse (appointed)

PROBATION OFFICER ___ Gene Powning

DATE OF BIRTH ___ March 29, 1963 (20)

BIRTHPLACE ___ Redding, Ca.

ADDRESS ___ 617 Maple Street, West Sacramento, CA.

TELEPHONE NUMBER ___ None

Section 187 P.C., 2nd Degree      15 years to life.

Section 211 P.C. (2 counts)        2 years, 3 years, 3 years.

ENHANCEMENTS:   (Charged and found)       P.C. Section 12022 (a).

GOVERNMENT CODE 13967 FINDINGS:   It is respectfully recommended that the Court find that this offense is a crime of violence and that there be no penalty assessment.

FINANCIAL RESPONSIBILITY:       None.

RECOMMENDATION:   It is respectfully recommended that probation be denied and that the defendant be committed to the Department of Corrections.

Respectfully submitted,

GP:gad

DONALD G. FARMER
CHIEF PROBATION OFFICER

Dated this 30th day of December, 1983.

Gene Fowning
Deputy Probation Officer

I have read and considered the foregoing report of the Probation Officer.

Leo Arredondo
Approved for filing

_____
Judge of the Superior Court

PENAL CODE SECTION 2900.5 - TIME SERVED CREDITS

THE DEFENDANT WAS IN CUSTODY IN THE FOLLOWING FACILITY(S) BECAUSE OF THE CONDUCT
FOR WHICH THE DEFENDANT WAS CONVICTED IN THIS CASE:

| | NAME OR LOCATION OF FACILITY | DATES FROM | TO | TOTAL DAYS |
|---|---|---|---|---|
| JAIL | Monterey County | 9-17-33 | 1-5-84 | 111 |
| CAMP | | | | |
| WORK FURLOUGH | | | | |
| HALF - WAY HOUSE | | | | |
| REHABILITATION FACILITIES | | | | |
| HOSPITAL | | | | |
| PRISON | | | | |

ANY OTHER PLACE DEFENDANT WAS ORDERED BY A COURT TO RESIDE AS A CONDITION OF
PROBATION, SUCH AS A RESIDENTIAL DRUG (ALCOHOL, PSYCHIATRIC) TREATMENT CENTER.

| | |
|---|---|
| Good time | 56 |
| TOTAL CREDITS | 167 |

CIRCUMSTANCES OF THE OFFENSE:    (Source:   Records supplied by the Monterey County Sheriff's Department)   On October 15, 1981, at approximately 10:50 p.m., Soledad Police responded to Pete's Shell (a service station and grocery store) on South Front Street regarding an armed robbery which had just occurred. Arthur Sandoval (17) was located behind the station face down in a pool of blood; there was no pulse.  Victims Pamela Lewis (21) and Sal Montoya (19) stated that two subjects with ski masks entered the store, ordered them to lay face down on the floor, took $13.00 from the cash register and ran from the store. A short time later they heard two shots.

It should be noted that during the robbery Dario Ballon (approximately age 30) and Sal Malchor (26) entered the store to buy beer.  They ignored the responsibles' demand that they join the other individuals on the floor. The subjects were gone by the time they returned to the counter with the beer. Ballon, Malchor

and his companion, Frank Garcia (17) remained at the scene after the arrival of the police. Arthur Sandoval had apparently been with them prior to the robbery.

The autopsy report indicates that Arthur Sandoval died from a gunshot wound to the head.

On May 20, 1983, Laura Horning contacted Detective Gordon Sonne at the Sheriff's Department regarding her concerns about her estranged husband Mark Horning being released from prison. Her concerns included the possibility that Horning may attempt to steal their child and that he may attempt to make good his threat to kill Detective Sonne. She further related that her husband Mark, Steven Horning and Joe Ekdahl had committed a murder and robbery in Soledad about two years ago. She claimed that she heard them discuss the robbery on two or three occasions. She stated that about one week prior to the offense, Mark decided to have Steven participate in the offense. After returning late one evening they talked about killing someone during the commission of the robbery.

Mark Horning was arrested on September 9, 1983. Steven Horning was arrested at his parent's home in Idaho on September 15, 1983.

Joe Ekdahl (20) was arrested on September 16, 1983. After advisement of rights, Ekdahl stated that he and Steven Horning had been given pistols by Mark Horning. They drove to Soledad, where Mark told him, "get out and go with Steven to do the job or I'll kick your ass." He followed Steven into the store. He stated that Steven ordered the victims to lie on the floor. Two Mexican adults entered the store and they refused to lie on the floor. They took the money from the register and ran from the store. Ekdahl stated that he heard two shots as they were running from the store to the vehicle which was occupied by Mark Horning. He mentioned that Mark Horning was angry because they had gotten so little money.

STATUS OF VICTIMS:    This officer was unable to contact Sal Montoya.   A

message was left with Ruth Lewis' sister regarding the probable disposition.

Mrs. Mary Serna Sandoval, the mother of Arthur Sandoval, was advised of the probable disposition.

DEFENDANT'S STATEMENT:    (Source:  Interview at the jail on December 23, 1983)

The defendant stated that he began associating with the Hornings a few weeks prior to the offense.  He heard of the robbery plans and willingly accompanied the Horning brothers (Mark, Danny & Steven) to Soledad. He thought that Mark Horning had delegated Danny and Steven to commit the robbery. Danny, however, did not like the plan and walked away after they arrived in Soledad from Salinas. Mark Horning then threatened violence upon the defendant if he refused to accompany Steven. Mr. Ekdahl indicated that he was more afraid of Mark and Steven than he was of committing the robbery. At any rate, Mark provided them each a gun and mask and they left the vehicle to commit the robbery.  The defendant stated that the vehicle was parked about one half mile from the market.

Mr. Ekdahl related that he and Steven entered the store and told the two people that they were being robbed and to lie on the floor.  They had trouble opening the cash register and had to ask assistance from the male victim.  They were finally able to get about $15.00 from the register.  It was at about this time that two Mexican adult males entered the store. After declining to lie on the floor, they stated that they merely wanted beer and for them to go on about their business.

Mr. Ekdahl related that he and Steven were quite frightened when they ran from the store with their $15.00. The defendant stated that he was first out the door and somewhat ahead of Steven as they ran into the fog. He stated after a short time he heard two shots. He emphasized that he did not fire his weapon.

He finally reached the vehicle with Steven nowhere in sight.  They drove around for a few minutes and found Steven who had apparently become lost in the

-6-

log.

Mr. Ekdahl stated that Mark was angry that they got only $15.00. They returned to Salinas and spent the night at Mark's girlfriend's home. He recalls that Mark stayed up all night looking at his police scanner.

The defendant stated the next morning Mark was packing to take a trip to the Los Padres Forest. It was at this point that Mark threatened violence against the defendant. Mr. Ekdahl mentioned that Mark always had guns and was packing guns for the camping trip. The defendant left the area for Sacramento.

The defendant, who was quite emotional during the interview, stated that he has had many nightmares since the offense. He related that "something died in me when it happened." Mr. Ekdahl recalls that Mark Horning seemed bigger and more powerful than he does at present.

PRIOR CRIMINAL RECORD:    None.

FAMILY HISTORY DATA:

| | |
|---|---|
| Father: | Emil J. Ekdahl - possibly resides in Texas - defendant has never known his father. |
| Mother: | Mona Christopher - age 46 - resides in Forest Hill, CA. (near Auburn) - bus driver for Placer County Public Transportation. |
| Step-father: | George Christopher - age unknown - marriage intact. |

Family Criminality History:    None reported.

DEFENDANT'S MENTALITY:    The defendant was very cooperative and appears to have at least average intelligence. He has a G.E.D.

WORK RECORD:    At the time of arrest in September, the defendant had been employed six months as an apprentice longshoreman for the Port of Sacramento.

-3-

He worked approximately two weeks each month and earned $160.00 a day. He also has experience as a farm worker in the Sacramento area.

MARITAL HISTORY:    The defendant married Darlene Victor (31) on April 13, 1982.  The defendant is unsure as to the stability of the marriage.  Mr. Ekdahl stated that his wife is an alcoholic.

HEALTH AND HABITS:    Good health – may be seriously depressed – possible alcohol problem – sporadic heroin use in the past two years.

MILITARY HISTORY:  The defendant was in the Army for the first nine months of 1982.  He did not adapt well to military life and was therefore given an early discharge.

EVALUATION:  It is this officer's opinion that the defendant's participation in the offenses was    at least partially a result of his weak willed personality in combination with the malevolent influence of Mark Horning.  Mr. Ekdahl was probably the ideal recruit as he could be dominated and later discarded by the much more forceful Horning.  He is the type of individual who would allow Horning to park a half mile from the robbery scene while he and another stooge did the dirty work.

Regardless of Mr. Ekdahl's possibly situational involvement, the defendant must accept the consequences of a young man being murdered.  The justifiable consequences for Mr. Ekdahl, whether or not he fired the weapon, are many years in state prison. Mitigating factors may justify a judgement of murder in the second degree.

## SENTENCING CONSIDERATIONS

PROBATION ELIGIBILITY:     Pursuant to P.C. Section 1203, the defendant is not

eligible for probation.


POSSIBLE FACTORS IN AGGRAVATION:     (Rule 421)

1.     The crimes involved great violence, great bodily harm, threat of

great bodily harm, or other acts disclosing a high degree of cruelty,

viciousness or callousness, whether or not charged or chargeable as an

enhancement under Section 12022.7.

2.     The defendant was armed with or used a weapon at the time of the

commission of the crime, whether or not charged or chargeable as an

enhancement under Section 12022 or 12022.5.

3.     It can be argued that the robberies were premeditated.


POSSIBLE FACTORS IN MITIGATION:     (Rule 423)

1.     It can be argued that the defendant participated in the crime under

circumstances of coercion or duress, or his conduct was partially

excusable for some other reason not amounting to a defense.

2.     The defendant has no prior record.

3.     The defendant is ineligible for probation and but for that ineligibility

would have been granted probation.


BASE TERM SENTENCE RANGE:

Section 187 P.C., 1st Degree          Death, life without possibility of parole

                                      Or 25 years to life.

# EXHIBIT E:

1        SUPERIOR COURT OF THE STATE OF CALIFORNIA

2            FOR THE COUNTY OF MONTEREY

3         HONORABLE RICHARD M. SILVER, JUDGE

4

5                                )

THE PEOPLE OF THE STATE OF CALIFORNIA, )

6                                )

7             Plaintiff,      )

                                )   No. CR 9938

8    vs.                      )

EMIL JOSEPH EKDAHL,             )

9                                )

             Defendant.      )

10                                )

11

12             TRANSCRIPT OF PROCEEDINGS

13         Courthouse, Monterey, California

14            January 5, 1984

15              ---oOo---

16

17

18

19

20

21

22  APPEARANCES:

23  For the People:                For the Defendant:

24  William D. Curtis           JAMES NEWHOUSE
    District Attorney          Attorney at Law

25  BY: WILLIAM McCARDLE
    Deputy District Attorney

26

27

28

Case 4:07-cv-03042-SBA    Document 12    Filed 10/16/2007    Page 45 of 106

January 5, 1984

1

2    THE COURT:  Matter of People vs. Ekdahl.  Mr.

3    Ekdahl is present.  This is the time we had set for

4    determination as to the degree under People vs. Dillon

5    and for sentencing thereafter.

6    The probation report has been received, and I

7    have considered that and also the points and authorities

8    that were submitted by Mr. Newhouse.

9    Any legal reason not to proceed?

10    MR. NEWHOUSE:  No, Your Honor.

11    THE COURT:  Any corrections in the probation

12    report?

13    MR. NEWHOUSE:  No, Your Honor.

14    THE COURT:  Mr. McCardle.

15    MR. McCARDLE:  Well, I went over Dillon again

16    last night and got the same thought the first time I

17    read the case.  I really wonder whether there will

18    ever be a first degree felony murder case in this

19    state again that isn't also first degree murder under

20    traditional murder concepts.

21    The facts of that case -- I find myself more in

22    agreement with the dissenters.  The facts of Dillon

23    in my opinion are quite aggravated, and that was not

24    an appropriate vehicle for doing what the Supreme

25    Court did.

26    THE COURT:  Actually, this would probably have

27    been a more appropriate case.

28    MR. McCARDLE:  Yes, it would, because you

1    can't really compare Mr. Ekdahl's involvement and the

2    cast of characters in this case with his record and

3    so forth with Mr. Dillon's and come to any other

4    conclusion than it should be a second.  I am not

5    going to argue anything to the contrary.

6         However, I do think that the enhancement is

7    appropriate in this case.  One year for -- he was

8    armed and also his accomplice was armed.

9         And secondly, I think that this should be --

10   there should be punishment imposed for the two

11   robbery victims.  I am not asking the Court to run

12   each of those robberies consecutive, but I think they

13   should be run concurrent with each other and consecutive

14   to the murder and the enhancements for a total of

15   17 years to life.

16   MR. NEWHOUSE:   I must say I find  myself

17   somewhat in agreement with Mr. McCardle with respect

18   to the appropriateness of Dillon being the case to

19   make that ruling on second degree felony murder.

20        As I analyzed Dillon and compared it to these

21   facts, all the reasons the Supreme Court seemed to

22   say that Dillon should  get a second seemed to me

23   in that case to lead  -- if anybody is going to get

24   a first degree felony murder, it should have been

25   Dillon.  He killed the guy that was basically the

26   person likely to get killed, whereas in this situation

27   the unfortunate person who was killed was a most

28   unlikely victim.

1    I think it's correct that this should be

2    second degree.  I don't think there is a whole lot

3    of question about  that.

4    I think, given the probation report, which I

5    think accurately reflects both Mr. Ekdahl's degree

6    of culpability in the crime vis-a-vis his co-participant's

7    and his relative lack of -- complete lack of

8    sophistication and maturity, should result in

9    imposition of a 15 to life sentence.

