

Emil Ekdahl, Pro se
P.O. Box C-79199 #3N67-U
San Quentin, CA. 94974.

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| **EMIL JOSEPH WILHELM EKDAHL, III,** ) | Case No.  C07-03642 SBA |
| ) | |
| Petitioner, ) | |
| ) | **PETITIONER'S TRAVERSE TO THE** |
| ) | **ANSWER TO THE PETITION FOR** |
| **v.** ) | **WRIT OF HABEAS CORPUS, AND** |
| ) | **MEMORANDUM OF POINTS AND** |
| **ROBERT AYERS, Warden,** ) | **AUTHORITIES** |
| ) | |
| Respondent. ) | |
| ) | Judge: The Honorable |
| _____ ) | Saundra B. Armstrong. |

### INTRODUCTION

Emil Ekdahl, III. (Petitioner) is a California prisoner at San Quentin State Prison held in illegal custody and is proceeding pro se in this action.  On July 16, 2007 Petitioner filed a federal petition for writ of habeas corpus. On September 04, 2007 the Honorable Saundra B. Armstrong issued an order to show cause as to why the antecedent mentioned writ should not be granted. On November 05, 2007 Respondent's attorney sent petitioner a copy of the Answer which he received on  November 06, 2007. Petitioner alleges that the Board of Parole Hearings (BPH) has unconstitutionally denied him parole at the July 01, 2007 subsequent parole consideration hearing.  Petitioner has proved that the stated

court decision and BPH decisions denying him relief or parole are contrary to, or are an unreasonable application of Clearly Established Federal law, or that the decision involved an unreasonable determination of the facts; therefore, this petition for federal writ of habeas corpus should be granted.

## TRAVERSE

Petitioner rejoins Respondent's thirty-one paragraphs ███████ contained in the Answer, plus the Memorandum of Points and Authorities, as follows:

Petitioner disagrees with Respondent's Answers except where he expresses that he agree's, alleges, or denies:

(1) Petitioner admits he is in custody of CDCR but questions the legality of that custody. Petitioner admits he has served 23 years of incarceration on a 15 year to life sentence in excess of his minimum term pursuant to California Penal Code § 3041, Normal parole rule, and regulations CCR Title 15 § 2404(c)(C); Which gives a minimum matrix term of 17 years. This is the same as the minimum term referred to in the Iron's, Sass and Biggs cases. The Ninth Circuit Court has held:

> "indefinite detention based solely on an inmate's commitment offense, regardless of the extent of his rehabilitation, will at some point violate due process given the liberty interest that flows from the relevant California statues."

Irons v. Carey, 479 F.3d 658, 665  (9th Cir. 2007).

> "a continued reliance in the future on an unchanging factor,
> the circumstances of the offense and conduct prior to
> imprisonment, runs contrary to the rehabilitative goals
> espoused by the prison system and could result in a due
> process violation."

Biggs V. Terhune, 334 F.3d 910, 916 (9th Cir. 2003)

> "While relying upon petitioner's crime as an indicator of
> dangerousness may be reasonable for some period this case,
> continued reliance on such circumstances--after nearly two
> decades of and half a dozen parole suitability violates due
> process because petitioner's offense has become such an
> unreliable his present and future dangerousness not satisfy
> the "some evidence"

Rosenkrantz v. Marshall, 444 F.Supp.2d 2063 (C.D. Cal. 2006)

(2) Petitioner believes he is innocent pursuant California
Penal Code § 26 (6)(8) where a defendant may be found innocent of
a crime if he participated in that crime under duress unless that
crime be punishable by the death penalty.  It is petitioners bel-
ief that once the trial court lowered the degree of crime from
first-degree to second-degree pursuant to the proportionality
holdings of People v. Dillon, 34 Cal. 3rd. 444 (1983);
the underlining criminal offense no longer was punishable by the
death penalty; therefore, by law, Penal Code § 26(6)(8), petiti-
oner is innocent.  Petitioner under the Duress defense admits to
most of Respondents allegations to the offense with exception to
one fact.  Petitioner denies Respondents allegation that:

"Petitioner or one of his companions shot the victim."
(Id Answer pg. 2 line(s) 21 - 22.)

Petitioner admits Steven Horning shot the victim causing Petitioner to be convicted under two theories; vicarious liability, pursuant to California Penal Code § 31, and the California felony murder rule. Respondent has introduced into evidence a fact that is not contained in any records concerning this offense. Petitioner alleges that the Board's "secret theory" is the source for Respondent's allegations and therefore prays the Court will grant any evidentiary hearing to clear up this most damaging false evidence. (See Evidentiary Motion filed with this Traverse) Petitioner also moves for a Discovery Motion, also filed with this Traverse, to obtain the trial transcripts of co-defendant Mark Horning, and the California Youth Authority (CYA) Parole Hearing Transcripts of co-defendant Steven Horning held in 1987. Petitioner alleges the Board is privy to these transcripts i.e. trial and CYA and that their discovery will prove beyond any doubt Steven shot the victim.

Rule 7, 28 U.S.C.A. foll. § 2254, Advisory Committee Notes (2007)

(3) Petitioner admits to duress and an innocent belief. Petitioner admits he has always and continually expressed sincere remorse for the victim. See the 2005 psychological report Id at pg. 3 XIII "Review of Life Crime" (Ex. C.) Also See Lee at pg.

1414:

> "To deny parole, the reason must relate to a defendant's
> continued unreasonable risk to public safety.  So long as
> [the prisoner] genuinely accepts responsibility, it does not
> matter how longstanding or recent it is.  Justice Felix
> Frankfurter observed, 'Wisdom too often never comes, and so
> one ought not to reject it merely because it comes late.'
> (Henslee v. Union Planters Bank (1949) 335 U.S. 595, 600 [69
> S.Ct. 290, 93 L.Ed. 259](dis. opn. of Frankfurter, Jr.))

In re Lee, 143 Cal.App. 4th 1400, 1414; 49 Cal.Rptr. 3rd 931, 941

(2006)


Petitioner admits he has always strived to overcome his

shortcomings that contributed to the commitment offense such as

attending the therapy group "Assertive Behavior" after the first

parole board panel recommended he take this therapy as a finding

of what petitioner could do in the future to become parole

suitable.


(4) Petitioner admits he periodically drank alcohol and has

been clean and sober since 1986.  Petitioner denies he abused

heroin.  Petitioner admits he experimented with heroin usage six

times, single dose, in 1983, following his common law wife's

pregnancy being terminated for complications.  Petitioner has

never used heroin since 1983.  Petitioner alleges that both

heroin and a type of homemade alcohol can be readily obtained in

prison, but despite the stresses of prison he has consistently

maintained his sobriety. Petitioner admits he has attended the

program of A.A. one to two times a week from 1986 to 2004.
Petitioner is well knowledgeable of the alcohol and drug
abstinate methods of A.A. and still uses these tools to always
maintain his sobriety.  Petitioner only objects to the A.A.
religious principles following his conversion to evolutionism.
See Roderick at pg. 36:

> "Nor is there any evidence that Roderick is at risk of
> returning to alcohol abuse if he were released, after more
> than 20 years of sobriety and more than 12 years of active
> participation in AA. (See Smith, supra, 114 Cal.App. 4th at
> p. 372, 7 Cal.Rptr.3d 655, [if defendant's past use of drugs
> established his unsuitablility for parole, "then the [Board]
> could deny parole for the rest of [the defendant's] life
> based on this immutable factor, without regard to or
> consideration of subsequent circumstances and evidence
> indicating that he has no current desire for drugs and that
> there is little current likelihood of drug relapse..."].)[24]"

In re Roderick, _____ Cal.App.4th _____ 65 Cal.Rptr. 3d. 16, 31
(2007)

    (5)  Petitioner admits to have nine disciplinary violations
over a 23 year period with each disciplinary spaced out about ▶
years in between.  Petitioner denies the eighteen 128 chrono's
are disciplinary, but instead are counseling chrono's. Petitioner
alleges the disciplinary history is only relevant to the extent
that it reflects his current risk of dangerousness to society.
See Martin where the Board had found Martin suitable although he
had numerous serious disciplinary infractions:

"Disciplinary infractions do not negate parole suitability."

Martin v. Marshall, 444 F.Supp.2d 1963 (N.D. 2006).

See also Gray who was found suitable for parole by the Board in spite of having disciplinary and minor 128 chrono's.

In re Gray, 59 Cal.Rptr. 3d 724, 730 (2007).

(6) Petitioner admits he stop attending all religious programs such as Yoga (Buddhism), and 12-steps (Christianity).

(7) Petitioner admits the 2005 psychological evaluation says Petitioner suffers from moderate Major Depressive Disorder and Polysubstance abuse in institutional remission. Petitioner alleges that a reviewing court must look to evidence under the "some evidence" (if it applies) to see if it supports the Boards findings. Here the Board did not use these above mentioned facts to make an unsuitability finding. The Board did use the psychological report as one of its unsuitability findings, but it was for Dr. Lewis's major concern with Petitioner attending the religion of 12 steps A.A.. As was held in the Deluna case:

> "We must confine our review to the stated factors found by
> the Board, and all the evidence presented at the parole
> hearing which is relevant to those findings, not to findings
> that the Attorney General ... suggests the Board might have
> made."

7.

In re Deluna, 126 Cal.App. 4th 585, 593-594 (2005).

The reviewing court could also look to see if the "some evidence" supports a decision that Petitioner would pose an unreasonable risk of danger to society. And not just that there is some evidence that points to a particular fact being true. The some evidence must be about the prisoner's current risk of danger to society pursuant to the statutes and regulations. In a recent decision by the State's Appellate court in the Lee case held:

> "Some evidence of the existence of a particular factor does not necessarily equate to some evidence the parolee's release unreasonable endangers public safety."

In re Lee, 143 Cal.App. 4th 1400, 1408; 49 Cal.Rptr. 3rd 931, 941 (2006).

In re Roderick, ____Cal.App. 4th ____ 65 Cal.Rptr.3d 16, 31 (2007).

Petitioner further alleges that Depression and Addictions are disabilities under the Americans with Disabilities Act (ADA). And this is especially true because Petitioner's depression has affected his daily life which is the qualifying legal definition of what constitutes a disability under the ADA. The Board did not use Petitioner's depression as an unsuitability factor because it would violate the ADA standards, so why should

Respondent be able to substitute her libel that depression somehow makes Petitioner unsuitable for parole ? Petitioner has since taken, as Dr. Lewis PhD had suggested, Serotonin Reuptake Inhibitors (SRI's) medications for his depression and stopped when his depression went away as approved by a psychiatrist. The doctors tell me that in my case, as in others SRI's can induce permanent neuron healing changes and that is why I don't suffer from depression currently.

(See **GOOGLE** search engine for: depression, SRI's, and brain healing of neurons from SRI's).

    (8) Petitioner denies that he did not have any housing or employment plans. Petitioner had a plan to reside at Genesis Residential Center in Seaside.

(Id Ex. A: at pg. 12  line(s) 1-10)

Petitioner had a plan to seek employment in his Certified Vocati-onal Fields of Automotive Repair Technician, and Union Machinist. Petitioner alleges that the CCR Title 15 § 2402 (d)(8); only requires that the inmate make plans for the future, or develop marketable skill that can be put to use upon release. Thus the Board's unsuitability finding here represents an unreasonable application of the facts. Petitioner has met the regulations requirement and has realist residential plans at Alcohol and Drug

9.

Treatment Center.    Petitioner has as the Board noted developed marketable vocational skills in Automotive, Machinist, and Sheet Metal trades that can be put to use upon release. Nowhere does the regulations require employment must be secured as a prerequisite for parole suitability.    The Board's finding here places an unrealistic burden upon inmates to find employment often in advance of a parole process of years suitability hearings.    In Petitioner's case, he has attended 7 parole hearings, beginning in 1991, for a 14 year period.    For a life term inmate to find employment, pre- advance, of an uncertainty of when parole may be granted because the Board, at some point in the future, may find the immutable factors of the commitment offense suddenly suitable is unrealistic.    Petitioner further alleges that not having an employment hiring before being paroled is in itself not a reason to make Petitioner a danger to society. Petitioner's plan to reside in Genesis Center is the same as the Gray case where the Board found Gray suitable for parole with plans to "reside at '"On the Right Road to Recovery,"' a sober living center.."    "Gray noted that if he applied in person, the Salvation Army would provide him with accommodations, but could not hold a bed for him." This is what Genesis Residential Center has told Petitioner.

In re Gray, ____ Cal.App.4th ____ 59 Cal.Rptr.3d 724, 731 (2007).

(9) Petitioner ^admits the Monterey County District Attorney opposed his parole in a letter the District Attorney sent to the Board after he had received his mandatory California Penal Code § 3042 Notice from the Board.  The Board did not send a 3042 Notice to Petitioner's Trial attorney, so no counter evidence from that source was presented.  The District Attorney opposed parole of petitioner on the ground that, "Setting a parole date this time would not adequately punish inmate Ekdahl to protect society."

(Id Ex. A: at pg. 13  line(s) 12-16)

Petitioner alleges that his further incarceration pursuant to California Penal Code § 3041(b) must be because he would pose an unreasonable risk of danger to society.  Petitioner has already served the punishment portion of his offense of 15 year to life; past that point he is presumed suitable unless dangerous.  There is no reasonable possibility that the Districts Attorney's request for "Adequate punishment" somehow makes Petitioner dangerousness.

(10)  Petitioner admits he chose not to be present at his 2005 parole consideration hearing before the Board of Prison Hearings in order to discover what evidence the Board had, and in that regard the Board exposed their secret "theory".

