

Emil Ekdahl, Pro se
P.O. Box C-79199 #3N67-U
San Quentin, CA. 94974.


IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION




|  |  |
|---|---|
| EMIL JOSEPH WILHELM EKDAHL, III, ) | Case No.  C07-03642 SBA |
| Petitioner, ) | |
| ) | MOTION FOR PERMISSION To EXPAND |
| v. ) | THE RECORD AND JUDICIAL |
| ) | NOTICE |
| ROBERT AYERS, Warden, ) | |
| ) | Judge: The Honorable |
| Respondent. ) | Saundra B. Armstrong. |


Petitioner motions the Court to Expand the record to include the two attached Exhibits and Respectfully asks the Court to take Judicial Notice of the information contained in the Exhibits.

The first Exhibit - **A:** is an Yahoo Internet download about the California Board of Prison Hearings Commissioners.

The Exhibit - **A:** Yahoo Internet download titled:

**"Parole board members feel pressure**

**Those asked to resign deny they're soft on crime."**


Is proof of an illegal no parole policy as claimed in Petitioners Traverse, and petition for writ of habeas corpus.

Apparently, two of the Commissioners have been forced to

resign behind pressure from the victims rights groups.

The problem with this kind of pressure is, it's proof of an illegal no parole policy in effect by the California Governor Schwarzenegger.

Due Process of Law in California Penal Code § 3041 (a)(b) requires a parole date to be fixed unless the prisoner poses a current risk to public safety.

The second Exhibit - **B:** is a California Appellate Court Un-published Decision from the Court Appellate District:

In re Staben, _____ Cal.App._____ Unpub. LEXIS 9002 #E041712 (2007)

While Petitioner admits unpublished decisions are not citable case law; nevertheless Petitioner asks the Court to take Judicial Notice of the Staben case because it is informative of the very same arguments raised in Petitioner's Traverse and petition for writ of habeas corpus.

In the Staben case, the court is talking about two Second degree murders of a pregnant mother and her eight-month fetus killed from a shot gun blast. (Id p. 3) The Staben court went on to find that these murders were not especially heinous, atrocious, or cruel. (Id p. 8) In Petitioner's case the Board found a single Second degree murder committed while in flight from a robbery some 1500 yards away, and the victim was shot once by a co-defendant. Without the Second degree felony murder court created (Petitioner's sentence can not be found in the California Penal Code or any other legislative enactment.) sentence

Petitioner's case could met with the Staben courts quote:

> "Second degree murder is a killing committed with malice, express or implied, but without the mental state of willful, deliberate premeditation. (§§ 188, 189.) Malice [*18] is implied if "no considerable provocation appears" ) § 188; cf. § 192, subd. (a)--voluntary manslaughter) or the circumstances of the killing "show an abandoned and malignant heart." [21] (§ 188.) The latter, in turn, requires ""an intentional act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows his conduct endangers the life of another and who acts with conscious disregard for life."" [Citation]" (People v. Robertson 34 Cal. 4th 156, 164 (2004)"

(Id p. 8)

Petitioner's case is not any more cruel than most of the recent published cases from the California Courts. Instead the Staben cases shows like most other published BPH cases is the Board finds all "lifers" offense to be especially heinous, atrocious, or cruel. This is proof the Board and Governor have an illegal no parole policy in effect at the time of Petitioner's Parole hearing.

The Staben case also went on to talk about a "review of published cases and a regular stream of petitions for habeas corpus complaining about parole denial makes it clear the Board almost always relies on the "exceptional" nature of the offense as a basis --often the only basis--for denying parole." The court further noted that "[W]e are not the first court to criticize an overly broad reliance on this factor." (Id p. 9)

The Staben case also noted the regulations meaning concerning California Penal Code § 3003 where the Board similarly to Petitioner's case refuses to let Petitioner parole to another

county then Monterey which is the reason for Petitioner's claim that Penal Code § 3003 is unconstitutional. (<u>Id</u> p. 11) the <u>Staben</u> court ordered <u>Staben</u> to have a new parole hearing. (<u>Id</u> p. 14)

Dated: December 17, 2007.

Respectfully Submitted,

*Emil Ekdahl*

Emil Ekdahl, pro se ....

Exhibit

A



Homes
IRS
JAIMECO
JOHANNA
JOY
JetBlue
Kelly
LAMB
LIFERRELEASE
Lane Bryant
LindaD
MCDONALDS
MCI
Macys
Matt Gray
Nextel
OLD FOLSOM
OnlyConstructio...
Orbitz
PCI
Parole hearing ...
RELOCATION
Ready4WorkReent...
Roderick
Roz
SAN QUENTIN
SUBWAY
SallieMae
San Quentin Gals
Sears
Southwest Airlines
SportyD
Sprint with Nextel
Steve Harvey
SuperBowl
THREE STRIKES
Townhomes on At...
Travelocity
USPS
Union Supply Co.
Verizon
Wheel Of Fortune
audrey
barnesandnoble.com
charter
giftbasket
mom
monesha

appointments secretary in Schwarzenegger's office, told her the governor would like her resignation from the board.

"I said, 'Why, what have I done?' And his response was that I hadn't done anything, just the governor wanted to go in a different direction," she said.

Harris-Ritter said she was stunned.

"He said, 'You're forbidden,' that was the specific word he used — 'you're forbidden to tell anyone about this phone call, you're forbidden to attend the board meeting next week, and we need to know if you're going to resign or be terminated.' "

Given that ultimatum, Harris-Ritter felt she had no choice but to resign. But she said she never agreed to keep quiet.

Schwarzenegger's office confirmed last week that the governor asked Harris-Ritter to resign, but declined to give a reason.

She tried to figure out the reason she was let go, and the only thing that made sense, she said, was that a few months earlier she'd seen a Web site criticizing her for granting "too many" paroles to prisoners with life sentences.

In the three months she served, Harris-Ritter says she gave only 12 parole grants out of approximately 300 life cases — about four percent.

"I didn't find a public safety reason not to grant them parole and so I followed the law and I granted it," she said.

To the Doris Tate Crime Victims Bureau, 12 was far too many.

"We were concerned with her performance on the board," said Christine Ward, executive director of the nonprofit group that had posted the criticism.

Although Ward said the group doesn't oppose parole in principle for all lifers, the exceptions are few and very far between.

"Her numbers were extraordinarily high," Ward said. "And that concerned us."

Harris-Ritter said that surprised her.

"There was a lot ... On this particular victims' group Web site that people should write to the governor and demand that this liberal parole board be removed," she said. "I've never been called liberal in my life."

A lifelong Republican, Harris-Ritter said she is especially conservative when it comes to public safety.

"I am not someone who would be considered pro-parole," she

"You're dealing with murder," she said. "And if there is any glimmer of hope and humanity ... then yes, I love that. It didn't happen a lot, but when it happened it was a good feeling. So I made that statement and I would say it again. But apparently it was very unpalatable during the election cycle."

Harris-Ritter wrote a letter about her own dismissal to the state Senate Rules Committee last spring.

Around that time, Sen. Jeff Denham, R-Merced, had sent out a news release criticizing the "early release of inmates" under the SchwarzeneggerÂ☐appointed board. Harris-Ritter says that phrase is inaccurate.

"I wanted to point out to the members of Rules that when someone gets a parole date and is paroled, it's not 'early release,'" she said. "That's the way the law is written â€" when you come up for your parole date, you shall be paroled unless there's a public safety issue that would trump that and would overrule it."

That's a point that a Santa Clara County judge took to heart recently when she issued a strongly worded ruling aimed at overhauling the Board of Parole Hearings.

"Something is certainly wrong" with the parole board, Superior Court Judge Linda Condron wrote when she ordered the "malfunctioning" board to come up with clear criteria for denying parole to lifer inmates.

In all of nearly 3,000 cases reviewed by the court, the board's reasons for denying parole to convicted murderers, Condron said, are "vague and all inclusive and thus truly meaningless. "

Condron found that the board was ignoring previous Supreme Court rulings in which the board was found at fault for using overly-broad interpretations of the nature of the original offense for denying parole.

Several federal courts have held that unless public safety can be shown to be at specific risk, lifer inmates should be allowed to be paroled when their minimum release date comes up â€" for example, after 25 years on a 25-to-life sentence.

The problem came when the board, in every one of the thousands of cases examined by Condron's court, cited "the nature of the crime" as its reason for denying parole, calling each murder "especially heinous, atrocious or cruel."

"The board has continued to deny countless paroles, labeling the crime 'callous' without ever suggesting what crime would not qualify as 'callous,'" Condron wrote.

Such terms are "unconstitutionally vague," the judge ruled. Other states, she wrote, have come up with much more specific language to distinguish between parole-eligible crimes and those

paroleinfo

photos

rentals

weightwatchers

Search Shortcuts

My Photos

My Attachments

 Save $.65 on
Frozen Veggies

 Online Degree
Programs

 Why refi is hot:
5.9% 30-yr.*

How to become a
teacher, lawyer

said. "I am pro-due process. I believe that we need to follow and
implement the laws that we have appropriately, and if we don't like
the law, then we need to make concerted efforts to change it."

Mike Reynolds, known as the "godfather of Three Strikes" for the
tougher sentencing law he pushed through in 1994, would agree
on that last point.

At a rally last month outside the two state prisons in Soledad, he
said life without parole or the death penalty for murderers would
be far more fitting than expecting victims' families to endure the
pain of attending parole hearings every two to five years, usually
at their own expense.

Harriet Salarno, chairwoman of the advocacy group Crime Victims
United of California, also attended the rally and criticized
Schwarzenegger for allowing some convicted murderers to be
paroled.

"It's shameful that victims and their families are re-victimized by
his parole policies," Salarno said.