10    I don't think it would be appropriate to run

11    the robbery offenses consecutive .

12    I think 15 to life, given his total lack of

13    prior criminal background and his lack of sophistication

14    and his youth. 15 to life in probably protective

15    custody is going to be a lot of time to do.

16    I have been informed through several sources,

17    including the probation officer, that the father of

18    the victim Sandoval is going back to prison, and he,

19    I am told, is a member of the N.F.   And the word

20    is that there is already a contract out on Mark and

21    Joe and everybody else involved.

22        MR. McCARDLE:   That's not appropriate.

23        THE COURT:   It's not going to make any difference.

24    It's probably true but --

25        MR. NEWHOUSE:   What I am saying --

26        THE COURT:   It's going to be hard time.

27        MR. NEWHOUSE:   It's going to be hard time.

28        THE COURT:   This  day and age any time is

1    hard time.

2        MR. NEWHOUSE:    He is doing a large time, and

3    he is obviously going to have to do it in PHU.    I

4    think under the circumstances, considering all the

5    facts, that the robberies ought to run concurrent.

6        THE COURT:    Well, this is obviously a situation

7    where, Mr. Ekdahl, you were found guilty of first

8    degree murder based upon a felony murder situation,

9    not a situation where I believe that you were actually

10   the person who did the shooting in that situation.    You had

11   Also it occurred two or three years ago now.    You had

12   not been in any trouble really at all in the past,

13   and in my opinion you clearly were involved in this

14   only because of the Hornings.

15       Be that as it may, under the law the  only

16   option, really, in second degree murder is 15 years

17   to life.    I think that is appropriate here.

18       I agree with everybody if it was appropriate

19   in Dillon, it would be hard put not to say it was

20   appropriate here.

21       So I will set the degree at second, deny

22   probation on all charges, commit you to the Department

23   of Corrections for the period of 15 years to life for

24   the violation of murder in the second degree.    I

25   think it is appropriate to run the robberies concurrent

26   under the circumstances that occurred here.

27       So I will set the middle term of three years on

28   each of the robberies, order them to run concurrent.

1   There was an armed allegation that applies to

2   the murder charge which imposes one year consecutive

3   sentence.  I will impose that, for a total term of

4   16 years to life.

5   You will be given credit for the 167 days

6   you have spent in custody thus far, which includes

7   56 days of good time/work time credits.

8   You do have a right to appeal.  I know you were

9   discussing this somewhat with Mr. Newhouse.  If you

10  are going to appeal anything in the case, remember

11  you  have to file that within 60 days of today's

12  date.  You have to specify what you felt was legally

13  wrong, and they will appoint a lawyer for you on

14  appeal, and the matter will be reviewed, and you

15  will be provided with transcripts of the proceedings,

16  assuming you can't afford to pay for them.

17  Any questions?

18  THE DEFENDANT:   No, sir.

19  MR. McCARDLE:   I would just ask that the

20  sheriff's office not deliver him to Vacaville until

21  after January 12.  Mark Horning's murder trial starts

22  Monday.

23  THE COURT:   That's fine.

24  ---oOo---

25

26

27

28

# EXHIBIT F:

33

1          CALIFORNIA BOARD OF PRISON TERMS

2                  D E C I S I O N

3          DEPUTY COMMISSIONER THOMPSON:  We're back on

4     the record.

5          PRESIDING COMMISSIONER HEPBURN:  All right.

6     The parties have returned to the room.  It's

7     1:22 p.m.  Mr. Ekdahl, we did deny your parole for

8     a one-year period.  Let me read the decision to

9     you.

10         INMATE EKDAHL:  Okay.

11         PRESIDING COMMISSIONER HEPBURN:  The Panel

12    reviewed all information received at the hearing

13    and relied on the following circumstances in

14    concluding that the prisoner is not yet suitable

15    for parole and would pose an unreasonable risk of

16    danger to society or a threat to public safety if

17    released from prison.  Number one was the timing

18    and gravity of the commitment offense itself which

19    involved a robbery at a gas station.  Mr. Ekdahl

20    and his crime partners planned and carried out a

21    robbery.  He was armed with a gun, as was his

22    crime partner.  They used ski masks, went inside

23    the location, had people lay down on the floor.

24    As they were fleeing the scene, Mr. Ekdahl's crime

25    partner shot an uninvolved person who was standing

26    outside the gas station.  He killed that person as

27    EMIL JOSEPH EKDAHL   C-79199  DECISION PAGE 1  2/27/02

34

1    they were fleeing.  His -- Regarding his previous

2    record, he had no prior convictions, no juvenile

3    record.  His institutional behavior as of late has

4    been pretty good.  He hasn't had any 115s since

5    1997, although that was a fairly serious one for

6    battery on an inmate.  He's received a total seven

7    115s throughout his period of incarceration.  On

8    the positive side, he has upgraded himself

9    educationally and vocationally, gets above average

10   work reports.  He has participated in some self-

11   help programs including AA for an extended period

12   of time and Kairos.  He should be commended for

13   those positive aspects of his behavior and for

14   remaining disciplinary-free for about the last

15   five-year period.  The psychological evaluation is

16   fairly positive, completed by Dr. Carr on 2/24 of

17   '99.  We are going to ask that there be a new

18   psychological evaluation before your next hearing,

19   Mr. Ekdahl.  We would like to see a report that's

20   a little more definitive when they talk about your

21   risk of dangerousness to the community.

22          INMATE EKDAHL:  Okay.

23          PRESIDING COMMISSIONER HEPBURN:  And by that

24   time, that report will have been about four years

25   old and it certainly would be in order to have a

26   new report.  And then we would like to see you

27   EMIL JOSEPH EKDAHL   C-79199   DECISION PAGE 2   2/27/02

35

1    work a little more on your parole plans if you

2    can. Come up with some more specific things in

3    Monterey County if you're able to do that.

4             INMATE EKDAHL:  All right.

5             PRESIDING COMMISSIONER HEPBURN:  We didn't

6    get any responses back from 3042 notices. And the

7    recommendations from the Panel are going to be

8    just that you continue your present program,

9    remaining disciplinary-free, participate in self-

10   help programs to the extent that they're available

11   to you --

12            INMATE EKDAHL:  Okay.

13            PRESIDING COMMISSIONER HEPBURN:  -- that

14   will assist you maybe in being a more assertive

15   person, a stronger person so that you're not

16   influenced by others when you are out there on the

17   street and temptation comes your way --

18            INMATE EKDAHL:  Okay.

19            PRESIDING COMMISSIONER HEPBURN:  -- and

20   remain disciplinary-free. And that completes the

21   reading of the decision. Commissioner Thompson,

22   do you have anything that you would like to add?

23            DEPUTY COMMISSIONER THOMPSON:  Good luck.

24            INMATE EKDAHL:  Okay, thank you.

25            PRESIDING COMMISSIONER HEPBURN:  All right,

26   good luck to you. That will conclude this hearing

27   EMIL JOSEPH EKDAHL   C-79199   DECISION PAGE 3   2/27/02

36

1     at 1:26 p.m.

2                                    --o0o--

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19          .

20

21

22

23

24

25     PAROLE DENIED ONE YEAR

26     EFFECTIVE DATE OF THIS DECISION_____APR 0 3 2002_____

27     EMIL JOSEPH EKDAHL  C-79199  DECISION PAGE 4  2/27/02

37

CERTIFICATE AND

DECLARATION OF TRANSCRIBER


I, PATRICIA M. JOHNSON, a duly designated
transcriber, CAPITOL ELECTRONIC REPORTING, do
hereby declare and certify under penalty of
perjury that I have transcribed tape(s) which
total one in number and cover a total of pages
numbered 1 through 36, and which recording was
duly recorded at CALIFORNIA STATE PRISON - SAN
QUENTIN, at SAN QUENTIN, CALIFORNIA, in the matter
of the SUBSEQUENT PAROLE CONSIDERATION HEARING of
EMIL JOSEPH EKDAHL, CDC No. C-79199, on FEBRUARY
27, 2002, and that the foregoing pages constitute
a true, complete, and accurate transcription of
the aforementioned tape(s) to the best of my
ability.

I hereby certify that I am a disinterested
party in the above-captioned matter and have no
interest in the outcome of the hearing.

Dated March 14, 2002, at Sacramento County,
California.


Patricia M. Johnson
Transcriber
**CAPITOL ELECTRONIC REPORTING**

# EXHIBIT G:

# MONTEREY COUNTY

## OFFICE OF THE DISTRICT ATTORNEY

DEAN D. FLIPPO
DISTRICT ATTORNEY

February 9, 2005

Ms. Tina Mattis, O.A.
San Quentin State Prison
Board Desk Coordinator
San Quentin, CA 94964

Re: Emil Ekdahl, C79199

Dear Board of Prison Terms:

Please note that we will not be attending the hearing at the prison, and this letter is written in lieu of a personal appearance.

It is the opinion of this office that a parole date should not be set for inmate Ekdahl at this time.

As the Board is aware, Mr. Ekdahl's offense involved the murder of seventeen year old Arthur Sandoval. Mr. Sandoval had been working as an attendant at Pete's Shell station in Soledad on October 18, 1981. Inmate Ekdahl and two others donned ski masks and held up the gas station at gunpoint. A confederate of inmate Ekdahl shot Mr. Sandoval as they were leaving the gas station. The murder was both cruel and senseless and did not aid in the completion of the crime. Subsequently, the victim was found face down in a pool of his own blood.

Inmate Ekdahl has always maintained that the robbery and murder were committed under duress from one of the co-defendants. Inmate Ekdahl self defined the "duress" as one single statement made from crime partner Mark Horning to "get out and go with Steve to do the job or I'll kick your ass". This simple statement was apparently the only peer pressure needed to influence inmate Ekdahl to commit robbery and murder.

Inmate Ekdahl has never come forward to express remorse or to assist in bringing his accomplices to justice. Instead he kept his silence long after the killing. The crime remained unsolved for almost two years before Mark Horing's ex-wife came forward and provided information leading to Ekdahl's arrest. In those two years, Mr. Ekdahl was arrested for new offenses in Sacramento, and he also became addicted to controlled substances.

---

☐ 240 CHURCH STREET, ROOM 101
P.O. BOX 1131
SALINAS, CALIFORNIA 93902
TELEPHONE: (831) 755-5070
FAX:        (831) 755-5068

☐ 1200 AGUAJITO ROAD, ROOM 301
MONTEREY, CALIFORNIA 93940
TELEPHONE: (831) 647-7770
FAX:        (831) 647-7762

☐ 250 FRANCISCAN WAY
P.O. BOX 632
KING CITY, CALIFORNIA 93930
TELEPHONE: (831) 385-8325
FAX:        (831) 385-8365

Regardless of the progress that inmate Ekdahl has made in prison, the fact remains that an adequate punishment must be meted out to inmate Ekdahl for his crime. Setting a parole date at this time would not adequately punish inmate Ekdahl nor protect society.

Sincerely,

DEAN D. FLIPPO
District Attorney

Rick Storms
Deputy District Attorney

# EXHIBIT H:

62

# CALIFORNIA BOARD OF PRISON TERMS

## D E C I S I O N

1

2

3      **DEPUTY COMMISSIONER HARMON:** -- on the

4      record.

5      **PRESIDING COMMISSIONER MOORE:** Thank you.

6      Let the record show that all interested parties

7      have returned to the room. Emil Ekdahl, CDC

8      number C, as in Charlie, 79199. The Panel has

9      reviewed all information received from the public

10     and relied on the following circumstances in

11     concluding that the prisoner is not suitable for

12     parole and would pose an unreasonable risk of

13     danger to society and a threat to public safety if

14     released to the -- released from prison at this

15     time. One paramount issue would be the committing

16     offense. The offense was carried out in a

17     dispassionate, calculated manner. There were

18     multiple victims attacked, injured, or killed in

19     the same incident. The motive for the crime was

20     inexplicable and very trivial in relationship to

21     the offense in terms of greed. These conclusions

22     are drawn from the Statement of Facts wherein the

23     prisoner and his crime partners were involved in a

24     robbery of a gas station. There was an individual

25     who was shot and killed. He was 17 years old.

26     His name was Arthur Sandoval. The prisoner and

27     **EMIL EKDAHL  C-79199       DECISION PAGE 1    3/26/03**

63

1    his crime partners were carrying out the robbery.

2    They were armed with handguns and used ski masks.

3    They forced the people to get down on the floor.

4    As they were fleeing the scene, one of the

5    prisoner's crime partners shot the -- an

6    uninvolved person who was standing outside of the

7    station, shot him, caused his demise as they were

8    fleeing the scene.  Previous record, the -- excuse

9    me -- prisoner has no real record of prior arrests

10   or convictions I should say.  He had an arrest as

11   an adult; however, the charges were dismissed.

12   Institutionally, the prisoner has been programming

13   pretty much performing well; however, it has not

14   been enough or sufficiently participated enough at

15   this point in self-help therapy at this time.  The

16   psychosocial report, the psychosocial report dated

17   February 25th of 2003 authored by L. Francis,

18   F-R-A-N-C-I-S, M.D., psychiatrist, is a positive

19   one.  The parole plans, the prisoner lacks

20   realistic parole plans or viable parole plans in

21   the last county of legal residence; however, he

22   does have a possible job offer in that county.

23   3042 notices, the Hearing Panel notes responses to

24   3042 notices indicate opposition to a finding of

25   suitability; specifically, the District Attorney's

26   office of Monterey County sent a letter dated

27   **EMIL EKDAHL   C-79199      DECISION PAGE 2    3/26/03**

1   March the 11th of 2003 authored by Michael Breeden

2   in opposition to a finding of suitability at this

3   time.  As well as other information bearing on the

4   suitability would be that the prisoner's

5   counselor, a CC-I T.E. Keesee, K-E-E-S-E-E, wrote

6   in the current Board report that the prisoner

7   would pose a moderate to low degree of threat if

8   released to the public at this time.  Remarks, the

9   prisoner should be commended.  He's been

10  disciplinary-free since 1997.  And in that regard,

11  his gains are recent and he must demonstrate an

12  ability to maintain those gains over an extended

13  period of time.  That was 1997, so let's see,

14  which was his last 115 for battery on an inmate.