(11)  Petitioner admits the Board found him unsuitable for

parole. Petitioner denies that the reason listed by Respondent are conclusive of all the reasons the Board used to find him unsuitable for parole. Petitioner admits the Board used the following reasons to find him unsuitable:

#1. "The offense was carried out in a cruel callous manner."
(Ex. B: Denial pg. 1 line(s) 11-12)

#2. "Offense was carried out in a dispassionate manner or that the crime was inexplicable and very trivial in relationship to the offense."
(Ex. B: Denial pg. 1 line(s) 14-17)

#3. "There's a (indiscernible) occasion that the inmate actually got worse after the incident, never turned anyone in. This **theory** indicates that maybe he had more participation in the crime than he alleges."
(Ex. B: Denial pg. 1 line(s) 22-26)

#4. "The bigger issue of course is the killing of the victim and there seems to be no reason why the victim had to be killed."
(Ex. B: Denial pg. 1 & 2 line(s) 26 & 1-2)

#5. "Prior programing [AA] has been limited while incarcerated."
(Ex. B: Denial pg. 2 line(s) 8-10)

#6. "He has failed to demonstrate evidence of positive change."
(Ex. B: Denial pg. 2 ine(s) 10-11)

#7. "Misconduct while incarcerated..."
(Ex. B: Denial pg. 2 line(s) 12)

#8. "The psychological report from a Dr. Louis [Lewis] indicates that there are concerns. One of the major concerns that the doctor had was in regards to his **AA. 12-step program.**"
(Ex. B: Denial pg. 2 line(s) 19-20)

#9. "Another reason for the denial is the 3042 response. Inmate has read the letters from the District Attorney's Office from Monterey County indicating their opposition to the inmate's release."
(Ex. B: Denial pg. 3 line(s) 10-14)

12.

#10. "The prisoner continues to need therapy programing and self-help in order (indiscernible) discuss the (indiscernible) cope and stress in a nondestructive manner as well as to gather greater insight into the crime."
(Ex. B: Denial pg. 3 line(s) 15-19)

#11.    "In review of the prisoner's social history and lack of program participation, [AA] there's no occasion that the prisoner should behave differently if paroled."
(Ex. B: Denial pg. 3 line(s) 20-23)

Petitioner will make allegations to each of the above Board's unsuitability Denial Factors except where the Denial Factor has been addressed in the Traverse as Respondent's Answers addressed the issue in another paragraph.    Petitioner alleges that for Denial Factors # 1, 2, and 4; the Board unreasonable found the offense be: "cruel, callous, dispassionate, inexplicable, trivial, and no reason why the victim had to be killed.

Petitioner ask the Court to take judicial notice of the recent Santa Clara County Superior Court case of <u>Criscione</u> where that court found all prisoners appearing before the Board between 2005 - 2007 had their case determined to be " heinous, atrocious, or cruel.    The Superior Court found that the Board switch denial findings for facts materially opposite in prisoners' cases. Petitioner's case is among the statistically sampled lot of Board cases considered by the Santa Clara County Superior Court. See <u>Criscione:</u>

"The evidence proves that in a relevant and statistical significant way where the Board has considered life term offenses in the context of a parole suitability

13.

determination, every such offense has been found to be:
"particularly egregious" or "heinous, atrocious, or cruel."
This evidence conclusively demonstrates that the Board
completely disregards the detailed standards and criteria
of § 2402 (c) "Especially" means particularly, or " to a
distinctly greater extent of degree than is common."
By simple definition the term "especially" as contained in
section 2402 (c)(1) cannot possible apply in 100% of cases,
yet that is precisely how it has been applied by the
Board."

People v. Criscione, Santa Clara County Superior Court H-03204.


The Criscione case like Petitioner's shows that the Board
applies terms like "cruel, callous, dispassionate, inexplicable,
and trivial 100% of the time without individual consideration.

Petitioner's case is most like the analysis of growing
number of California Appellate Court Decisions that were not
available at the time the Monterey County Superior Court denied
Petitioner's writ on August 28, 2006, as follows:


In re Barker, 151 Cal.App.4th 346, 59 Cal.Rptr.3d 746 (2007).

In re Elkins, 144 Cal.App.4th 475, 50 Cal.Rptr.3d 503 (Oct.2006).

In re Gray, 151 Cal.App.4th 379, 59 Cal.Rptr.3d 724 (2007).

Irons v. Carey, 479 F.3d 658, 665 (9th Cir. 2007).

In re Lawrence, 150 Cal.App.4th ____ 59 Cal.Rptr.3d 537

In re Lee, 143 Cal.App. 4th 1400, 1414; 49 Cal.Rptr. 3rd 931, 941
(Oct. 2006)

Martin v. Marshall, 431 F.Supp.2d 1038 (N.D. Cal. 2006)

In re Roderick, ____ Cal.App.4th ____ 65 Cal.Rptr. 3d. 16, (2007)

Rosenkrantz v. Marshall, 444 F.Supp.2d 2063 (C.D. Cal. 2006)

Petitioner begins with the analysis in <u>Gray</u> at pg. 740 where the court noted the <u>Rosenkrantz</u> & <u>Dannenberg</u> cases held that an offense must be "particularly egregious" or "no circumstance of the offense reasonably could be considered more aggravated of violent than the minimum necessary to sustain a conviction for that offense." And in Petitioner's case he is eligible for parole as a first or second degree because of the 23 years of time served. Therefore Petitioner's 2nd degree felony murder that occurred during the get away phase of an armed robbery where the victim was shot by co-defendant Steven Horning cannot be more aggravated, violent, or particularly egregious than is necessary to sustain a conviction for second degree or even first degree by amount of time served.

<u>In re Dannenberg</u>, 34 Cal.App.4th 1061 (2005)

<u>In re Rosenkrantz</u>, 29 Cal.App.4th 616, 683 (2002)

See <u>Gray</u> at pg. 740, quoting from <u>Lee</u>:

> "In In re Lee (2006) 143 Cal.App.4th 1400, 49 Cal.Rptr.3d 931 (Lee), the court explained: "The measure of atrociousness is not general notions of common decency or social norms, for by that yardstick all murders are atrocious (Citation) '" [A]ll second degree murders by definition involve some callousness -- i.e., lack of emotion or sympathy, emotional insensitivity, indifference to the feelings and suffering of others"'. Rather, the inquiry is whether among murders the one committed by [the inmate] was particularly heinous, atrocious or cruel." (Id at p. 1409, 49 Cal.Rptr.3d 931, italics added.)

In re Gray, 151 Cal.App.4th 379, 59 Cal.Rptr.3d 724, 740 (2007).

In Petitioner's offense the Board did not even apply the qualifying modifier of "particularly", or "especially", as the regulations of CCR Title 15 § 2402 (c) (1) require. Instead the Board just used "cruel". Petitioner alleges that his offense the Board unreasonable applied the regulations to the facts because the Board offered little or no reasoning to justify their unsuitability findings. For Example where the Board finds the offense: "The offense was carried out in a cruel and callous manner." The some evidence offered by the Board to prove this fact: "Multiple victims were robbed and one person killed." That is not some evidence that the offense was cruel or callous. See Barker:

> "[6] Finally, as has been recently stated, because the **over-arching** consideration is public safety, the test in reviewing the Board's decision denying parole "is not whether some evidence supports the reasons [the Board] cites for denying parole, but whether some evidence indicates a parolee's release unreasonably endangers public safety [Citations.] Some evidence of the existence of a particular factor does not necessarily equate to some evidence the parolee's release unreasonable endangers public safety." (Lee, supra, 143 Cal.App.4th 1408, 49 Cal.Rptr.3d 931, fn. omitted.)

In re Barker, 151 Cal.App.4th 346, 59 Cal.Rptr.3d 746, 760 (2007).

Multiple victims (2) being robbed is a fact that by itself does not supply the some evidence to prove Petitioner endangers

16.

Case 4:07-cv-03642-SBA    Document 11    Filed 12/03/2007    Page 17 of 87


society if paroled, nor does it supply some evidence the offense was "cruel" or "callous".

Petitioner is convicted of second degree felony murder under the holdings of <u>People v. Dillon</u>, 34 Cal.3rd 444 (1983). Petitioner received the <u>Dillon</u> finding because of immaturity, young age of 18, and lack of malice. The Case most like Petitioners is <u>Elkins</u> where that prisoner was convicted of first degree murder but found suitable for parole. In <u>Elkins</u> the court noted at pg. 518- 519 that like petitioner robbery drew a concurrent determinate term and that <u>Elkins'</u> first degree murder robbery was not cruel. See <u>Elkins</u>:

> "The regulations also propose unsuitablity for offenses against multiple victims (§ 2402, subd. (c)(1)(A)), which did not apply here, and for offenses "carried out in a dispassionate and calculate manner, such as an execution-style murder" (i, subd. (c)(1)(A))."

> "9. We also have no jury instructions from the trial. Thus, while a conviction for first degree murder might ordinarily suggest malice from, perhaps a suddenly formed intent to kill (People v. Saille (1991) 54 Cal.3d 1103, 1114-1115, 2 Cal.Rptr.2d 364, 820 P.2d 588), the killing in this case having occurred during the commission of robbery strongly suggest felony murder instructions that allowed a first degree murder verdict without any finding of malice. (People v. Dillon (1983) 34 Cal.3d 441, 462-465, 475-477 & fn 24, 194 Cal.Rptr. 390, 668 P.2d 697."

<u>In re Elkins</u>, 144 Cal.App.4th 475, 50 Cal.Rptr.3d 503, 518-519 (Oct.2006).

While the Board did find an unsuitablility finding of multiple victims being attacked, and one killed, there was no

malice aforethought; otherwise the Trial Court never would of applied the <u>Dillon</u> proportionality sentence to Petitioner. The other Board claim of "dispassionate matter", also is an unreasonable application, as Petitioners offense is not, as the regulations require an execution style murder. The Board claim of "inexplicable and very trivial in relation to the offense" and the related, "there seems to be no reason why the victim had to be killed."; are an unreasonable application of the facts because the offense was a robbery with the murder committed during the getaway phase of the robbery; therefore the facts of the offense supply the reason. See <u>Roderick</u> at pg. 33 where that court found the killing of drunken midnight brawl no evidence of trivial in significance to other second degree murders like Petitioner's second degree conviction. The <u>Barker</u> court also noted:

> "Regarding the Board's statement that "the motive for the crime was inexplicable or very trivial", as we observed in Scott I, "The Board did not indicate whether it found [Barkers's] motive 'inexplicable' or 'very trivial in relationship to the offense', as it could be both."(Scott I, supra, 119 Cal.App.4th at p. 892, 15 Cal.Rptr.3d 32.) "An 'inexplicable' motive, as we understand it, is one that is unexplained or unintelligible, as where the commitment offense does not appear to be related to the conduct of the victim[s] and has no other discernible purpose. A person whose motive for criminal act cannot be explained or is unintelligible is therefore unusually unpredictable and dangerous." (Id. at p. 893, 15 CalRptr.3rd. 32.)"

<u>In re Barker</u>, 151 Cal.App.4th 346, 59 Cal.Rptr.3d 746, 766-767 (2007).

In re Barker, 151 Cal.App.4th 346, 59 Cal.Rptr.3d 746 (2007).

Petitioner also alleges that in <u>Elkins</u>, the court noted:

"The reliability of the facts of the crime as a predictor for his dangerousness was diminished further by his young age of 18, just barely an adult.  "The susceptibility of juveniles to immature and irresponsible conduct is not as morally reprehensible as that of an adult.' [Citation]" (Ibid) By comparison, Elkins was 19 years old when he offended, and in these proceeding, had served over 25 years and been denied parole until his 10th subsequent Board hearing.

    In a second such case, former Governor Davis had reversed a BPT suitability determination, stressing principally the gravity to the commitment offense. (Martin v. Marshall, supra, 431 F.Supp.2d at pp. 1040-1042.) After first finding no support for the other grounds (id. at pp. 1045-1046), the court turned to the factors surrounding and preceding the offense, which included the 26-year-old petitioner fleeing the scene of his fatally shooting a drug dealer acquaintance and bystander in a blaze of gunfire at a restaurant, wounding yet another bystander, and without seeking medical assistance for any of his victims (ibid.)."

<u>In re Elkins</u>, 144 Cal.App.4th 475, 50 Cal.Rptr.3d 503, 522-523 (Oct.2006).

The <u>Elkins</u> court went on to note that <u>Martin</u> had served 26 years and was past his minimum term for 2nd degree murder.  The <u>Elkins</u> court also noted <u>Irons v. Warden of California State Prison--Solano</u>, (E.D. Cal. 2005) where <u>Irons</u> was only 17 years old at the time of his offense.  Petitioner admits that he was only 18 at the time of his offense his codefendant was 15.  Both of us were given guns by an older brother whose age was 27 years old and told to go do the robbery under duress Petitioner was fearful of his life not only from Mark Horning, but also the fourth

brother Danny Horning who although had left the robbery Petitioner knew he would kill him if Danny found out he had not robbed the store as his brother Mark had threatened him to do so. Danny Horning is now on Death Row for another murder unrelated to this case except as proof of the dangerous level of Danny. See People v. Horning, 34 Cal.4th 871, 891 (2004). Petitioner admits that his age of 18 and his level of immaturity were the primary factors that lead the Trial Court to lower the culpability for a more proportional term pursuant to People v. Dillon, 34 Cal. 3rd. 444 (1983). Petitioner ask the District Court to compare his case to Martin and Elkins noting those crime are more severe in nature than Petitioner's offense; to note the ages of Martin, and Elkins and review the some evidence under the judgement of, the susceptibility of juveniles to immature and irresponsible conduct is not as morally reprehensible as that of an adult, standard from the Elkins case

In re Elkins, 144 Cal.App.4th 475, 50 Cal.Rptr.3d 503, 522-523 (Oct.2006).