The rally was held to lend moral support to a mother who that
afternoon attended the fourth parole hearing of her daughter's
killer at the Correctional Training Facility.

While that man was once more denied, he is scheduled to come
back before the board in four years.

**Others asked to leave**

Harris-Ritter is not the only parole board member who was asked
to leave her post. Tracey St. Julien, also of Sacramento, blames
politics for her dismissal.

Appointed by Schwarzenegger in July 2005, St. Julien served on
the board and was a few weeks away from her official Senate
confirmation. But before that could happen, she was asked to step
down.

The reason, she said, was that between hearings at the
Correctional Training Facility in Soledad a conferencing
microphone was accidentally left on.

Some district attorneys overheard her casually telling an inmate's
lawyer she "loved" giving parole grants. Riverside County
prosecutors complained about it in a letter to the board's executive
director, while a state group of district attorneys wrote to the
governor, St. Julien said.

St. Julien, who said she gave very few grants, defends her
eavesdropped statement.

that truly represent a danger to public safety.

"The system is malfunctioning and must be repaired," she wrote in the Aug. 30 ruling. "The board must make efforts to comply with due process."

Harris-Ritter said she also had a hard time interpreting the board's criteria when she served as a commissioner.

"It is really a subjective thing whether the crime is horrible enough to fit the criteria," she said. "They're just saying every single case is horrific and that's not possible."

Gov. Schwarzenegger has used the same criteria when he overruled many of the rare board decisions in favor of parole, something he's done hundreds of times since he took office.

"It's my personal opinion that it's overused by the governor's office, but I also feel that if you're the victim, or your next of kin is the victim of a crime, it doesn't matter what the circumstances are. It's horrific to you," Harris-Ritter said. "That's a really tough place the court has put people in, making a decision about 'Well, this was a really horrible crime and this was just a regular murder.'"

An appeals court is reviewing Condron's order to the Board of Parole Hearings to come up with clearer definitions and better training within 90 days. The state Attorney General's Office is scheduled to present its opening brief Nov. 13.

If upheld, Condron's ruling could mean that many of the 3,000 lifers who come up for review each year might seek new hearings.

Meanwhile, the Senate Rules Committee, headed by Senate President Pro Tem Don Perata, D-Oakland, is looking into other complaints about parole board practices.

Harris-Ritter said she is not all that confident things will change soon â€" not as long as politicians are calling the shots.

"It appears," she said, "that there is a lot of pressure on the governor."

Julia Reynolds can be reached at 648-1187 or jreynolds@montereyherald.com.

Share your thoughts To express your views about the state's Board of Parole Hearings, contact Governor Arnold Schwarzenegger: Phone: 916-445-2841 Fax: 916-445-4633 Address: State Capitol Building Sacramento 95814

http://www.monterey herald.com/ ci_7124743? source=email

Prison Talk > U.S. REGIONAL FORUMS > CALIFORNIA > California News & Events

**How Bad our Parole Board Really is.**

User Name    User Name    Remember Me?

Password          Log in

Register    FAQ    Members List    Calendar    Arcade    Chat Room [5]

**California News & Events** Do you have news relating to California's Prison System and related efforts? Post them here!

Page 1 of 7    1 2 3

Thread Tools    Display Modes

07-06-2007, 10:50 PM    #1

**Morris1**
Registered User

Join Date: Jul 2006
Location: Lake Elsinore, CA
Posts: 1,297

How Bad our Parole Board Really is.

*This is a letter sent to the Senate by an actual ex-commissioner Belinda Harris Ritter regarding the corrupt state of the parole board. TIPs was given the letter to put up on their site. I hope it's ok to let everyone read it. We are in serious trouble in this state. This letter is long, but worth reading. The frustrations this woman had in trying to do her job and being stopped at every turn finally caused her to step down.*

PAROLE BOARD POLITICS AND DEEP-SEEDED PROBLEMS

DETAILED BY FORMER BPH COMMISSIONER

On June 5th, former BPH Commissioner Belinda Harris-Ritter wrote a detailed 5-page letter to the Senate Rules Committee, and "To Whom it May Concern," to enlighten interested parties on some of the serious problems at the heart of the Board's ineptitude. Ms. Ritter-Harris, who resigned six months earlier in January, 2007, after chairing her suitability hearings for six months, graciously gave her permission to publish her exposé in full:

DO NOT BLAME THE COMMISSIONERS FOR PAROLE BOARD PROBLEMS

Last July I began my term as a Commissioner on the Board of Parole Hearings, an appointee of Governor Schwarzenegger. I was naive in thinking that the Board would be allowed to do its job. I left the Board in January of this year frustrated by the inability of the Board to function, exhausted from the out of control travel schedule and still weak from the flu and norovirus picked up in prison facilities crawling with disease. I left, not because I had given up, but because I received a telephone call from Alberto Roldan, a deputy appointment's secretary, in which he told me I was being given the opportunity to resign because the Governor wanted to go in another direction and appoint someone else in my place. I was told that I was forbidden to tell anyone of the call, forbidden to attend the upcoming Board meeting and if I did not do what I was told, I would be terminated. I asked what I had done to cause this to occur and was told I had done nothing wrong. I knew that if the Governor wanted to put someone new on the Board there was an open seat so clearly I was considered a problem. There was no opposition to me on record and I was often told by victim advocates/relatives and inmate counsel alike that I did an excellent job. I had been unaware that there was opposition to me from the people responsible for my being there in the first place. I am not the only Commissioner to have met that fate. Recently, another excellent Commissioner was confirmed by the Senate but only after an attack on her by people in the Governor's office, the District Attorney's Association and spearheaded by Senator Jeff Denham. Senator Denham sent out press releases saying he was appalled by early releases due to grants. A grant of parole is not an early release. The penal code specifically states that Parole shall be granted unless there is a public safety reason not to grant it. They forget not only the actual law that controls what Commissioners must do but also that the Commissioner does not make the Decision alone. A civil service Deputy Commissioner is involved in every case and must agree with the Commissioner to grant parole or it is a split vote that goes to the full Board sitting en banc. The Commissioner has no say in who the deputy Commissioner will be or what prison he or she is assigned to each week. That is all engineered by the Executive Officer who answers to the Governor and /or CDCR. When the Governor and legislature reorganized the Department of Corrections effective July, 2005, they destroyed any independence of the Board of Parole Hearings. The Board was no longer free-standing but was stuffed into the newly named California Department of Corrections and Rehabilitation (CDCR). The Board itself has no control over the hiring of the civil service staff. The legal counsel will tell you they work for CDCR and the Executive Officer is appointed by the Governor, not the Board. He, like the Board, is part of CDCR. Although he is not appointed by the Board the role of the administrator should still be to take direction from the Board he or she serves, not to dictate what is done. This is because the Executive Officer is not a member of the Board. That reality was lost in the transition. He acts on direction from somewhere other than the Board, unknown to the Commissioners. Commissioners are assigned to various prisons weeks in advance then at the last minute without explanation the Executive Officer tells scheduling to change the schedule and inform the Commissioners of the switch. That is just one example. Add to the reorganization problems the fact that the legal staff considers itself to work for CDCR, apparently not understanding who the client is (the Board) regardless of who pays their salaries (CDCR) and that the legal staff has, in my opinion, absolutely no understanding of the Bagley –Keene Open Meeting Act and you have a recipe for disaster. Regulations are presented for approval by the Board when the Board has not considered or voted on whether regulations are needed. Although there is an item on each agenda for the legal report and the Executive Officer report those have at times consisted of announcing the number of cases in the backlog for the legal staff and introducing the new deputy commissioners by the Executive Officer. Never, during my time on the Board, did either present any report of substance. The Board members are never told how the number in the backlog is calculated and there is no acknowledgement of cases that are on appeal or problems that come up in panel decisions except in illegal closed sessions allegedly to consider litigation. However, the Bagley- Keene Act is very clear that to be considered under the litigation exception there must be "...an adjudicatory proceeding before a court, administrative body, hearing officer or arbitrator. Litigation is considered to be pending if **1) a has been initiated formally (e.g. a complaint, claim or petition has been filed) or (2) based on existing facts and circumstances and on the advice of its legal counsel, the