15  His last 128 was in 1999.  He's gotten positive

16  work reports.  He's currently in PIA upholstery

17  furniture shop.  He's got, what, one, two

18  certificates of vocation for machine shop, as well

19  as for auto shop or auto mechanics.  He's upgraded

20  himself educationally in the past in Chapman

21  College, receiving units there, as well as

22  currently participating in the Kairos program back

23  in 2000.  However, these positive aspects of his

24  behavior do not outweigh the factors of

25  unsuitability at this time.  This is a one-year

26  denial, Mr. Ekdahl.  I want you to do a couple of

27  **EMIL EKDAHL  C-79199    DECISION PAGE 3    3/26/03**

65

1   things:  To remain disciplinary-free, if it's

2   available to you to continue to participate in

3   beneficial self-help and therapy programming to

4   better understand the causative factors, as well

5   as to get your parole plans in order.  Whether or

6   not it's -- Do the best you can in the county of

7   commitment, but it is understood that you want to

8   try to go to an alternate placement.

9        INMATE EKDAHL:  Yes, Sir.

10       PRESIDING COMMISSIONER MOORE:  So you need

11  to have the letters of support and acceptance from

12  those locations as well.  And the Board has to --

13  As mentioned, the Board does have the authority to

14  make a recommendation to send you to an alternate

15  placement --

16       INMATE EKDAHL:  Okay.

17       PRESIDING COMMISSIONER MOORE:  -- if we deem

18  it necessary, okay.

19       INMATE EKDAHL:  All right.

20       PRESIDING COMMISSIONER MOORE:  All right.

21  You're on the right track.  Continue where you

22  are.  You need some more time.  And, you know, as

23  mentioned earlier, the last 115 was in '97, but

24  that was a battery on an inmate and that's

25  violence, and you're going to still need a little

26  more time to clear between that violence.  You

27  EMIL EKDAHL  C-79199      DECISION PAGE 4    3/26/03

66

1    only had seven in your entirety.   Okay.

2         INMATE EKDAHL:   All right.

3         PRESIDING COMMISSIONER MOORE:   All right.

4    Commissioner, any comments to the prisoner?

5         DEPUTY COMMISSIONER HARMON:   Just to

6    reiterate, I don't think -- at least I hope you

7    haven't lost sight of the fact that you're down to

8    one-year denials, but you're going to have to do

9    extra work now each and every time you appear

10   before the Board to make sure that all of your

11   ducks are in order.

12        INMATE EKDAHL:   Okay.

13        DEPUTY COMMISSIONER HARMON:   You know what

14   I'm saying?

15        INMATE EKDAHL:   Ducks in order.

16        DEPUTY COMMISSIONER HARMON:   You know what

17   I'm saying.

18        INMATE EKDAHL:   Yeah.

19        DEPUTY COMMISSIONER HARMON:   In other words,

20   you want to make sure that you've got all your

21   areas that leave little question as to your parole

22   plans and your -- you know, the fact that you're

23   continuing with your AA and get yourself, you

24   know, a group on the outside if you're

25   unsuccessful in getting into this home,

26   transitional place.

27   EMIL EKDAHL   C-79199      DECISION PAGE 5   3/26/03

1    INMATE EKDAHL:  All right.

2    DEPUTY COMMISSIONER HARMON:  Make sure you

3    have the --

4    INMATE EKDAHL:  Genesis, yeah.

5    DEPUTY COMMISSIONER HARMON:  Yeah.  Make

6    sure you have the 12-step programs available in

7    the area you're going to be moving into in both

8    areas.  So, yeah, it's going to take more work on

9    your part, but then again you're being looked at

10    in a much more positive light right now and you

11    should not lose sight of that.

12    PRESIDING COMMISSIONER MOORE:  You weren't

13    the shooter, so, you know --

14    INMATE EKDAHL:  All right, because there's

15    some parts of times where, you know, I become

16    depressed over this and I think it's hopeless, you

17    know.  I have went to that point.

18    PRESIDING COMMISSIONER MOORE:  But it's like

19    you said, you can't change what you did, you can

20    only change you --

21    INMATE EKDAHL:  Yes, Sir.

22    PRESIDING COMMISSIONER MOORE:  -- make you a

23    better person.  Getting all your ducks in a row

24    makes you the better person.  But you've got to

25    understand, you didn't come in here and be squeaky

26    clean either.

27    EMIL EKDAHL  C-79199    DECISION PAGE 6    3/26/03

68

1          INMATE EKDAHL:  That's true.

2          PRESIDING COMMISSIONER MOORE:  Okay.

3          INMATE EKDAHL:  I did it myself.

4          PRESIDING COMMISSIONER MOORE:  Yeah.

5   Grandma say you made your own bed hard and you've

6   got to lay in it.

7          INMATE EKDAHL:  Yes, she did.  She would say

8   that, yes.

9          PRESIDING COMMISSIONER MOORE:  Okay.  So,

10  but -- So what I'm saying is you've got to get

11  some time between those things, those actions.

12  You've got to show that clean time.  So that means

13  stay positive, don't lose sight of that.

14         INMATE EKDAHL:  All right.

15         PRESIDING COMMISSIONER MOORE:  You're on the

16  right track, okay.  You're doing the right kinds

17  of things now.  Stay there.

18         INMATE EKDAHL:  I'm going to stay there

19  because actually I think it just comes to me

20  naturally, so --

21         PRESIDING COMMISSIONER MOORE:  Okay.

22         INMATE EKDAHL:  -- I don't see --

23         PRESIDING COMMISSIONER MOORE:  All right.

24  Well, stay away from the 115s.

25         INMATE EKDAHL:  All right.

26         PRESIDING COMMISSIONER MOORE:  All right.

27  EMIL EKDAHL   C-79199      DECISION PAGE 7   3/26/03

69

1     Okay.

2          DEPUTY COMMISSIONER HARMON:  Good luck to

3     you, sir.

4          PRESIDING COMMISSIONER MOORE:   Good luck to

5     you, sir.  This concludes --

6          INMATE EKDAHL:  Thank you.

7          PRESIDING COMMISSIONER MOORE:   -- our

8     hearing.  The time is 1505 hours.

9                      --oOo--

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25     PAROLE DENIED ONE YEAR

26     FINAL DATE OF DECISION_____      JUN 2 4 2003

27     EMIL EKDAHL   C-79199      DECISION PAGE 8   3/26/03

70

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, PATRICIA M. JOHNSON, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 through 69, and which recording was duly recorded at CALIFORNIA STATE PRISON - SAN QUENTIN, at SAN QUENTIN, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of EMIL EKDAHL, CDC No. C-79199, on MARCH 26, 2003, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated April 7, 2003, at Sacramento County, California.


_____
Patricia M. Johnson
Transcriber
**CAPITOL ELECTRONIC REPORTING**

# EXHIBIT I:

ekdahl, emil 06/16/05 C-79199

# PSYCHOLOGICAL EVALUATION
# FOR THE BOARD OF PRISON TERMS
# JUNE 2005 LIFER HEARING
# SAN QUENTIN STATE PRISON

## PSYCHOSOCIAL ASSESSMENT

1. <u>Identifying Information:</u>  Emil Ekdahl is a 42-year old Caucasian male who is serving a 15-year to life sentence for the 1981 murder of 17-year old Arthur Sandoval. For a thorough review of background information see Section X through XI of Dr. Francis' evaluation of February, 2004 and Dr. Carr's evaluation of February, 1999.

This report is based on two, one hour interviews occurring on June 6, 2005 and June 13, 2005.  Also reviewed were the medical records and the Central File including the previous psychological evaluations for the Board of Prison Terms.

## CLINICAL ASSESSMENT

XII.  Current Mental Status and Treatment Needs
    A.  <u>Mental Status evaluation:</u>  Mr. Ekdahl presented as an adult male of medium build and stature who was clean shaven with short, dark blonde hair worn in a combed-back style. His attention to grooming was more than adequate. He was polite and deferential and made good eye contact through out. Mr. Ekdahl was consistently engaged and cooperative. In keeping with impressions in previous evaluations, he presents as reserved but easily discusses his concerns and addresses interviewer questions in depth when encouraged. Mr. Ekdahl discussed topics of intellectual interest to him and in this sense indicative of a curious and active mind of a man who has endeavored to increase his knowledge base while incarcerated. His thought processes were logical and coherent with no evidence of psychosis current or within the past year since his last evaluation in July of 2004. At present he reports significant symptoms of depression including anhedonia and hypersomnia and lack of motivation. Observably his thinking tends to be negativistic in that his perceived life options are unrealistically restricted. limited to him. Mr. Ekdahl reports that he became quite depressed after the Prozac he relied on ceased to be effective. He reports that his depression began two years ago resulting in mental health and anti-depressant medication. He reports that the medication helped him for approximately one year before his depression returned. He was subsequently prescribed a higher dosage that was only marginally effective. As of the second interview with Mr. Ekdahl, a medical order was placed for another dose increase of which the therapeutic effects are yet to be known. Mr. Ekdahl denied suicidal and homicidal ideation or intent.

At the first interview he appeared markedly depressed and vocalized that he felt like he was "just waiting to die." He explained that some of his friends at San Quentin have died this year while waiting for parole causing him to feel that he may meet the same fate. Mr. Ekdahl explained that he feels caught between trying to stay positive and work

1

ekdahl, emil  06/16/05 C-79199

toward parole or to give up and resign himself to living the rest of his life in prison. He is pessimistic about his chances for release and questions whether he should continue to make meaningful efforts in this direction. At our second interview, Mr. Ekdahl appeared more energized and upbeat. He still expressed pessimism but was significantly more able to consider that though his chances to parole were not as great as he would like, it was still worth his efforts to meet Parole Board concerns for the possibility of release. Mr. Ekdahl explained that the improvement in his mood since the first meeting, one week before resulted from a physical work several hours prior to the interview. He was able to consider that regular physical exercise could help alleviate some of his depressive symptoms, improving his overall mood. He agreed that physical exercise was worthwhile to incorporate into his daily routine. Mr. Ekdahl does not want to attend work, citing fatigue and lack of energy have greatly reduced his ability to motivate himself. He speculated that both his depression and Hepatitis C status impact his capacity to work. As far as formal activities self enhancement activities he has attended vocational sheet metal training for 6 months while also attending college classes. Mr. Ekdahl has limited the amount of college courses he takes per semester to one to two because of his diminished energy levels for activities.

Mr. Ekdahl is no longer attending therapeutic group activities. He recently dropped a yoga class that he had attended briefly and and no longer attends his many year, weekly 12-step meetings. He ceased to go one year ago. Mr. Ekdahl explained that he no longer attends 12 step groups because he objects to the Christian religious overtones in the program. Nevertheless, he strongly asserts that he has no desire to return to alcohol and drugs and that he feels as committed as ever to maintaining his clean and sober status. He added that, were he released, he would continue to remain drug and alcohol free because he has no desire to return to his previous active addiction lifestyle. His insight and judgment were within normal limits with chronic depression an influencing factor of mild to moderate degree.

B. <u>Clinical Diagnosis and Level of Functioning/Diagnostic Impressions:</u>

| | | |
|---|---|---|
| Axis I: | 296.32 | Major Depressive Disorder, recurrent, moderate |
| | 304.80 | Polysubstance Dependence, in full sustained institutional remission |
| Axis II: | V71.01 | History of Adult Antisocial Behavior |
| Axis III: | | Hepatitis C, Back Problems, Allergies r/o Benign Tumor, r/o Seizure Disorder |
| Axis IV: | | Stressors: Incarceration with Life Term and Health Problems |
| Axis V: | | Global Assessment of Functioning (GAF) = 60 |

C. <u>Current Level of Care:</u> CCCMS Program
D. <u>Treatment Activities:</u> Contact with Social Worker every 90 days
  Contact with Psychiatrist on as needed basis
E. <u>Medications:</u> Prozac

2

ekdahl, emil 06/16/05 C-19199

   F. Prognosis: Guarded: Monitoring important to track depressive symptoms. Mr.
Ekdahl could benefit from regular exercise, returning to self-enhancing group
activities, especially 12 step meetings and regular individual counseling for his
depression..

XIII: Review of Life Crime:
   A. Inmates view of offense and attitude toward victim; assessment of causative
factors: Mr. Ekdahl refused to discuss the crime event stating that he has "already been
through that before and there is nothing more to say about it." When asked how he felt
about his involvement in the homicide he briefly became quite emotional and expressive
for him. He said that he felt great remorse and that "it breaks my heart because the last
thing I wanted to do was to be a part of killing someone."

   B. Relevance of mental condition to life crime/criminal behavior. In keeping with
the psychological evaluation of June 29, 2004 by Dr. Zak Benicich, at the time of the life
crime is appears that Mr. Ekdahl had significant emotional difficulties from a difficult
childhood. He had a harsh and restrictive stepfather while his family frequently
relocated. At the same time, Mr. Ekdahl's mother did not protect him from the hurtful
and overbearing step-father; a failure in parenting function on her part. The cumulative
effects of these experiences probably engendered a low estimate of his self worth and the
inclination toward over-submissiveness and compliance to intimidating and dominant
others. At the time of the life crime it appears that the young Mr. Ekdahl complied with
the apparent "ringleader's" deadly plan to commit armed robbery that killed the 17-year
old victim. At the time of the commitment offense, Mr. Ekdahl's capacity to form
reasoned judgment and to make good decisions were likely trumped by the psychological
liabilities referenced above. In addition to unhealthy conforming tendencies and
compromised self worth as causative factors in the life crime, he was also abusing drugs
and alcohol on a regular basis. The routine abuse of mood altering substances may
indicate that he suffered a mood disorder, likely depression that caused him to self-
medicate to control for his dysphoric affect Mr. Ekdahl's than active addiction is one
contributing factor to the life crime because the regular intake of substances tends to
increase vulnerability to behave in ways they would not if they were abstinent.
   C. Inmate's level of insight and remorse/empathy. Since Mr. Ekdahl refused to
discuss the life crime in any detail it is difficult to fully ascertain the quality of his
thoughts and feelings about participating in the homicide death of the victim. However,
he was able to express brief but apparently genuine regret when pressed by this examiner
(previously detailed in Section XIII. A.)