See also Barker at pg. 769:

> "[W]e agree with the observation of the federal district court in Rosenkrantz v. Marshall (C.D. Cal. 2006) 444 F.Supp. 2d 1063, that "the general unreliability of predicting violence is exacerbated in [a] case by ....petitioner's young age at the time of the offense [and] the passage [in that case] of nearly twenty years since that offense was committed ...'" (Elkins, supra, at p. 500, 50 Cal.Rptr.3d 503.)

In re Barker, 151 Cal.App.4th 346, 59 Cal.Rptr.3d 746, 769

20.

(2007).

Petitioner's offense occurred in 1981 and he was convicted in 1983 and has served 23 years of incarceration on the offense. See In re Lawrence, 150 Cal.App.4th ____ 59 Cal.Rptr.3d 537, 575 (2007) where Lawrence had 23 years incarceration.

Petitioner denies the unsuitability factor # 5 & # 11; that prior programing has been limited, or "in review of prisoner's social history there's no occasion that the prisoner would behave differently if paroled. Petitioner alleges the Boards own evidence reviewed at the parole hearing belies this claim. The Board noted that Petitioner had completed:

(1) Alcoholics Anonymous [from 1986 to 2004 for 18 years]

(2) Alternatives to Violence Project Workshop [a 3 day seminar]

(3) GED

(4) Chapman College Classes

(5) Patten University Classes.

(6) Certified in Vocational Automotive [4 Certificates]

(7) Certified in Vocational Machinist Trade.

(8) Kirois Men's Retreat [Catholic 3 day extensive seminar]

(Ex. A pg. 9 line(s) 12 - 21.)

Petitioner alleges this is the same amount of programing as

Roderick Id at page 39.


Petitioner also notes that the social history unsuitability finding of the Board the Board offered no evidence to prove the finding. See Roderick:


> "[12] Under section 2402 subdivision (b), the Board is directed to consider the "circumstances of the prisoner's social history" in determining his or her suitability for parole. An "[u]nstable [s]ocial [h]istory," which is defined as "a history of unstable or tumultuous relationships with others," is one circumstance tending to show unsuitability. (§ 2402, subd. (c)(3).)  In its decision, the Panel's only reference to social history is a generalized statement that Roderick's "unstable social history is certainly related to [his] criminal history but also to the abuse of alcohol."  But the Panel cited no facts or circumstances to support its premise that Roderick has an unstable social history (as distinguished from his criminal history) and we see no evidence to bear it out."


In re Roderick, ____ Cal.App.4th ____ 65 Cal.Rptr. 3d. 16, 34 (2007).


(12) Petitioner admits that on August 28, 2006 the Monterey County Superior Court denied petitioner's petition for writ of habeas corpus after ordering an informal response concerning the AA religion claim.  Petitioner alleges that the Monterey County Superior Court Summarily Denial are contrary to, or an unreasonable application of, clearly established federal law, or that the decision involved an unreasonable determination of the facts; therefore, this petition should be granted.

(13) Petitioner admits that the California Court of Appeal summarily denied his petition for writ of habeas corpus which alleged the same grounds for relief as the current federal petition for writ of habeas corpus. This fact took place on October 16, 2006.

(14) Petitioner admits that the California Supreme Court summarily denied his petition for writ of habeas corpus which alleged the same grounds for relief as the current federal petition for writ of habeas corpus. This fact took place on May 16, 2007.

(15) Petitioner denies Respondent's allegations contained in Answer paragraph # 15. Petitioner alleges that <u>Greenholtz's</u> mandatory language of shall and unless formula clearly apply to California's statutory framework in Penal Code § 3041(a)(b) that uses identically language is settled case law and the Ninth Circuit holdings are controlling.

<u>Greenholtz v. Inmates of Nebraska Penal & Correctional Complex</u>, 442 U.S. 1, (1979).
<u>Sass v. California Board of Prison Terms</u>, 461 F.3d 1123, 1128 (9th Cir. 2006).
<u>McQuillon v. Duncan</u>, 334 F.3d 895, 902-903 (9th Cir. 2002)
<u>Martin v. Marshall</u>, 431 F.Supp 2d 1038, 1044 (N.D. Cal. 2006)

Respondent does acknowledge that <u>Sass</u> is dispositive on this issue, but merely makes her allegations to preserve the argument. Petitioner further alleges that he has a federally protected liberty interest in parole under <u>Sandin</u>.

<u>Sandin v. Conner</u>, 515 U.S. 472 (1995).

Petitioner also further alleges that in the <u>Greenholtz's</u> decision the Supreme Court reached its due process qualification not only just on the mandatory language, but also on that which flowed from the Nebraska statutory framework and complementing regulations.    In that regard, Petitioner wants to preserve the argument that the California statutory framework contains mandatory language that differs from the Nebraska's statutory language.    California's Statue contains language such as "Shall normally" and "The release date shall be set in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public,...", thus the relevant California Parole statutes and regulations give federally protected due process rights beyond those contemplated by the Supreme Court in <u>Greenholtz</u>.

<u>Greenholtz v. Inmates of Nebraska Penal & Correctional Complex</u>, 442 U.S. 1, (1979).

(16) Petitioner denies Respondent's allegations contained in Answer paragraph # 16. Petitioner has proved that the stated court decision denying him relief are contrary to, or an unreasonable application of, clearly established federal law, or that the decision involved an unreasonable determination of the facts, therefore this petition should be granted.

Petitioner alleges that the AEDPA is Unconstitutional, as the 14th Amendment, added to the Federal Constitution, in the mid 1860's, Expresses: "No State shall make or enforce any law..."; thereby, placing the Federal Judiciary directly in charge of the States Laws and State Court Jurisdiction of state laws. When the 14th Amendment was passed the Federal District and Federal Circuit Courts were already in existence and thus the 14th Amendment Codified the Federal Courts Authority over state laws. Petitioner brings up this contention to preserve the argument for the United States Supreme Court.

(17) Petitioner denies Respondent's allegations contained in Answer paragraph # 17. Petitioner alleges that the due process standard that is clearly established federal law of the United States Supreme Court is in <u>Santosky v.    Kramer</u>, 455 U.S. 745 (1982) that the federal standard of review of a state administrative decision that materially affects fundamental rights, is **clear and convincing evidence** "when the individual interests at stake in a state proceeding are both 'particularly important' and 'more substantial than mere loss of money'"(citing

Addington v. Texas, 441 U.S. 418). e.g., when the petitioner would otherwise be 'condemned to suffer grievous loss."

Santosky v. Kramer, 455 U.S. 745 (1982)

(18)    Petitioner denies that the Board considered all relevant and reliable evidence, or conducted an individualized assessment of Petitioner's parole suitability. Petitioner admits that the Board did consider illegal evidence i.e. the Board's "Theory" to deny parole. Petitioner alleges that "theorys" do not have any indica of reliability See Jancsek:

Jancsek v. Oregon Bd. Parole 833 F.2d 1389, 1390 (9th Cir. 1987)

(19)  Petitioner admits that the "some evidence" standard from Hill does not apply to review parole hearing evidence.  The United States Supreme Court in Hill clearly established federal law of a "some evidence" standard of evidence review for courts to consider in cases that involve prison disciplinary hearings only.    Thus parole hearings are not the same as prison disciplinary hearings.

Superintendent v. Hill, 472 U.S. 445, 455 (1985).

Petitioner alleges that the  Supreme Court in Greenholtz did not limit a reviewing court in considering evidence from a parole

26.

hearing. In other words the reviewing court can consider parole

hearing evidence de novo.   The two processes due in <u>Greenholtz</u>

(1) "opportunity to be heard" (2) "informs the inmate in what

respects he falls short of qualifying for parole;" which flow

from the relevant Nebraska statutes do not limit a reviewing

court to some minimum review of evidence standard.   Similarly,

the Supreme Court in <u>Greenholtz</u> by stating:


> "Next, we find nothing in the due process concepts as they
> have thus far evolved that require the Parole Board to
> specify the particular "evidence" in the inmate's file or at
> his interview --- To require the parole authority to provide
> a summary of the evidence would tend to convert the process
> into an adversary proceeding and to equate the Board's
> parole-release determination with a guilty determination."

<u>Greenholtz v. Inmates of Nebraska Penal & Correctional Complex</u>,

442 U.S. 1, 15-16 (1979).


The Supreme Court did not limit a reviewing court to a

standard of limited evidence review.   While the federal law may

not require the Board to provide specifics of its evidence, in

California the evidence is supplied pursuant to the statutory and

regulatory framework, (Ca. Penal Code § 3041.5(1)(2)(3)(4)(b)(2))

Thus once the evidence is presented a court is free to review the

evidence de novo because the underlining concept of procedural

due process is to insure that a fair hearing before a neutral

decision maker has taken place. <u>Id</u> <u>Hamdi</u> at pg. 537-538.


<u>Hamdi v. Rumsfeld</u>, U.S. 507, 537-338 (2004)

Inevitable any evidence stemming from a California parole hearing is likely to produce evidence that is in conflict with other evidence and a reviewing court needs some evidence weighing standard to reach a decision that protects the prisoner's due process rights.     Petitioner asks the Court to adopt the "preponderance of the evidence" standard from the Board's regulations CCR Title 15 § 2000 Article 1.(50):

> "A finding by the board based upon a **preponderance of the evidence** that there is a factual basis and good reason for the denial made."

California Code of Regulations,  Title 15 § 2000 Article 1.(50)

Or Petitioner ask the Court to adopt the clearly established federal law of the United States Supreme Court in <u>Santosky v. Kramer</u>, 455 U.S. 745 (1982) that the federal standard of review of a state administrative decision that materially affects fundamental rights, is **clear and convincing evidence** "when the individual interests at stake in a state proceeding are both 'particularly important' and 'more substantial than mere loss of money'"(citing Addington v. Texas, 441 U.S. 418). e.g., when the petitioner would otherwise be 'condemned to suffer grievous loss."

<u>Santosky v. Kramer</u>, 455 U.S. 745 (1982)

Petitioner alleges that he has suffered grievous loss to his liberty interest by the Board and State Courts. Petitioner admits that the California Supreme Court adopted the "some evidence" standard from <u>Hill</u> as it applies to California Constitutional due process claims only.  The California Supreme Court has refused to address the adequacy of the "some evidence" standard to protect a California prisoner's federal due process.  The California Supreme Court noted in the footnote of the <u>Rosenkrantz</u> case:

> "12 Because we conclude as a matter of California law that the "some evidence" standard of review is applicable to judicial review of a Board's decision denying parole, we have no occasion to determine whether the same standard is also mandated under federal constitutional principles. (See McQuillion v. Duncan (9th Cir. 2002) 306 F.3d 895, 901-904.) We note that petitioner does not contend that the federal Constitution imposes a more stringent standard of review than the "some evidence" standard."

<u>In re Rosenkrantz</u>, 29 Cal. 4th 616, 658 (Dec. 2002).

<u>Superintendent v. Hill</u>, 472 U.S. 445, 455 (1985)

Petitioner admits he presented the California Supreme Court the contention that the "some evidence" standard was insufficient to protect his Federal Constitutional Due Process Rights, and the California Supreme Court summarily denied the petition for writ of habeas corpus, thus passing on the occasion to determine the matter. (See ground # 1 (<u>One</u>)) Petitioner alleges that in the absence of State Court ruling in this matter the Ninth Circuit decisions are controlling and those decision do hold that the "some evidence" standard applies to California prisoners parole

denial reviews by a court to determine if the federal due process
rights have been violated.


Sass v. Ca. BPT 461 F.3d 1123, 1128 (9th Cir. 2006).

Biggs v. Terhune, 334 F.3d 910, 915 (9th Cir. 2003).

McQuillon v. Duncan, 306 F.3d 895, 902-903 (9th Cir. 2002).

Willis v. Kane, 465 F.Supp. 2d 1126 (N.D. Cal. 2007).


Because the Ninth Circuit cases are controlling in this
matter Petitioner wishes to preserve the argument.


(20) Petitioner denies Respondent's allegations contained in
Answer paragraph # 20. Petitioner alleges that the Hill court did
mention the phrase: "modicum of evidence" in passing, but the
Hill court definitely established the evidence review standard as
**"some evidence"**, and not the lesser standard of "modicum of
evidence".


Superintendent v. Hill, 472 U.S. 445, 455 (1985)


(21)  Petitioner denies Respondent's allegation that the
Board relied on immutable factors to deny parole, or that the
Board properly considered the gravity of the commitment offense
by applying the statutory and regulatory.  Petitioner alleges
that the Board violated his liberty interest in parole by an

unreasonable determination of the facts in applying the statutory and regulations to the immutable factors of the commitment offense.    Petitioner alleges that    Sass was overruled by the Irons, Court held that continued reliance on immutable factors to deny parole can raise to a federal due process violation if the prisoner has served his minimum term.    Petitioner admits he has served his minimum term of 23 years, plus 6 months precustody credits and 7.5 years postconviction credits pursuant to CCR Title 15 § 2410, for a constructive custody term totalling 31 years.    Petitioner's based term pursuant to CCR Title 15 § 2403 (b)(I) is 17 years; therefore petitioner is 14 years overdue for parole release. See Smith:

In re Ernest Smith, 2007 DJDAR 6217, 6218-6219.

Sass v. Ca. BPT, 461 F.3d 1123, 1128 (9th Cir. 2006).

Irons v. Carey, 478 F.3d 658, 663-665 (9th Cir. 2007).


(22) Petitioner denies Respondent's allegations contained in Answer paragraph # 22.    Respondent is pulling the analogy of a magicians trick called the slight of hand. The magic illusion of where one hand starts moving so that the audience's attention is drawn from the what the other hand is doing.    So in legal analogy argument Respondent wants to misdirect this Courts attention from the A.A. religion issue and have the Court focus on the Board's recommendation that Petitioner "return to self-help".    However Petitioner wishes to return the Courts attention to where the

Board used as one of its denial of parole reasons; the psycholog-
ical report not being totally supportive of parole. The Board's
exact problem with the psychological report was Dr. Lewis's
concern with forcing Petitioner into their A.A. religion.
Petitioner alleges that the Board specifically had great concern
with indoctrinating Petitioner into their religion of 12 steps
i.e. A.A. The Board said:

> "The other reason for the denial at this point in time is
> his institutional behavior. Prior programming has only been
> limited while incarcerated. He has not sufficiently partici-
> pated in the programs." [AA].