must be sent to the Board members by the staff and after the litigation is resolved that memo becomes a publicly accessible document. Under the Act, "the agency's legal counsel must submit a memorandum which complies with the requirements of Section 11126(e)(2)(C)(ii) prior to the closed session. This document is confidential until the pending litigation has been finally adjudicated or otherwise settled. There was never any discussion of the Board budget nor was a budget ever approved while I was on the Board. I was told by the Executive Officer in December that "the Board is working on the budget" apparently meaning his civil service staff. Also in December I was told by him that the names of three potential civil service commissioners (civil service employees) were run through the Governor's office prior to any hiring decision being made. I am not mentioning their names out of respect for the three individuals involved. Two were hired and one was not. Why is the Governor's office involved in civil service hiring outside his office? The scheduling of the Commissioners at the various institutions is a process without input from the individuals involved and appears to me to benefit certain Commissioners while punishing others. In a semi-mutiny all the Board members agreed that the scheduling needed to be addressed along with some other housekeeping issues. This was presented to the Board Chair following a closed session in December. He tried to say the issues could not be discussed because of the Bagley-Keene Act. This made it clear to me that he had, just like the legal staff, no understanding of the Act or its purpose. Needless to say the scheduling was not improved. I was told I could not be scheduled at the prisons near my home because it was not fair to the Commissioners who lived far away from prisons. Repeatedly I was told that everyone had to travel three to four hours. Other Commissioners were, however, routinely scheduled at prisons near their homes. Many times hearings had to be canceled because of disease at the institutions. These diseases included norovirus, tuberculosis, chicken pox and the flu. I am not the only Commissioner to have contracted the flu and norovirus. I have canceled hearings of prisoners who were vomiting in the holding cells while waiting to have their hearings and taken flak for the postponements. At one facility the Commissioner was told by CDCR staff that even though six of the inmates were in quarantine the hearings should go forward and the Commissioner and Deputy Commissioner could wear masks. The Commissioner and Deputy Commissioner refused to hold the hearings under those circumstances. Clearly if the inmate is too ill to stand up there are due process considerations being violated. Another problem related to this is that under Penal Code section 5080 the Board can ask CDCR to move a prisoner because of health reasons. I had a case where the inmate absolutely needed to be moved to a facility where he could have mental health treatment and medical intervention. I cited this section in the postponement of his hearing. Under that code section CDCR must report to BPH within 30 days why he cannot be moved for the medical treatment or move him. In this particular case he was not moved and did not receive the medical attention and CDCR gave no reason. The Commissioner who followed me ignored these serious considerations and denied the parole for 5 years without addressing the medical issues. At an open- to- the-public training session in December, I asked our legal staff about the application of this code section. The reply from the attorney training us was that she was still getting up to speed and would get back to me. She never did. In that same training we were repeatedly told "the Board wants it done this way" or the Board wants you to do this". I finally raised the point that we were the Board and we had given no such direction and I questioned who had. There was no answer. The Chair, however, did go to two other Commissioners (both women) and tell them to please let me know to stop asking questions in open session. I find it incredible first, that he would say that and second, that he could not he could not talk to me himself. All the Commissioners have many similar stories about problems with CDCR but problems with CDCR are never addressed at the Board or at the Senate Rules Committee. The Commissioners have become merely hearing officers. At most state Boards the trial level is conducted by administrative law judges and/or hearing officers and appeals are taken by the Board itself. At the BPH the Commissioners are the hearing officers and while I was on the Board there was no appeals process. It had been removed following some court action indicating it was a problem because no appeal was ever granted. I understand the appeals process is being reinstituted. How do you do that after a court has told you to stop? This implementation of the appeals process was not done at the behest of the Board. The Board never discussed it nor voted on it. The agenda is put together by staff but the Board members are never asked if they have items for the agenda. Items on the agenda include cases where there was a split decision between the Deputy Commissioner and the Commissioner and referrals of non murder cases from the Governor for en banc review of a panel decision. These are the only Board meetings I have ever been to where no one on the Board says anything except the Chair who is running the meeting. Board business is rarely ever addressed by the members of the Board. The problem of untimely psychological evaluations was to end when the Board took over responsibility from CDCR for preparation of the reports. It has not changed. At some institutions it appears the union of psychologists has instigated a work slow down or stoppage by not preparing the reports timely. This causes legitimate reasons for inmates to request postponements and Commissioners are told by their legal staff to do the hearings anyway. Add to all of this the track record of CDCR in every other area. Across the Board headline after headline shows it is the same response as stated in a report from the State Bureau of Audits in follow-up to an audit done in 2005 to see if there had been any changes. In the March 27, 2007 letter from state auditor Elaine Howle to the Governor and legislative leaders it was stated that there was still a lack of validity in the projections of the prison population. This report, titled "Department of Corrections: It needs to better ensure against conflicts of interest and to improve its inmate population projections (2005-105)" was also copied to every member of the legislature. It seems that nearly every week we in Sacramento read about CDCR not cooperating with a court or a special master related to conditions at the prisons whether it is health, overcrowding or some other area. I believe it is time to look at how badly CDCR has compromised the Parole process as well. Let me be perfectly clear. I understand the need for public safety. It is paramount. I say that from the shoes of the victim's next of kin. My father and stepmother were murdered and I have worked for many years in the state where that occurred to ensure due process for victims and their families. I also believe that while protecting due process for victims we cannot throw out due process for the inmates. As an attorney, I understand the significance of due process and believe that it is the very foundation of our way of life in this country. Due process should not be tossed aside because there is a backlog of hearings. The Governor should appoint the twelfth member of the Board- this was not done the entire time I was on the Board. Prior Commissioners should be recruited to come back for a limited period to take care of the backlog, but hearings should not be crammed down the throats of inmates who are ill, have not had an opportunity to appeal a serious discipline accusation or who have a habeas case at the appellate level or need time to meet with counsel. Postponements and continuances should not be allowed for the purpose of choosing a specific Commissioner or manipulating the process but legitimate reasons should not be ignored. I would be fine with a law that stated convicted murderers shall never be released from prison. But that is not the law we have. The law states that when these life inmates come up for parole they are to be paroled unless it would be a public safety problem. The burden is on the state to show there is a public safety issue. Either follow this or change the law. The legal staff should be trained in the Bagley-Keene Act and should be responsive to questions from Commissioners and cite authority for their opinions, all the while understanding the Board is their client, not CDCR. CDCR should also understand that the Board is the client. The legal staff should also understand that they merely advise the Board and the Board makes the decisions. But most important, for the Board to actually function, there must be openness about who is doing what and at whose direction and if that cannot occur under the present structure the Board should be removed from CDCR and allowed to hire its own Executive Officer and legal staff.



4.6 by Google

Exhibit
B

In re LEE STABEN, On Habeas Corpus.

E041712

COURT OF APPEAL OF CALIFORNIA, FOURTH
APPELLATE DISTRICT, DIVISION TWO

2007 Cal. App. Unpub. LEXIS 9002

November 6, 2007, Filed

**NOTICE:**    NOT TO BE PUBLISHED IN OFFICIAL REPORTS. CALIFORNIA
RULES OF COURT, RULE 8.1115(a), PROHIBITS COURTS AND PARTIES FROM
CITING OR RELYING ON OPINIONS NOT CERTIFIED FOR PUBLICATION OR
ORDERED PUBLISHED, EXCEPT AS SPECIFIED BY RULE 8.1115(b). THIS
OPINION HAS NOT BEEN CERTIFIED FOR PUBLICATION OR ORDERED
PUBLISHED FOR THE PURPOSES OF RULE 8.1115.

**PRIOR HISTORY:** [*1]
    ORIGINAL PROCEEDING; petition for writ of habeas corpus. Super. Ct. No.
RIC454914.

**DISPOSITION:**    Petition granted.

**COUNSEL:** Marc Elliott Grossman and Richard Pfeiffer for Petitioner.

Edmund G. Brown, Jr., Attorney General, and Amanda Lloyd, Deputy Attorney General,
for Respondent.

**JUDGES:** King, J.; Gaut, Acting P.J., Miller, J., concurred.

**OPINION BY:** King

**OPINION**

    In this matter petitioner Lee Staben challenges a decision by the Board of Parole
Hearings (Board) finding him unsuitable for parole. ¹ We resolve the case on the simple
basis that no evidence supports the Board's stated reasons for this finding. Accordingly,
we will direct the Board to vacate its decision and conduct a new parole hearing for
petitioner, following the guidance provided in this opinion. (Pen. Code, § 3041, subd.
(b).) ²

    1  Following a hearing before the Board on December 20, 2002, petitioner was

found *suitable* for parole. However, this was reversed by the Governor under the authority granted by Penal Code section 3041.2. The instant petition involves the Board's decision following a hearing held on August 8, 2005.

2   All subsequent statutory references are to the Penal Code.

FACTS OF THE OFFENSE

In 1991, petitioner was convicted of two counts of second degree murder (§ [*2] 187), and the jury also found true a "personal use" enhancement under section 12022.5. He received concurrent terms of 15 years to life for the murders and a three-year enhancement for the firearm use. ³ With one significant exception, which we will discuss below, the circumstances surrounding the killing are not in dispute. We take our primary recitation of facts from that given by the Board, which in turn derived from a correctional counselor's report, which is not itself part of the record. Elements added by petitioner at the hearing are so noted.

3   This represented the *low*, or mitigated, term for the enhancement. (§ 12022.5, subd. (a).)

In May 1990, petitioner and his girlfriend had moved into a residence that was to be shared with Wayne Goodhue and his girlfriend, Donya Boyd. According to petitioner, Goodhue was twice his age (43 years of age as against petitioner's 19). Goodhue, however, did not pay his portion of the rent, and after an argument with petitioner, Goodhue and Boyd moved out. ⁴ Petitioner was evidently concerned, because on July 12, 1990, he contacted the Riverside County Sheriff's Department concerning the argument and apparently stated that Goodhue had threatened [*3] him with a stick or club. ⁵ He also told the Board that Goodhue had threatened to harm him or his family after that altercation. He also borrowed a shotgun from his brother-in-law.

4   At the previous hearing, petitioner explained that the older Goodhue was named on the lease because petitioner had no credit history. Petitioner gave his share of the rent money to Goodhue, but Goodhue never gave it to the landlord.

5   At the hearing, petitioner described the weapon as a pickaxe handle. Our opinion on appeal (*People v. Staben* (Mar. 10, 1993, E010375) [nonpub. opn.]) also contains the details corroborating petitioner's anxiety. Petitioner seemed frightened of Goodhue after the argument; he changed the locks, boarded up and covered the windows, and would not let his girlfriend go outside.

Goodhue and Boyd moved into a small trailer. On July 15, 1990, petitioner and his girlfriend were away from home on a "family outing." When they returned, they found that their home had been burglarized and vandalized; petitioner testified that "unmentionables" had been done to the house. Among the items stolen was a television set.

Petitioner suspected Goodhue and drove angrily to Goodhue's trailer with the [*4] shotgun. It was well after dark, but before 10:30 p.m. Petitioner's testimony was (and has consistently been) that he banged on the door of the trailer and shouted but received no response. When he saw what he believed to be his stolen television set against a window, he pulled the extruding cord until it crashed to the floor. He still heard nothing.