XIV: Assessment of Dangerousness:
   A. Within controlled setting: At the time of the 2004 evaluation by Dr. Benicich,
Mr. Ekdahl had eight disciplinary actions consisting of fighting and refusing to perform
assigned tasks. As well he had several actions involving the possession and use of
alcohol. He since has acquired another disciplinary action pertaining to work refusal.
However, he was able to remain discipline free from 1997 to 2004 suggesting that he is
capable of sustaining significant time without engaging in behaviors that can get him in
trouble with prison authority. He has been drug and alcohol free since 1986. However,

3

ekdahl, emil 06/16/05 C-19199

within the last year he has ceased to attend 12 step meetings for his addiction issues. Yet within the controlled setting of prison he has been able to sustain his sobriety and drug free status despite the absence of 12 step support.

B.    If released to the outside community:    Dr. Francis' assessment of February 25, 2003 details Mr. Ekdahl's risks and deterrents to dangerousness. Per Dr. Benicichs' report, his sustained abstinence from drugs and alcohol lowers his violence potential compared to the average lifer. However, his capacity to sustain his clean and sober status were he released is compromised since he is no longer availing himself of the weekly support of 12 step meetings. This makes it more likely that he will relapse than persons who regularly attend meetings. Therefore this is a risk factor were he paroled.

C.    Significant risk factors/precursors to violence:    No doubt since he has ceased to avail himself of the maintenance support of 12 step meetings, this is a risk factor because he is more likely to relapse. Because he does not elaborate on the life crime and his view of his life crime it is difficult to accurately ascertain other possible factors that may make him at risk to the community. Although, he was able to briefly express apparent sincere regret for what he had done lowering the propensity to violence to some degree.

XV.    Clinician Observations/Comments/Recommendation:    Parole plans consist of prisoner advocating for release to Board of Prisons half-way house in the community at his hearing. This plan may have limited viability because, according to Mr. Ekdahl, the Board is less likely to make this placement for someone of his criminal status. His parole plans seem to rely on the Board making an exception in Mr. Ekdahl's case. Relying on the possibility that the Board will have to make an exception in his case is a gamble, however Mr. Ekdahl feels that his options are limited because has been unable since last year, to qualify for a residential drug rehabilitation program placement that could take him in were he released. As well he no longer has living relatives in Monterey County where he will be released and unable to move outside of its borders. As an alternative plan he intends to petition to be released to a neighboring county where he has a sister however, their relationship has been conflictual, making this plan less likely to provide him with the quality and consistency of family support and community that he needs in place to militate against the stressors he will likely experience living in society after so many years in prison. Mr. Ekdahl has dropped off his group activities including yoga and 12-step meetings since his last hearing. This appears to largely result from a recurrence of major depression in the last couple of years. Mr. Ekdahl, in my opinion, derives essential benefits from participating in group activities because of his depression and the tendency to isolate himself from others. Lack of meaningful contact with others and community is contra-indicated for persons who are depressed since social contact is a buffer against loneliness and unrealistic and negative thinking typical of this disorder.. Mr. Ekdahl needs to be more proactive in participating in goal oriented structured social activities by returning to 12 step meetings. Mr. Ekdahl is also aware that regular physical activity will significantly improve his mood states and provide him real relief. But because of the depression he also lacks the energy and motivation to sustain this on his own. He would best benefit from the structure of a yoga class or any other routinized physical activities group because the structure will enable him to sustain continuity.. It must be noted that Mr. Ekdahl struggles with health issues, most especially Hepatitis C and back problems. These health problems likely contribute to his depression both

ekdahl, emil  06/16/05 C-79199

psychologically and physiologically. The physical effects from his illness most likely contribute to a lack of energy and poor motivation. Mr. Ekdahl, as of the date of this report, is in line to receive an increase in his Prozac dosage which should help his depression somewhat. However, in this examiner's judgment, he needs a more comprehensive treatment approach than just medications and a few group activities. Studies indicate that the most effective treatment for depression involves simultaneous psychotherapy and anti-depressant medications. If possible Mr. Ekdahl would likely greatly benefit from the addition of regular one-to-one counseling sessions; most optimally on a weekly basis. The additional factor of counseling would be the most effective and expeditious avenue to treating his depression. He is also a very good candidate for talk therapy. Mr. Ekdahl asserts with the confidence of an individual who knows his capacities and limitations that were he to be released at this time, and had to make his way without support and limited resources he would succeed by relying on his survival skills and vocational training background. This is probably true, however the question of his capacity to maintain his drug and alcohol free status over time is diminished by not attending 12 step support groups, making him more of a risk for relapse and increase in his risk for violence than he was at the time of his last hearing. Mr. Ekdahl must resume attendance of 12 step meetings before consideration for parole since his risk factors have increased since last year. Were he to resume his former drug and alcohol support groups and receive adequate treatment for his depression, this examiner believes that Mr. Ekdahl would be a viable candidate for Parole release.

*Elizabeth R. Lewis, PhD*

Elizabeth R. lewis, Ph.D.
Contract Psychologist
San Quentin State Prison

# EXHIBIT J:

PSYCHOLOGICAL EVALUATION
FOR THE BOARD OF PRISON TERMS
JULY 2004 LIFER HEARING
SAN QUENTIN STATE PRISON


PSYCHOSOCIAL ASSESSMENT


1. <u>Identifying Information</u>:  Emil Ekdahl is a 41 year old Caucasian male who is serving a 15 year to life sentence for the 1981 murder of Arthur Sandoval.  For a thorough review of background information, including developmental history, education and substance abuse history please see Sections I through XI of Dr. Francis' evaluation of February, 2004 and Dr. Carr's evaluation of February, 1999.

This report is based on two hours of interview on June 21, 2004 and one and a half hours on June 23, 2004.  The Unit Health Record and Central File were also reviewed, as well as his previous evaluations for the Board.


CLINICAL ASSESSMENT


XII.  Current Mental Status/Treatment Needs
    A.  <u>Summary Mental Status Evaluation</u>:  Mr. Ekdahl presented as a well nourished, well groomed 41 year old male. He was informed of our appointment less than an hour ahead of the assigned time, but this appeared to pose no problem for him.  He was composed and cooperative.  He answered my questions in a straightforward manner and volunteered information when appropriate.  Although he initially presents as quite reserved, when given permission and encouragement, he can go on at length about his personal history and interests.  Although he has only a 9th grade education and a GED, he is surprisingly well read and articulate in subjects that are of interest to him.  His speech and thought processes were clear and coherent.  There is no history of delusions or hallucinations, but he did describe some occurrences of what may have been dissociative states as a teenager.  He believed these could have been related to substance abuse, but I am more inclined to believe they were the result of living in a chronic state of anxiety created by an extremely overbearing "survivalist" stepfather who's paranoid beliefs were a source of torment for the family.

Mr. Ekdahl reported one suicide attempt in 1985 when he hung himself while incarcerated in Vacaville.  In May of 2002, he was he was admitted to the Outpatient Housing Unit of San Quentin's Infirmary for three days on "suicide precautions".  In May of 2004 he went on a "hunger strike" for 3 days when the California Supreme Court decided he would not be allowed to change his name. He continues to suffer from depression, but reports that the Prozac he is taking helps alleviate the symptoms a great

EKDAHL, Emil                                                                    June 29, 2004

deal. Insight and judgment are influenced by his chronic state of depression but not significantly impaired. This becomes most obvious when asked about involvement in various self help and personal development activities. Mr. Ekdahl admits that he simply does not have the energy or motivation to pursue many activities. Sleep pattern is disturbed, about 4 hours per night, with early morning awakening and inability to return to sleep.

B. <u>Clinical Diagnoses and Level of Functioning/Diagnostic Impression:</u>

| | | |
|---|---|---|
| Axis I: | 296.22 | Major Depressive Disorder, Single Episode, Moderate |
| | 304.80 | Polysubstance Dependence, in full sustained institutional remission |
| Axis II: | V71.01 | History of Adult Antisocial Behavior |
| Axis III: | | Hepatitis C |
| Axis IV: | | Stressors: Life Sentence |
| Axis V: | | Current Global Assessment of Functioning Level GAF = 65 |

C. <u>Current Level of Care:</u> Mr. Ekdahl is currently in the CCCMS Program

D. <u>Treatment Activities:</u> Weekly group therapy: Stress Management
                      Contact with Case Manager every 90 days
                      Contact with Psychiatrist as needed

E. <u>Medications:</u> Prozac

F. <u>Prognosis:</u> Guarded: although Mr. Ekdahl's depressive symptoms are significantly improved and his mood has been stable, monitoring remains important.

XIII: <u>Review of Life Crime:</u>

A. Inmate's version of offense/attitude toward victim/assessment of causative factors: Mr. Ekdahl refuses to discuss the crime beyond the consequences, i.e., the punishments doled out to each of the men involved and his perception of the inequity of such.

B. Relevance of mental condition to life crime/criminal behavior: evaluation of Mr. Ekdahl at the time of his initial incarceration for this crime yielded comments such as "a weak, frightened individual" and "extremely remorseful and deeply depressed". Given the history he has described while growing up, I would suspect that the descriptives were quite possibly applicable even before the crime was committed. I suspect his depression and very low self esteem were long standing, since childhood, and untreated because the family was so isolated and transient. I believe the fear he evidenced in his early incarceration, when custody felt he could easily be victimized, was quite possibly similar to the fear he felt in childhood under his stepfather's command and as a young adult when coerced into the commission of the crime by a much more forceful acquaintance. This certainly does not exonerate him from responsibility for the murder that occurred but can perhaps help explain why an individual with no significant prior history of violence could be an accomplice in such a deplorable act.

EKDAHL, Emil                                    San Quentin                                    06/29/04

EKDAHL, Emil   C-78599                                                                June 29, 2004

C. Inmate's level of insight/remorse/empathy:  Unable to determine given his reluctance to discuss the crime.

D. Causative factors:  Abuse of controlled substances, victimization in childhood, poor socialization in childhood and adolescence, and low self-esteem resulting in increased vulnerability to negative influence.

XIV:  Assessment of Dangerousness:
A. Within controlled setting:  Mr. Ekdahl has a total of eight disciplinary actions, including two for alcohol prior to 1986, three for fighting and three for refusing to perform assigned tasks.  The most recent was in May of 2004 (refusing to work) following a personality conflict with his supervisor.  The disciplinary action prior to this one was in 1997.  He is very proud of his ability to remain free of drugs and alcohol since 1986.

B. If released to the outside community:  Please see Dr. Francis' excellent assessment (2/25/03 Report to the Board of Prison Terms) for thorough review of Mr. Ekdahl's risks of and deterrents to dangerousness.  May I add that should he be able to maintain his abstinence from drugs and alcohol, I believe his violence risk potential would be lower than the average lifer.

C. Significant risk factors/precursors to violence:  Clearly use of controlled substances is a major risk factor.  Beyond this, it is difficult to know what other factors may provoke violence in this individual since he is not inclined to discuss feelings about the life crime.

XV.  Clinician Observation/Comments/Recommendation:  Parole plans remain very vague.  Mr. Ekdahl initially stated that he wanted to go to Placer County to the home of his sister and brother in law, but further discussion revealed that they have not communicated in the past year and that his sister may be having some significant personal problems that would preclude his residing with her.  His mother's home is no longer an option since they had a "falling out" 4 or 5 years ago.  Given the fact that he received the 115 Disciplinary Action last month, Mr. Ekdahl is both depressed and very pessimistic about the outcome of this upcoming Board Hearing.  As a result, he is unmotivated to try to develop any alternative parole plans, but is confident that he could do so quickly if the future felt more promising.

E. Zak Bencich, Ph.D.
Clinical Psychologist
San Quentin State Prison

EKDAHL, Emil                              San Quentin                              06/29/04

# EXHIBIT K:

BOARD OF PRISON TERMS
LIFE PRISONER HEARING – EXTRAORDINARY ACTION AND DECISION

STATE OF CALIFORNIA
BPT 1001A (REV. 10/89)

| ACTION TYPE (select one) | ☐ Waiver of Appearance | ☐ Request for Postponement | ☐ Waiver of Parole Consideration Hearing - Stipulation of Unsuitability |
|---|---|---|---|
| HEARING TYPE (select one) | ☒ Parole Consideration | ☐ Progress | ☐ Rescission Hearing Date: WEEK OF: 06-27-05 |

### WAIVER OF RIGHT TO ATTEND HEARING

I understand that I am scheduled for the Board of Prison Terms hearing indicated above.

☒ I do not wish to attend my Board hearing and do not wish to be represented at the hearing. The hearing will be held in my absence.

☐ I do not personally wish to attend my hearing but I do wish to be represented by counsel at the hearing.

    ☐ I will employ counsel to represent me at the hearing.

    ☐ I cannot afford counsel and wish counsel appointed to represent me.

### POSTPONEMENT

I understand that I am scheduled for the Board of Prison Terms Hearing indicated above.

☐ I hereby request that the hearing indicated above be Postponed to _____.
    The reasons for my request for a postponement are stated below.

### WAIVER OF HEARING AND STIPULATION TO UNSUITABILITY

I understand that I am scheduled for the Board of Prison Terms hearing indicated above.

☐ I waive my right to a parole consideration hearing and I waive the right to have an attorney represent me at a hearing in my absence. I find that I am unsuitable for parole based on my reasons given on this form and therefore request that you find me unsuitable.