Exhibit A Board Denial Decision page 2 line(s) 6 - 9.

Petitioner alleges that in the above paragraph when the Board
says "programs" the Board also means A.A. 12-step religion.
The board continued with this line of denial reasoning with:

> "The Psychological report from a Dr. Louis PhD indicates
> that there are concerns. One of the major concerns that the
> doctor had was in regards to his AA 12-step **program**.

Exhibit A Board Denial Decision page 2 line(s) 19 - 22.

Petitioner alleges that the Board had no other problem with the
psychological report being unsupportive of parole other than
Petitioner's refusal to participate sufficiently in the Board's
religious program of 12-steps A.A. The Board made further denial
findings:

> "However, your therapy as well as **your 12-steps** are very
> important to the Panel as all recommendations are, and the
> fact that you have not followed the recommendations causes
> us great concern."

Exhibit A Board Denial Decision page 4 line(s) 17 - 21.

In the above paragraph, Petitioner alleges that the Board differ-

entiated here between therapy and 12-steps A.A. religion.   When

the Board says "therapy" they mean "return to self-help" as

Respondent has alleged.   When the Board says "your 12-steps" they

mean religion.   Petitioner alleges the Board had great concern

with his failing to sufficiently participate in the Religion of

12-steps.   The Board went even further with this concern when it

reiterated:

> "The reason why we did not go to four years is because of
> the fact that the next three years you will (indiscernible)
> continue your **therapy** and **12 steps** and all the other sugges-
> tions made by previous Panels. The reason for this denial
> also is because multiple victims were robbed and one killed.
> The offense was carried out in a dispassionate and calculat-
> ed manner. It is clear that the (indiscernible) robbery.
> The psychological report **clearly indicates concern in reg-
> ards to inmate's failure to continue in his 12 steps."**

Exhibit A Board Denial Decision page 5 line(s) 15 - 22

Petitioner alleges that the decision of <u>Inouye</u> has ruled A.A. is

a religion, and that it is impermissible for the Board to require

a prisoner to attend this religion as a absolute in order to

obtain a parole release date.   The Board is and was aware of the

Courts decisions against A.A. at the time of Petitioner's July
01, 2005 parole hearing, yet the Board continued to violate
Petitioner's constitutional rights in this regard anyway.  As a
consequence Petitioner has suffered three additional years of
illegal incarceration, and prays the Court orders Petitioner's
release for illegally requiring Petitioner attend the A.A.
religion as  Petitioner will have no other recourse to correct
the violation of his constitutional rights.

Inouye v. Kenna, 2007 WL 2556277 (C.A. 9(Hawai'i)2007).

Turner v. Hickman, 342 F.Supp.2d 887 (E.D. Cal. 2004).

Thompson v. Carey, 2005 WL 3287503 (E.D. Cal. 2005).

Kerr v. Farrey, 95 F.3d 472 (C.A. 7(Wis.) 1996).

Budd v. California, 385 U.S. 909, 911 (U.S. 1966)

     (23)  Petitioner admits the Board did not contact his Trial
Attorney as mandated by California Penal Code § 3042 because the
Board's claim that they were unable to locate the Attorney's
address.  Petitioner alleges that the Board did not have any
difficulty looking up the addresses of the other people mandated
by § 3042 notification requirement, such as the District
Attorney, Trial Judge, or  the Sheriffs Department.  The Board
had to have used reference books to find these addresses.  The
Board has access to the California Bar Directory in order to find
attorneys to represent prisoners ect... Petitioner's Trial

34

Attorney James Newhouse is listed in the California Bar Director of all licensed attorneys to practice law in this state. Petitioner alleges the Board purposely did not contact Mr. Newhouse in order to avoid any positive parole suitability evidence favorable to Petitioners release. The Board predetermined Petitioner's unsuitablity and worked to make favorable evidence disappear in order to carry out the illegal no parole policy. Petitioner admits that the harm caused by this violation of his federal constitutional rights is a grevious loss of his liberty interest.

Petitioner admits the legislative history of this statute is most informing. At one point the California Attorney General issued an Opinion # 64 claim if notice was sent to the prisoner's appointed counsel for the upcoming parole hearing the §3042 notification was satisfied. However the California Legislature amended § 3042 with the specific language definition defining the phrase: "notice to the Trial Attorney" means the Attorney who represented the inmate at the time of trial. The Legislature made it clear to the Board and Attorney General that Penal Code § 3042 meant to send a Notice to the Attorney who represented the prisoner at trail.

Petitioner attempted several times to provide the Board with Trial Attorney James Newhouse 460 Alma Street. Monterey CA. 93940 address, yet the Board still claims it could not send a notice because they didn't know the address.

Petitioner alleges that this was an attempt to keep

35.

evidences that would support Petitioner's Trial Court found true facts of the crime and not the Board's "theory" that maybe he has something more to do with the offense then he alleges. The damage from this Board action resulted in grevious loss to Petitioner's liberty interest in parole.

(24) Petitioner denies Respondent's allegations contained in Answer paragraph # 24. Petitioner alleges that the exact recommendation from the Board was as follows:

> "The prisoner continues to need therapy programing and self-help in order (indiscernible) discuss the (indiscernible) cope and stress in a nondestructive manner as well as to gather greater insight into the crime."
> (Ex. B: Denial pg. 3 line(s) 15-19)

Petitioner alleges that this Board finding is a boilerplate stock phrase used in all parole denials. See Barker:

> "And we are particularly troubled by the mere presence of this finding, which appears to be, yet again, a boilerplate finding that seems to make its way into every denial of parole, whatever the record-and despite repeated criticisms from the courts."

In re Barker, 151 Cal.App. 4th 346; 59 Cal.Rptr. 3d 746, 761 (2007)

Petitioner alleges that is more proof that the Board just cookie-cutter approached his parole denial in order to carry out an illegal no parole policy. See also Roderick at pg 29, Footnote #

36.

14:

> "Ultimately, however, the Panel found, again, that '"the prisoner needs to participate in self-help in order to understand and cope with stress in a non-destructive manner, [14] and concluded that, '"[i]n view of the prisoner's history and his lack of program participation there's no indication that he would behave differently if paroled."'
>
> "14. This stock phrase was used to deny parole to Roderick four times. Apparently it is also used generically across the state. (See e.g., In re Dannenberg (2005) 34 Cal.4th 1061, 1074-1075, 23 Cal.Rptr.3d. 417, 104 P.3d 783 (Dannenberg); In re Rosenkrantz (2002) 29 Cal.4th 616, 633, 128 Cal.Rptr.2d 104, 59 P.3d 174 (Rosenkrantz); In Re Barker (2007) 151 Cal.App.4th 346, 360, 59 Cal.Rptr.3d 746 (Barker); In re Weider (2006) 145 Cal.App.4th 570, 582, 52 Cal.Rptr.3d 147; In re Burns (2006) 136 Cal.App.4th 1318, 1324, 40 Cal.Rptr.3d 1; In re DeLuna (2005) 126 Cal.App.4th 585, 596, 24 Cal.Rptr.3d 643 (DeLuna); In re Scott (2004) 119 Cal.App.4th 871, 883, 15 Cal.Rptr.3d 32 (Scoot I); In re Morrall (2002) 102 Cal.App.4th 280, 303, 125 Cal.Rptr. 2d 391; In re Ramirez (2001) 94 Cal.App.4th 549, 558, 114 Cal.Rptr.2d 381, disapproved on another ground in Dannenberg, supra, 34 Cal.App.4th at pp. 1084-1085, 1100, 23 Cal.Rptr.3d 417, 104 P.3d 783; Biggs v. Terhune (9th Cir.2003) 334 F.3d. 910, 913 (Biggs).) A Westlaw search turned up an additional 25 unpublished Federal District Court cases in which this reason was applied to deny parole."

In re Roderick, _____ Cal.App.4th _____, 65 Cal.Rptr.3d 16, 29 (2007).

(25)   Petitioner denies Respondent's allegations contained in Answer paragraph # 25. Petitioner admits he inadvertently mis-typed the wrong California Penal Code Statute of § 3001 when the correct statute was § 3003. Petitioner alleges the Board's requirement pursuant to § 3003 that he parole to the committing county of Monterey cuts him off from family support and

37.

employment offers in Placer County and that this violates his federal constitutional rights.

(26)   Petitioner denies Respondent's allegations contained in Answer paragraph # 26.

(27)   Petitioner denies Respondent's allegations contained in Answer paragraph # 27.

(28)   Petitioner denies that an illegal sentence can ever be untimely. Petitioner preserves the argument that the AEDPA is un-constitutional.

(29)   Petitioner admits that an evidentiary hearing is necessary to establish:

(A) The factual truth to Respondent's false allegation that "Petitioner or one of his companions shot the victim..."

(B) The source of the Board's "Theory"

(C) The statistically evidence from the Santa Clara County Superior Court case were in 2700 parole hearings (Petitioner's Case is one of the cases in the statistical sampling) the Board found in 100 % of the cases each offense was heinous,

(D) The evidence from the unpublished Coleman case where the District Court Judge found that the Board has been carrying out an illegal no parole policy in violation of life prisoners' rights.

Coleman v. BPT, WL 4629202 Case No. Civ S-96-0783 LKK PAN.

People v. Criscione, Santa Clara County Superior Court H-032048.

(30) Petitioner denies Respondent's allegations contained in Answer paragraph # 30.  Petitioner alleges he has proven his grounds and need for federal petition for writ of habeas corpus relief.

(31) Petitioner denies Respondent's allegations contained in Answer paragraph # 31.  Petitioner alleges he has significantly proved his administrative, constitutional, and statutory rights have been violated by the Board and State Courts.

## CONCLUSION

Petitioner has proven his claims and request that the Court Appoint Counsel, Conduct an Evidentiary Hearing, and Ultimately Order Complete Habeas Corpus Relief in the Form of Release from Incarceration (See Martin case) including Release from all State of California Supervision, or Parole, Another Parole Hearing, or Governor's Review as it is Futile and Unnecessary because of the

Governor's No Parole Policy and this Board's Capitulation to the Governor's Whims / Polices.


Martin v. Marshall, 321 F.Supp. 2d 1038, 1043 (N.D. Cal. 2006).


**VERIFICATION**

I, Emil Ekdahl, declare under the penalty of perjury that I am the same in the above entitled action; I have read the foregoing documents and know the contents thereof; and the same is true of my knowledge, except as to matters stated therein upon information and belief, and as to those matters, I believe they are true.

Executed this _~~11th~~ 29th_ day of _NOVEMBER_ 2007.

_Emil Ekdahl_.

**EMIL JOSEPH WILHELM EKDAHL, III.**

40.

## MEMORANDUM OF POINTS AND AUTHORITIES

### ARGUMENT

### STANDARD OF REVIEW

### I.

**AEDPA**

Title 28 U.S.C. § 2254(a), allows for federal review of "the judgment of a State Court only on the ground that [habeas petitioner] is in Custody in violation of the Constitution or Laws or Treaties of the United States." 28 U.S.C. § 2254(a) (2007). The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) applies to habeas petitions filed after 1996.

Lindh v. Murphy, 521 U.S. 320 (1997).

The current petition for writ of habeas corpus filed by Petitioner is in 2007, and is therefore governed by the AEDPA. Except for preservation of the legal challenge by Petitioner that the AEDPA is in violation of the 14th Amendment. As amended by the AEDPA 28 U.S.C. § 2254(d):

> "An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgement of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State Court proceedings unless the adjudication of the claim:
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States ; or

(2) resulted in a decision that was based on an unreasonable
determination of the facts in light of the evidence presen-
ted in the State court proceeding."

28 U.S.C. § 2254(d)(2007).


## AEDPA's Unconstitutional Status

The Fourteenth Amendment to the United States Constitution
was passed following the end of the Civil War in the late 1860's.
The purpose of the Fourteenth was primarily to prevent the States
from re-establishing the Institution of Slavery.  Otherwise the
Rebel States would through Democratic process of Legislative,
Executive, and Judicial State Government re-pass Morally Reprehe-
nsible Evil Acts, such as Slavery, (liberty) and the Federal Gov-
ernment would be powerless to stop; thereby, making the Civil War
fought in vain.  The Fourteenth Amendment reads as follows:

> "No State shall make or enforce any law which shall abridge
> the privileges or immunities of citizens of the United
> States; nor shall any State deprive any person of life,
> liberty, or property without due process of law; nor deny to
> any person within its jurisdiction the equal protection of
> the laws...". **Amendment XIV.**

United States Federal Constitution Amendment XIV.


The Fourteenth Amendment definition of "States" means the
State of California, and similarly the definition of "jurisdic-
tion" includes the State of California's Judicial Branch of Gove-
rnment's interpretation of the States Laws. When Congress passed
the Fourteenth Amendment the United States already had Federal
District Courts and Federal Circuit Courts. These Federal Courts

were also established by Congress in earlier legislation. The
fact that these Federal Courts were in existence at the time that
Congress amended the Constitution with the Fourteenth proves that
Congress intended for the Fourteenth Amendment to place all
Federal Courts in Jurisdictional Power over State's Laws. Or in
other words, the Fourteenth Amendment Codified the Lower Federal
Courts Powers over the State's Laws.

<u>Irons v. Carey</u>, _____ F.3d. _____ 2007 WL 2027359 (9th Cir. 2007).
Circuit Judge NOONAN, concurring opinion about AEDPA.