Petitioner then went to his truck and drove off, but almost immediately returned to the trailer and fired one blast from his shotgun through a window. ⁶ He told the Board that his intention was simply to cause damage to Goodhue's home in retaliation for the damage he believed Goodhue had caused to his home, and to warn Goodhue not to trifle with him. Tragically, however, both Goodhue and Donya Boyd *were* in the trailer; Boyd was fatally wounded and her eight-month fetus also died. Goodhue suffered minor injuries.

6 The window was boarded up on the inside, so petitioner could not have seen into the trailer. However, he also stated that he did not realize it was boarded up.

According to petitioner's version, he was unaware that Goodhue and Boyd were in the trailer. The only "evidence" to the contrary was a statement by a neighbor, Carrie McClearan, [*5] who had recognized petitioner and heard him yelling obscenities and profanities at the trailer. ⁷ According to the deputy district attorney who attended the parole hearing, Ms. McClearan's statement also indicated that she believed that petitioner was "getting some response" to his shouts. This statement is not in the record before us, although it may have been presented to the Board.

7 Petitioner did not deny the use of vulgar language.

It is, however, reasonably clear that there was no testimony at trial that suggested that petitioner knew that the trailer was occupied. ⁸ The deputy district attorney who prosecuted petitioner, E. Michael Soccio, in 1993 wrote a letter, which wound up in petitioner's file. ⁹ While acknowledging that petitioner's actions were "inappropriate and deadly," Soccio expressed the belief that "he did not know he would injure anyone when he fired his shotgun . . . there was no evidence to indicate that he probably did not know that anyone was in there." ¹⁰ Soccio at that time recommended leniency and confirmed this position in a later letter submitted in approximately 2000. ¹¹

8 Our opinion indicates that eyewitness testimony was provided by a neighbor named Robin [*6] Farrington, but there is no reference to Ms. McClearan. Farrington testified only that petitioner appeared to be "listening" at the windows. Evidence tending to show that petitioner was aware that someone was inside the trailer would have been extremely relevant and critical to the prosecution's attempt to prove first degree murder.

9 The letter was addressed to "Mr. Zarate" at a post office box in Calipatria. The letter states that Soccio was "writing to provide you with information regarding my

3.

impression of Mr. Staben," but it is not clear who Zarate is or was.

10   Goodhue apparently also did not testify. The probation report indicates that he could not be located at the time the report was prepared.

11   Although a detailed legal analysis is unnecessary, if he were to be retried today, petitioner would be entitled to instructions on manslaughter. It appears that such instructions were refused at the time because it was believed that *intent to kill* was an element of voluntary manslaughter; we now know that this is not the case. (See e.g., *People v. Lasko* (2000) 23 Cal.4th 101, 110.) On appeal, we commented that because the prosecutor obtained instructions on *first degree* murder, it was  [*7] reasonable to suppose that there was sufficient evidence of intent to support voluntary manslaughter. However, we found any error harmless because the evidence of "heat of passion" was inadequate. Absent the "intent" issue, the trial court might well have instructed on manslaughter; and trial counsel's conversations with a number of the jurors strongly suggests that the jury might well have been eager for the opportunity to convict of a lesser charge. As it was, the only options were acquittal or a murder conviction.

## FACTORS PERTINENT TO PETITIONER

At the time of the killings, petitioner was 19 years old and had no prior criminal or juvenile record. After graduating from high school, he became employed in a cabinet shop but was terminated for taking excess time off after the birth of his son. [12] He then began to support himself trading motor vehicles, at which time he became acquainted with Goodhue. He had no history of substance abuse although he had experimented with marijuana and alcohol while in high school.

12   His son was borne by his then girlfriend, to whom he later had a brief marriage.

While incarcerated, petitioner has been virtually discipline free. In 1993 he received a "115" [*8] for pilferage. [13] On the other side, he has consistently received good work reports; particularly, a laudatory "chrono" for his accomplishments in vocational welding, which he hopes to pursue on release. The most recent document in the file, covering an unspecified period beginning sometime in 2004, notes that he had acquired two new certificates (plumber and electrician) and had received numerous "laudatory chronos" relating to his "positive, respectful attitude, cooperation with staff and excellent work performance." He also received a total of 10 favorable reports relating to work performance. At the hearing, the Board quoted briefly from several of his supervisors, who consistently used terms such as "self-motivated," "hard worker," "positive attitude," "non-aggressive," and "mature and calm."

13   The 2002 panel evidently examined the record in detail and learned that it involved the theft of cans of soda from the canteen; the prison authorities could not determine who was responsible, but gave "115's" to everyone working in the

4.

canteen.

Petitioner has also participated in a number of "self-help" programs, primarily religiously oriented. Among his support letters submitted to the [*9] Board were two commending him for his efforts to reach at-risk youth as part of Convicts Reaching Out to People (CROP). He also participated regularly--three to four times a week--in "church programs."

If released, petitioner intended to live with his parents in Orange County, joined by his wife. " He had offers of employment in both plumbing and welding; he indicated that although he considers welding to be his primary trade, he would be inclined to accept the plumbing job because he viewed the employer as better-established. " He had letters of support from his sister-in-law, aunts, stepdaughter, niece, and cousins. One cousin represented that petitioner "comes from a large family of productive and responsible members of society. He has a huge support network waiting for him."

14   After his marriage to the mother of his child dissolved, petitioner married his current wife in 2001.

15   He had an additional job offer from a cousin in Washington who operates a sign graphics business. However, this out-of-state offer was deemed secondary.

THE HEARING

After the presentation of general information, the Board read into the record portions of a letter from the district attorney's office in Riverside [*10] County opposing petitioner's release on parole. The only stated reason was "evidence of premeditation and deliberation." The Board referred to the Governor's denial letter of 2002, which expressed concern that petitioner's record did not exhibit substantial self-help efforts between 2002 and 2005; petitioner's response was that he had for some time been compelled to choose, time wise, between AA/NA and his church meetings, and that he had felt that the latter better served his needs. Nevertheless, and despite a letter from the prison pastor, the Board expressed concern that there was no specific "proof" of his participation. "

16   It did note a certificate of completion for a religiously-based correspondence course in 2005 and petitioner's participation in Feed the Children, also in that year. There was also corroborating evidence of his participation in the CROP program.

The Board also referred to the Governor's concerns that petitioner needed "anger management." Petitioner responded that he had participated in a Hands of Peace program, which the Board noted was "some time ago." Petitioner then explained that no such program was currently available to him, and cogently pointed out, [*11] that in over 15 years of incarceration, he had not been cited for a single violent or impulsive act. The Board then asked if he read any books on such topics, and petitioner answered that he read several self-help books each year. When asked, he was able to name the last two books he had read. " The Board then suggested that he should prepare "book reports" in

the future.

17  Harris, I'm O.K, You're O.K. (1969) and Warren, The Purpose-Driven Life (2002).

· The Board then reviewed petitioner's 2001 psychological report--the most recent available. Salient points noted were the absence of any significant drug or alcohol history; no mental disorder; and his lack of the typical "risk factors" such as gang affiliation, substance abuse, lack of support, and chronic aggression. However, the Board also noted that the report listed petitioner's insight as "fair" and that no opinion was given as to petitioner's risk of violence in society. ᴵᴬ Petitioner commented that he had requested a current evaluation but that this had been refused because only the Board could order this, which it had not done. Interestingly, at petitioner's 2002 hearing, the Board quoted from a 1998 evaluation, which *did* specifically  [*12] state that "[petitioner's] potential for violence within the community, as well as the free community, are considered to be less than average at this time and to remain so in the future." There was no reference to such an evaluation at the current hearing.

18  The evaluator considered him a *low* risk in a controlled setting.

After reading a letter from Donya Boyd's sister opposing parole, the Board allowed a representative from the district attorney to question petitioner about the statement by Carrie McClearan; petitioner continued to deny the accuracy of any suggestion that he heard responses. The district attorney also suggested that shooting into the trailer was somehow inconsistent with an intent to do vandalism. He also insinuated that petitioner might have intended his shot to ignite a propane tank at the front of the trailer; petitioner denied knowing that a tank was there.

Finally, the Board asked petitioner to explain what insights he had acquired that would prevent him from offending again. Petitioner attempted to express how his responsibility for Donya Boyd's death had motivated him to "become a better person . . . to take a good honest look at myself. I think that the only  [*13] way that I could make amends for what I did is by . . . developing changes in myself, mentally, physically, spiritually, educationally, vocationally." Told that he was not answering the question, petitioner indicated that he was reluctant to "throw[ ] the religious card out there," but asserted that his spiritual experiences had resulted in positive changes. Earlier in the hearing, when asked about his feelings about the crime, petitioner had stated, "I feel horrible about it . . . Donya was my friend . . . her death has been a motivation to better myself and to change my life, not because of what your expectations might be of me, but because of being able to look at myself in the mirror . . . it disturbs me as much today as it did then. And I don't think I'll ever get beyond that."

In a final statement, the district attorney continued to assert that petitioner "probably did know that there was somebody inside that trailer sleeping," ᴵᴬ referring again to the McClearan report.

6.

19  The prosecutor's attempt to paint a picture of a sleeping victim is unpersuasive. Not only had petitioner spent 10-20 minutes banging on the door and yelling; he had also pushed a television set onto the [*14] floor.

In finding petitioner unsuitable for parole, the Board relied "primarily" upon the "gravity of the offense," which it found to be "especially calculated" and "especially cruel and callous." It also expressed the view that petitioner had not "sufficiently participated in beneficial and self-help programs, specifically in the area of anger management and other self-help programs that would focus on the development of insight and remorse." It found that the most recent psychological report "does not appear to be totally supportive of release" and was critical of parole plans. It ruled that no further hearing would be held for two years.