    ☐ One-year Denial      ☐ Two-year Denial      ☐ Three-year Denial

PRISONER'S REASON(S) FOR REQUEST:
(For Example: Psychiatric Evaluation Not Supportive, Programming Inadequate, Cat H Incomplete, etc.)

_____

_____

_____

_____

_____

| Signature of Prisoner _Ekdahl_ | Date 05/13/2005 |
|---|---|
| Signature of Attorney (If applicable) | Date |
| Signature and Title of Witness (CDC) | Date |

| NAME | CDC NUMBER | INISTITUTION | CALENDAR | DATE |
|---|---|---|---|---|
| EKDAHL, EMIL | C-79199 | SAN QUENTIN | SUB 7 | WEEK OF: 06-27-05 |

BOARD OF PRISON TERMS
LIFE PRISONER HEARING – EXTRAORD... RY ACTION AND DECISION

STATE OF CALIFORNIA
BPT 1001A (Rev. 10/89)

☐ I certify to the best of my knowledge and information, the foregoing reasons as stated by the prisoner are accurate, and that the prisoner was capable of making a knowledgeable decision regarding his/her hearing.

The following information is submitted for the Board's consideration in making their decision:

_____

_____

_____

C&PR Signature                                             Date:

*FOR BOARD OF PRISON TERMS USE ONLY*

**DECISION / ORDER**
**WAIVER OF RIGHT TO ATTEND HEARING**

☐ Request is denied.

☐ Request is granted.  Hearing will be conducted in absence of prisoner.

**POSTPONEMENT**

1. ☐ Request is denied.

☐ Request is granted.  Granted based on a finding of good cause.  Place on _____ calendar.

**WAIVER OF HEARING AND STIPULATION TO UNSUITABILITY**

2. ☐ Request is denied.

☐ Request is granted.  The Board agrees to enter into the stipulation, on a finding of good cause. Offered by the prisoner on the waiver of his/her Life Parole Consideration Hearing and orders a:

☐ One-year denial          ☐ Two-year denial*          ☐ Three-Year denial**

• The Board must find it unreasonable to expect that the prisoner would be eligible for parole during the second, or second Or second and third year, and the Board must state the reasons for its finding.

** In addition to the above (*), the prisoner must have been convicted of more than one offense which involves the taking of a life.

(The basis of the finding of good cause for postponement or multiple-year denial must be stated below.)

☐ Good cause based on the reasons given by the prisoner.

Other comments (if applicable):

_____

_____

Signatures of BPT Commissioners
1. _____    Date _____
2. _____    Date _____

BPT Action taken at:    ☐ BPT Headquarters    ☐ Institution

| Name | CDC Number | Institution | Calendar | Date |
|------|-----------|-------------|----------|------|
| EKDAHL, EMIL | C-79199 | SAN QUENTIN | SUB 7 | WEEK OF: 06-27-05 |

BOARD OF PRISON TERMS                                                    STATE OF CALIFORNIA

**LIFE PRISONER: NOTICE OF HEARING RIGHTS**

1. **PURPOSE OF HEARING:**

   The purpose of a parole consideration hearing is to determine whether you are a suitable for parole (15 CCR Secs. 2281/2402). The purpose of a progress hearing is to determine whether a parole release date should be advance (15 CCR Sec. 2269(a)). The purpose of a rescission hearing is to determine whether a parole date should be rescinded or postponed (15 CCR Sec. 2450).

2. **RIGHT TO HEARING:**

   One year prior to your minimum eligible parole date a parole suitability hearing will be held (PC Sec. 3041(a)). You are entitled to a formal parole suitability hearing each year thereafter unless the hearing panel denies parole for more than one year (PC Secs. 3041(c), 3041.5 (b) (2)).

3. **RIGHT TO BE PRESENT, SPEAK: WAIVER: CONSEQUENCE OF ABSENCE:**

   You have a right to attend the hearing, ask and answer questions, and speck on your own behalf (PC Sec. 3041.5(a)(2)). You may waive this right (see In re Sydney M. (1984) 162 CA3d 39, 48 (juvenile haring)). If you do not attend the hearing (unless you waive the hearing), a decision will be made in your absence (15 CCR Sec. 2248).

4. **ATTORNEY:**

   You are entitled to be represented by an attorney at the hearing (except progress hearings) (PC Sec. 3041.7). You may waive that right (15 CCR Sec. 2256(b)). If you are unable to afford counsel (i.e., you have less than $1,500 in cash and/or accounts), an attorney will be provided at state expense (15 CCR Sec. 2256(c)).

5. **NOTICE:**

   You will be notified of the week during which the hearing will be held at least one month before the hearing (15 CCR Sec. 2246). You will be given reasonable notice of the time, date, and place of the hearing.

6. **WITNESSES:**

   At a rescission hearing you are entitled to present and confront witnesses. At parole consideration and progress hearing you are not entitled to witnesses (see PC Secs. 3041.5(a)(5), 2932 (x)).

7. **OTHERS WHO MAY ATTEND THE HEARING:**

   At paroles consideration hearings the prosecutor (or representative) at the trial on the charges for which you are incarcerated will be invited to the hearing to represent the interests of the people (PC Sec. 3041.7). At parole consideration hearings notice of the hearing will also be given to the Judge, prosecutor and your attorney at your trial (PC Sec. 3042(a)). The victim or next of kin or their attorney may also attend and address the hearing panel (PC Sec. 3043).

8. **REVIEW OF FILE: OPPORTUNITY TO PRESENT EVIDENCE:**

   You have the right to review non-confidential documents in your Department of Corrections central file and you may appeal insufficient disclosure. You may enter a written response to any material in the file and may present relevant documents to the hearing panel (15 CCR Secs. 2247, 2249). At a rescission hearing you may call witnesses and may request that witnesses (including adverse witnesses) or documents be subpoenaed (15 CCR Sec. 2465©).

| NAME | CDC NUMBER | INST/REGION |
|------|------------|-------------|
| EKDAHL, EMIL | C-79199 | SAN QUENTIN |

BOARD OF PRISON TERMS                                                                        STATE OF CALIFORNIA

### LIFE PRISONER: NOTICE OF HEARING RIGHTS:

**9.  ASSISTANCE IN PREPARING FOR THE HEARING:  ASSISTANCE IN COMMUNICATION:**

You may receive reasonable assistance in preparing for the hearing.  If you are unable to effectively communicate due to language difficulties or a physical or mental defect, appropriate assistance (e.g., an interpreter) will be arranged for you (15 CCR Sec. 2251).

**10.  POSTPONEMENTS:**

A postponement is a delay of a hearing date requested and granted before the hearing actually starts.  You may request a postponement by doing so in writing to department staff before the hearing or orally immediately prior to the hearing.  Requests for postponements may be granted where good cause is found (see 15 CCR Sec. 2253).  Where the hearing has already started, continuances may be granted where: (1) Insufficient information is present to determine any to determine any necessary fact (15 CCR Sec. 2238), or (2) the panel determines that a decision regarding parole cannot be made because of pending new criminal or disciplinary charges (15 CCR Sec. 2272).

**11.  IMPARTIAL PANEL:**

You are entitled to a hearing by an impartial panel and may request the disqualification of one or more panel members where grounds for disqualification exist (15 CCR Sec. 2250).

**12.  RECORD:  DECISION:**

You are entitled to a copy of the record of the hearing upon request (15 CCR Sec. 2254).  You are entitled to a copy of the decision which includes the information considered and the reasons for the decision (15 CCR Se. 2255).

---

**Abbreviations:**

|  |  |
|---|---|
| **PC** | = **California Penal Code** |
| **CCR** | = **California Code of Regulations, formerly California Administrative Code** |
| **CA** | = **California Appellate Reports.** |

---

**I have read and understand the list of rights and procedures (items 1 through 12, above) and I have had an opportunity to ask questions about any rights or procedures that I did not understand.**

| Signature | CDC Number | Date |
|---|---|---|
|  |  |  |

**I explained the foregoing rights to the prisoner, provided him/her with an opportunity to ask questions, and answered all questions he or she asked**

| Signature | Date |
|---|---|
|  |  |

| Name | Title |
|---|---|
| *Ekdahl* | *C-79199* |

| NAME | CDC NUMBER | INST/REGION |
|---|---|---|
| EKDAHL, EMIL | C-79199 | SAN QUENTIN |

---

BPT 1002 (REV 9/90)                                                                  PAGE 2 OF 2 PAGES

BOARD OF PRISON TERMS                                                                 STATE OF CALIFORNIA

## LIFE PRISONER: REQUEST FOR ATTORNEY / WAIVER OF ATTORNEY OR WITHDRAWAL OF REQUEST

| Date of Hearing: | Time of Hearing: | Type of Hearing: |
|---|---|---|
| WEEK OF: 06-27-05 | T.B.D. | SUB 7 |

Please complete and return as instructed by staff as soon as possible but no later than 5 days after receipt.

## REQUEST FOR ATTORNEY

☐   I request the assistance of an attorney at my hearing.

1.   ☐   I have or can retain my own attorney. The attorney is:

Attorney's Name                                                    Telephone Number

Attorney's Address

Signature of Prisoner                         CDC Number                         Date

2. ☐    I wish to have the state provide an attorney to assist me. I declare under penalty of perjury that I am indigent (I have less than $1,500 in cash and/or accounts, Title 15 CCR§2256© and cannot afford an attorney.

## WAIVER OF ATTORNEY

☑   I waive my right to have an attorney.

On _____(Date), I was informed that I have been scheduled to appear before the BOARD OF PRISON TERMS for a hearing. I was also informed of my right to be represented by an attorney at my Board hearing. I know that if I am indigent and cannot afford to retain an attorney the state will appoint an attorney to represent me at state expense. Knowing this, I have decided that **I DO NOT** wish to have the assistance of an attorney at my Board hearing.

| Signature of Prisoner | CDC Number | Date |
|---|---|---|
| Ekdahl | C-79199 | 06/13/2005 |

## WITHDRAWL OF REQUEST FOR AN ATTORNEY

☐   I withdraw my request for an attorney.

I have reconsidered my request for an attorney at my Board hearing and have decided that **I DO NOT** wish to have the assistance of an attorney at my Board hearing. This decision to withdraw my request for an attorney is not being made as a result of any promises or duress. I know that if I withdraw my request for an attorney, I will not be able to later request an attorney again for this hearing.

Signature of Prisoner                         CDC Number                         Date

| NAME | CDC NUMBER | INISTITUTION |
|---|---|---|
| EKDAHL, EMIL | C-79199 | SAN QUENTIN |

BPT 1003 (REV 9/90)

BOARD OF PRISON TERMS                                                                                    STATE OF CALIFORNIA

# BPT 1073 – NOTICE AND REQUEST FOR REASONABLE ACCOMMODATION

## I. PRE-INTERVIEW FILE REVIEW (STAFF ONLY)

Documents verifying/identifying disability: (Check all verifying documents and attach copies to 1073.)

☐ CDC 128C ☐ CDC 128C-1 ☐ CDC 128C-2 ☐ CDC 611 ☐ CDC 1845 ☐ CDC 1515 ☐ Current BPT 1073

☐ CDC 128B (TABE 4.0 or lower) Score/GPL_____ ☐ Other Documents_____ ☐ No verifying documents in file

☐ Accommodation is required for effective communication and/or access (enter type, i.e., sign language interpreter, staff assistance, assistive listening device, alternate accessible location, etc.):

## II. PRISONER/PAROLEE RIGHTS & SELF-IDENTIFICATION

The Americans with Disabilities Act (ADA) is a law to help people with disabilities. Disabilities are problems that make it harder for some people to see, hear, breathe, talk, walk, learn, think, work, or take care of themselves than it is for others. Nobody can be kept out of public places or activities because of a disability. If you have a disability, you have the right to ask for help to get ready for your BPT hearing, get to the hearing, talk, read forms and papers, and understand the hearing process. BPT will look at what you ask for to make sure that you have a disability, that is covered b the ADA, and that you have asked for the right kind of help. If you do not get help, or if you don't think you got the kind of help you need, ask for a BPT 1074 Grievance Form. You can also get help to fill it out.

☐ **I do not** have a disability. (Sign and date at the "X" below.)

☐ **I do have a disability.**

**My disability is:** ☐ Seeing ☐ Talking ☐ Reading ☐ Hearing ☐ Walking ☐ Understanding/Learning

☐ Mental Problems ☐ Other_____

**I need help for my parole hearing:** (Check all boxes that apply to you)

☐ Reading ☐ Understanding ☐ Talking

☐ Hearing Device (type)_____ ☐ Wheelchair or_____

☐ Visual Aids/optical device (type)_____ ☐ Walking

☐ Sign language Interpreter (type)_____ ☐ Other_____

☐ Attorney ☐ I do not need help for my parole hearing.

X_____     X_____
  Prisoner/Parolee Signature          CDC #          Date Signed

## III. INITIAL SERVICE OF RIGHTS (STAFF ONLY)

I have informed prisoner/parolee of the above information, and any relevant charges, and have determined that he/she:

☐ Appears to understand.          ☐ Appears to have difficulty understanding

☐ **Non-English Speaking** (indicate language):_____

☐ **EFFECTIVE COMMUNICATION METHOD USED:** (Sign language interpreter, staff assistance, assistive device, alternate accessible location, etc.):_____
Comments:_____

_____
Staff Name and Title (please print)          Staff Signature          Date

## IV.    REVIEW INDICATING NO CHANGES

| TYPE OF HEARING | PRINT NAME AND WRITE INITIALS | TITLE | INSTITUTION/REG | DATE |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

| NAME: | CDC# | TYPE OF HEARING | DATE OF HEARING |
|---|---|---|---|
| EKDAHL, EMIL | C-79199 | SUB 7 | WEEK OF: 06-27-05 |

BPT 1073 (REV ½)

BOARD OF PRISON TERMS                                                                STATE OF CALIFORNIA

## REQUEST FOR INTERPRETER

Please complete and return as instructed by staff as soon as possible but no later than 5 days after receipt.