**Evidence Review Standard under AEDPA**

    28 U.S.C. 2254(d)(2), allows a Federal Circuit Court to
review all evidence de novo.  Congress intended for a Reviewing
Federal Court to determine if the State Court proceedings are an
unreasonable determination of facts in light of the evidence pre-
sented in the State court proceeding. The Federal Court cannot
reach a determination without examining all the evidence
presented to the State Court thus, the AEDPA overruled the "some
evidence" review standard.

28 U.S.C. § 2254(d)(2007).

**Review of State Court Decisions**

Where there is no reasoned decision from the State's Highest Court to review, a Federal Court "looks through" the silent State Court decision to the "last reasoned opinion" issued in the State's Courts.

Ylst    v.    Nunnemaker,    501    U.S.    797,    803,    805    (1991). Van Lynn v. Farmon, 347 F.3d. 735, 738 (9th Cir. 2003)

In Petitioner's case, the California Supreme Court summarily denied the State petition for habeas corpus on May 16, 2007. And The California Court of Appeals summarily denied Petitioner's State petition for writ of habeas corpus.    Therefore for the Federal District Court to review Petitioner's claims the Court would have to look to the "reasoned opinion" of the Monterey County Superior issued on August 28, 2006. Ylst, 501 U.S. 801-806.    The Federal District Court would look through that decision to determine whether it was contrary to, or involved an unreasonable application of Clearly Established Federal Law, or was based on an unreasonable determination of the facts.

**Adjudicated On The Merits.**

Congress never meant for the phrase "adjudicated on the merits" to apply to summarily denied State petitions for writ of habeas corpus.    Congress never intended for the phrase to apply to Summarily Denied Orders with length Opinions included.    The phrase adjudicated on the merits means a State petition for writ

of habeas corpus that received full adjudication including the Petitioner's right to:

> (1) An Order to Show Cause.
>
> (2) A Reply from the States Attorney General in the form of an Answer as to why the writ should not be granted.
>
> (3) A Reasoned Opinion from the State Court which reviews both sides arguments and applies the holding case laws to issue the correct law.

This would be what Congress intended, as a State Court Opinion adjudicated on the merits. Consequently, the Monterey County Superior Court Summarily Denial with Opinion was not an adjudication upon the merits.

**Procedural Due Process**

Though criminal defendants enjoy a due process right to trial, "[t]he Fifth Amendment does not require a trial-type of hearing in every conceivable case of government impairment of private interest."

Cafeteria & Restaurant Workers Union v. McElroy, 367 U.S. 886 (1961)

In examining questions of procedural due process in adjudicative administrative proceedings the Supreme Court has developed a two-part inquiry:

(1) consideration of the government function involved and
the private interest that has been affected;

(2) assessment of the procedural safeguards necessary to
protect that private interest from unwarranted deprivation.

<u>Cafeteria & Restaurant Workers Union v. McElroy</u>, 367 U.S. 886,

894 (1961).


In the context of administrative adjudications concerning

parole of an indeterminate sentenced prisoner the Supreme Court

established that prisoner's have due process rights in:


<u>Greenholtz v. Nebraska Penal Inmates</u>, 442 U.S. 1, 60 L.Ed.2d.

668, 99 S.Ct.2100 (1979).


The United States Supreme Court in examining these questions

has expanded and overruled earlier decisions in this area at

least in respect to some type of administrative tribunals:


"Because we conclude that due process demands some system
for a citizen detainee to refute his classification, the
proposed "some evidence" standard is inadequate.  Any
process in which the Executive's factual assertions go
wholly unchallenged or are simply presumed correct without
any opportunity for the alleged combatant to demonstrate
otherwise falls constitutionally short.  As the Government
itself has recognized we have utilized the "some evidence"
standard in the past as a standard of review, not as a
standard of proof.  Brief for Respondents 35. That is, it
primarily has been employed by courts in examining an
administrative record developed after an adversarial
proceedings--one with process at least of the sort we today
is constitutionally mandated in the citizen enemy-combatant
setting. See e.g., St. Cyr, supra; Hill, 472 US, at 455-457,
86 L.Ed. 2d 356, 105 S.Ct. 2768.  This standard therefore is
ill suited to the situation in which a habeas petitioner has
received no prior proceedings before any tribunal and had no
prior opportunity to rebut the Executive's factual

assertions before a neutral decision maker."


Hamdi v. Rumsfeld, 542 U.S. 507, 537 (2004)


        The United States Supreme Court has in decisions earlier
than Hamdi has applied the Cafeteria Union's due process analysis
to the context of parole revocation in Morrissey v. Brewer, 408
U.S. 471 (1972).  The Supreme Court determined that "the liberty
of a parolee.. is valuable and must be seen as within the protec-
tion of the Fourteenth Amendment." Id at 482.  The Supreme Court
prescribed "the minimum requirements of due process" for parole
revocation hearings. Id at 488 -489.  The Supreme Court subseque-
ntly established similar, but lesser minimum requirements of pro-
cedural due process for prison disciplinary hearings which might
result in a loss of good time credits, in Wolff v. McDonnell, 418
U.S. 539, 563 - 567 (1974).  In Greenholtz v. Nebraska Penal
Inmates, 442 U.S. 1, 9 - 11 (1979), the Supreme Court distinguis-
hed the due process rights of prisoners in relation to parole
release from the right of prisoners facing parole revocation:


        "That the state holds out the possibility of parole provides
        no more than a mere hope that the benefit will be obtained.
        To that extent the general interest asserted here is no more
        substantial than the inmate's hope that he will not be
        transferred to another prison, a hope which is not protected
        by due process."


Greenholtz v. Nebraska Penal Inmates, 442 U.S. 1, 9 - 11 (1979).

In the decision of  Greenholtz the Supreme Court upheld the due process rights of the prisoner there because the Nebraska parole procedures inherent in that State's statutes, and regulations governing parole provided adequate due process. Id at 442 U.S.  5-6 & 16.  In California the relevant parole statues of Penal Code §§ 3041(a)(b); 3042 §§ ect.., and relevant regulations CCR Title 15 §§ 2400 - 2406 establish due process rights beyond what the Greenholtz Court contemplated.

Greenholtz v. Nebraska Penal Inmates, 442 U.S. 1, 5-6 & 16 (1979).

**PURPOSE OF DUE PROCESS**

The purpose of due process, in a parole hearing, is not just to establish some minimum procedural process due, and have a reviewing court look to see if that minimum requirement was given by the parole authority. In both the Hamdi and Greenholtz decisions, the Supreme Court has established federal law that the purpose of due process in  administrative adjudication, such as a parole hearing, is fundamental fairness before a neutral decision maker to prevent erroneous decisions. The purpose of due process in a parole hearing was first established by the Supreme Court in Greenholtz:

> "The function of legal process, as that concept is embodied in the Constitution, and in the realm of factfinding, is to minimize the risk of erroneous decisions. Because of the broad spectrum of concerns to which the term must apply, flexibility is necessary to gear the process to the particular need; the quantum and quality of the process due in a

particular situation depend upon the need to serve the
   purpose of **minimizing the risk of error.** Mathews v Eldridge,
   424 U.S. 319, 335, 47 L.Ed. 2d. 18, 96 S. Ct. 893 (1976)."

Greenholtz v. Nebraska Penal Inmates, 442 U.S. 1, 13, 60 L.Ed.2d

668, 99 S.Ct. 2100 (1979). (Bold highlighted added).

Hamdi v. Rumsfeld, 542 U.S. 507, 537 (2004).


**Evidentiary Standard of Review**

The evidentiary standard of review for a Federal Court to

review State Laws depends upon the quantum, quality, and assess-

ment of the procedural safeguards necessary to protect that priv-

ate interest from unwarranted deprivation. Or that  resulted in a

decision that was based on an unreasonable determination of the

facts in light of the evidence presented in the State court

proceedings:


"Because of the broad spectrum of concerns to which the term
must apply, flexibility is necessary to gear the process to
the particular need; the quantum and quality of the process
due in a particular situation depend upon the need to serve
the purpose of **minimizing the risk of error.** Mathews v
Eldridge, 424 U.S. 319, 335, 47 L.Ed. 2d. 18, 96 S. Ct. 893
(1976)."


Greenholtz v. Nebraska Penal Inmates, 442 U.S. 1, 13 60 L.Ed.2d.

668, 99 S.Ct. 2100 (1979). (Bold highlighted added).


Also, in examining questions of procedural due process in

adjudicative administrative proceedings the Supreme Court has

developed an inquiry:

(2) assessment of the procedural safeguards necessary to protect that private interest from unwarranted deprivation.

Cafeteria & Restaurant Workers Union v. McElroy, 367 U.S. 886, 894 (1961).


Including the review of evidence under the AEDPA 28 U.S.C. § 2254(d):

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the **evidence presented** in the State court proceeding."

AEDPA 28 U.S.C. § 2254(d).


The Greenholtz Court did establish some minimum procedural process due; although these were mainly derived from the relevant Nebraska State Statues (Greenholtz Id at pg. 14-15) of which California's Statutes seem to provide far more "liberty interest", and thus more procedural process due under the Fourteenth Amendment. The question would become: how much importance to attache to the relevant California parole statues, in order to establish the prisoners' rights to his "liberty interest" in parole freedom The reviewing Court certainly could, by reason of California's more substantial statutory provisions, amplified, or augmented the importance of the allotment, and value, of the California prisoners' due process rights, surpassing the minimum Greenholtz due process standards all while comprehending the exigency of the procedural safeguards necessary to protect that prisoners' due process interest from unfair review by a biased state decision

maker.  But even if a reviewing court accepted the minimum <u>Green-
holtz</u> due process review, the Supreme Court did not limit in any
way the reviewing federal court's ability to re-weigh the eviden-
ce.  <u>Greenholtz</u> does not establish any kind of evidence review
standard to guide any reviewing federal court.    In absence of a
clearly established federal law standard by the Supreme Court,
and given the importance of a California prisoners' liberty inte-
rest in parole the applicable evidence review standard would stem
from the Supreme Courts decision in <u>Santosky</u>.    The Supreme Court
held in <u>Santosky</u> that the federal standard of review of a state
administrative agency decision that materially affects fundame-
ntal rights, is **clear and convincing evidence:**

> "when the individual interests at stake in a state proceed-
> ing are both ' particularly important' and more substantial
> than the mere loss of money'" (citing <u>Addington v. Texas</u>,
> 441 U.S. 418) (#) e.g., when the detriment constitutes
> "a significant deprivation of liberty" or "stigma" or when
> relief is required because the petitioner would otherwise be
> "condemned to suffer grievous loss."(additional citations)
> (#) ."

<u>Santosky v. Kraner</u>, 455 U.S. 745,    (1982)


**The Some Evidence Standard of Evidentiary Review**
The United States Supreme Court established an evidentiary
standard for the revocation of prisoners' good time credits in:


<u>Superintendent v. Hill</u> 472 U.S. 445 (1985).


In <u>Hill</u> the Supreme Court held that the requirements of due

process are satisfied if "some evidence" supports the decision by prison disciplinary board to revoke good time credits." 472 U.S. at 455. "Some evidence" remains the evidentiary standard for a prison disciplinary hearing that would cause revocation of a prisoner's good time credits, See:


Sass v. California BPT, 461 F.3d 1123, 1128 (9th Cir. 2006);

Reynolds v. Williamson, 197 Fed.Appx. 196, 199 (3rd Cir. 2006);

Garcia v. Martinez, 197 Fed.Appx. 490 492 (7th Cir. 2006);

Preble v. Estep, 190 Fed.Appx. 697, 699-700 (10th Cir. 2006);

Louis et al. v. Department of Correctional  Services of Nebraska, 437 F.3d 697, 701 (8th Cir. 2006);

Stiger v. Grayer,  159 Fed.Appx.914, 915 (11th Cir. 2005);

Sira v. Morton, 380 F.3d 57, 69 (2nd Cir. 2004);

McClung v. Shearin, 90 Fed.Appx. 444, 446 (4th Cir. 2004);

Richards v. Dretke, 394 F.3d 291, 293 (5th Cir. 2004);

Sarmiento v. Hamingway, 93 Fed.Appx. 65, 66 (6th Cir. 2004).


The Ninth Circuit adopted the "some evidence" standard for prison parole board's which have denied the prisoner parole in:


Janscek v. Oregon Board of Parole, 833 F.2d 1389 (9th Cir. 1987).


The Ninth Circuit Court of Appeals applied the holdings of Hill while acknowledging the factual differences between a prisoner's liberty interest in parole, and a prisoner's liberty interest in protecting earned good time credits against arbitrary

loss in a disciplinary hearing. See <u>Janscek</u> at 1390:

> "The quantum of evidence necessary to satisfy due process in
> a prison board determination was addressed by the Supreme
> Court in <u>Superintendent v. Hill</u>, 472 U.S. 445, 86 L.Ed.2d.
> 356, 105 S.Ct. 2768 (1985). Though the liberty interest at
> stake there surrounded the accumulation of good-time
> credits, rather than the parole decision which is at issue
> here, both directly affect the duration of the prison term;
> thus, the <u>Hill</u> holding is applicable in this case. The Court
> there concluded that the requirements of due process are
> satisfied if some evidence supports the decision.

<u>Janscek v. Oregon Board of Parole</u>, 833 F.2d 1389, 1390
(9th Cir. 1987).

Recently, in <u>Sass</u> the Ninth Circuit Court of Appeals substa-
ntiated that in the context of a habeas corpus decision that the
"some evidence" standard is Clearly Established Federal Law, for
review of parole board decisions, as determined by the United
States Supreme Court. The Ninth Circuit, in applying the AEDPA
standard, held that where evidence used by a parole board consti-
tuted "some evidence" to support the parole board's decision, a
state court decision confirming the denial of parole suitability
on that basis was not contrary to, nor an unreasonable applica-
tion of Clearly Established Federal Law.