DISCUSSION

Although petitioner devotes a substantial amount of his brief to arguments generally criticizing the continued use of an invariable factor such as the nature of the crime to deny parole, we need not address the significant legal issues he raises. We find that, even under the deferential review we give to parole decisions, there is *no* evidence supporting a finding of unsuitability under the applicable criteria.

As is true for most decisions involving the confinement of inmates, a decision granting or refusing parole must be upheld if it is [*15] supported by "some evidence" and as long as the Board considers all relevant circumstances and factors. (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 626; see also *Superintendent v. Hill* (1985) 472 U.S. 445, 455-456.) "Consideration of public safety" is the primary statutory issue to be determined by the Board in determining whether to set a parole date. (§ 3041, subd. (b).) However, the Legislature also instructs the Board to follow guidelines set out in the Code of Regulations. ²⁰

20  The "suitability/unsuitability" factors are set out in California Code of Regulations, title 15, section 2402. Several of the "unsuitability" factors relate to the commitment offense and the ultimate finding that it was "especially heinous, atrocious, or cruel"; multiple victims; commission of the offense in a dispassionate and calculated manner; abuse, defilement, or mutilation of the victim; commission of the offense in a manner demonstrating "exceptionally" callous disregard for human suffering; and triviality of motive. Others relate to the inmate: previous record of violence; unstable social history; sexual sadism; mental problems; and institutional misconduct. On the "suitability" side, the regulation [*16] lists lack of juvenile record, stable social history, remorse, significant stress as a motivation, battered woman syndrome, lack of criminal history, current age, plans for the future, and institutional behavior.

Although our review is deferential, as the court aptly commented in *In re Scott* (2004) 119 Cal.App.4th 871, 898, this "does not convert a court reviewing the denial of parole

into a potted plant." Not only must there be "some evidence" supporting the decision; that evidence must have """some indicia of reliability."""" (*Id.* at p. 899, quoting *Biggs v. Terhune* (9th Cir. 2003) 334 F.3d 910, 915.) Thus, we proceed to examine the factors of unsuitability upon which the Board relied.

Among the various factors specified in the governing regulations (see fn. 20), the Board may properly rely solely on the aggravated nature of the offense. (*In re Dannenberg* (2005) 34 Cal.4th 1061, 1071.) However, "a life term offense . . . must be particularly egregious to justify the denial of a parole date." (*In re Ramirez* (2001) 94 Cal.App.4th 549, 570 (*Ramirez*) [disapproved on another ground by *In re Dannenberg, supra,* 34 Cal.4th 1061, 1082-1083, 1100].) The offense must reflect circumstances that [*17] "reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense." (*In re Rosenkrantz, supra,* 29 Cal.4th at p. 683.) As the court pointed out in *Ramirez,* section 3041, subdivision (a), provides that on its *initial* review conducted one year before a life inmate's minimum eligible parole release date, a panel "shall *normally* set a parole release date." (Italics added.) *All* life crimes, and especially all murders, are grave and highly reprehensible offenses. But, unless the panel is required to specify some *unusually* cruel, violent, or depraved circumstances, reliance on the "gravity of the offense" alone would "swallow" the "normally" rule, and would also destroy the proportionality structure enacted by the Legislature in imposing terms of (for example) straight life (aggravated kidnapping, § 209), 15 to life (most second degree murders, § 190, subd. (a)), and 25 to life (noncapital first degree murders and some second degree murders; § 190, subds. (a) & (b).)

Second degree murder is a killing committed *with* malice, express or implied, but *without* the mental state of willful, deliberate premeditation. (§§ 188, 189.) Malice [*18] is implied if "no considerable provocation appears" (§ 188; cf. § 192, subd. (a)--voluntary manslaughter) or the circumstances of the killing "show an abandoned and malignant heart." [21] (§ 188.) The latter, in turn, requires """an intentional act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.'" [Citation.]" (*People v. Robertson* (2004) 34 Cal.4th 156, 164.)

> 21  In this case, the jury was instructed on theories of express malice or implied malice arising from the commission of an act inherently dangerous to human life. (*People v. Staben, supra,* E010375.) The jury was not instructed on second degree felony murder based on shooting at an occupied residence (§ 246) because the trial court believed that that offense "merged" in the killing. (See *People v. Ireland* (1969) 70 Cal.2d 522.) This view was later proved to be erroneous. (See *People v. Hansen* (1994) 9 Cal.4th 300, 316.)

Petitioner was convicted of two counts of second degree murder. Was it "especially heinous, atrocious, or cruel?" The record indicates that it was not.

8.

First, [*19] in our view, the fact that two lives were taken does not, in the unique circumstances of this case, bring this case under the "multiple victims" guideline or make this an unusually atrocious killing. While we by no means intend to minimize the death of a fetus, petitioner, as we explain below, can have had no knowledge that his shot was likely to take a single life, let alone two. The fact that Donya Boyd not only suffered fatal injuries, but that those injuries also proved fatal to her child, is tragic, but it does not increase petitioner's moral culpability.

Next, the Board found the offense to be both "calculated" and "cruel and callous." According to section 2402, subdivision (c) of title 15 of the California Code of Regulations, this is an appropriate factor to consider in evaluating the gravity of the specific offense. As we suggested above, "[t]he measure of atrociousness is not general notions of common decency or social norms, for by that yardstick all murders are atrocious." (*In re Lee* (2006) 143 Cal.App.4th 1400, 1409.) Similarly, "'all second degree murders by definition involve callousness-i.e., lack of emotion or sympathy, emotional insensitivity, indifference to the feelings [*20] and sufferings of others.' [Citation.]" (*In re Scott, supra,* 119 Cal.App.4th at p. 891.) As for the supposed factor of "calculation," it is true that petitioner armed himself before going to Goodhue's trailer. However, this would be equally true of many second degree murders. The guidelines make clear that far more is necessary to make a killing "calculated" by giving as an example an "execution-style murder." Nor was the killing especially cruel or callous. There is no evidence that petitioner intended to, was aware that he did, or even *did* inflict cruelly extreme pain, and none that he was indifferent to the victims' sufferings. He did not taunt the victims, gloat over their distress, or refuse to allow others to help them. (Cf. *People v. Misa* (2006) 140 Cal.App.4th 837, 842-843 [a torture case under § 206].) Viewed under the appropriate guidelines, petitioner's crime simply does not qualify as unusually calculated, cruel, or callous. He blindly fired a single shot into the trailer and left. ²² That is all.

22  The shooting occurred at about 10:30 p.m.--an hour when the victims would not necessarily have been home.

Nor is there any evidence that would support a positive finding based [*21] on any other circumstance set out in the guidelines as tending to show that the offense was exceptionally bad. The victims were not "abused, defiled, or mutilated"; petitioner's motive--to protect himself and his family--was not "inexplicable or very trivial." Finally, we have explained above why the "multiple victims" element is inadequate in this case to elevate the offense to a level justifying denial of parole.

Although we have not ourselves compiled statistics, and are unaware of any such compilation, our review of published cases and the regular stream of petitions for habeas corpus complaining about parole denial makes it clear that the Board almost always relies on the "exceptional" nature of the offense as a basis--often the only basis--for denying parole. And we are not the first court to criticize an overly broad reliance on this factor.

In *In re Scott, supra,* 119 Cal.App.4th 871, the victim was not only having an affair

with defendant's wife, but was also supplying her with drugs. The victim had also threatened defendant with a gun. On the night of the killing, defendant's wife indicated she wished to reconcile with him but then left. Defendant went to the victim's home, [*22] believing that his wife was there. Indeed, she and the victim were "hugging affectionately" on the lawn, and defendant drew a pistol, told the victim he was going to kill him, and did so. [23] Rejecting the Board's findings, the Court of Appeal held that the crime was *not* committed in a "dispassionate and calculated" manner (citing the emotional stress Scott was under); his motive--not just jealousy, but concern that the victim was supplying his wife with drugs--was *not* trivial; and it did not involve the kind of "gratuitous cruelty" (cf. *In re Van Houten* (2004) 116 Cal.App.4th 339, 351) or massive trauma that would show "exceptional" callousness. (*In re Scott, supra*, 119 Cal.App.4th at pp. 889-895.)

> 23  Scott was originally convicted of first degree felony murder; but when he moved for a new trial, the prosecutor offered to stipulate to the relief sought if Scott would enter a plea of guilty to second degree murder, which he did. The jury's verdicts also *rejected* first degree murder based on premeditation.

The defendant in *In re Lee, supra*, 143 Cal.App.4th 1400 was a middle-aged businessman who was facing financial difficulties because one of the victims was not making payments for a business [*23] he had purchased from defendant. Heated exchanges had ensued; and defendant finally decided that if the intended victim continued to refuse to pay, defendant would kill him and himself. At the fatal meeting, the victim refused and defendant fired several shots. The intended victim survived but his wife, tragically, was killed. Defendant was convicted of second degree murder and first degree attempted murder. Rejecting the Governor's characterization, the court held that Lee's crimes were *not* "more atrocious than whenever one human being kills another. . . ." (*Id.* at p. 1409.) Rather, it found that the crimes were "more commonplace than egregious." [24] (*Ibid.*)

> 24  *In re Lee* also contains a useful summary of cases in which a killing *was* found to be *exceptionally* atrocious. One is *In re Van Houten, supra*, 116 Cal.App.4th 339, which involved the notorious Charles Manson murders. In *In re Dannenberg, supra*, 34 Cal.4th 1061, defendant, during a domestic argument, beat his wife with a pipe and then drowned her in the bathtub. The defendant in *In re Burns* (2006) 136 Cal.App.4th 1318 lured his victim to an isolated spot and shot her, then went to watch football with his roommate. When the victim [*24] was found around two hours later, she was still alive and moaning, and appeared to have been trying to move; thus, defendant simply left her to suffer and die.