I do not speak or understand the English language, and I request the assistance of an interpreter at my hearing.

Signature                                        CDC Number                        Date

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## SOLICITUD PARA INTÉRPRETE

Favor de llenar como le indique el miembro del personal y devolver tan pronot como le sea posible, en cinco días a  más tardar.

No hablo ni entiendo el idioma inglés, y solicito la ayuda de un intérprete en mi audiencia.

FIRMA                                            NUMERO DE CDC                    FECHA

NAME                                             CDC NUMBER                       INST/REGION

EKDAHL, EMIL                                     C-79199                          SAN QUENTIN

BPT 1079 (REV 9/1/82)

BOARD OF PRISON TERMS                                           STATE OF CALIFORNIA

**NOTICE OF DATE, TIME AND PLACE OF HEARING**

Your_____ SUB 7 _____ hearing is scheduled for
                              (Type)

_____ T.B.D. _____ on _____ WEEK OF: 06-27-05 _____
                 (Time)                                    (Date)

at _____ SAN QUENTIN STATE PRISON – BOARD ROOM _____

_____

**CERTIFICATE OF SERVICE**

On _____

I ( ) gave    ( ) mailed this notice to the prisoner/parolee.

_____

**Signature of State Agent**                                 Date

_____

**Receipt Acknowledged** (*For Institutional Use Only*)

| Signature | CDC Number | Date |
|-----------|------------|------|

| NAME | CDC NUMBER | INST/REGION |
|------|------------|-------------|
| EKDAHL, EMIL | C-79199 | SAN QUENTIN |

BPT 1080  (REV 8/1/81)

# EXHIBIT L:

SEARCH

| NYT Since 1981 ▾ |   Search

▸ TimesSelect FREE '4-DAY TRIAL'

Tip for TimesSelect subscribers. Want to easily save this page? Use Times File by simply clicking on the Save Article icon in the Article Tools box below.

NATIONAL DESK

# To More Inmates, Life Term Means Dying Behind Bars

**By ADAM LIPTAK; JANET ROBERTS OF THE TIMES'S COMPUTER-ASSISTED REPORTING UNIT CONTRIBUTED REPORTING FOR THIS SERIES. SHE WAS ASSISTED BY JACK STYCZYNSKI, DONNA ANDERSON, LINDA AMSTER, JACK BEGG, ALAIN DELAQUÉRIÈRE, SANDRA JAMISON, TOBY LYLES AND CAROLYN WILDER. (NYT) 5113 words**
Published: October 2, 2005

In the winter woods near Gaines, Pa., on the day before New Year's Eve in 1969, four 15-year-olds were hunting rabbits when Charlotte Goodwin told Jackie Lee Thompson a lie. They had been having sex for about a month, and she said she was pregnant.

That angered Jackie, and he shot Charlotte three times and then drowned her in the icy waters of Pine Creek.

A few months later, Judge Charles G. Webb sentenced him to life in prison. But the judge told him:

"You will always have hope in a thing of this kind. We have found that, in the past, quite frequently, if you behave yourself, there is a good chance that you will learn a trade and you will be paroled after a few years."

Mr. Thompson did behave himself, learned quite a few trades in his 35 years in prison -- he is an accomplished carpenter, bricklayer, electrician, plumber, welder and mechanic -- and earned a high school diploma and an associate's degree in business.

So exemplary is his prison record that when Mr. Thompson, now 50, asked the state pardons board to release him, the victim's father begged for his release, and a retired prison official offered Mr. Thompson a place to stay and a job.

"We can forgive him," said Duane Goodwin, Charlotte's father. "Why can't you?"

The board turned Mr. Thompson down.

Tom Corbett, the state attorney general, cast the decisive vote.

"He shot her with a pump-action shotgun, three times," Mr. Corbett said. "This was a cold-blooded killing."

Just a few decades ago, a life sentence was often a misnomer, a way to suggest harsh punishment but

deliver only 10 to 20 years.

But now, driven by tougher laws and political pressure on governors and parole boards, thousands of lifers are going into prisons each year, and in many states only a few are ever coming out, even in cases where judges and prosecutors did not intend to put them away forever.

Indeed, in just the last 30 years, the United States has created something never before seen in its history and unheard of around the globe: a booming population of prisoners whose only way out of prison is likely to be inside a coffin.

A survey by The New York Times found that about 132,000 of the nation's prisoners, or almost 1 in 10, are serving life sentences. The number of lifers has almost doubled in the last decade, far outpacing the overall growth in the prison population. Of those lifers sentenced between 1988 and 2001, about a third are serving time for sentences other than murder, including burglary and drug crimes.

Growth has been especially sharp among lifers with the words "without parole" appended to their sentences. In 1993, the Times survey found, about 20 percent of all lifers had no chance of parole. Last year, the number rose to 28 percent.

The phenomenon is in some ways an artifact of the death penalty. Opponents of capital punishment have promoted life sentences as an alternative to execution. And as the nation's enthusiasm for the death penalty wanes amid restrictive Supreme Court rulings and a spate of death row exonerations, more states are turning to life sentences.

Defendants facing a potential death sentence often plead to life; those who go to trial and are convicted are sentenced to life about half the time by juries that are sometimes swayed by the lingering possibility of innocence.

As a result the United States is now housing a large and permanent population of prisoners who will die of old age behind bars. At the Louisiana State Penitentiary in Angola, for instance, more than 3,000 of the 5,100 prisoners are serving life without parole, and most of the rest are serving sentences so long that they cannot be completed in a typical lifetime.

About 150 inmates have died there in the last five years, and the prison recently opened a second cemetery, where simple white crosses are adorned with only the inmate's name and prisoner ID number.

Growing Reliance on Life Terms

American enthusiasm for life sentences reflects an uneasy societal consensus. Such sentences are undeniably tough, pleasing politicians and prosecutors, but they also satisfy opponents of capital punishment.

"If you are punishing a heinous criminal who has committed a violent murder, it is appropriate to use severe sanctions," said Julian H. Wright Jr., a lawyer in North Carolina and the author of a study on life without parole. "It has the advantage of achieving a harsh penalty and keeping a violent offender off the streets. And you don't take a human life in the process. Indeed, if you mess up and do it wrong, you haven't taken someone's life."

The prison wardens, criminologists and groups that study sentencing say the growing reliance on

life terms also raises a host of questions.

Permanent incarceration may be the fitting punishment for murder. Few shed tears for Gary L. Ridgway, the Green River killer, who was sentenced to 48 consecutive life terms in Washington State, one for each of the women he admitted to killing.

But some critics of life sentences say they are overused, pointing to people like Jerald Sanders, who is serving a life sentence in Alabama. He was a small-time burglar and had never been convicted of a violent crime. Under the state's habitual offender law, he was sent away after stealing a $60 bicycle.

Fewer than two-thirds of the 70,000 people sentenced to life from 1988 to 2001 are in for murder, the Times analysis found. Other lifers -- more than 25,000 of them -- were convicted of crimes like rape, kidnapping, armed robbery, assault, extortion, burglary and arson. People convicted of drug trafficking account for 16 percent of all lifers.

Life sentences certainly keep criminals off the streets. But, as decades pass and prisoners grow more mature and less violent, does the cost of keeping them locked up justify what may be a diminishing benefit in public safety? By a conservative estimate, it costs $3 billion a year to house America's lifers. And as prisoners age, their medical care can become very expensive.

At the same time, studies show, most prisoners become markedly less violent as they grow older.

"Committing crime, particularly violent crime, is an activity of the young," said Richard Kern, the director of the Virginia Criminal Sentencing Commission.

Marc Mauer, executive director of the Sentencing Project, a research and advocacy group that issued a report on life sentences last year, said that about a fifth of released lifers were arrested again, compared with two-thirds of all released prisoners.

"Many lifers," Mr. Mauer said, "are kept in prison long after they represent a public safety threat."

In much of the rest of the world, sentences of natural life are all but unknown.

"Western Europeans regard 10 or 12 years as an extremely long term, even for offenders sentenced in theory to life," said James Q. Whitman, a law professor at Yale and the author of "Harsh Justice," which compares criminal punishment in the United States and Europe.

Michael H. Tonry, a professor of law and public policy at the University of Minnesota and an expert on comparative punishment, said life without parole was a legal impossibility in much of the world.

Mexico will not extradite defendants who face sentences of life without parole. And when Mehmet Ali Agca, the Turkish gunman who tried to kill Pope John Paul II in 1981, was pardoned in 2000, an Italian judge remarked, "No one stays 20 years in prison."

Some developing and Islamic nations mete out brutal sanctions, including corporal punishment and mutilation. But if the discussion is limited to very long prison sentences, Professor Tonry said, "we are vastly more punitive than anybody else."

The reasons for this gap are hard to pinpoint. Professor Whitman detects an American appetite for harsh retribution. Professor Tonry locates that appetite in a Calvinist tradition.

"It's the same reason we're not a socialist welfare state," he said. "You deserve what you get, both good and bad."

That sort of talk struck M.L. Ebert Jr., a former president of the Pennsylvania District Attorneys Association and the district attorney of Cumberland County, Pa., as a little fancy.

"Is it too much to ask that people don't kill people?" he said. "I can't tell you the devastation it causes families, who never forget. If you kill somebody, life means life without parole."

The Crime and the Victim

"My anger broke loose, and I shot her," Mr. Thompson said recently, recalling for the millionth time the day he killed Charlotte Goodwin. He was afraid, he said, that her pregnancy would get him kicked out of his foster home, his fourth in five years and the first one that he liked.

Mr. Thompson is a slight, almost elfin man, with receding, wispy, unkempt salt-and-pepper hair, a casual mustache, breath that smells of cigarettes and moody brown eyes in a heavily creased face.

He is serving his time at the Rockview Correctional Institution near Bellefonte, just up the road from Pennsylvania State University. It is a soaring and forbidding mass of granite, a piece of Gotham City plunked down in the rolling hills of rural Pennsylvania.

He used his friend Dennis Ellis's pump-action shotgun, Mr. Thompson said, and he shot Charlotte at close range three times. He tried to explain the repeated shots.

"You have to pump each time," he said. "It is true. Dennis and I, we always had a habit of going out in the woods with a gun and see how fast we could empty a gun. That's where the second and third shots come from."

Charlotte's wounds were not immediately fatal. The youths had the idea, Mr. Thompson said, of putting her in a nearby creek. But she bobbed to the surface. So the three teenagers slid her body under the ice that covered a part of the creek, drowning her.

"You should have seen how stupid we was," Mr. Thompson said. "I wish I could change that."

Mr. Thompson grew up as a slow and confused child, with a slight speech impediment. He had 13 brothers and sisters, "and that's not counting the half ones," he said.

"Three or four of them have died so far," he said. His mother died when he was 10, he added, "I'm told of cancer."

Mr. Thompson recalled his younger self.

"That 15-year-old kid was so scared. He was a special-ed kid. Special-ed kids get teased a lot. I was small. I kept running away. Here was a kid who was always scared to death, picked on, possibly beat up."

"Looking back," he said, "I wish someone would have grabbed hold of me and kicked my butt. I wasn't a bad kid."

He met Charlotte Goodwin at the foster home.

"I didn't get to know her that well," Mr. Thompson said. "At that age, boys are after one thing. A girl can talk all she wants and you ain't listening to her. You're thinking of only one thing."

Duane Goodwin, Charlotte's father, remembered a cheerful child.

"She was just happy-go-lucky," Mr. Goodwin said of her. "If there was any kind of music on, she'd move to it."

Jackie confessed to killing Charlotte, and Judge Webb sentenced him to life. At that time, 1970, in Pennsylvania, a life sentence usually meant fewer than 20 years.

Dorothy D. Quimby was the clerk of the Orphans Court of Tioga County at the time and she knew him as "a gentle, good boy who had suffered a lot of hurt."

"I also knew Judge Webb very well," she wrote to the pardons board, "and know that his intentions were not to have Jackie incarcerated for any great length of time."

A few months ago, Mr. Goodwin, 78, traveled 100 miles to speak up for his daughter's killer before the pardons board, which meets in an ornate courtroom of the State Supreme Court here, under a stained-glass cupola and a dozen frescoes attesting to the majesty of the law.

Mr. Goodwin, a retired glass factory worker with a gray goatee and a hearing aid, is a small man with erect posture, alert eyes and quick laugh, but he gets a little overwhelmed by public speaking. He spoke softly and haltingly.

"He was just a scared little kid," Mr. Goodwin said of Jackie. "If he ever gets out, he's got a good education, and I think he'll use it."

Kenneth Chubb, a retired facilities manager at the prison in Camp Hill, told the board that he had a proposal.

"My wife and I would both like to offer, if needed, a place for him to stay," Mr. Chubb said, his voice choking with emotion. "Plus, my son, who has a plumbing business, will offer him a job."

That drew a low whistle of surprise from a former prison official in the audience.

"For a corrections person to embrace an inmate is just incredible," the official, W. Scott Thornsley, said.

A few days before the hearing, Mr. Corbett, the state attorney general, met with Mr. Thompson.

"I walked out of the room thinking and feeling that he was going to say yes," Mr. Thompson later said. "He was not coldhearted. He wasn't drilling me. He gets to the point. He's a decent man."

But in the end, that visit, Mr. Goodwin's pleas and Mr. Chubb's offer were not enough to sway Mr. Corbett, the one dissenting vote on the five-member parole board.

"I am not prepared," Mr. Corbett said, "at this time to vote in the affirmative."

John F. Cowley, the district attorney in Tioga County, where the killing took place, agreed that Mr. Thompson should never be free.

"At the end of the day, in Pennsylvania life means life," Mr. Cowley said. "I come down on the side -- not firmly -- but I come down on the side that there should be no pardon. It's a tough case. The only reason is the age at the time of the crime. Everything else is way beyond ugly."