<u>Sass v. California BPT</u>, 461 F.3d 1123, 1128-1129 (9th Cir. 2006).

**LIBERTY INTEREST**

The first step in analyzing a procedural due process claim is to consider:

> "whether there exist a liberty of property interest which has been interfered with by the state."

Sass v. California BPT, 461 F.3d 1123, 1128 (9th Cir. 2006); (Quoting Kentucky Department of Corrections v. Thompson, 490 U.S. 454, 460 (1989)).

The Ninth Circuit Court has held that the California Supreme Court did not "explicitly or implicitly hold that there is no constitutionally protected liberty interest in parole" when it examined the issue and decided In re Dannenberg, 34 Cal.4th 1061 (2005). Sass, 461 F.3d at 1128; accord Rosenkrantz v. Marshall, 444 F.Supp.2d 1063, 1078-1079 (C.D.Cal. 2006); Martin v. Marshall, 431 F.Supp. 2d 1038, 1044 (N.D.Cal. 2006) (finding a liberty interest in parole and citing unpublished United States District Court Opinions from the Eastern and Central Districts of California in accord); Sanchez v. Kane, 444 F.Supp. 2d 1049, 1059 (C.D.Cal. 2006), reversed in part on other grounds; Quinteros v. Hernadez, 419 F.Supp. 2d 1209, 1216 (C.D.Cal. 2006); Cass v. Woodford, 432 F.Supp. 2d 1061, 1072 (S.D.Cal. 2005); Willis v. Kane, 465 F.Supp. 2d 1126 (N.D.Cal. 2007).

Since the California Supreme Court has not provided a conclusive opinion as to whether California's prisoners have a

liberty interest in parole, the Ninth Circuit's own decisions are controlling, and those decisions do hold that a Constitutionally protected Liberty Interest in Parole exist upon the incarceration of a prisoner with an indeterminate sentence in California. See Sass, Biggs, and McQuillon:

Sass v. California BPT, 461 F.3d 1123, 1128 (9th Cir. 2006);
Biggs v. Terhune, 334 F.3d 910, 914-915 (9th Cir. 2003);
McQuillon v. Duncan, 306 F.3d 895, 902-903 (9th Cir. 2002).

Having thus concluded that Petitioner claims the deprivation of a Constitutionally protected Liberty Interest a Court would proceed to examine "whether the procedures attendant upon the deprivation were Constitutionally sufficient."

Sass v. California BPT, 461 F.3d 1123, 1128 (9th Cir. 2006).

Petitioner asks the Court to take Judicial Notice of the recently Certified for Publication case law from the Sixth Appellate District Court In re Dannenberg, # H-030031 (2007) where the court ordered Dannenberg's parole date reinstated because there was no evidence the crime was "especially heinous", and that after 20 years of incarceration the nexus between the crime and the current risk of danger to society no longer existed. Also that the immutable factor of the commitment offense could not be used after 20 years incarceration.

Also the Certified for Publication Second Appellate District

Court case law of <u>In re Montgomery</u>, 2d Civil No. B-192544 (2007).

Petitioner has been incarcerated for 23 years for a crime that is 25 years old.  Petitioner has had 7 parole hearings beginning in 1991 a period of over 16 years.  In that 16 years of parole denials it's always the immutable factor of the commitment offense found arbitrarily by the Board to be "cruel,callous, ect, but after 23 years of incarceration, and rehabilitation this offense does not have the ability to predict Petitioner's future dangerousness.  Petitioner knows in his heart of hearts that he has rehabilitated and pose no danger to society.

Nov. 29th 2007

Emil Ekdahl, pro se

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )
Hearing of: )          CDC Number C-79199
 )
EMIL EKDAHL )
 )          **RECORDS**
 )
_____)          **COPY**

CALIFORNIA STATE PRISON

SAN QUENTIN, CALIFORNIA

JULY 1, 2005

TIME NOT DICTATED

PANEL PRESENT:

Mr. Stephen Lee, Presiding Commissioner
Ms. Noreen Blonien, Deputy Commissioner

OTHERS PRESENT:

Mr. Emil Ekdahl, Inmate (Preliminary Hearing Only)
Mr. Ed Albord, Attorney for Inmate (Preliminary
Hearing Only)

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____ No      See Review of Hearing
_____ Yes     Transcript Memorandum

**Kathryn Kenyon, Peters Shorthand Reporting**

ii

## INDEX

PAGE

Preliminary Hearing.................................... 1

Proceedings........................................... 5

Case Factors.......................................... 6

Pre-Commitment Factors................................ 7

Post-Commitment Factors............................... 8

Parole Plans.......................................... 12

Recess................................................ 14

Decision.............................................. 15

Adjournment........................................... 20

Transcriber Certification............................. 21

--oOo--

1

1       <u>P R E L I M I N A R Y   H E A R I N G</u>

2       **PRESIDING COMMISSIONER LEE:**   Mr. Ekdahl,

3       Jerry, Emil, C-79199.  (Indiscernible) this is a

4       preliminary hearing prior to his actual Board

5       hearing.  And this is necessary because of the

6       information that I have in the file.  At this

7       point in time what I would usually

8       (indiscernible).  My name is Stephen Lee,

9       Commissioner Presiding.  We'll go to my right

10      and when it reaches your turn, sir, please give

11      us your CDC number as well.

12      **DEPUTY COMMISSIONER BLONIEN:**   I'm Noreen

13      Blonien, B-L-O-N-I-E-N.  I'm the Deputy

14      Commissioner.

15      **INMATE EKDAHL:**   Ekdahl, E-K-D-A-H-L, C-

16      79199.

17      **ATTORNEY ALBORD:**   Ed Albord, A-L-B-O-R-

18      D.

19      **PRESIDING COMMISSIONER LEE:**   We are all

20      here because I have a document that indicates

21      that Mr. Ekdahl wishes to waive attorney and

22      waive his presence.  Generally, that is

23      absolutely right.  He can do whatever he chooses

24      to do.  However, I can do so only if he is able

25      to waive his rights.  Counsel, you've had an

26      opportunity to speak with Mr. Ekdahl.  Do you

27      believe that Mr. Ekdahl can waive his rights in

2

1  regards to this hearing and his representation

2  by counsel?

3      ATTORNEY ALBORD:    I read his file.    I

4  attempted to discuss with Mr. Ekdahl and we

5  spoke (indiscernible) and then did not want the

6  participation.    He did convey to me that he

7  wanted to waive (indiscernible).

8      PRESIDING COMMISSIONER LEE:    Mr. Ekdahl,

9  let's talk.    You know your rights.

10     INMATE EKDAHL:    Yes, sir.

11     PRESIDING COMMISSIONER LEE:    That I'm

12 quite sure of.    And my problem is this, is that

13 you're (indiscernible), you had psychotropic

14 medication, you had certain bouts of depression.

15     INMATE EKDAHL:    Okay.    But you seem to

16 be like stereotyping or something there.    I have

17 triple CMS for depression.

18     PRESIDING COMMISSIONER LEE:    Oh, no, no,

19 no.

20     INMATE EKDAHL:    It doesn't make me

21 mentally ill, doesn't mean I'm stupid, doesn't

22 mean I don't know my right, and I ask to waive

23 this parole hearing.

24     PRESIDING COMMISSIONER LEE:    All right

25 (indiscernible).    The law requires me that

26 (indiscernible) EOP.    I can't even allow you to

27 waive (indiscernible), so now you're up to CMS

3

1   so I have to make that determination.  So
2   believe me, I'm not insulting you in any way.
3   In fact, I don't even think -- I wasn't even
4   thinking along those lines (indiscernible). I
5   just wanted to make sure that this was a
6   situation that you were doing it -- of that you
7   are fully understanding of what you were going
8   to do, so I will not violate your rights.  If
9   you wish to waive your hearing, you absolutely
10  have that right to waive your attorney.  I just
11  want to verify on the record that you know what
12  you're doing, that this is (indiscernible).  So
13  at this time, sir, understand that all the
14  reasons (indiscernible) 115 and at this point in
15  time you don't want to sit through this and that
16  you don't want an attorney to represent you; is
17  that correct?
18        **INMATE EKDAHL:**   It isn't because of a
19  115, but, yes, I do want to waive my right --
20  waive my right to attend a hearing.  I want to
21  waive my right to a attorney.
22        **PRESIDING COMMISSIONER LEE:**   Would you
23  like to tell me the reason?  You don't have to.
24        **INMATE EKDAHL:**   I don't think I have to
25  respond to you.
26        **PRESIDING COMMISSIONER LEE:**   No, you
27  don't.

4

1          INMATE EKDAHL:    I've exercised my

2    rights.

3          PRESIDING COMMISSIONER LEE:    You don't

4    want to?

5          INMATE EKDAHL:    I don't want to.

6          PRESIDING COMMISSIONER LEE:    All right.

7    At this point in time I'm going to make a

8    determination that (indiscernible) the ability

9    to waive (indiscernible) to waive that

10   (indiscernible) up.  Counsel, make sure you

11   (indiscernible).

12                          --oOo—

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

5

1              P R O C E E D I N G S

2          DEPUTY COMMISSIONER BLONIEN:    We're on

3    record.

4          PRESIDING COMMISSIONER LEE:    All right.

5    This is the subsequent parole consideration for

6    Emil Ekdahl, E-K-D-A-H-L, CDC Number C-79199.

7    We are currently located at San Quentin State

8    Prison.   The date is June -- no, July the 1st,

9    2005.   Inmate was received on January 16, 1984,

10   out of the County of Monterey, Case Number CR

11   9938.   The offense was murder in the second

12   degree.   The term was set at 15 years to life.

13   Minimum eligibility for parole, June the 7th,

14   1992.   We had a previous hearing and at that

15   particular hearing we determined that Mr.

16   Ekdahl, though he is triple CMS, has voluntarily

17   waived his attorney as well as his presence at

18   this hearing.   Mr. Ekdahl actually appeared

19   before the Commissioners, and we believe that

20   Mr. Ekdahl has the ability to waive his

21   appearance as well as his attorney and he has

22   the ability to represent himself and he did so.

23         DEPUTY COMMISSIONER BLONIEN:    Mr. Lee, I

24   just wanted to point out that we documented that

25   on tape and we have it at the beginning of this

26   hearing.

27         PRESIDING COMMISSIONER LEE:    Okay.

6

1  Thank you.  At this point in time, we found no

2  ADA issues.  We had an attorney speak with Mr.

3  Ekdahl and he indicated that at that point in

4  time as far as he knew that there were no ADA

5  issues.  The purpose of today's hearing was to

6  consider suitability for parole.  Since the

7  inmate has waived his appearance, I don't

8  believe it's necessary at this point in time to

9  go through the procedural aspects of the

10  hearing.  This is not his first hearing.  I

11  believe that he understands what would have

12  occurred during the hearing.  The inmate still

13  has his administrative decision, grievance

14  procedure pursuant to 0401.  At this time

15  (indiscernible) the fact that the inmate is not

16  here, we will go to the facts of the case.  The

17  facts of the case are being taken from the June

18  2005 report.  On this summary, in October 18th,

19  1981, at approximately 10:50 p.m., Soledad

20  relief officers responded to Pete's Shell on

21  South Front Street regarding an armed robbery.

22  Mr. Sandoval was located behind the station face

23  down in a pool of blood.  There was no pulse.

24  Victim's (indiscernible) Sal Montoya stated that

25  two subjects with ski masks entered the store,

26  ordered them to lay on the floor, took $13 from

27  the cash register, and ran from the store.  A

1  short time later, they heard two shots.  Autopsy

2  report indicates that Arthur Sandoval died from

3  gunshot wounds to the head.  Inmate was in fact

4  convicted of this offense and I will now go into

5  his juvenile record.  The report seems to

6  indicate that inmate has no juvenile

7  convictions.  Adult convictions.  Inmate at this

8  time appears to have a 470 forgery from a

9  computer, as well as a grand theft pursuant to

10  Penal Code Section 487 and a criminal conspiracy

11  to Penal Code Section 182.  All these charges

12  were dismissed on November 9th, 1983, by the

13  Sacramento County Municipal Court.  Inmate was

14  arrested for this case on September 17th, 1983.

15  Personal factors.  Inmate was born to parents

16  Emil Ekdahl, Sr., and Norma Christopher on March

17  29th, 1963.  He is an only child born to this

18  relationship.  Ekdahl never knew his father and

19  he was raised by his mother and stepfather,

20  George Christopher, in northern California.  He

21  has two brothers, Jamie and his twin

22  Christopher, and two sisters (indiscernible)

23  Sylvia Montgomery who live in California.

24  Ekdahl attended school until the ninth grade.

25  He later earned a GED.  Ekdahl was

26  (indiscernible) married Darleen Duketar in 1982.

27  He found out later the marriage was not legal

8

1    (indiscernible) common-law relationship, Ekdahl

2    has no children.  Military records indicate

3    Ekdahl served in the United States Army for nine

4    months in 1982 and did not adapt well to

5    military life.  He was granted an early

6    discharge and at the time of his arrest, the

7    inmate had been in for six months as an

8    apprenticeship -- excuse me, as an apprentice

9    for a Sacramento (indiscernible).  At this point

10   in time, I'll turn it over to Deputy

11   Commissioner to speak in regards to the inmate's

12   parole -- excuse me, programming while

13   incarcerated and his psychological reports.

14        **DEPUTY COMMISSIONER BLONIEN:**    This is

15   Mr. Ekdahl's seventh subsequent hearing.  His

16   last appearance before the Board was February

17   27, 2002, and the decision was for a one-year

18   denial.  The Panel recommended that Mr. Ekdahl

19   remain disciplinary-free and participate in

20   self-help and therapy if available.  Mr. Ekdahl

21   is currently a medium A custody level.  His

22   classification score is 19.  In order to do this

23   report, I have read the counselor's report of M.