More recently, in *In re Elkins* (2006) 144 Cal.App.4th 475 (*Elkins*), the defendant was heavily indebted to his drug dealer, who had introduced him to cocaine. While intoxicated, he decided to rob the dealer as he slept. To make sure the victim did not wake, he struck him with a baseball bat. When the victim nevertheless roused, defendant

hit him several more times. He then disposed of the body and robbed the victim's storage facility. Agreeing that repeatedly bludgeoning a robbery victim would establish an exceptionally callous *robbery*, the court explained that where the intent was to quiet the victim to facilitate the robbery, the fact that repeated blows were necessary did not make the *murder* unusually heinous. Also agreeing that the *robbery* was "calculated," the court found no evidence that the *killing* was anything but "an afterthought, if thought about at all." (*Id.* at p. 497.) Finally, in *In re Weider* (2006) 145 Cal.App.4th 570, the court applied a "not unusually heinous" analysis to reverse a finding of unsuitability [*25] where the killing occurred during a scuffle between the distraught defendant and the current boyfriend of his estranged wife.

> 25  *Elkins* may implicitly concede that defendant's actions *after* the murder--dumping the body and then stealing from the victim's storage unit and the residence of his girlfriend--might make the offense unusually callous; to the extent that they do so, *Elkins* held that after 26 years and "exemplary rehabilitative gains," these factors simply did not retain any predictive value as to the defendant's future dangerousness. We might well conclude similarly in this case if required to reach the point, but as petitioner's offense was in no way exceptional, as we have explained, we do not need to consider when, or whether, the gravity of an offense alone ceases to justify a denial of parole.

In light of these cases--and as contrasted with those represented by the citations in footnote 25--we have no hesitation in finding that nothing in petitioner's offense was "exceptionally atrocious, heinous, or cruel." Hence, the Board could not rely on this factor in denying parole.

The other grounds cited by the Board are even less substantial. As described above, petitioner has [*26] excellent parole plans with firm job offers, and there was no evidence to refute the showing that he has a "huge support system" waiting for him comprised primarily of "his large family of productive and responsible members of society." The Board's only criticism was that his plans involved Orange County rather than Riverside County, his last legal residence. But while it is true that an inmate's last county of legal residence is the presumptive county for parole, the Board has authority to approve parole to *any* county. (§ 3003, subds. (a), (b).) Under subdivision (b), parole to another county is appropriate if the inmate has a "(3) . . . verified . . . work offer" and "(4) . . . family in another county with whom the inmate has maintained strong ties and whose support would increase the chance that the inmate's parole would be successfully completed." That is exactly this case, and the Board's reluctance to accept this option appears to have been completely arbitrary.

> 26  Parole to a different county is also appropriate where the inmate's last county of legal residence presents negative issues, such as public hostility (the statute says "concern") or danger to the victim, the parolee, [*27] a witness, or anyone else. (§ 3003, subd. (b)(1), (2).) Nothing in the record suggests that Orange County would

be inappropriate under these standards.

The Board also criticized petitioner for not participating in an "anger management" program. Leaving aside the fact that no such program has been available to him, there is absolutely no evidence that going through such a program would reduce his dangerousness. [27] Although it is, of course, true that the life offense was committed in anger--as petitioner admits--it was also prompted by unique stresses and even fear. Nothing in petitioner's pre-offense history suggests that he had difficulty managing his temper, and the descriptions of him while incarcerated consistently refute the need for further treatment in this respect: Petitioner is "non-aggressive" and "mature and calm." It is also to be noted that petitioner's psychiatric reports have consistently concluded that he has *no* mental health issues requiring treatment or supervision.

> 27   n27 Recall that petitioner *did* participate in a program called "Hands of Peace," which apparently encourages nonviolent methods of conflict resolution; the Board simply commented that this was "some time  [*28] ago." However, nothing in petitioner's prison record supports a concern that any lessons learned in "Hands of Peace" did not "take."

The Board also mentioned that petitioner had not demonstrated sufficient "insight or remorse" and that the most recent psychological report was "not totally favorable."

On the first point, if this kind of "quantity" analysis were permitted to stand, no decision could ever be challenged. How much remorse is "enough?" By any standard, we think the Board's concerns were unjustified.

Petitioner has never denied responsibility for the crime. In his 2001 psychological evaluation his remorse is described as "appear[ing] genuine." Although it is difficult to analyze a cold record, his statements at the hearing read as sincere expressions of regret and resolve to make "amends" by changing himself as a human being to ensure that nothing similar would ever happen again. The fact that an inmate may not express himself in the precise terms desired by the Board (which can never be known to the inmate) cannot be a basis for a finding of unsuitability.

As for petitioner's "insight," the 1998 psychiatric evaluation considered his insight to be "good." The "downgrade" to "fair"  [*29] in the 2001 report does not justify a finding of unsuitability, especially where it is unexplained. The fact is that petitioner has always shown ample insight into his particular offense. He was angry and frightened and wanted to teach Goodhue a lesson. This is not a situation, for example, in which an inmate has failed to make progress in understanding the social, economic, and psychological factors that led him into a life of gang violence. Petitioner was a law-abiding young family man who reacted foolishly and criminally to a perceived threat, and there is no indication that he does not understand this.

Finally, we deal with the Board's concerns over the most recent psychiatric report. It is true that the evaluator does not expressly state an opinion on petitioner's level of risk

*outside* prison. " However, the Board overlooked the evaluator's comment that petitioner's "[p]rognosis for community living appears to be good." As we noted above, the 1998 evaluation *did* expressly rate petitioner as a less than average risk "in the free community," and the evaluator also commented that this was likely to hold true in the future. Leaving aside the issue of whether the Board can fairly rely [*30] on an incomplete psychiatric report when it has failed to authorize the preparation of a new one, there is simply no basis in the record to suppose that petitioner's level of risk has *increased* or that his "prognosis" has deteriorated. Again, where the clear tenor of an evaluation is favorable, it is unfair to penalize an inmate because the evaluator did not express his views in the precise language desired by the Board. We stress that the reports are consistent to the effect that petitioner has *no* mental health issues whatsoever that require treatment or supervision.

28   The evaluator did consider him at a low risk of dangerousness "[w]ithin a controlled setting."

As a last point, the Board noted that the district attorney of the county in which petitioner was tried opposed release. The prosecutor is entitled by statute to represent the interests of the People at a parole hearing and the Board is entitled to consider his comments. (§§ 3041.7, 3042, 3046, subd. (c).) However, where the district attorney is represented by a deputy with no personal knowledge of the case, and where the actual prosecuting attorney has recommended leniency, the formal opposition by the office is entitled to [*31] little weight. Somewhat similarly, although the Board could properly consider the opposition of the victim's family members (§ 3043, subd. (e)), where that opposition was not based on any facts unique to this case or outside the trial record, it could not have substantial weight.

In summary, we find that the Board's finding of unsuitability was unsupported by even a modicum of evidence. *None* of the factors of unsuitability can properly be applied to petitioner, and *all* of the applicable factors of suitability bear in his favor. " First, it should be noted that the panel completely ignored the mitigating factor that the offense was committed under circumstances of unusual stress. (Cal. Code Regs., tit. 15, § 2402, subd. (d)(4).) Petitioner had been threatened by Goodhue and believed that his home had been burglarized and vandalized by the latter; even before that incident, he had expressed concerns over his and his family's safety. Recall that he was himself the father of a young child. Significantly, this stress was not related to pressures that are endemic to modern life, such as economic or relationship issues; rather, it involved a perceived serious threat to the safety of petitioner [*32] and his family of the type unlikely to be repeated. " The Board clearly erred in failing to consider this evidence of a positive factor. Furthermore, petitioner had no previous criminal history; his social history (insofar as he had developed one at age 19) was reasonably stable; he is now middle-aged; his institutional behavior has been excellent; and he has solid plans for success in the community. The Board's decision was unsupported by the record.

13.

29  Battered Woman's Syndrome is obviously inapplicable.

30  Where an offense is committed in part due to stress experienced by the actor, the fact that the stress--or at least a similar trigger--is unlikely to recur is a valid consideration in evaluating the inmate's degree of dangerousness and suitability for parole. (*In re Scott* (2005) 133 Cal.App.4th 573, 601.)

The only remaining question is that of remedy.

DISPOSITION

Petitioner requests that we reinstate the *2002* finding of suitability and direct the Board to calculate his release date pursuant to the term then set. But that decision was reversed by the Governor and is not now before us; absent any authority supporting our power to take such action, we decline to do so.

As a rule, courts  [*33] must not only "refrain from reweighing the evidence, [but] should [also] be reluctant to direct a particular result." (*Ramirez, supra*, 94 Cal.App.4th at p. 572.) If the Board's findings are not supported by the required "modicum" of evidence, a writ of habeas corpus should issue directing the Board to vacate its decision and thereafter "to proceed in accordance with due process of law." (*In re Rosenkrantz, supra*, 29 Cal.4th at p. 658.) ³¹

31  The procedure is different when the court is reviewing a decision of the *Governor* reversing the Board's *grant* of parole. In that case, the Governor's decision may be vacated, with the effect of reinstating the Board's decision. (*In re Lee, supra*, 143 Cal.App.4th at pp. 1414-1415.)