In lawsuits around the country, lifers are complaining that the rules were changed after sentencing. In some cases, they have the support of the judges who sentenced them.

A survey of 95 current and retired judges by the Michigan state bar released in 2002 found that, on average, the judges had expected prisoners sentenced to life with the possibility of parole to become eligible for parole in 12 years and to be released in 16 years. In July, a Michigan appeals court echoed that, saying that many lawyers there used to assume that a life sentence meant 12 to 20 years.

"This belief seems to have been somewhat supported by parole data," the court said in rejecting a claim from a prisoner who claimed that recent changes in the parole system had worked to his disadvantage. "For example, between 1941 and 1974, 416 parole-eligible lifers were paroled, averaging 12 per year."

In the last 24 years, by contrast, a New York Times analysis found that while the number of lifers shot up, the number of lifers who were paroled declined to about seven per year -- even using the most liberal of definitions.

In 2002, for instance, a Michigan judge tried to reopen the case of John Alexander, whom he had sentenced to life with the possibility of parole for a seemingly unprovoked street shooting in 1981.

The judge, Michael F. Sapala, said he had not anticipated the extent to which the parole board "wouldn't simply change policies but, in fact, would ignore the law" in denying parole to Mr. Alexander. "If I wanted to make sure he stayed in prison for the rest of his life, I would have imposed" a sentence "like 30 to 150 years," the judge said.

An appeals court ruled that the judge no longer had jurisdiction over the case.

Executive Clemency Wanes

In Louisiana, which, like Michigan and Pennsylvania, has a large number of lifers, "it was common knowledge that life imprisonment generally means 10 years and 6 months" in the 1970's, the state's Supreme Court said in 1982.

Since 1979, all life sentences there have come without the possibility of parole, and the governor rarely intervenes.

The use of executive clemency has withered, as it has all over the country, especially with lifers," said Burk Foster, a recently retired professor of criminal justice at the University of Louisiana at Lafayette.

The federal appeals court in California is considering whether the parole board there may deny parole to lifers based on the nature of the original crime, which, prisoners say, is a form of double jeopardy. The plaintiff in the case, Carl Merton Irons II, shot and stabbed a housemate, John Nicholson, in 1984 after hearing that Mr. Nicholson was stealing from their landlord. Mr. Irons was sentenced to 17 years to life for second-degree murder.

The parole board refused for a fifth time to release him in 2001, saying that the killing was "especially cruel and callous."

The prosecutor who sent Mr. Irons away spoke up for him at a hearing the next year, to no avail. "If life would have it that Carl Irons was my next-door neighbor or I heard he was going to move next door to me," the prosecutor, Stephen M. Wagstaffe said, "my view to you would be that I'm going to have a good neighbor."

Mr. Irons filed a lawsuit challenging the board's decision. A federal district judge agreed, ordering him paroled. The federal appeals court is expected to rule soon.

The state has 30,000 lifers, of whom 27,000 will eventually become eligible for parole. As a practical matter, parole for lifers is a two-step process: the parole board must recommend it, and the governor must approve it. Neither step is easy. In a 28-month period ending in 2001, according to the California Supreme Court, the board considered 4,800 cases and granted parole in 48. Gov. Gray Davis, a Democrat, reversed 47 of the decisions.

Governor Davis had run on a tough-on-crime platform. In five years as governor, he paroled five lifers, all murderers.

Gov. Arnold Schwarzenegger, a Republican who succeeded Mr. Davis in late 2003, has been more receptive to parole. He has paroled 103 lifers, 89 of them murderers.

"Even though he is letting out more than Davis, it is still just a trickle," said Don Spector, executive director of the Prison Law Office, a legal group concerned with inmate rights and prison reform. "The victims' rights groups are used to seeing nothing, so to them, it seems like there's been a flood of releases."

Reginald McFadden is the reason lifers no longer get pardons in Pennsylvania.

Mr. McFadden had served 24 years of a life sentence for suffocating Sonia Rosenbaum, 60, during a burglary of her home when a divided Board of Pardons voted to release him in 1992. After Gov. Robert P. Casey signed the commutation papers two years later, Mr. McFadden moved to New York, where he promptly killed two people and kidnapped and raped a third. He is now serving another life sentence there.

Lt. Gov. Mark Singel had voted to release Mr. McFadden. When news of the New York murders broke, Mr. Singel was running for governor and was well ahead in the polls. The commutation became a campaign issue, and Mr. Singel was defeated by Tom Ridge, who did not commute a single lifer's sentence in his six years in office.

Ernest D. Preate Jr., the state attorney general at the time, was the sole dissenting vote in Mr. McFadden's case.

Then, it took only a majority vote of the board to recommend clemency. Mr. Preate worked to change that, and in 1997 Pennsylvania voters passed a constitutional amendment requiring a unanimous vote in cases involving the death penalty and life sentences. The amendment also changed the composition of the board, substituting, for instance, a crime victim for a lawyer.

Mr. Thornsley, a former corrections official who now teaches at Mansfield University, said the

amendment made a sensible change. "It took a unanimous vote to convict somebody," he said. "It should take a unanimous vote to send a case to the governor. If you're going to have a sentence, it should be served out in its entirety."

The McFadden experience in Pennsylvania is a representative one, said Michael Heise, a law professor at Cornell.

'Around World War II, governors were giving away clemency like candy," Dr. Heise said. "Ever since Governor Dukakis and Willie Horton and President Clinton and Marc Rich, executive officers have been far, far more reticent to exercise their power. The politics are pretty clear: they don't want to get burned."

As recently as 30 years ago, pardons for lifers were common in Pennsylvania. In eight years in the 1970's, for instance, Gov. Milton Shapp granted clemency to 251 lifers. Since 1995, even as the number of lifers has more than doubled, three governors combined have commuted a single life sentence.

These days, Mr. Preate is on the other side of the issue, working to overturn the amendment that he himself set in motion. He said his change of heart came after he spent a year in prison on a mail fraud conviction in the mid-90's. Meeting older lifers convinced him that the current system could be unduly punitive, he said.

That got me involved in the fight against the amendment I helped create and supported," he said.

Mr. Preate now supports legislation that would allow a parole board to consider the cases of lifers who have served 25 years and are at least 50. "I never foresaw the politicization of this process," he said, and the fear that has crept into the process."

Mr. Thompson entered prison in an era when its goal was rehabilitation, even for people serving criminal life terms. These days, he works as a prison carpenter, earning 42 cents an hour building cabinets and fixing things up around the prison, which houses about 1,800 inmates, more than 180 of whom are lifers.

It helps pay the cable and gets you a little bit of commissary," he said. "It might be strange to say, but coming to jail helped me. I got an education. Would I have got that out there? I probably would have quit like my brothers and most of my sisters. Would I have an associate's degree? Would I have job training?"

He has a cell to himself, with a television and a guitar. He plays "the old rock, the classics" and said he was partial to Bob Dylan. He has started playing sports.

Softball season started up again and the young boys talked me in to playing again, and I'm pretty good," he said several months ago. He plays second base.

A lifer entering the system today would have few of Mr. Thompson's advantages. Programs have been cut back, and those that still exist are often reserved for prisoners serving short sentences.

Mr. Thompson sounded resigned when he talked about being turned down by the pardons board.

A lot of guys in here really thought I was going to make it, staff and inmates, to give a little hope to the lifers," he said wearily. "I didn't cry this time. I committed a crime. Even though I think I've been

punished enough, I'm to the point where I'm worried about my people, my supporters, because it really does take a toll on them."

How the Survey Was Conducted

To determine how many people are serving life sentences in United States prisons, The New York Times conducted a survey of corrections departments in all 50 states and the federal prison system.

The study considered two basic types of life sentences.

The first is life with the possibility of parole. These prisoners can appeal to parole boards after completing a fixed term, as in a sentence of 25 years to life. The rise in truth-in-sentencing laws, the oft-repeated maxim that "life means life" and tougher parole boards have made the prospect of parole very limited in some states.

The second type of sentence does not allow for parole, and the Times survey found that 28 percent of lifers fit into this category. In 1993, it was about 20 percent.

Prisoners in a third category, of people sentenced to very long prison terms, were not included in the survey because of gaps in the available data. There are probably tens of thousands of such inmates, whom other prisoners call "lifers with numbers." Someone serving 99 or 200 years is effectively serving a sentence of life without parole.

Some lifers are released, of course. In a recent 14-year period, 28,000 lifers left the prison system, by parole, commutation, court action or death. But 70,000 lifers entered the system in those same years, and the difference -- 42,000 -- explains the explosive growth of the nation's lifer population.

It addition to the survey, The Times analyzed data from the National Corrections Reporting Program, which collects information from states about prisoners, their offenses and their sentences. Although some states do not participate in the program, the database covers about 90 percent of the admissions and releases from state prisons nationwide. The Times analysis covered the years 1988 through 2001.

For a closer look at a lifer population, The Times analyzed a database of Michigan prisoners incarcerated since 1981.

In all cases, The Times defined a life sentence as one with a maximum term specified as life in prison. It should be noted that the Michigan Corrections Department uses a different definition, one that omits indeterminate sentences -- those with a minimum term defined in days, months or years and a maximum of life. As a result, The Times's counts of Michigan lifers are about 2 percent higher than the state's own counts.

Juveniles were defined as anyone younger than 18 at the time of offense or arrest; however, some states that The Times surveyed could not provide a count based on such ages. In those cases, to account for the time lag between offense and sentencing, The Times counted anyone under the age of 20 at sentencing as a juvenile.

Articles in this series will examine the swelling population of lifers who committed their crimes as teenagers and the culture of hopelessness in American prisons. Audio with Adam Liptak, additional photographs and a readers' forum are online at nytimes.com/national.

Photos: 1969, AGE 15 -- Jackie Lee Thompson's mug shot after Charlotte Goodwin's killing. (Photo by Elmira Star-Gazette); 2004, AGE 49 -- Mr. Thompson has spent 35 years in a Pennsylvania prison. (pg.1); THE VICTIM --

Charlotte Goodwin was 15 in 1969, the year she was killed by Jackie Lee Thompson, also 15. She was shot three times, then drowned. (Photo by Elmira Star-Gazette); THE LIFER -- Jackie Lee Thompson, left, and Duane Goodwin embraced during a prison visit in 2000. Mr. Goodwin has repeatedly asked for the release of Mr. Thompson, who has spent 35 years behind bars. (Photo by Jeff Richards/Elmira Star-Gazette); THE VICTIM'S FAMILY -- Mr. Goodwin and his wife, Jean, traveled to Harrisburg, Pa., in April so he could speak up for his daughter's killer before the pardons board, which rejected Mr. Thompson's appeal. (Photo by Kalim A. Bhatti for The New York Times)(pg. 28); THE SENTENCE ENDS AT THE CEMETERY -- A prisoner is buried at the Louisiana State Penitentiary in Angola, where more than 3,000 of the 5,100 inmates are serving sentences of life without parole. Most of the rest have been given sentences so long that they cannot be completed in a typical lifetime. (Photo by Richard Patterson for The New York Times)(pg. 29)

Chart: "In Pennsylvania, Fewer Commutations"
In Pennsylvania, the number of life sentences commuted by the governor has dropped over the past several decades. In 1997, the state's voters passed a constitutional amendment requiring a unanimous recommendation from all five members of the board.

Governor: Raymond P. Shafer
Term: 1967-1971
NUMBER OF LIFE SENTENCES
Recommended for commutation by Board of Pardons: 363
Commuted by governor: 94

Governor: Milton J. Shapp
Term: 1971-1979
NUMBER OF LIFE SENTENCES
Recommended for commutation by Board of Pardons: 267
Commuted by governor: 251

Governor: Dick Thornburgh
Term: 1979-1987
NUMBER OF LIFE SENTENCES
Recommended for commutation by Board of Pardons: 75
Commuted by governor: 7

Governor: Robert P. Casey
Term: 1987-1995
NUMBER OF LIFE SENTENCES
Recommended for commutation by Board of Pardons: 118
Commuted by governor: 27

Governor: Tom Ridge
Term: 1995-2001
NUMBER OF LIFE SENTENCES
Recommended for commutation by Board of Pardons: 4
Commuted by governor: 0

Governor: Mark S. Schweiker
Term: 2001-2003
NUMBER OF LIFE SENTENCES
Recommended for commutation by Board of Pardons: 1
Commuted by governor: 1

Governor: Edward G. Rendell
Term: 2003-
NUMBER OF LIFE SENTENCES
Recommended for commutation by Board of Pardons: 2
Commuted by governor: 0

(Source by Pennsylvania Prison Society)(pg. 28)

Chart: "A Growing Population"
The number of people in prison serving life sentences has surged over the past decade, with only one state -- Indiana -- seeing a decline. Of the 40 states for which data was available, more than two-thirds saw their population of lifers increase by 50 percent or more.

Map of the United States tracks the change in number of people serving life sentences, 1993 to 2004.

The states with the most people serving life sentences overlap substantially with the states that have had the highest execution rates in modern times, notably in the Southeast. Legal experts attribute this to tough local attitudes about crime and to the prospect of possible execution, which can cause defendants to plead to life.

Map of the United States highlighting the number of people serving life sentences, per 100,000 population

Demographics of those sentenced to life, 1988-2001

TYPE OF CRIME COMMITTED
Murder: 63%
Drug crime: 16%
Other violent: 18%
Other: 3%

RACE -- Data is for 2001 only
White: 40%
Black: 48%
Asian: 1%
Other: 10%
Amer. Indian: 1%

AGE -- When admitted to prison
Under 18: 3%
18-29: 53%
30-39: 26%
40-49: 12%
50 or older: 5%

GENDER

Men: 95%
Women: 5%

(Sources by State corrections departments; National Corrections Reporting Program; Death Penalty
Information Center)(pg. 29)

Copyright 2005 The New York Times Company | Privacy Policy | Home | Search | Corrections | Help | Back to Top

NATIONAL DESK

# Serving Life, With No Chance of Redemption

**By ADAM LIPTAK; JANET ROBERTS CONTRIBUTED REPORTING FOR THIS SERIES. RESEARCH WAS CONTRIBUTED BY JACK STYCZYNSKI, LINDA AMSTER, DONNA ANDERSON, JACK BEGG, ALAIN DELAQUéRIèRE, SANDRA JAMISON, TOBY LYLES AND CAROLYN WILDER. (NYT) 2857 words**

Published: October 5, 2005

Minutes after the United States Supreme Court threw out the juvenile death penalty in March, word reached death row here, setting off a pandemonium of banging, yelling and whoops of joy, among many of the 28 men whose lives were spared by the decision.