24   Garcia dated June 2005, the psychiatric report

25   by Dr. L. Francis, F-R-A-N-C-I-S, dated 2/25/03,

26   and the doctor psych report of 2/24/99 by Dr.

27   Les Carr, C-A-R-R, PhD.  I also have done a

9

1    review of Mr. Ekdahl's C file.  Mr. Ekdahl has

2    received five 115s, the last one being on

3    4/29/04 for refusal to report to work.  He has

4    received 18 128s, and since his last hearing

5    he's received five 128s which are included in

6    the 18: July 17, 2003; April 5th, 2004;

7    4/28/2004; June 3rd, 2004; and January 14th,

8    2005 all relating to his failure to report to

9    the work assignment.  Those five 115s

10   culminating -- five 128s culminated with the 115

11   issued on 4/29/04, refusal to report to work.

12   Mr. Ekdahl has been involved in Alcoholics

13   Anonymous, alternatives to violence project

14   workshop, an anger management group.  He's

15   participated in -- he had an 11th grade

16   education, but he got his GED and he has been in

17   the Chapman College in San Quentin College

18   program.  He's received vocational training in

19   auto shop and vocational mechanics, machines,

20   and he attended the (indiscernible) men's

21   retreat held in the year 2000.  On his

22   counselor's summary, he notes that,

23   "Unfortunately, Mr. Ekdahl has been facing

24   severe medical issues which has affected his

25   progress to parole.  Due to the current

26   medication Ekdahl has been receiving, he's been

27   unable to participate in self-help therapy or

10

1  attend his current job at a regular basis.  Mr.

2  Ekdahl does have hepatitis B.  Mr. Ekdahl

3  understands the expectations of the Board and

4  knows his lack of participation will possibly

5  affect his ability to parole."  In terms of the

6  psych report, the doctor -- started with Dr.

7  Carr in 1999 who noted that Mr. Ekdahl does

8  not -- did not -- have at that point any mental

9  health issues and took him out of the triple CMS

10  program.  Mr. Ekdahl has been attempting to

11  change his name, and in May of 2004 he went on a

12  hunger strike for three days when the California

13  Superior Court decided he would not be allowed

14  to change his name.  This was a trigger of

15  depression and he continues to suffer from

16  depression, reports that the Prozac he is taking

17  helps alleviate the symptoms to a great deal.

18  The inmates taking this medication are triple

19  CMS.  So that's why the designation of triple

20  CMS is because of the depression.  Under

21  clinical diagnosis and level of functioning, GAF

22  score Axis I, a diagnosis of major depressive

23  disorder, single episode moderate polysubstance

24  (indiscernible) full sustained institutional

25  remission.  Axis II notes the history of adult

26  antisocial behavior.  Axis III denotes the

27  hepatitis C and current global assessment

11

1   functioning level of 65.  He -- in terms of

2   treatment activities, he attends weekly group

3   therapy, stress management, contact with a case

4   manager every 90 days and contact with a

5   psychiatrist as needed for the depression.  Dr.

6   Bencich, B-E-N-C-I-C-H in his 6/29/04 report

7   notes that Mr. Ekdahl as recent of May 2004 had

8   a refusing to work 115 following a personality

9   conflict with his supervisor.  The discipline

10  therapy action prior to this one was in 1997.

11  He is very proud of his ability to remain free

12  of drugs and alcohol since 1986.  The doctor

13  believes his violence risk potential would be

14  lower than that of the average lifer.

15  (Indiscernible) of control substance is a major

16  risk factor.  Beyond this, it's difficult to

17  know what other factors may provoke violence in

18  this individual since he is not inclined to

19  discuss feelings about the life crime.  Given

20  the fact that Mr. Ekdahl received the 115

21  disciplinary last month, Mr. Ekdahl is both

22  depressed and very pessimistic about the outcome

23  of this upcoming Board hearing.  As a result, he

24  is unmotivated to try to develop any alternative

25  parole plans.  He is confident that he could do

26  so quickly if the future felt more promising.

27  And with that, I'll return to the Chair.

12

1              **PRESIDING COMMISSIONER LEE:**    Prior to

2     Mr. Ekdahl's depression over his last 115, his

3     future plans were as follows.  The file

4     indicates that he is going to reapply for the

5     Genesis Residential Center in Seaside,

6     California, for placement in their drug and

7     alcohol residential program.  He has no response

8     at this time.  Employment, he indicates that he

9     will attempt to find work as a machinist in auto

10    mechanics or sheet metal.  I will now go to the

11    notices.  Notices pursuant to 3042 are notices

12    that are sent out to individuals as well as

13    parties who have special interest in the

14    inmate's case.  In this particular case, we do

15    have a response.  The response is from the

16    District Attorney of Monterey County that is

17    indicated June the 18th, year 2004.  Beginning

18    on the fourth paragraph, the district attorney's

19    letter indicates, "Inmate Ekdahl has always

20    maintained the robbery and the murder was

21    committed under duress from one of the

22    codefendants.  Inmate Ekdahl (indiscernible)

23    duress as one single statement from the crime

24    partner, Mark Horning," H-O-R-N-I-N-G.   "'Get

25    out and go with Steve to do the job or I'll kick

26    your ass.'  This simple statement was apparently

27    the only peer pressure needed to induce inmate

13

1    Ekdahl to commit robbery and murder.   Inmate

2    Ekdahl had never come forward to express remorse

3    or to assist in bringing his accomplices to

4    justice.   Instead he kept his silence long after

5    the killing.   The crime remained unsolved for

6    almost two years before Mark Horning's ex-wife

7    came forward and provided information leading to

8    Ekdahl's arrest.   In those two years, Ekdahl was

9    arrested for new offenses in Sacramento.   He

10   also became addicted to controlled substances.

11   Regardless of progress the inmate has made in

12   prison, the fact remains that an adequate

13   punishment must be met out to admit himself for

14   this crime.   Setting a parole date at this time

15   would not adequately punish inmate Ekdahl to

16   protect society.   Sincerely, Dean Flippo, F-L-I-

17   P-P-O, by Rick Storms, Deputy District Attorney

18   for Monterey County."   At this time I've gone

19   over the parole plans as well as the letters.

20   All right.   The fact that he has no attorney,

21   there are no questions to ask the inmate.   There

22   are no statements, the statements that we have

23   are (indiscernible) district attorney's office.

24   And I indicate there is yet a more recent letter

25   from the district attorney's office.   This

26   letter is written by Michael Greeden, Monterey

27   County Deputy District Attorney, and basically

14

1    the last paragraph corroborates the initial

2    letter that was sent and indicates, "I see that

3    Mr. Ekdahl, when asked to comment upon his crime

4    said, 'I am factually innocent. I don't discuss

5    the case.' He appears to be -- still be a

6    substantial risk to the community. For the

7    above-cited reasons, the Monterey County

8    District Attorney's Office respectfully request

9    that the Board deny parole at this time for Mr.

10   Ekdahl." At this time this hearing is

11   concluded. We will recess, deliberate, and come

12   back with a decision.

13                    R E C E S S

14                    --oOo—

15

16

17

18

19

20

21

22

23

24

25

26

27

# EXHIBIT   A

15

1          CALIFORNIA BOARD OF PAROLE HEARINGS

2                  D E C I S I O N

3    DEPUTY COMMISSIONER BLONIEN:    Okay.  We're back

4    on the record.

5          PRESIDING COMMISSIONER LEE:    The Panel

6    has reviewed all information received from the

7    public and relied on the following circumstances

8    in concluding prisoner is not suitable for

9    parole and would pose an unreasonable risk to

10   danger to society and a threat to public safety

11   if released from prison.  The offense was

12   carried out in a cruel and callous manner.

13   Multiple victims were robbed and one person

14   killed.  Offense was carried out in a

15   dispassionate manner or that the crime was

16   inexplicable and very trivial in relationship to

17   the offense.  Even if we were to take the

18   inmate's (indiscernible) that he was a willing

19   participant in the robbery, but that was based

20   upon that he was threatened, we have an

21   individual who was killed, two other individuals

22   robbed.  There's a (indiscernible) occasion that

23   the inmate actually got worse after the

24   incident, never turned anyone in.  This theory

25   indicates that maybe he had more participation

26   in the crime than he alleges.  The bigger issue,

27   EMIL EKDAHL   C-79199  DECISION PAGE 1   7/1/05

16

1  of course, is the killing of the victim and

2  there seems to be no reason why the victim had

3  to be killed.  This was not a situation where

4  the victim was attempting to fight off the

5  robbers with guns or (indiscernible) anything

6  like that.  The other reason for the denial at

7  this point in time is his institutional

8  behavior.  Prior programming has only been

9  limited while incarcerated.  He has not

10  sufficiently participated in the programs.  He

11  has failed to demonstrate evidence of positive

12  change.  Misconduct while incarcerated include

13  recently a 115, April 29th, year 2004 as well as

14  five recent 128s, starting with chrono 2003

15  which is his last parole date.  He had a 115 on

16  July 2000 -- excuse me, a 128 of July 2003;

17  April of 2004; another one in April 2004; in

18  June 2004 128 and finally a recent January 2005.

19  The psychological report from a Dr. Louis PhD

20  indicates that there are concerns.  One of the

21  major concerns that the doctor had was in

22  regards to his AA 12-step program.  Basically

23  the doctor indicates that under impressions,

24  assessment of (indiscernible) 2003 details a

25  risk and return to dangerousness.  Under Dr.

26  Bencichs, B-E-N-C-I-C-H-S, reports, "If the

27  **EMIL EKDAHL   C-79199   DECISION PAGE 2 · 7/1/05**

17

1   state absolutely asks for drug and alcohol

2   (indiscernible) finds potential compared to

3   average lifer.  However, his capacity

4   (indiscernible) social status were he released

5   is compromised since he is no longer availing

6   himself for (indiscernible) of weekly support of

7   12-step meeting.  This makes it more likely that

8   he will relapse.  (Indiscernible) meeting.

9   Therefore, (indiscernible) he be paroled."

10  Another reason for the denial is the 3042

11  response.  Inmate has read the letters from the

12  District Attorney's Office from Monterey County

13  indicating their opposition to the inmate's

14  release. Remarks.  The Panel makes the

15  following findings.  The prisoner continues to

16  need therapy programming and self-help in order

17  (indiscernible) discuss the (indiscernible) cope

18  and stress in a nondestructive manner as well as

19  to gather greater insight into the crime.  In

20  review of the prisoner's social history and lack

21  of program participation, there's no occasion

22  that the prisoner would behave differently if

23  paroled.  Prisoner should be commended for the

24  fact that he is attempting -- prisoner is

25  commended by the Commission to the fact that he

26  realized that he was unsuitable and has not

27  EMIL EKDAHL  C-79199  DECISION PAGE 3   7/1/05

18

1   attempted to mitigate his numerous violations

2   while incarcerated, and for that reason, we will

3   take that into account during the deliberations

4   regarding the amount of denial.  These factors,

5   however, do not outweigh the factors of

6   unsuitability.  Mr. Ekdahl, I suspect very

7   strongly that you will read this particular

8   transcript and I will address my comments to you

9   directly.  Sir, I know how frustrated you must

10  feel.  It appears that based upon the reports

11  that I have that indicate that you have received

12  a setback in your attempt to be free.  However,

13  I will indicate to you that that is -- that is a

14  sign of how you will react.  In society, once

15  you are released -- I'm glad that you did not

16  come into the hearing to try to excuse your 115s

17  and 128.  The Panel appreciates that.  However,

18  your therapy as well as your 12 steps are very

19  important to the Panel as all recommendations

20  are, and the fact that you have not followed the

21  recommendations causes us great concern.  So in

22  a separate decision, the Panel finds that it is

23  not reasonable to expect that parole will be

24  granted in the next three years.  Though the

25  115s and 128s suggest that you are deteriorating

26  in your programming while incarcerated, I don't,

27  **EMIL EKDAHL   C-79199  DECISION PAGE 4   7/1/05**

19

1   nor does the Deputy Commissioner, feel that five

2   years is warranted in this particular case.    In

3   (indiscernible) excuses, you realize that you

4   have a problem and you realize that you have to

5   put your 115s and 128s as far behind you as

6   possible.   (Indiscernible) argue and suggested

7   that the prisoner needs to look at what 115s and

8   128s in a rear-view mirror that (indiscernible)

9   that they are still a problem.   The reason why

10  we did not go to four years is because of the

11  fact that the next three years you will

12  hopefully get back to your previous ways

13  (indiscernible) continue your therapy and 12

14  steps and all the other suggestions made by

15  previous Panels.   The reason for this denial

16  also is because multiple victims were robbed and

17  one killed.   The offense was carried out in a

18  dispassionate and calculated manner.   It is

19  clear that the (indiscernible) robbery.   The

20  psychological report clearly indicates concern

21  in regards to inmate's failure to continue in

22  his 12 steps.   The prisoner recently has

23  committed a serious disciplinary violation by

24  way of (indiscernible) 115 as well as five 128s

25  since the last hearing of 19 -- excuse me 2003.

26  For these reasons, a longer period of

27  **EMIL EKDAHL   C-79199   DECISION PAGE 5   7/1/05**

20

1   observation and evaluation of the prisoner is

2   required before the Board should find this

3   prisoner suitable for parole.  At this time,

4   Deputy Commissioner, is there anything further?

5   　　　　DEPUTY COMMISSIONER BLONIEN:  Yeah.  I

6   just wanted to say -- advise the inmate to

7   resolve his work issues through the proper

8   channels and work with medical staff to address

9   his medical and psych issues in a positive

10  manner which would allow his progress and to

11  return to his self-help and, again, reiterating

12  to more 115s or 128s and you're back on the road

13  again.  So good luck to you, sir.