We may, however, direct the Board with respect to the conclusions that must be drawn from certain evidence where its contrary decision was arbitrary and unreasonable. (*In re Scott, supra*, 119 Cal.App.4th at p. 899 [Board directed to consider psychological reports as favoring petitioner's application for parole].) Accordingly, albeit with some reluctance, we will remand the matter to the Board with directions to conduct a new hearing as soon as practicable upon the finality  [*34] of this opinion, to evaluate the proportional gravity of petitioner's offense in accordance with the views expressed in this opinion; to consider the psychological reports of record as supporting release unless contradicted by information or opinions contained in a new report (see *Ramirez, supra*, 94 Cal.App.4th at p. 972); to consider petitioner's parole plans of record as satisfactory; to consider the factor of unusual stress; and otherwise to proceed in accordance with due process of law. The Board is further directed to schedule such a hearing within 30 days of the finality of this opinion.

/s/ King

J.

I concur:

14.

/s/ Gaut

Acting P.J.

## CONCUR

Miller, J., Concurring and Dissenting.

I agree with the majority's determination that the Board improperly found petitioner was unsuited for failing to participate in self help and anger-management programs. As the majority noted, petitioner cannot be faulted for failing to participate in a program that did not exist.

I also agree with the majority's observation that the Board cannot find that the most recent psychiatric report "was not totally supportive of his release" when it failed to even authorize that a new report be prepared.

However, I respectfully [*35] disagree with the majority's finding that the petitioner's commission of the offense was not especially grave, calculated, cruel or callous.

The Board is the administrative agency within the executive branch that has jurisdiction to fix the length of sentence a prisoner must serve, to grant parole, and to set release dates. (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 653, 665, 667 (*Rosenkrantz*); *In re Schoengarth* (1967) 66 Cal.2d 295, 302; *In re Dannenberg* (2005) 34 Cal.4th 1061, 1078.) Parole applicants have a procedural due process right to be free from an arbitrary decision and to have their applications """duly considered.""" (*Rosenkrantz, supra*, 29 Cal.4th at p. 655.) In reviewing those applications, the Board must make its parole decisions on some factual basis: it must resolve any conflicts in the evidence and assign the weight to be given that evidence. Denying a prisoner a release date without "'some evidence'" would be arbitrary and capricious, thus requiring reversal so as to preserve a prisoner's due process rights. (*Id.* at p. 657.)

To remedy any abrogation of procedural due process rights, a prisoner may seek judicial review of the Board's decision by way of a petition for [*36] writ of habeas corpus. (*Rosenkrantz, supra*, 29 Cal.4th at p. 664; *In re Strum* (1974) 11 Cal.3d 258, 259-270; *Superintendent v. Hill* (1985) 472 U.S. 445, 451, 455.) The standard of review of a Board's decision denying parole is the "some evidence" standard. (*Rosenkrantz, supra*, 29 Cal.4th at p. 658.) That is, a reviewing court's inquiry is limited to determining whether there is "some evidence" in the record before the Board that supported its decision to deny parole, based upon the factors specified by statute and regulation. If the Board's consideration of the specified factors is not supported by "some evidence" in the record, it is devoid of a factual basis, and hence the petition for writ of habeas corpus should be granted. (*Ibid.*)

It is true, as the majority laudably noted, that reviewing courts do not become "potted plants," torpidly reviewing parole denials. However, our only role is to assiduously apply the correct standard of review--to decide if there is *some* evidence. "[T]he 'some evidence'

15.

standard is extremely deferential." (*Rosenkrantz, supra*, 29 Cal.4th at p. 665, 679.) We may neither reweigh facts nor substitute our discretion for the Board's.

"The powers of state government [*37] are legislative, executive, and judicial. Persons charged with the exercise of one power may not exercise either of the others except as permitted by this Constitution." (Cal. Const., art. III, § 3.) The constitutional mandate is to protect one branch against overreaching from another branch. (*Rosenkrantz, supra*, 29 Cal.4th at p. 662.) This separation of powers doctrine prevents one branch from materially impairing the functions so as to completely divest the other branch from power. (*Ibid.*)

It is a judicial function to try criminal cases. Once a verdict is rendered, the trial judge exercises his discretion in selecting a sentence within a range delineated by the Legislature. It is an executive function to execute the sentence imposed by the judiciary. For indeterminate life sentences, it is the function of the Board, an executive agency, to determine the length of the life sentence by balancing the safety of the public against the inmate's liberty interest.

An appellate court's function is to insure the Board has conducted its review of the prisoner's parole with "due consideration." The court's sole task to guarantee the prisoner has received procedural due process--that is, to make [*38] certain that the Board properly denied his parole request based on "some evidence."

In this instance, I believe the Board correctly denied petitioner's request for parole based on "some evidence" that the underlying offense was calculated, cruel and callous.

Petitioner and Goodhue had some "bad blood" between them as a result of a landlord/tenant dispute: Goodhue was angry that petitioner moved his belongings out of the residence. During that altercation, Goodhue said he was going to kill petitioner; he picked up a pickax, slammed it into the ground so the head of the axe came off, and then used the ax handle to swing at petitioner.

As a result of the clash, petitioner felt the need for protection, so he borrowed a shotgun.

Four or five days later, petitioner returned home on a Sunday from a weekend away and discovered his home had been burglarized. Petitioner suspected Goodhue was responsible for the break-in. He took the shotgun and five shells and loaded the weapon. At 10 o'clock at night, he drove to Goodhue's and Boyd's home and parked his truck in front of their trailer. Some time later he drove his truck away, but after either making a U-turn or driving around the block, [32] petitioner [*39] returned and again parked in front of their trailer. He exited the vehicle with the shotgun, walked towards the front of the trailer and stood next to a window as if he were listening or looking inside. He took a step toward the corner of the trailer and shot into the trailer from approximately 20 feet away.

32   There was a discrepancy between the defendant's and a prosecution witness's testimony.

16.

Goodhue and Boyd were inside the trailer. Goodhue suffered three shotgun pellets in his back. Boyd, who was eight months pregnant, sustained shotgun wounds to her back. Boyd died as a result of her wounds one hour later. Physicians performed an emergency caesarian section to deliver the fetus, but the fetus had died from a lack of oxygen following Boyd's death.

Ten o'clock p.m. on a Sunday night is a time when people are commonly at home. Firing into an inhabited dwelling from 20 feet away is a cruel and callous act that shows a disregard for human life. Although petitioner may not have been certain that Boyd and Goodhue were within, firing into their home from close range resulted in a high probability of injuring someone.

Petitioner testified that he fired the shot because he wanted to make  [*40] a statement that "he had been there, he was upset with Goodhue, and he wanted Goodhue to know he had protection."

If petitioner needed a shotgun for protection because he was so afraid of Goodhue, petitioner would never have driven to Goodhue's trailer in the first place. Petitioner's actions show he was calculating: he loaded the shotgun with a shell, drove in a truck with the loaded shotgun to the trailer, fired the gun into the trailer at night when it was more likely people would be in the trailer, and when it was dark enough so his actions would be undetected.

Petitioner had an opportunity to cease his criminal activity when he drove away from the trailer the first time. Returning to the trailer and then shooting into the dwelling further demonstrates petitioner actions were calculating.

Petitioner fired into Goodhue's trailer because he was angry that Goodhue burglarized his home in retaliation for the previous landlord/tenant dispute. Petitioner testified that he reported the burglary to the sheriff's department, but neglected to inform them of Goodhue's threat to kill him. Instead of allowing the wheels of justice to resolve the burglary and the threats, petitioner took the law  [*41] into his own hands by going to Goodhue's home and shooting into it to "prove to Goodhue he had protection." Petitioner's action of recklessly firing into the trailer was cruel and callous. "The nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole." (*Rosenkrantz*, *supra*, 29 Cal.4th at p. 682; see also *In re Ramirez* (2001) 94 Cal.App.4th 549, 569.) The parole authority "properly may weigh heavily the degree of violence used and the amount of viciousness shown by a defendant." (*Rosenkrantz*, at p. 683.)

The majority opinion accurately recites petitioner's exemplary record as support for its finding he is a strong candidate for release on parole. However, we are not authorized to reweigh the various factors for parole suitability. It is irrelevant that a court might determine that evidence in the record demonstrates the suitability factors outweigh unsuitability factors. Our review is limited to whether the Board accorded procedural due process to the petitioner by citing some evidence in support of its finding. (*Rosenkrantz*, *supra*, 29 Cal.4th at p. 677.) I believe the Board has comported with due process as there

is some evidence in the record to [*42] support its finding that the offense was calculated, cruel, and callous. It is violative of the separation of powers doctrine for the judicial branch to divest the executive branch (the Board) of its power to deny parole by impliedly stating it gave improper weight to facts and reached the wrong conclusion.

/s/ Miller

J.

## DISSENT

Miller, J., Concurring and Dissenting.

I agree with the majority's determination that the Board improperly found petitioner was unsuited for failing to participate in self help and anger-management programs. As the majority noted, petitioner cannot be faulted for failing to participate in a program that did not exist.

I also agree with the majority's observation that the Board cannot find that the most recent psychiatric report "was not totally supportive of his release" when it failed to even authorize that a new report be prepared.

However, I respectfully disagree with the majority's finding that the petitioner's commission of the offense was not especially grave, calculated, cruel or callous.

The Board is the administrative agency within the executive branch that has jurisdiction to fix the length of sentence a prisoner must serve, to grant parole, and to set release [*43] dates. (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 653, 665, 667 (*Rosenkrantz*); *In re Schoengarth* (1967) 66 Cal.2d 295, 302; *In re Dannenberg* (2005) 34 Cal.4th 1061, 1078.) Parole applicants have a procedural due process right to be free from an arbitrary decision and to have their applications """duly considered.""" (*Rosenkrantz, supra*, 29 Cal.4th at p. 655.) In reviewing those applications, the Board must make its parole decisions on some factual basis: it must resolve any conflicts in the evidence and assign the weight to be given that evidence. Denying a prisoner a release date without "'some evidence'" would be arbitrary and capricious, thus requiring reversal so as to preserve a prisoner's due process rights. (*Id.* at p. 657.)