But the news devastated Randy Arroyo, who had faced execution for helping kidnap and kill an Air Force officer while stealing his car for parts.

Mr. Arroyo realized he had just become a lifer, and that was the last thing he wanted. Lifers, he said, exist in a world without hope. "I wish I still had that death sentence," he said. "I believe my chances have gone down the drain. No one will ever look at my case."

Mr. Arroyo has a point. People on death row are provided with free lawyers to pursue their cases in federal court long after their convictions have been affirmed; lifers are not. The pro bono lawyers who work so aggressively to exonerate or spare the lives of death row inmates are not interested in the cases of people merely serving life terms. And appeals courts scrutinize death penalty cases much more closely than others.

Mr. Arroyo will become eligible for parole in 2037, when he is 57. But he doubts he will ever get out.

"This is hopeless," he said.

Scores of lifers, in interviews at 10 prisons in six states, echoed Mr. Arroyo's despondency. They have, they said, nothing to look forward to and no way to redeem themselves.

More than one in four lifers will never even see a parole board. The boards that the remaining lifers encounter have often been refashioned to include representatives of crime victims and elected officials not receptive to pleas for lenience.

And the nation's governors, concerned about the possibility of repeated offenses by paroled criminals and the public outcry that often follows, have all but stopped commuting life sentences.

In at least 22 states, lifers have virtually no way out. Fourteen states reported that they released fewer

than 10 in 2001, the latest year for which national data is available, and the other eight states said fewer than two dozen each.

The number of lifers thus continues to swell in prisons across the nation, even as the number of new life sentences has dropped in recent years along with the crime rate.

According to a New York Times survey, the number of lifers has almost doubled in the last decade, to 132,000. Historical data on juvenile offenders is incomplete. But among the 18 states that can provide data from 1993, the juvenile lifer population rose 74 percent in the next decade.

Prosecutors and representatives of crime victims applaud the trend. The prisoners, they say, are paying the minimum fit punishment for their terrible crimes.

But even supporters of the death penalty wonder about this state of affairs.

'Life without parole is a very strange sentence when you think about it," said Robert Blecker, a professor at New York Law School. "The punishment seems either too much or too little. If a sadistic or extraordinarily cold, callous killer deserves to die, then why not kill him? But if we are going to keep the killer alive when we could otherwise execute him, why strip him of all hope?"

Burl Cain, the warden of the Louisiana State Penitentiary in Angola, which houses thousands of lifers, said older prisoners who have served many years should be able to make their cases to a parole or pardon board that has an open mind. Because all life sentences in Louisiana are without the possibility of parole, only a governor's pardon can bring about a release.

The prospect of a meaningful hearing would, Mr. Cain said, provide lifers with a taste of hope.

'Prison should be a place for predators and not dying old men," Mr. Cain said. "Some people should die in prison, but everyone should get a hearing."

Television and Boredom

In interviews, lifers said they tried to resign themselves to spending down their days entirely behind bars. But the prison programs that once kept them busy in an effort at training and rehabilitation have largely been dismantled, replaced by television and boredom.

The lot of the lifer may be said to be cruel or pampered, depending on one's perspective. "It's a bleak imprisonment," said W. Scott Thornsley, a former corrections official in Pennsylvania. "When you take away someone's hope, you take away a lot."

It was not always that way, said Steven Benjamin, a 56-year-old Michigan lifer.

'The whole perception of incarceration changed in the 1970's," said Mr. Benjamin, who is serving a sentence of life without parole for participating in a robbery in 1973 in which an accomplice killed a man. "They're dismantling all meaningful programs. We just write people off without a second thought."

As the years pass and the lifers grow old, they sometimes tend to dying prisoners and then die themselves. Some are buried in cemeteries on prison grounds by other lifers, who will then go on to repeat the cycle.

"They're never going to leave here," said Mr. Cain, the warden at Angola, of inmates he looks after. "They're going to die here."

Some defendants view the prospect of life in prison as so bleak and the possibility of exoneration for lifers as so remote that they are willing to roll the dice with death.

In Alabama, six men convicted of capital crimes have asked their juries for death rather than life sentences, said Bryan Stevenson, director of the Equal Justice Initiative of Alabama.

The idea seems to have its roots in the experience of Walter McMillian, who was convicted of capital murder by an Alabama jury in 1988. The jury recommended that he be sentenced to life without parole, but Judge Robert E. Lee Key Jr. overrode that recommendation and sentenced Mr. McMillian to death by electrocution.

Because of that death sentence, lawyers opposed to capital punishment took up Mr. McMillian's case. Through their efforts, Mr. McMillian was exonerated five years later after prosecutors conceded that they had relied on perjured testimony. "Had there not been that decision to override," said Mr. Stevenson, one of Mr. McMillian's lawyers, "he would be in prison today."

Other Alabama defendants have learned a lesson from Mr. McMillian.

"We have a lot of death penalty cases where, perversely, the client at the penalty phase asks to be sentenced to death," Mr. Stevenson said.

Judges and other legal experts say that risky decision could be a wise one for defendants who are innocent or who were convicted under flawed procedures. "Capital cases get an automatic royal treatment, whereas noncapital cases are fairly routine," said Alex Kozinski, a federal appeals court judge in California.

David R. Dow, one of Mr. Arroyo's lawyers and the director of the Texas Innocence Network, said groups like his did not have the resources to represent lifers.

"If we got Arroyo's case as a non-death-penalty case," Mr. Dow said, "we would have terminated it in the very early stages of investigation."

Mr. Arroyo, who is 25 but still has something of the pimply, squirmy adolescent about him, said he already detected a certain quiet descending on his case.

"You don't hear too many religious groups or foreign governments or nonprofit organizations fighting for lifers," he said.

Gov. Rick Perry of Texas signed a bill in June adding life without parole as an option for juries to consider in capital cases. Opponents of the death penalty have embraced and promoted this alternative, pointing to studies that show that support for the death penalty dropped drastically among jurors and the public when life without parole, or LWOP, was an alternative.

"Life without parole has been absolutely crucial to whatever progress has been made against the death penalty," said James Liebman, a law professor at Columbia. "The drop in death sentences" -- from 320 in 1996 to 125 last year -- "would not have happened without LWOP."

But some questioned the strategy.

"I have a problem with death penalty abolitionists," said Paul Wright, the editor of Prison Legal News and a former lifer, released in Washington State in 2003 after serving 17 years for killing a man in a robbery attempt. "They're positing life without parole as an option, but it's a death sentence by incarceration. You're trading a slow form of death for a faster one."

Mr. Arroyo shares that view.

"I'd roll the dice with death and stay on death row," he said. "Really, death has never been my fear. What do people believe? That being alive in prison is a good life? This is slavery."

Murder Follows a Kidnapping

Mr. Arroyo was convicted in 1998 for his role in the killing of Jose Cobo, 39, an Air Force captain and the chief of maintenance training at the Inter-American Air Forces Academy in Lackland, Tex. Mr. Arroyo, then 17, and an accomplice, Vincent Gutierrez, 18, wanted to steal Captain Cobo's red Mazda RX-7 for parts.

Captain Cobo tried to escape but became tangled in his seat belt. Mr. Gutierrez shot him twice in the back and shoved the dying man onto the shoulder of Interstate 410 during rush hour on a rainy Tuesday morning.

Although Mr. Arroyo did not pull the trigger, he was convicted of felony murder, or participation in a serious crime that led to a killing. He contends that he had no reason to think Mr. Gutierrez would kill Captain Cobo and therefore cannot be guilty of felony murder. "I don't mind taking responsibility for my actions, for my part in this crime," he said. "But don't act like I'm a murderer or violent or that this was premeditated."

That argument misunderstands the felony murder law, legal experts said. Mr. Arroyo's decision to participate in the carjacking is, they say, more than enough to support his murder conviction.

Captain Cobo left behind a 17-year-old daughter, Reena.

"I miss him so much it hurts when I think about it," she said of her father in a victim impact statement presented at trial. "I know he is in heaven with my grandmother and God is taking care of him. I want to see the murderers punished not necessarily by death. I feel sorry that they wasted theirs and my father's life."

Ms. Cobo declined to be interviewed.

Mr. Arroyo said he was not eager to leave death row, and not just because of dwindling interest in his case.

"All I know is death row," he said. "This is my life. This is where I grew up."

His lawyer sees reasons for him to be concerned about moving off death row.

"He's going to become someone's plaything in the general population," Mr. Dow said. "He's a small guy, and the first time someone tries to kill him they'll probably succeed."

That kind of violence is not the way most lifers die. At Angola, for instance, two prisoners were killed by fellow inmates in the five years ended in 2004. One committed suicide, and two were executed. The other 150 or so died in the usual ways.

The prison operates a hospice to tend to dying prisoners, and it has opened a second cemetery, Point Lookout Two, to accommodate the dead.

On a warm afternoon earlier this year, men in wheelchairs moved slowly around the main open area of the prison hospice. Others lounged in bed.

The private rooms, for terminal patients, are as pleasant as most hospital rooms, though the doors are sturdier. The inmates have televisions, video games, coffeepots and DVD players. One patient watched "Lara Croft: Tomb Raider."

Robert Downs, a 69-year old career bank robber serving a 198-year term as a habitual felon, died in one of those rooms the day before. In his final days, other inmates tended to him, in four-hour shifts, around the clock. They held his hand and eased his passage. "Our responsibility," said Randolph Matthieu, 53, a hospice volunteer, "is so that he doesn't die there by himself. We wash him and clean him if he messes himself. It's a real humbling experience."

Mr. Matthieu is serving a life sentence for killing a man he met at the C'est La Guerre Lounge in Lafayette, La., in 1983.

At Point Lookout Two the next day, there were six mounds of fresh dirt and one deep hole, ready to receive Mr. Downs. Under the piles of dirt were other inmates who had recently died. They were awaiting simple white crosses like the 120 or so nearby. The crosses bear two pieces of information. One is the dead man's name, of course. Instead of the end points of his life, though, his six-digit prison number is stamped below.

The sun was hot, and the gravediggers paused for a rest after their toil.

"I'm hoping I don't come this way," said Charles Vassel, 66, who is serving a life sentence for killing a clerk while robbing a liquor store in Monroe, La., in 1972. "I want to be buried around my family."

The families of prisoners who die at Angola have 30 hours to claim their bodies, and about half do. The rest are buried at Point Lookout Two.

"It's pretty much the only way you leave," said Timothy Bray, 45, also in for life. Mr. Bray, who helped beat a man to death for falling behind in his debts, tends to the horses that pull the hearse on funeral days, placing white and red rosettes in their manes.

Wary of a Transformed World

Not all older lifers are eager to leave prison. Many have grown used to the free food and medical care. They have no skills, they say, and they worry about living in a world that has been radically transformed by technology in the decades that they have been locked up.

Wardens like Mr. Cain say that lifers are docile, mature and helpful.

"Many of the lifers are not habitual felons," he added. "They committed a murder that was a crime of

passion. That inmate is not necessarily hard to manage."

What is needed, he said, is hope, and that is in short supply. "I tell them, 'You never know when you might win the lottery,'" Mr. Cain said. "You never know when you might get a pardon. You never know when they might change the law.'"

Up the road from Point Lookout Two, near the main entrance, is the building that houses the state's death row. Lawyers for the 89 men there are hard at work, trying to overturn their clients' convictions or at least convert their death sentences into life terms. According to the Death Penalty Information Center, eight Louisiana death row inmates have been exonerated in the last three decades. More than 50, prison officials said, have had their sentences commuted to life.

But those hard-won life sentences, when they come, do not always please the prisoners.

"I have to put a lot of these guys on suicide watch when they get off death row," said Cathy Fontenot, an assistant warden, "because their chances have gone down to this."

She put her thumb and forefinger together, making a zero.

No Way Out

Articles in this series examine the swelling population of prisoners who are serving life sentences. Audio with Adam Liptak, additional photographs and a readers' forum are online at

nytimes.com/national.

Photos: Markers at the Louisiana penitentiary cemetery bear only the inmate's name and prison number. (Photo by Richard Patterson for The New York Times)(pg. A1); THE GUNMAN -- Vincent Gutierrez, who was 18 at the time of the crime, was convicted of capital murder for killing Captain Cobo and sentenced to death. (Photo by San Antonio Express-News); THE CRIME -- On March 11, 1997, Vincent Gutierrez and Randy Arroyo abducted Capt. Jose Cobo, planning to steal his Mazda RX-7 for parts. Captain Cobo tried to escape but became tangled in his seat belt. Mr. Gutierrez shot him twice in the back and shoved him onto the shoulder of a highway in San Antonio.; THE VICTIM -- Captain Cobo, 39, was survived by a 17-year-old daughter. He served as the chief of maintenance training at the Inter-American Air Forces Academy in Lackland, Tex. (Photo by San Antonio Express-News); THE LIFER -- Randy Arroyo is serving a life sentence for helping kill Captain Cobo, a crime committed when he was 17. He will become eligible for parole in 2037, when he is 57. He doubts he will ever get out. "This is hopeless," he said. (Photo by Richard Patterson for The New York Times)(pg. A18)

Copyright 2005 The New York Times Company | Privacy Policy | Home | Search | Corrections | Help | Back to Top