14  　　　　PRESIDING COMMISSIONER LEE:   This

15  hearing is adjourned.

16  　　　　　　　　　　--o0o--

17

18

19

20

21

22

23  PAROLE DENIED THREE YEARS

24  THIS DECISION WILL BE FINAL ON: _____

25  YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT

26  DATE, THE DECISION IS MODIFIED.

27  EMIL EKDAHL   C-79199   DECISION PAGE 6   7/1/05

21

CERTIFICATE AND
DECLARATION OF TRANSCRIBER


I, KATHRYN KENYON, a duly designated
transcriber, PETERS SHORTHAND REPORTING, do hereby
declare and certify under penalty of perjury that I
have transcribed tape(s) which total one in number and
cover a total of pages numbered 1 - 20, and which
recording was duly recorded at CALIFORNIA STATE
PRISON, SAN QUENTIN, CALIFORNIA, in the matter of the
SUBSEQUENT PAROLE CONSIDERATION HEARING OF EMIL
EKDAHL, CDC NO. C-79199, ON JULY 1, 2005, and that the
foregoing pages constitute a true, complete, and
accurate transcription of the aforementioned tape to
the best of my ability.

I hereby certify that I am a disinterested
party in the above-mentioned matter and have no
interest in the outcome of the hearing.

Dated JULY 20, 2005, at Sacramento, California.


KATHRYN KENYON
TRANSCRIBER
**PETERS SHORTHAND REPORTING**

# EXHIBIT B

# PSYCHOLOGICAL EVALUATION
# FOR THE BOARD OF PRISON TERMS
# JUNE 2005 LIFER HEARING
# SAN QUENTIN STATE PRISON

## PSYCHOSOCIAL ASSESSMENT

1. <u>Identifying Information:</u>  Emil Ekdahl is a 42-year old Caucasian male who is serving a 15-year to life sentence for the 1981 murder of 17-year old Arthur Sandoval.  For a thorough review of background information see Section X through XI of Dr. Francis' evaluation of February, 2004 and Dr. Carr's evaluation of February, 1999.

This report is based on two, one hour interviews occurring on June 6, 2005 and June 13, 2005.  Also reviewed were the medical records and the Central File including the previous psychological evaluations for the Board of Prison Terms.

## CLINICAL ASSESSMENT

XII.  Current Mental Status and Treatment Needs
    A. <u>Mental Status evaluation:</u>  Mr. Ekdahl presented as an adult male of medium build and stature who was clean shaven with short, dark blonde hair worn in a combed-back style.  His attention to grooming was more than adequate.  He was polite and deferential and made good eye contact through out.  Mr. Ekdahl was consistently engaged and cooperative.  In keeping with impressions in previous evaluations, he presents as reserved but easily discusses his concerns and addresses interviewer questions in depth when encouraged.  Mr. Ekdahl discussed topics of intellectual interest to him and in this sense indicative of a curious and active mind of a man who has endeavored to increase his knowledge base while incarcerated.  His thought processes were logical and coherent with no evidence of psychosis current or within the past year since his last evaluation in July of 2004.  At present he reports significant symptoms of depression including anhedonia and hypersomnia and lack of motivation.  Observably his thinking tends to be negativistic in that his perceived life options are unrealistically restricted. limited to him.  Mr. Ekdahl reports that he became quite depressed after the Prozac he relied on ceased to be effective.  He reports that his depression began two years ago resulting in mental health and anti-depressant medication. He reports that the medication helped him for approximately one year before his depression returned.  He was subsequently prescribed a higher dosage that was only marginally effective.  As of the second interview with Mr. Ekdahl, a medical order was placed for another dose increase of which the therapeutic effects are yet to be known.  Mr. Ekdahl denied suicidal and homicidal ideation or intent.

  At the first interview he appeared markedly depressed and vocalized that he felt like he was "just waiting to die."  He explained that some of his friends at San Quentin have died this year while waiting for parole causing him to feel that he may meet the same fate. Mr. Ekdahl explained that he feels caught between trying to stay positive and work

ekdahl. emil 06/16/05 C-79199

toward parole or to give up and resign himself to living the rest of his life in prison. He is pessimistic about his chances for release and questions whether he should continue to make meaningful efforts in this direction. At our second interview, Mr. Ekdahl appeared more energized and upbeat. He still expressed pessimism but was significantly more able to consider that though his chances to parole were not as great as he would like, it was still worth his efforts to meet Parole Board concerns for the possibility of release. Mr. Ekdahl explained that the improvement in his mood since the first meeting, one week before resulted from a physical work several hours prior to the interview. He was able to consider that regular physical exercise could help alleviate some of his depressive symptoms, improving his overall mood. He agreed that physical exercise was worthwhile to incorporate into his daily routine. Mr. Ekdahl does not want to attend work, citing fatigue and lack of energy have greatly reduced his ability to motivate himself. He speculated that both his depression and Hepatitis C status impact his capacity to work. As far as formal activities self enhancement activities he has attended vocational sheet metal training for 6 months while also attending college classes. Mr. Ekdahl has limited the amount of college courses he takes per semester to one to two because of his diminished energy levels for activities.

Mr. Ekdahl is no longer attending therapeutic group activities. He recently dropped a yoga class that he had attended briefly and no longer attends his many year, weekly 12-step meetings. He ceased to go one year ago. Mr. Ekdahl explained that he no longer attends 12 step groups because he objects to the Christian religious overtones in the program. Nevertheless, he strongly asserts that he has no desire to return to alcohol and drugs and that he feels as committed as ever to maintaining his clean and sober status. He added that, were he released, he would continue to remain drug and alcohol free because he has no desire to return to his previous active addiction lifestyle. His insight and judgment were within normal limits with chronic depression an influencing factor of mild to moderate degree.

B.  Clinical Diagnosis and Level of Functioning/Diagnostic Impressions:

Axis I:   296.32   Major Depressive Disorder, recurrent, moderate
          304.80   Polysubstance Dependence, in full sustained institutional remission
Axis II:  V71.01   History of Adult Antisocial Behavior
Axis III:          Hepatitis C, Back Problems, Allergies r/o Benign Tumor, r/o Seizure Disorder
Axis IV:           Stressors: Incarceration with Life Term and Health Problems

Axis V:            Global Assessment of Functioning (GAF) = 60

C.  Current Level of Care:  CCCMS Program
D.  Treatment Activities:  Contact with Social Worker every 90 days
                           Contact with Psychiatrist on as needed basis
E.  Medications:  Prozac

2

ekdahl, emil  06/16/05 C-79199

F. Prognosis: Guarded: Monitoring important to track depressive symptoms. Mr. Ekdahl could benefit from regular exercise, returning to self-enhancing group activities, especially 12 step meetings and regular individual counseling for his depression..

XIII:  Review of Life Crime:
    A.  Inmates view of offense and attitude toward victim; assessment of causative factors: Mr. Ekdahl refused to discuss the crime event stating that he has "already been through that before and there is nothing more to say about it." When asked how he felt about his involvement in the homicide he briefly became quite emotional and expressive for him ████████████████████████████████████████████████████ ."

    B.  Relevance of mental condition to life crime/criminal behavior. In keeping with the psychological evaluation of June 29, 2004 by Dr. Zak Benicich, at the time of the life crime is appears that Mr. Ekdahl had significant emotional difficulties from a difficult childhood. He had a harsh and restrictive stepfather while his family frequently relocated. At the same time, Mr. Ekdahl's mother did not protect him from the hurtful and overbearing step-father; a failure in parenting function on her part. The cumulative effects of these experiences probably engendered a low estimate of his self worth and the inclination toward over-submissiveness and compliance to intimidating and dominant others. At the time of the life crime it appears that the young Mr. Ekdahl complied with the apparent "ringleader's" deadly plan to commit armed robbery that killed the 17-year old victim. At the time of the commitment offense, Mr. Ekdahl's capacity to form reasoned judgment and to make good decisions were likely trumped by the psychological liabilities referenced above. In addition to unhealthy conforming tendencies and compromised self worth as causative factors in the life crime, he was also abusing drugs and alcohol on a regular basis.  The routine abuse of mood altering substances may indicate that he suffered a mood disorder, likely depression that caused him to self-medicate to control for his dysphoric affect Mr. Ekdahl's than active addiction is one contributing factor to the life crime because the regular intake of substances tends to increase vulnerability to behave in ways they would not if they were abstinent.
    C.  Inmate's level of insight and remorse/empathy. Since Mr. Ekdahl refused to discuss the life crime in any detail it is difficult to fully ascertain the quality of his thoughts and feelings about participating in the homicide death of the victim. However, he was able to express brief but apparently genuine regret when pressed by this examiner (previously detailed in Section XIII. A.)

XIV:  Assessment of Dangerousness:
    A.  Within controlled setting:  At the time of the 2004 evaluation by Dr. Benicich, Mr. Ekdahl had eight disciplinary actions consisting of fighting and refusing to perform assigned tasks. As well he had several actions involving the possession and use of alcohol. He since has acquired another disciplinary action pertaining to work refusal. However, he was able to remain discipline free from 1997 to 2004 suggesting that he is capable of sustaining significant time without engaging in behaviors that can get him in trouble with prison authority. He has been drug and alcohol free since 1986. However,

3

ekdahl, emil 06/16/05 C-79199

within the last year he has ceased to attend 12 step meetings for his addiction issues. Yet within the controlled setting of prison he has been able to sustain his sobriety and drug free status despite the absence of 12 step support.

    B. <u>If released to the outside community:</u> Dr. Francis' assessment of February 25, 2003 details Mr. Ekdahl's risks and deterrents to dangerousness. Per Dr. Benicichs' report, his sustained abstinence from drugs and alcohol lowers his violence potential compared to the average lifer. However, his capacity to sustain his clean and sober status were he released is compromised since he is no longer availing himself of the weekly support of 12 step meetings. This makes it more likely that he will relapse than persons who regularly attend meetings. Therefore this is a risk factor were he paroled.

    C. <u>Significant risk factors/precursors to violence:</u> No doubt since he has ceased to avail himself of the maintenance support of 12 step meetings, this is a risk factor because he is more likely to relapse. Because he does not elaborate on the life crime and his view of his life crime it is difficult to accurately ascertain other possible factors that may make him at risk to the community. Although, he was able to briefly express apparent sincere regret for what he had done lowering the propensity to violence to some degree.

XV. <u>Clinician Observations/Comments/Recommendation:</u> Parole plans consist of prisoner advocating for release to Board of Prisons half-way house in the community at his hearing. This plan may have limited viability because, according to Mr. Ekdahl, the Board is less likely to make this placement for someone of his criminal status. His parole plans seem to rely on the Board making an exception in Mr. Ekdahl's case. Relying on the possibility that the Board will have to make an exception in his case is a gamble, however Mr. Ekdahl feels that his options are limited because has been unable since last year, to qualify for a residential drug rehabilitation program placement that could take him in were he released. As well he no longer has living relatives in Monterey County where he will be released and unable to move outside of its borders. As an alternative plan he intends to petition to be released to a neighboring county where he has a sister however, their relationship has been conflictual, making this plan less likely to provide him with the quality and consistency of family support and community that he needs in place to militate against the stressors he will likely experience living in society after so many years in prison. Mr. Ekdahl has dropped off his group activities including yoga and 12-step meetings since his last hearing. This appears to largely result from a recurrence of major depression in the last couple of years. Mr. Ekdahl, in my opinion, derives essential benefits from participating in group activities because of his depression and the tendency to isolate himself from others. Lack of meaningful contact with others and community is contra-indicated for persons who are depressed since social contact is a buffer against loneliness and unrealistic and negative thinking typical of this disorder.. Mr. Ekdahl needs to be more proactive in participating in goal oriented structured social activities by returning to 12 step meetings. Mr. Ekdahl is also aware that regular physical activity will significantly improve his mood states and provide him real relief. But because of the depression he also lacks the energy and motivation to sustain this on his own. He would best benefit from the structure of a yoga class or any other routinized physical activities group because the structure will enable him to sustain continuity.. It must be noted that Mr. Ekdahl struggles with health issues, most especially Hepatitis C and back problems. These health problems likely contribute to his depression both

ekdahl, emil  06/16/05 C-79199

psychologically and physiologically.  The physical effects from his illness most likely
contribute to a lack of energy and poor motivation.  Mr. Ekdahl, as of the date of this
report, is in line to receive an increase in his Prozac dosage which should help his
depression somewhat.  However, in this examiner's judgment, he needs a more
comprehensive treatment approach than just medications and a few group activities.
Studies indicate that the most effective treatment for depression involves simultaneous
psychotherapy and anti-depressant medications.  If possible Mr. Ekdahl would likely
greatly benefit from the addition of regular one-to-one counseling sessions; most
optimally on a weekly basis.  The additional factor of counseling would be the most
effective and expeditious avenue to treating his depression.  He is also a very good
candidate for talk therapy.  Mr. Ekdahl asserts with the confidence of an individual who
knows his capacities and limitations that were he to be released at this time, and had to
make his way without support and limited resources he would succeed by relying on his
survival skills and vocational training background.  This is probably true, however the
question of his capacity to maintain his drug and alcohol free status over time is
diminished by not attending 12 step support groups, making him more of a risk for
relapse and increase in his risk for violence than he was at the time of his last hearing.
Mr. Ekdahl must resume attendance of 12 step meetings before consideration for parole
since his risk factors have increased since last year.  Were he to resume his former drug
and alcohol support groups and receive adequate treatment for his depression, this
examiner believes that Mr. Ekdahl would be a viable candidate for Parole release.

*Elizabeth R. Lewis, PhD*

Elizabeth R. lewis, Ph.D.
Contract Psychologist
San Quentin State Prison

5

# EXHIBIT C