To remedy any abrogation of procedural due process rights, a prisoner may seek judicial review of the Board's decision by way of a petition for writ of habeas corpus. (*Rosenkrantz, supra*, 29 Cal.4th at p. 664; *In re Strum* (1974) 11 Cal.3d 258, 259-270; *Superintendent v. Hill* (1985) 472 U.S. 445, 451, 455.) The standard of review of a Board's decision denying parole is the "some evidence" standard. (*Rosenkrantz, supra*, 29 Cal.4th at p. 658.) That is, a reviewing [*44] court's inquiry is limited to determining whether there is "some evidence" in the record before the Board that supported its decision to deny parole, based upon the factors specified by statute and regulation. If the Board's consideration of the specified factors is not supported by "some evidence" in the record, it is devoid of a factual basis, and hence the petition for writ of habeas corpus should be granted. (*Ibid.*)

It is true, as the majority laudably noted, that reviewing courts do not become "potted plants," torpidly reviewing parole denials. However, our only role is to assiduously apply the correct standard of review--to decide if there is *some* evidence. "[T]he 'some evidence' standard is extremely deferential." (*Rosenkrantz, supra,* 29 Cal.4th at p. 665, 679.) We may neither reweigh facts nor substitute our discretion for the Board's.

"The powers of state government are legislative, executive, and judicial. Persons charged with the exercise of one power may not exercise either of the others except as permitted by this Constitution." (Cal. Const., art. III, § 3.) The constitutional mandate is to protect one branch against overreaching from another branch. (*Rosenkrantz, supra,* 29 Cal.4th at p. 662.) [*45] This separation of powers doctrine prevents one branch from materially impairing the functions so as to completely divest the other branch from power. (*Ibid.*)

It is a judicial function to try criminal cases. Once a verdict is rendered, the trial judge exercises his discretion in selecting a sentence within a range delineated by the Legislature. It is an executive function to execute the sentence imposed by the judiciary. For indeterminate life sentences, it is the function of the Board, an executive agency, to determine the length of the life sentence by balancing the safety of the public against the inmate's liberty interest.

An appellate court's function is to insure the Board has conducted its review of the prisoner's parole with "due consideration." The court's sole task to guarantee the prisoner has received procedural due process--that is, to make certain that the Board properly denied his parole request based on "some evidence."

In this instance, I believe the Board correctly denied petitioner's request for parole based on "some evidence" that the underlying offense was calculated, cruel and callous.

Petitioner and Goodhue had some "bad blood" between them as a result of a landlord/tenant [*46] dispute: Goodhue was angry that petitioner moved his belongings out of the residence. During that altercation, Goodhue said he was going to kill petitioner; he picked up a pickax, slammed it into the ground so the head of the axe came off, and then used the ax handle to swing at petitioner.

As a result of the clash, petitioner felt the need for protection, so he borrowed a shotgun.

Four or five days later, petitioner returned home on a Sunday from a weekend away and discovered his home had been burglarized. Petitioner suspected Goodhue was responsible for the break-in. He took the shotgun and five shells and loaded the weapon. At 10 o'clock at night, he drove to Goodhue's and Boyd's home and parked his truck in front of their trailer. Some time later he drove his truck away, but after either making a U-turn or driving around the block, " petitioner returned and again parked in front of their trailer. He exited the vehicle with the shotgun, walked towards the front of the trailer and stood next to a window as if he were listening or looking inside. He took a step toward the corner of the trailer and shot into the trailer from approximately 20 feet away.

32   There was a discrepancy between  [*47] the defendant's and a prosecution witness's testimony.

Goodhue and Boyd were inside the trailer. Goodhue suffered three shotgun pellets in his back. Boyd, who was eight months pregnant, sustained shotgun wounds to her back. Boyd died as a result of her wounds one hour later. Physicians performed an emergency caesarian section to deliver the fetus, but the fetus had died from a lack of oxygen following Boyd's death.

Ten o'clock p.m. on a Sunday night is a time when people are commonly at home. Firing into an inhabited dwelling from 20 feet away is a cruel and callous act that shows a disregard for human life. Although petitioner may not have been certain that Boyd and Goodhue were within, firing into their home from close range resulted in a high probability of injuring someone.

Petitioner testified that he fired the shot because he wanted to make a statement that "he had been there, he was upset with Goodhue, and he wanted Goodhue to know he had protection."

If petitioner needed a shotgun for protection because he was so afraid of Goodhue, petitioner would never have driven to Goodhue's trailer in the first place. Petitioner's actions show he was calculating: he loaded the shotgun with  [*48] a shell, drove in a truck with the loaded shotgun to the trailer, fired the gun into the trailer at night when it was more likely people would be in the trailer, and when it was dark enough so his actions would be undetected.

Petitioner had an opportunity to cease his criminal activity when he drove away from the trailer the first time. Returning to the trailer and then shooting into the dwelling further demonstrates petitioner actions were calculating.

Petitioner fired into Goodhue's trailer because he was angry that Goodhue burglarized his home in retaliation for the previous landlord/tenant dispute. Petitioner testified that he reported the burglary to the sheriff's department, but neglected to inform them of Goodhue's threat to kill him. Instead of allowing the wheels of justice to resolve the burglary and the threats, petitioner took the law into his own hands by going to Goodhue's home and shooting into it to "prove to Goodhue he had protection." Petitioner's action of recklessly firing into the trailer was cruel and callous. "The nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole." (*Rosenkrantz, supra,* 29 Cal.4th at p. 682; see also *In re Ramirez* (2001) 94 Cal.App.4th 549, 569.)  [*49] The parole authority "properly may weigh heavily the degree of violence used and the amount of viciousness shown by a defendant." (*Rosenkrantz,* at p. 683.)

The majority opinion accurately recites petitioner's exemplary record as support for its finding he is a strong candidate for release on parole. However, we are not authorized to reweigh the various factors for parole suitability. It is irrelevant that a court might determine that evidence in the record demonstrates the suitability factors outweigh

unsuitability factors. Our review is limited to whether the Board accorded procedural due process to the petitioner by citing some evidence in support of its finding. (*Rosenkrantz, supra,* 29 Cal.4th at p. 677.) I believe the Board has comported with due process as there is some evidence in the record to support its finding that the offense was calculated, cruel, and callous. It is violative of the separation of powers doctrine for the judicial branch to divest the executive branch (the Board) of its power to deny parole by impliedly stating it gave improper weight to facts and reached the wrong conclusion.

/s/ Miller

J.

# DECLARATION OF SERVICE BY MAIL

I, _____*Emil Ekdahl*_____, the undersigned, declare:

    Printed Name of Declarant

I am over the age of 18 years, a citizen of the United States of America, and am not a party to the cause within. My residence address is:

   CDC No. _*C-79199*_   Housing _*3N67-U*_
   San Quentin State Prison
   San Quentin, CA 94974

On _*December 17*_, _*2006*_, I served the following document(s):

    Month/Day        Year

_*One Motion For Permission To Expand the Record and*_
_*Judicial Notice.*_

on the parties and at the addresses described below by placing the pleadings in a sealed envelope, with postage fully prepaid, and presented said item(s) to Corrections Department staff for mailing in the United States Mail as per the rules and regulations governing outgoing legal mail at San Quentin State Prison.

OFFICE OF THE CLERK
U.S. DISTRICT COURT FOR THE
NORTHERN DISTRICT OF CALIFORNIA
1301 Clay Street., #400 S.
Oakland, CA. 94612-5212.

I swear under penalty of perjury that the foregoing is true of my own personal knowledge. Executed on this _*17*_ day of _*December*_, _*2007*_, at San Quentin, CA, County of Marin.

                    _*Emil Ekdahl*_
                    Signature of declarant

# DECLARATION OF SERVICE BY MAIL

I, _____EMIL EKDAHL_____, the undersigned, declare:
Printed Name of Declarant

I am over the age of 18 years, a citizen of the United States of America, and am not a party to the cause within. My residence address is:

CDC No. _C-79199_    Housing _3N67-U_
San Quentin State Prison
San Quentin, CA 94974

On _December 17_, _2007_, I served the following document(s):
     Month/Day          Year

_One Motion For Permission to Expand the Record and Judicial Notice_

on the parties and at the addresses described below by placing the pleadings in a sealed envelope, with postage fully prepaid, and presented said item(s) to Corrections Department staff for mailing in the United States Mail as per the rules and regulations governing outgoing legal mail at San Quentin State Prison.

```
California Attorney General
455 Golden Gate Ave.
Suite 11000
San Francisco, Ca. 94102-7004.
Attn: Correctional Law Section.
```

I swear under penalty of perjury that the foregoing is true of my own personal knowledge. Executed on this _17_ day of _December_, _2007_, at San Quentin, CA, County of Marin.

_Emil Ekdahl_
Signature of declarant



$01.82⁰

US POSTAGE

0004248283    DEC 19 2007

MAILED FROM ZIP CODE 94964

OFFICE OF THE CLERK
U.S. DISTRICT COURT FOR THE
NORTHERN DISTRICT OF CALIFORNIA
1301 Clay Street:, #400 S.
Oakland, CA. 94612-5212.

Emil Ekdahl, pro se...
C-79199 / #3N67-U, CSP
San Quentin, Ca. 94974.

San Quentin Legal Mail: