

FILED

JAN 1 8 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

Emil Ekdahl, Pro se
P.O. Box C-79199 #3N67-U
San Quentin, CA. 94974.

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| EMIL JOSEPH WILHELM EKDAHL, III, )<br><br>Petitioner, )<br><br>v.<br><br>ROBERT AYERS, Warden,<br><br>Respondent. )<br>_____ ) | Case No.  C07-03642 SBA<br><br>**MOTION FOR THIS COURT TO JUDICIAL NOTICE OF RECENT NINTH CIRCUIT HOLDING AND CALIFORNIA SUPERIOR COURT HOLDINGS.** |

Judge: The Honorable
Saundra B. Armstrong.

Please see the enclosed Exhibits **A** and **B**. Exhibit A is a recent Ninth Circuit decision of <u>Hayward v. Marshall</u>, ____ F.3d ____ No. 06-55392 (2008)

The <u>Hayward</u> case is yet another California lifer prisoner having his liberty interest in parole violated by the BPH / Governor.

Exhibit B is the actual <u>Criscione</u> case referenced to in Petitioner's pending Traverse and Motion to expand the record, and Discovery Motion.

The Discovery motion asks for the Board to turn over the 2690 randomly chosen BPH case discovered by the <u>Criscione</u> Court. The <u>Criscione</u> Court found that it is statistically significant in terms of violating prisoners' due process that the Board finds 100% of the sample lot of life prisoners' parole denials to be based upon the commitment offense finding all such prisoners offenses to be "particularly egregious" or "especially heinous, atrocious or cruel." (<u>Id</u> pg 12)

Petitioner's parole hearing is one of the sample lot of cases included in the 2690 looked at by the <u>Criscione</u> Court, and the Board based Petitioner's parole denial upon "cruel" findings.

Dated : January 14, 2008.

_____.

Emil Ekdahl, pro se...

Exhibit-A

FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

RONALD HAYWARD,

Petitioner-Appellant,

v.

JOHN MARSHALL, Warden,
California Men's Colony East,

Respondent-Appellee.

No. 06-55392

D.C. No.
CV-05-07239-
GAF(CT)

OPINION

Appeal from the United States District Court
for the Central District of California
Gary A. Feess, District Judge, Presiding

Argued and Submitted
June 8, 2007—Pasadena, California

Filed January 3, 2008

Before: Alex Kozinski, Chief Judge, Daniel M. Friedman,*
and Ronald M. Gould, Circuit Judges.

Opinion by Judge Gould

*The Honorable Daniel M. Friedman, Senior United States Circuit
Judge for the Federal Circuit, sitting by designation.

35

---

3

## COUNSEL

Joseph V. Camarata, Vallejo, California, for petitioner-
appellant Ronald Hayward.

Bill Lockyer, Attorney General of the State of California,
Mary Jo Graves, Chief Assistant Attorney General, Julie L.
Garland, Senior Assistant Attorney General, Jennifer A. Neill,
Supervising Deputy Attorney General, Jane Catherine Malich,
Deputy Attorney General, Los Angeles, California, for
respondent-appellee John Marshall.

## OPINION

GOULD, Circuit Judge:

California state prisoner Ronald Hayward has twice been
granted a parole date by the California Board of Prison Terms

("Board").[1] California's Governor has twice reversed the Board's determination that Hayward was suitable for parole. Hayward appeals the district court's denial of his petition for a writ of habeas corpus.

## I

On December 15, 1978, Hayward, with other members of the Vagos motorcycle gang, traveled to the Buccaneer Bar in Sierra Madre, California. There, he confronted a man who, according to conflicting accounts, had either slapped or, battered and attempted to rape Hayward's girlfriend (who would later become Hayward's wife). The confrontation turned physical and ended after Hayward stabbed the man twelve times, killing him. In 1980, a California jury convicted Hayward of second degree murder, and the court sentenced Hayward to state prison for a term of fifteen years to life.

Hayward has spent the last twenty-seven years in prison. He is now sixty-four years old. He retired from the Vagos motorcycle gang in 1981. In the twenty-seven years Hayward has spent in prison, he has completed substantial vocational training in the fields of plumbing, mechanics, welding, meat cutting, and shoe repair. Hayward obtained a GED in 1981 and has developed typing and computer skills through job assignments in prison. For the last twenty years, Hayward has led prison tours for university students studying criminal justice. He has not had a major disciplinary violation in prison since 1989, and his last minor disciplinary infraction was in 1997.

Hayward initially denied responsibility for the murder that led to his imprisonment, claiming that he was at the scene, but that two of his friends had stabbed and killed the victim. However, during a parole hearing in 1993, Hayward admitted

[1]On July 1, 2005, California created the Board of Parole Hearings to replace the Board of Prison Terms. Cal. Penal Code § 5075(a).

that he was responsible for the murder and has accepted responsibility for the crime ever since.[2]

Before Hayward was sent to prison, he had a history of substance abuse. In a prison psychological evaluation, he stated the drugs he preferred to use were marijuana and cocaine, but that he no longer uses drugs. He stated that he stopped smoking marijuana in 1985, that he never purchased drugs himself, and that the only used drugs when they were available because someone else had them. He also reported that he used heroin in prison "a few times" but that "it scared [him] and [he] didn't like it." Hayward stated that he had not had a drink of alcohol since a 1974 conviction for driving under the influence.

Hayward has managed to stay free of drug use by taking advantage of therapy opportunities available to him in prison. Since 1997, Hayward has participated in Yoke Fellows groups. These groups follow a "spiritual twelve step" approach to help members overcome substance abuse problems. Hayward attends two Yoke Fellows group meetings per week. Hayward has also participated in the Project Change substance abuse program, has been a volunteer in the prison's Protestant chapel, and has completed a program entitled Alternatives to Violence.

In a 2002 psychological evaluation and at his 2003 parole suitability hearing, Hayward discussed what he would do if granted parole: He planned to move to Monrovia, California, where he would live with a friend, Robert Sharp. In Monrovia, Hayward had two job offers, one with a firm that builds golf carts and another to work as a laborer through the Team-

[2]At his most recent parole hearing, Hayward explained his remorse for the crime: "I feel horrible. . . . I took somebody's life . . . . How do you ever adjust to that?" When asked if the victim deserved what he got because he allegedly attempted to rape Hayward's wife, Hayward responded: "No, Ma'am. No, he didn't. No one deserves that."

sters Union. Hayward also said that his preferred option would be to obtain a transfer of his probation to Idaho, where he could be with his ailing parents, two of his daughters, and six of his grandchildren. Hayward believed that the family support he could obtain in Idaho would enable him to find employment. Hayward also noted that he has a carpenters' pension coming to him and that he should qualify for some social security benefits resulting from the death of his wife.

Dr. Erich Rueschenberg, who prepared the 2002 psychological evaluation of Hayward, concluded that "Mr. Hayward's prognosis for community living seems to be favorable," that "he appears to have a viable parole plan," and that he "appears to be a strong candidate for a favorable readjustment in the community."

On June 27, 2002, after Hayward's tenth parole consideration hearing, a two-member panel of the Board reached a split decision regarding Hayward's suitability for parole. The panel referred the decision to the en banc Board which found Hayward suitable for parole by a majority vote.

Then-Governor Gray Davis reviewed the Board's decision as article 5, section 8(b) of the California Constitution entitles him to do.[3] On January 10, 2003, the Governor reversed the parole grant, giving the following reasons for denying Hayward's parole: (1) Hayward's crime was "particularly grave," "premeditated, and perpetrated against an outnumbered,

[3] Article 5, section 8(b) of the California Constitution provides, in relevant part:

No decision of the parole authority of this state with respect to the granting, denial, revocation, or suspension of parole of a person sentenced to an indeterminate term upon conviction of murder shall become effective for a period of 30 days, during which the Governor may review the decision subject to procedures provided by statute. The Governor may only affirm, modify, or reverse the decision of the parole authority on the basis of the same factors which the parole authority is required to consider.

unarmed, and inebriated victim; (2) Hayward had refused to assume adequate responsibility for the victim's death; (3) Hayward had a "lifetime of escalating criminality and violence"; (4) Hayward had an unstable social history, including an extensive history of alcohol and substance abuse; (5) Hayward had been extensively involved in gangs, both inside and outside of prison; and (6) Hayward's psychological evaluators "remain[ed] convinced that he poses a danger to society."

A panel of the Board held Hayward's eleventh parole consideration hearing on June 19, 2003. In addition to reconsidering the evidence with which it had been previously presented, several letters were submitted to and reviewed by the Board at that hearing. Randy Cammack, the secretary/treasurer of Teamsters Local 63 wrote to indicate that he would support Hayward's efforts to find work if Hayward was granted parole. Robert Sharp, Hayward's best friend for forty-five years, wrote to say that, if released, Hayward could live with him and borrow his truck to get to work and for any other transportation needs Hayward might have. Clifford Rees, the president and owner of a company called California Golf Cars, wrote to offer Hayward an entry-level position with his company. Ralph Steelhead, who was a teacher and coach of Hayward's when Hayward was in junior high school (and is now a chaplain's assistant at the facility in which Hayward is imprisoned) wrote to offer his support. Pastor Warren Nielsen stated his belief that Hayward was ready for parole. Many other family members and acquaintances wrote to emphasize that they would be willing to offer emotional and financial support to Hayward as he readjusts to freedom.

Against the background of this redeeming presentation, the panel granted Hayward parole, concluding that Hayward would not pose an unreasonable risk of danger to society if released from prison. In its decision, the panel noted that Hayward had a stable social history, as evidenced by his stable relationships with his family, friends, and supporters. The panel found that, while in prison, Hayward had enhanced his

44

ability to function within the law upon release by educating himself, receiving vocational training, and participating in therapy like the Yoke Fellows. The panel found that Hayward committed the 1980 murder as a result of significant stress in his life caused by the victim's attempted rape and violent beating of Hayward's future wife. The panel also found that the victim provoked Hayward by throwing a bottle at him on the night of the murder. The panel found that Hayward's parole plans were realistic and that he now understood the magnitude of and accepted responsibility for the murder he committed.

On November 10, 2003, the Governor again reversed the parole grant. Governor Davis cited the same factors as he had cited in his reversal of the Board's previous parole grant. In addition, the Governor cited the Los Angeles County District Attorney's opposition to Hayward's release from prison as further justification for his reversal of the Board's parole grant.[4]

After the Governor's second reversal of parole, Hayward filed a petition for a writ of habeas corpus in the Los Angeles County Superior Court. On June 30, 2004, the court denied the petition in a minute order. The court rejected many of the Governor's findings, particularly those regarding Hayward's failure to accept responsibility, his criminal history, and his unstable social history. Nonetheless, the court found that the Governor's decision to deny parole was supported by "some evidence." Hayward then filed a petition for a writ of habeas corpus with the California Supreme Court. That court denied the petition without comment on July 27, 2005.

Hayward filed a petition for a writ of habeas corpus in district court on October 5, 2005. Hayward contended that Governor Davis's reversal of the Board's parole grant violated his

[4]The district attorney had not previously opposed parole for Hayward, and the record does not explain why the district attorney chose Hayward's eleventh parole suitability hearing to intervene.

45

right to due process of law. In her report and recommendation, the magistrate judge concluded that, under the United States Supreme Court's decision in *Greenholtz v. Inmates of the Nebraska Penal and Correctional Complex*, 442 U.S. 1 (1979), and the California Supreme Court's decision in *In re Dannenberg*, 104 P.3d 783 (Cal. 2005), Hayward had no constitutionally-protected liberty interest in parole. The magistrate judge also explained that, even if Hayward had a liberty interest in parole, the Governor's reversal of the Board's parole grant was consistent with due process of law because "some evidence" supported the Governor's conclusion that Hayward posed an unreasonable risk to public safety if released. *See Superintendent v. Hill*, 472 U.S. 445 (1985). Finally, the magistrate judge rejected Hayward's contention that the Governor had a "no-parole-for-murderers" policy and that such a policy violated Hayward's due process rights.

The district court then accepted the magistrate judge's recommendation that it deny Hayward's habeas petition with prejudice, and entered judgment on February 16, 2006.[5]

II

[1] We review de novo the district court's denial of a habeas petition. *Lambert v. Blodgett*, 393 F.3d 943, 964 (9th Cir. 2004). Because Hayward is in custody pursuant to a state court adjudication and because Hayward filed his habeas petition after the effective date of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), we cannot grant a writ of habeas corpus unless the state court's adjudication of Hayward's due process claim resulted in a decision that (a) was contrary to, or involved an unreasonable application of,

[5]Hayward has requested that we take judicial notice of two recent California Court of Appeal opinions. We construe the request for judicial notice as a citation of supplemental authorities pursuant to Federal Rule of Appellate Procedure 28(j), and the opinions shall be considered by us. We thus deny the request for judicial notice as moot.

clearly established federal law as determined by the United States Supreme Court or (b) was based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d). Because there was a reasoned state-court judgment rejecting Hayward's federal claims—the Superior Court judgment—we look through the later unexplained order of the California Supreme Court and analyze whether the reasoned state judgment was erroneous under the standard of § 2254(d). *See Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991).[6]

### III

**[2]** The Supreme Court has instructed us to analyze a prisoner's due process claim in two steps. We first ask whether the prisoner had a liberty or property interest with which the State has interfered. And if so, we then ask whether the procedures accompanying that interference were constitutionally sufficient. *Ky. Dep't of Corrections v. Thompson*, 490 U.S. 454, 460 (1989); *Sass v. Cal. Bd. of Prison Terms*, 461 F.3d 1123, 1127 (9th Cir. 2006). If we determine that the State has violated the prisoner's due process rights, we may only grant habeas relief if the state court's incorrect decision was contrary to or an unreasonable application of the Supreme Court's holdings. *Carey v. Musladin*, 127 S. Ct. 649, 653 (2006); *Williams v. Taylor*, 529 U.S. 362, 410-12 (2000).

**[3]** As to the first question, in *Sass*, 461 F.3d at 1127-28, we held that California prisoners have a liberty interest in parole. This interest arises as a result of California Penal Code section 3041(b), which provides that, at a parole consideration

---

hearing, the Board "*shall* set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration." Cal. Penal Code § 3041(b) (emphasis added). Thus, by reversing Hayward's parole grant, the Governor deprived him of a constitutionally-protected liberty interest. The primary questions for us, then, are (1) whether California provided the constitutionally-required procedural safeguards when depriving Hayward of his liberty interest, and, if not, (2) whether the Los Angeles County Superior Court's conclusion that it did was contrary to or an unreasonable application of clearly established federal law as determined by the Supreme Court.

**[4]** Under California law, the Governor, in considering whether to reverse a grant of parole by the Board, must consider the same factors the Board is required to consider. *See* Cal. Const. art. 5, § 8(b); *In re Rosenkrantz*, 59 P.3d 174, 210 (Cal. 2002). Accordingly, we review the Governor's decision to reverse a parole grant under the same procedural due process principles we use to review challenges to the Board's denial of parole.

**[5]** We have held that "the Supreme Court ha[s] clearly established that a parole board's decision deprives a prisoner of due process with respect to this interest if the board's decision is not supported by 'some evidence' in the record," or is "otherwise arbitrary." *Irons v. Carey*, No. 05-15275, 2007 WL 2027359, at *3 (9th Cir. July 13, 2007) (quoting *Hill*, 472 U.S. at 457; *Sass*, 461 F.3d at 1128-29). "When we assess whether a state parole board's suitability determination was supported by 'some evidence' in a habeas case, our analysis is framed by the statutes and regulations governing parole suitability determinations in the relevant state." *Id.* Accordingly, we first "look to California law to determine the findings that are necessary to deem a prisoner unsuitable for parole." *Id.* Then, we "must review the record in order to

---

[6] The government argues that we lack jurisdiction because Hayward did not obtain a certificate of appealability. However, in *Rosas v. Nielsen*, 428 F.3d 1229, 1232 (9th Cir. 2005), we explicitly held that AEDPA does not require a petitioner to obtain a certificate of appealability when the federal claim underlying the petition is that the petitioner was unconstitutionally denied parole. Because Hayward's petition challenges the Governor's decision that denied him parole, Hayward did not need to obtain a certificate of appealability to present his claim to us.

determine whether the state court decision holding that these findings were supported by 'some evidence' . . . constituted an unreasonable application of the 'some evidence' principle articulated in *Hill*." *Id.*

Under California law, prisoners serving an indeterminate life sentence, like Hayward, become eligible for a parole date after serving minimum terms of confinement required by statute. *See Dannenberg,* 104 P.3d at 785; *see also* Cal. Penal Code § 3041(a). California law provides that, at that point, the Board "shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for" the prisoner. Cal. Penal Code § 3041(b).

Accordingly, regulations promulgated by the Board pursuant to California Penal Code section 3041(a)[7] provide that "a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." Cal. Code Regs. tit. 15, § 2402(a). The Board decides whether a prisoner is too dangerous to be suitable for parole by applying factors it has set forth in the California Code of Regulations.[8]

[7] California Penal Code section 3041(a) instructs the Board to "establish criteria for the setting of parole release dates and in doing so shall consider the number of victims of the crime for which the inmate was sentenced and other factors in mitigation or aggravation of the crime."

[8] The following factors tend to show unsuitability for parole: (1) the prisoner committed the offense in an especially heinous, atrocious, or cruel manner; (2) the prisoner has a previous record of violence; (3) the prisoner has an unstable social history; (4) the prisoner has committed sadistic sex offenses; (5) the prisoner has a history of mental or psychological problems; and (6) the prisoner has engaged in serious misconduct while in prison. Cal. Code Regs. tit. 15, § 2402(c). Factors tending to show suitability for parole include: (1) the prisoner has no juvenile record; (2) the prisoner has a stable social history; (3) the prisoner has shown

When the Governor reviews a decision of the Board, he must apply these same criteria.

[6] Even though these suitability and unsuitability factors are helpful in analyzing whether a prisoner should be granted parole, California courts have made clear that the "findings that are necessary to deem a prisoner unsuitable for parole," *Irons,* 2007 WL 2927359, at *3, are not that a particular factor or factors indicating unsuitability exist, but that a prisoner's release will unreasonably endanger public safety. *In re Dannenberg,* No. H030031, 2007 WL 3408290, at *9 (Cal. Ct. App. Dec. 3, 2007); *In re Lee,* 143 Cal. App. 4th 1400, 1408 (Cal. Ct. App. 2006); *In re Scott,* 133 Cal. App. 4th 573, 595 (Cal. Ct. App. 2005); *see* Cal. Penal Code § 3041(b) (providing that the Board "shall set a release date unless . . . consideration of the public safety requires a more lengthy period of incarceration for this individual"). For our purposes, then, "[t]he test is not whether some evidence supports the reasons the Governor cites for denying parole, but whether some evidence indicates a parolee's release unreasonably endangers public safety. Some evidence of the existence of a particular factor does not necessarily equate to some evidence the parolee's release unreasonably endangers public safety." *Lee,* 143 Cal. App. 4th at 1408 (citations and footnote omitted); *see also In re Elkins,* 144 Cal. App. 4th 475, 499 (Cal. Ct. App. 2006) (holding that the "governor, in reviewing a suitability determination, must remain focused . . . on facts indicating that release currently poses 'an unreasonable risk of danger to society.'" (citing Cal. Code Regs. tit. 15, § 2402(a))); *Scott,* 133 Cal. App. 4th at 591 ("The factor statutorily required to

signs of remorse; (4) the prisoner was motivated to commit the crime out of stress; (5) the prisoner suffered from Battered Woman Syndrome; (6) the prisoner lacks a significant criminal history; (7) the prisoner's age reduces the probability of recidivism; (8) the prisoner has realistic plans for release; and (9) the prisoner's behavior in prison indicates an ability to function within the law upon release. *Id.* § 2402(d).

be considered, and the overarching consideration, is 'public safety.'" (citing Cal. Penal Code § 3041(b))).

[7] After carefully reviewing the record, we conclude that the the Los Angeles County Superior Court unreasonably applied the some evidence standard when it concluded that the Governor's reversal of the Board's grant of parole to Hayward was justified. We conclude that, viewed fairly and in its context, no evidence in the record supports a determination that Hayward's release would unreasonably endanger public safety.

[8] Hayward's initial crime was committed decades ago and with the type of unusual provocation, the victim's threat to or assault of Hayward's girlfriend, that seems not likely to recur in the years of life remaining for him. Hayward has accepted responsibility for his crime and does not seek to minimize its impact. At the same time, several additional factors demonstrate persuasively that Hayward can be released under supervisory conditions presenting no probable danger to society: his record of education in prison; the lack of any recent disciplinary offense or misconduct in prison; the many people who have gone to bat for him in their letters; along with the considered decisions of the parole board to first grant Hayward parole on his tenth application in 2001 and then, despite the Governor's rejection of the parole board's 2001 decision, decline to adopt the Governor's unsuitability findings and grant Hayward parole again upon his eleventh application in 2003.

[9] Many of the factual findings upon which the Governor relied in reversing the Board's grant of parole have no evidentiary support in the record. First, the Governor asserted that Hayward was unsuitable for parole because, until relatively recently, he refused to accept responsibility for his crime and did not demonstrate any remorse for his crime. However, Hayward admitted his guilt and took responsibility for his crime at a 1993 Board hearing, more than ten years before the Governor reversed the parole grant.

Second, the Governor based his reversal of Hayward's parole on his finding that Hayward had an extensive record of alcohol and drug abuse. Hayward, however, has not used alcohol since 1974, much less abused it. The Governor stated that Hayward used heroin from 1955 until 1976. To the contrary, Hayward experimented with the drug for one month, while he was in prison, and then immediately quit and has never used it again. The Governor also expressed his concern that Hayward had only engaged in limited substance abuse counseling. However, Hayward has participated in the Yoke Fellows, Project Change, and other support and counseling programs for many years.

Third, the Governor relied on Hayward's "lifetime of escalating criminality and violence" in reversing his parole. The Governor stated that Hayward admitted he was responsible for 75 to 120 very serious crimes for which he was never arrested. There is simply no basis for such an assertion in the record.

Fourth, the Governor stated that Hayward's psychological "evaluators remain convinced that he poses a danger to society." Again, this is simply not true. The most recent psychological evaluation, performed by Dr. Rueschenberg in 2002, concluded that Hayward had a viable parole plan and that he had a favorable prognosis for adjusting to living in the community. While Dr. Rueschenberg concluded that Hayward presented a low-to-moderate risk of danger to society, he also emphasized that any risk Hayward might pose was adequately contained.

Having rejected the grounds relied upon by the Governor that are not supported by evidence in the record, we are left with only three grounds that the Governor possibly could have based his reversal of parole on: (1) Hayward's criminal history (other than the 75 to 120 alleged crimes not supported by the record); (2) Hayward's unstable social history, includ-

ing a history of gang involvement; and (3) the nature of Hayward's commitment offense.9

[10] We have cautioned that a continued reliance on an unchanging factor such as the circumstances of the commitment offense, pre-conviction criminal history, or other past conduct, might in some cases result in a due process violation at some point. *Biggs v. Terhune*, 334 F.3d 910, 916 (9th Cir. 2003). *Biggs* upheld the Board's denial of parole based on the commitment offense, but cautioned:

[T]he parole board's sole supportable reliance on the gravity of the offense and conduct prior to imprisonment to justify denial of parole can be initially justified as fulfilling the requirements set forth by state law. Over time, however, should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of Biggs' offense and prior conduct would raise serious questions involving his liberty interest in parole.

*Id.* We further noted that the denial of parole based on "[a] continued reliance . . . on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." *Id.* at 915.

9 In addition to the factors we discuss here, the Governor also considered the opposition of the Los Angeles County District Attorney to Hayward's release. Even though the district attorney is permitted to attend parole hearings and express an opinion on the prisoner's suitability for parole, *see* Cal. Penal Code § 3041.7 (providing that prosecutor may be present at a parole hearing "to represent the interests of the people"), the district attorney's opinion, without more, cannot be considered "some evidence" under *Hill*, that supports the Governor's reversal of parole. *Rosenkrantz v. Marshall*, 444 F. Supp. 2d 1063, 1080 n.14 (C.D. Cal. 2006).

[11] We restated this point in *Irons*, noting that "in some cases, indefinite detention based solely on an inmate's commitment offense, regardless of the extent of his rehabilitation, will at some point violate due process, given the liberty interest in parole that flows from the relevant California statutes." *Irons*, 2007 WL 2027359, at *6. "The commitment offense can negate suitability only if circumstances of the crime reliably established by evidence in the record rationally indicate that the offender will present an unreasonable public safety risk if released from prison." *Scott*, 133 Cal. App. 4th at 595.

We turn to the three remaining factors that the Governor cited in support of his reversal of the Board's grant of parole and conclude that these factors, whether analyzed individually or collectively, do not constitute evidence that Hayward would pose a danger to public safety if released from prison.

[12] First, the Governor cited Hayward's "long criminal history." The Governor specifically noted Hayward's history of juvenile mischief and asserted that Hayward was first placed on probation at age eight. Hayward's juvenile conduct, which occurred nearly fifty years ago, provides no basis for a conclusion that Hayward currently poses a risk to public safety. Though Hayward was arrested many times before he committed the murder in this case, these arrests occurred thirty or more years ago and also do not support a conclusion that Hayward currently poses any threat to public safety. It can hardly be doubted that time may attenuate the taint of certain prior misconduct, and this is particularly true as applied to consideration of Hayward's misconduct before he committed the murder that led to his conviction.

Second, the Governor reversed the Board's grant of parole to Hayward because of his unstable social history, including his history of gang activity both inside and outside of prison. However, Hayward quit the Vagos gang in 1981 and has not been involved in any prison gang activity since 1989. Hayward's social history is, as a whole, quite stable. After Hay-

ward committed the murder in this case, he married his girlfriend. He maintains contact with his children, parents, and other relatives. As indicated by the letters Hayward's relatives submitted to the Board, they look forward to welcoming him back into their family if he is released. In concluding that Hayward had an unstable social history, the Governor also emphasized that when Hayward was eleven years old, he impregnated an eleven-year-old girl. This conduct, which occurred more than fifty years ago, does not provide any evidence that Hayward currently poses a risk to public safety.

[13] The final basis for the Governor's reversal of Hayward's parole is based on the gravity of Hayward's commitment offense, as the Governor found that Hayward's conduct was particularly heinous. We conclude, however, that in the unusual circumstances of this case, including Hayward's rehabilitation by education and conduct while imprisoned and the Board's successive favorable views of his application for release, Hayward's commitment offense, which occurred twenty-five years ago, cannot demonstrate that Hayward's release will pose an imminent danger to public safety. See *Rosenkrantz v. Marshall*, 444 F. Supp. 2d 1063, 1084 (C.D. Cal. 2006) ("While relying upon petitioner's crime as an indicator of his dangerousness may be reasonable for some period of time, in this case, continued reliance on such unchanging circumstances—after nearly two decades of incarceration and half a dozen parole suitability hearings—violates due process because petitioner's commitment offense has become such an unreliable predictor of his present and future dangerousness that it does not satisfy the 'some evidence' standard. After nearly twenty years of rehabilitation, the ability to predict a prisoner's future dangerousness based simply on the circumstances of his or her crime is nil."); *Scott*, 133 Cal. App. 4th at 595 ("[T]he predictive value of the commitment offense may be very questionable after a long period of time."). Hayward is now sixty-four years old. The Governor was reviewing Hayward's eleventh parole suitability hearing. Hayward had been in prison for nearly thirty years and had an exem-

plary record of conduct for most of that time. In light of the extraordinary circumstances of this case—given the provocation for Hayward's violent crime in 1978, his incarceration for almost thirty years with his positive prison record in recent times, and the favorable discretionary decisions of the Board in successive hearings, which were reversed by the Governor on factual premises most of which were not documented in the record—we conclude that the unchanging factor of the gravity of Hayward's commitment offense had no predictive value regarding his suitability for parole. In the circumstances of this case, the Governor violated Hayward's due process rights by relying on that stale and static factor in reversing his parole grant.[10]

The Governor also based his reversal of the Board's parole grant on Hayward's motive to commit the crime. The Governor concluded that the "official record" indicated that Hayward committed the crime in retaliation for the victim slapping Hayward's then-girlfriend. However, the Board concluded that the victim had in fact battered and attempted to rape Hayward's future wife, and that Hayward attacked the victim in retaliation for that incident, after being provoked by the victim throwing a beer bottle at him. The Governor's conclusion that Hayward committed the crime in retaliation for a slap is based on the incomplete facts recited in the opinion of the California Court of Appeal affirming Hayward's conviction on direct review. Even if the Governor's interpretation of the facts is the correct one, the unchanging factor of Hay-

[10] We emphasize that Hayward was convicted of second degree murder for stabbing a man he believed had physically assaulted his girlfriend. In concluding that Hayward's conviction offense does not, at this time, after nearly thirty years of incarceration, accurately predict that Hayward currently poses a danger to society, we do recognize that certain conviction offenses may be so "heinous, atrocious or cruel" that a prisoner's due process rights might be violated if he or she were denied parole solely on the basis of the nature of the conviction offense. We need not identify those offenses here. We confine our holding to the facts of this case and the nature of Hayward's particular conviction offense.

ward's motive for committing the crime did not provide a factual basis for the Governor to conclude that Hayward's release presented a risk to public safety. The Governor violated Hayward's due process rights by relying on the unchanging factor of motive for the commitment offense in reversing parole.

Hayward was initially sentenced to a term of fifteen years to life in prison. Hayward has been in prison for twenty-seven years. In *Irons*, we noted that

in all the cases in which we have held that a parole board's decision to deem a prisoner unsuitable for parole solely on the basis of his commitment offense comports with due process, the decision was made before the inmate had served the minimum number of years required by his sentence. Specifically, in *Biggs, Sass,* and here, the petitioners had not served the minimum number of years to which they had been sentenced at the time of the challenged parole denial by the Board.

*Irons,* 2007 WL 2027359, at *6. Therefore, we concluded that "[a]ll we held in those cases and all we hold today . . . is that, given the particular circumstances of the offenses in these cases, due process was not violated when these prisoners were deemed unsuitable for parole prior to the expiration of their minimum terms." *Id.* Here, by contrast, Hayward has long served more than his minimum fifteen-year term of imprisonment. We hold that the Governor's reversal of parole in this case was not supported by any evidence that Hayward's release would threaten public safety, and that the Governor's reversal of his parole thus violated his due process rights.

[14] For the same reasons, we conclude that the Los Angeles County Superior Court unreasonably applied the some evidence standard to Hayward's petition. The Superior Court identified two pieces of evidence supporting the Governor's

reversal of parole. First, the Superior Court noted that the nature of the commitment offense supported the Governor's finding that Hayward was unsuitable for parole. However, as we have explained, in the circumstances of this case, reliance on Hayward's commitment offense was not sufficient to provide some evidence that his release would endanger the public. Second, the Superior Court noted that the "somewhat unfavorable psychological and counselor reports" provided some evidence to support the Governor's reversal. However, as we discussed above, the reports are not "somewhat unfavorable," but instead give a positive report on Hayward's potential to adapt to freedom and to avoid committing crimes if released. Dr. Rueschenberg, who prepared the most recent psychological evaluation of Hayward, concluded that "Mr. Hayward's prognosis for community living seems to be favorable," that "he appears to have a viable parole plan," and that he "appears to be a strong candidate for a favorable readjustment in the community." The Superior Court's determination that Hayward's psychological and counselor reports were "somewhat unfavorable" was an unreasonable interpretation of those reports, and the Superior Court's conclusion that the reports provided some evidence to support the Governor's determination that Hayward was not suitable for parole was an unreasonable application of the some evidence standard articulated in *Hill*.

[15] In sum, we conclude that, considering all the circumstances, the denial of parole to Hayward denied him due process. We therefore reverse the district court's order denying Hayward's petition for a writ of habeas corpus, and remand the case with instructions to grant the writ.

**REVERSED AND REMANDED.**

Exhibit- B

09/12/2007  11:00  ▬▬▬▬▬  ▬▬▬▬▬                          PAGE  01/34



(ENDORSED)
**F I L E D**

AUG 3 0 2007

KIRI TORRE
Chief Executive Officer/Clerk
Superior Court of Cal... Santa Clara
BRET MORROW
_____ DEPUTY

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SANTA CLARA

In re                          )    No.: 71614
                               )
  ARTHUR CRISCIONE,            )
                               )    ORDER
On Habeas Corpus               )
_____)

## INTRODUCTION

Petitioner alleges that he has been denied due process of law because the Board has used standards and criteria which are unconstitutionally vague in order to find him unsuitable for parole. Alternatively, he argues that those standards, even if constitutionally sound, are nonetheless being applied in an arbitrary and meaningless fashion by the Board. He relies upon evidence that in one hundred percent of 2690 randomly chosen cases, the Board found the commitment offense to be "especially heinous, atrocious or cruel", a factor tending to show unsuitability under Title 15 §2402(c)(1).

### Are the Board Criteria Unconstitutionally Vague?

Our courts have long recognized that both state and federal due process requirements dictate that the Board must apply detailed standards when evaluating whether an individual inmate is unsuitable for parole on public safety grounds. (See *In re Dannenberg* (2005) 34

09/12/2007  11:00                     PAGE  02/34

Cal.4th 1061 at p. 1096, footnote 16.). Those standards are found in 15 CCR §2402(c) (*Dannenberg, supra,* 34 Cal.4th at p. 1080,) and do include detailed criteria to be applied by the Board when considering the commitment offense:

> (c) Circumstances Tending to Show Unsuitability. The following circumstances each tend to indicate unsuitability for release. These circumstances are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel. Circumstances tending to indicate unsuitability include:
>
> (1) Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include:
>
> (A) Multiple victims were attacked, injured or killed in the same or separate incidents.
>
> (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.
>
> (C) The victim was abused, defiled or mutilated during or after the offense.
>
> (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.
>
> (E) The motive for the crime is inexplicable or very trivial in relation to the offense.

In response to Petitioners claim that the regulations are impermissibly vague, Respondent argues that while "especially heinous, atrocious or cruel" might be vague in the abstract it is limited by factors (A)-(E) of §2402(c)(1), and thus provides a 'principled basis' for distinguishing between those cases which are contemplated in that section and those which are not. An examination of cases involving vagueness challenges to death penalty statutes is instructive here and shows that Respondent's position has merit:

> "Our precedents make clear that a State's capital sentencing

1  scheme also must genuinely narrow the class of persons eligible
   for the death penalty.  When the purpose of a statutory
2  aggravating circumstance is to enable the sentencer to
   distinguish those who deserve capital punishment from those who
3  do not, the circumstance must provide a principled basis for
   doing so.  If the sentencer fairly could conclude that an
4  aggravating circumstance applies to every defendant eligible for
   the death penalty, the circumstance is constitutionally infirm."
5     (Arave v. Creech (1993) 507 U.S. 463, 474, citing Maynard v.
   Cartwright (1988) 486 U.S. 356, 364: "invalidating aggravating
6  circumstance that 'an ordinary person could honestly believe'
   described every murder," and, Godfrey v. Georgia (1980) 446 U.S.
7  420, 428-429: "A person of ordinary sensibility could fairly
   characterize almost every murder as 'outrageously or wantonly
8  vile, horrible and inhuman.'")

9     It cannot fairly be said that 'every murder' could be

10 categorized as "especially heinous, atrocious or cruel" under the

11 Board regulations, since the defining factors contained in

12 subdivisions (A)-(E) clearly narrow the group of cases to which it

13 applies.  Although Petitioner also argues that the "vague statutory

14 language is not rendered more precise by defining it in terms or

15 synonyms of equal or greater uncertainty" (People v. Superior Court

16 (Engert) (1982) 31 Cal.3d 797, 803, Pryor v. Municipal Court (1979)

17 25 Cal.3d 238, 249. See also Walton v. Arizona (1990) 497 U.S. 639,

18 654), the factors in those subdivisions are not themselves vague or

19 uncertain.  The mere fact that there may be some subjective component

20 (such as "exceptionally callous" disregard for human suffering) does

21 not render that factor unconstitutionally vague.   The proper degree

22 of definition of such factors is not susceptible of mathematical

23 precision, but will be constitutionally sufficient if it gives

24 meaningful guidance to the Board.

25     A law is void for vagueness if it "fails to provide adequate
   notice to those who must observe its strictures and
26 impermissibly delegates basic policy matters to policemen,
   judges, and juries for resolution on an ad hoc and subjective
27 basis, with the attendant dangers of arbitrary and

28

                                    3

09/12/2007  11:00    ▓▓▓▓▓▓▓    ▓▓▓▓▓    PAGE  04/34

1  discriminatory application."  (*People v. Rubalcava* (2000) 23
2  Cal.4th 322, 332, quoting *People ex rel. Gallo v. Acuna* (1997)
   14 Cal. 4th 1090, 1116, quoting *Grayned v. City of Rockford*
   (1972) 408 U.S. 104, 108-109.)

3  A review of cases expressing approval of definitions to limit the
4  application of otherwise vague terms in death penalty statutes leads
5  inextricably to the conclusion that the limiting factors in §2402(c)
6  easily pass constitutional muster.  An Arizona statute was upheld
7  that provided a crime is committed in an 'especially cruel manner'
8  when the perpetrator inflicts mental anguish or physical abuse before
9  the victim's death," and that "mental anguish includes a victim's
10 uncertainty as to his ultimate fate."  (*Walton v. Arizona* (1990) 497
11 U.S. 639, 654.)  Similarly, the court in *Maynard v. Cartwright*, 486
12 U.S. at 364-365, approved a definition that would limit Oklahoma's
13 "especially heinous, atrocious, or cruel" aggravating circumstance to
14 murders involving "some kind of torture or physical abuse.  In
15 Florida, the statute authorizing the death penalty if the crime is
16 "especially heinous, atrocious, or cruel," satisfied due process
17 concerns where it was further defined as "the conscienceless or
18 pitiless crime which is unnecessarily torturous to the victim."
19 *State v. Dixon* (1973) 283 So. 2d 1 at p. 9.

20     Here, the factors in subdivisions (A)-(E) provide equally clear
21 limiting construction to the term "especially heinous, atrocious, or
22 cruel" in §2402(c).

23 ### Has the Board Engaged in a Pattern of Arbitrary Application of the
24 Criteria?

25     As previously noted, 15 CCR §2402 provides detailed criteria for
26 determining whether a crime is "exceptionally heinous, atrocious or
27 cruel" such that it tends to indicate unsuitability for parole.  Our

28

1  courts have held that to fit within those criteria and thus serve as

2  a basis for a finding of unsuitability, the circumstances of the

3  crime must be more aggravated or violent than the minimum necessary

4  to sustain a conviction for that offense.  (*In re Rosenkrantz* (2002)

5  29 Cal.4th 616, 682-683.)  Where that is the case, the nature of the

6  prisoner's offense, *alone*, can constitute a sufficient basis for

7  denying parole.  (*In re Dannenberg*, *supra*, 34 Cal.4th at p. 1095.)

8       Petitioner claims that those criteria, even if constitutionally

9  sound, have been applied by the Board in an arbitrary and capricious

10  manner rendering them devoid of any meaning whatever.  The role of

11  the reviewing court under these circumstances has been addressed

12  previously in the specific context of Parole Board actions:

13      "[Courts have] an obligation, however, to look beyond the facial
        validity of a statute that is subject to possible
14      unconstitutional administration since a law though fair on its
        face and impartial in appearance may be open to serious abuses
15      in administration and courts may be imposed upon if the
        substantial rights of the persons charged are not adequately
16      safeguarded at every stage of the proceedings.  We have
        recognized that this court's obligation to oversee the execution
17      of the penal laws of California extends not only to judicial
        proceedings, but also to the administration of the Indeterminate
18      Sentence Law."  (*In re Rodriguez* (1975) 14 Cal.3d 639, 648,
        quoting *Minnesota* v. *Probate Court* (1940) 309 U.S. 270, 277.)

19

20      Similarly, in *In re Minnis* (1972) 7 Cal.3d 639, 645, the case

21  closest on point to the present situation, the California Supreme

22  Court stated: "This court has traditionally accepted its

23  responsibility to prevent an authority vested with discretion from

24  implementing a policy which would defeat the legislative motive for

25  enacting a system of laws."  Where, as here, the question is whether

26  determinations are being made in a manner that is arbitrary and

27  capricious, judicial oversight "must be extensive enough to protect

28

09/12/2007  11:00                                              PAGE  05/34

1  limited right of parole applicants 'to be free from an arbitrary

2  parole decision... and to something more than mere pro-forma

3  consideration.'"   (In re Ramirez (2001) 94 Cal.App.4th 549 at p. 564,

4  quoting In re Sturm (1974) 11 Cal.3d 258 at p. 268.)

5        This Court, therefore, now examines Petitioner's "as applied"

6  void for vagueness challenge.

7

8                        ### The Evidence Presented

9        A similar claim to those raised here, involving allegations of

10  abuse of discretion by the Board in making parole decisions, was

11  presented to the Court of Appeal in In re Ramirez, supra.  The Court

12  there observed that such a "serious claim of abuse of discretion"

13  must be "adequately supported with evidence" which should be

14  "comprehensive."  (Ramirez, supra, 94 Cal.App.4th at p. 564, fn. 5.)

15  The claim was rejected in that case because there was not "a

16  sufficient record to evaluate."  (Ibid.)  In these cases, however,

17  there is comprehensive evidence offered in support of Petitioner's

18  claims.

19        Discovery orders were issued in five different cases involving

20  life term inmates (Petitioners) who all presented identical claims.[1]

21

22  [1] This Court takes judicial notice of the several other cases currently
     pending (Lewis #68038, Jameison #71194, Bragg #108543, Ngo #127611.) which
23  raise this same issue and in which proof was presented on this same point.
     (Evidence Code § 452(d).  See specifically, in the habeas corpus context,
24  In re Vargus (2000) 83 Cal.App.4th 1125, 1134-1136, 1143, in which judicial
     notice was taken of the evidence in four other cases and in which the court
25  noted: "Facts from other cases may assist petitioner in establishing a
     pattern."  See generally McKell v. Washington Mutual, Inc, (2006) 142
26  Cal.App.4th 1457, 1491: "trial and appellate courts ... may properly take
     judicial notice of ... established facts from both the same case and other
27  cases."  And see AB Group v. Wertin (1997) 59 Cal.App.4th 1022, 1036:
     Judicial notice taken of other cases when matters are "just as relevant to
     the present [case] as they are to the others.")

28

                                    6

1  The purpose of the discovery was to bring before the Court a

2  comprehensive compilation and examination of Board decisions in a

3  statistically significant number of cases.  The Board decisions under

4  examination consisted of final decisions of the Board for life-term

5  inmates convicted of first or second degree murder and presently

6  eligible for parole.  Included were all such decisions issued in

7  certain months, chosen by virtue of their proximity in time to the

8  parole denials challenged in the pending petitions.  All Board

9  decisions in the months of August, September and October of 2002,

10  July, August, September, October, November, and December of 2003,

11  January and February of 2004, February of 2005, and January of 2006

12  were compiled.  This resulted in a review of 2690 cases decided in a

13  total of 13 months.

14         The purpose of the review was to determine how many inmates had

15  actually been denied parole based in whole or in part on the Board's

16  finding that their commitment offense fits the criteria set forth in

17  Title 15 §2402(c)(1) as "especially heinous, atrocious or cruel."  A

18  member of the research team conducting the review, Karen Rega,

19  testified that in its decisions the Board does not actually cite CCR

20  rule §2402(c), but consistently uses the specific words or phrases

21  ("verbiage from code") contained therein, so that it could easily be

22  determined when that criteria was being applied.  (For example,

23  finding "multiple victims" invokes §2402(c)(1)(A); finding the crime

24  "dispassionate" "calculated" or "execution style" invokes

25  §2402(c)(1)(B); that a victim was "abused" "mutilated" or "defiled"

26  invokes §2402(c)(1)(C); a crime that is "exceptionally callous" or

27  demonstrated a "disregard for human suffering" fits criteria

28

1   §2402(c)(1)(D); and finding the motive for the crime "inexplicable"

2   or "trivial" invokes §2402(c)(1)(E).)

3        Petitioners provided charts, summaries, declarations, and the

4   raw data establishing the above in the cases of Lewis #68038,

5   Jameison #71194, Bragg #108543, and Ngo #127611.  In this case

6   (Criscione #71614) the evidence was presented somewhat differently.

7   Both to spread the burden of the exhaustive examination, and to

8   provide a check on Petitioners' methods, this Court ordered

9   Respondent to undertake an examination of two randomly chosen months

10  in the same manner as Petitioner had been doing.  Respondent complied

11  and provided periodic updates in which they continued to report that

12  at all "the relevant hearings the Board relied on the commitment

13  offense as a basis for denying parole."  (See "Respondent's Final

14  Discovery Update" filed April 5, 2007.)  At the evidentiary hearing

15  on this matter counsel for Respondents stipulated that "in all of

16  those cases examined [by Respondent pursuant to the Criscione

17  discovery orders] the Board relied on the commitment offense as a

18  basis for denying parole."  (See pages 34-35 of the June 1, 2007,

19  evidentiary hearing transcript.)

20       The result of the initial examination was that in over 90

21  percent of cases the Board had found the commitment offense to be

22  "especially heinous, atrocious or cruel" as set forth in Title 15

23  §2402(c)(1).  In the remaining 10% of cases either parole had been

24  granted, or it was unclear whether §2402(c)(1) was a reason for the

25  parole denial.  For all such cases, the decisions in the prior

26  hearing for the inmate were obtained and examined.  In every case,

27  the Board had determined at some point in time that every inmates

28

8

1  crime was "especially heinous, atrocious or cruel" under Title 15

2  §2402(c)(1).

3      Thus, it was shown that 100% of commitment offenses reviewed by

4  the Board during the 13 months under examination were found to be

5  "especially heinous, atrocious or cruel" under Title 15 §2402(c)(1).

6      A further statistic of significance in this case is that there

7  are only 9,750 inmates total who are eligible for, and who are

8  currently receiving, parole consideration hearings as life term

9  inmates. (See "Respondent's Evidentiary Hearing Brief," at p. 4,

10  filed April 16, 2007.)

11

12                        USE OF STATISTICS

13      In *International Brotherhood of Teamsters v. United States*

14  (1977) 431 U.S. 324, 338-340, the United States Supreme Court

15  reaffirmed that statistical evidence, of sufficient "proportions,"

16  can be sound and compelling proof.  As noted by the court in *Everett*

17  *v. Superior Court* (2002) 104 Cal.App.4th 388, 393, and the cases cited

18  therein, "courts regularly have employed statistics to support an

19  inference of intentional discrimination."

20      More recently, the United States Supreme Court, in *Miller-El v.*

21  *Cockrell* (2003) 537 U.S. 322, 154 L.Ed.2d 931, when examining a habeas

22  petitioner's allegations that the prosecutor was illegally using his

23  peremptory challenges to exclude African-Americans from the

24  petitioner's jury, noted that "the statistical evidence alone" was

25  compelling.  The high court analyzed the numbers and concluded:

26  "Happenstance is unlikely to produce this disparity."  (See also

27  *People v. Hofsheier* (2004) 117 Cal.App.4th 438 in which "statistical

28

9

1   evidence" was noted as possibly being dispositive.  And see *People v.*
2   *Flores* (2006) 144 Cal.App.4th 625 in which a statistical survey and
3   analysis, combined into an "actuarial instrument" was substantial
4   proof.)
5        A statistical compilation and examination such as has been
6   presented in these cases is entirely appropriate and sufficient
7   evidence from which to draw sound conclusions about the Board's
8   overall methods and practices.

9
10                        <u>THE EXPERT'S TESTIMONY</u>

11       Petitioners provided expert testimony from Professor Mohammad
12   Kafai regarding the statistics and the conclusions that necessarily
13   follow from them.  Professor Kafai is the director of the statistics
14   program at San Francisco State University, he personally teaches
15   statistics and probabilities, and it was undisputed that he was
16   qualified to give the expert testimony that he did.  No evidence was
17   presented that conflicts or contradicts the testimony and conclusions
18   of Professor Kafai.  By stipulation of the parties, Professor Kafai's
19   testimony was to be admissible and considered in the cases of all
20   five petitioners.  (See page 35 of the June 1, 2007, evidentiary
21   hearing transcript.)

22       Professor Kafai testified that the samples in each case, which
23   consisted of two or three months of Board decisions, are
24   statistically sufficient to draw conclusions about the entire
25   population of life term inmates currently facing parole eligibility
26   hearings.  Given that every inmate within the statistically
27   significant samples had his or her crime labeled "particularly

28

                                10



1   egregious'" or "especially heincus, atrocious or cruel" under Title

2   15 §2402(c)(1), it can be mathematically concluded that the same

3   finding has been made for every inmate in the entire population of

4   9,750.  Although he testified that statisticians never like to state

5   unequivocally that something is proven to a 100% certainty, (because

6   unforeseen anomalies are always theoretically possible,) he did

7   indicate the evidence he had thus far examined came as close to that

8   conclusion as could be allowed.  Not surprisingly, Professor Kafai

9   also testified that "more than 50% can't by definition constitute an

10   exception."

11       Having found the data provided to the expert to be sound this

12   Court also finds the expert's conclusions to be sound.  In each of

13   the five cases before the Court over 400 inmates were randomly chosen

14   for examination.  That number was statistically significant and was

15   enough for the expert to draw conclusions about the entire population

16   of 9,750 parole eligible inmates.  The fact that the approximately

17   2000 inmates examined in the other cases also had their parole denied

18   based entirely or in part on the crime itself (§2402(c)(1)), both

19   corroborates and validates the expert's conclusion in each individual

20   case and also provides an overwhelming and irrefutable sample size

21   from which even a non expert can confidently draw conclusions.

22

23                 <u>DISCUSSION</u>

24     Although the evidence establishes that the Board frequently says

25   parole is denied "first," "foremost," "primarily," or "mainly,"

26   because of the commitment offense, this statement of primacy or

27   weight is not relevant to the question now before the Court.

28

11

1   Petitioners acknowledge that the Board generally also cites other

2   reasons for its decision.  The question before this Court, however,

3   is not whether the commitment offense is the primary or sole reason

4   why parole is denied -- the question is whether the commitment

5   offense is labeled "'particularly egregious'" and thus could be used,

6   under *Dannenberg*, primarily or exclusively to deny parole.

7        The evidence proves that in a relevant and statistically

8   significant period where the Board has considered life term offenses

9   in the context of a parole suitability determination, every such

10  offense has been found to be "particularly egregious" or "especially

11  heinous, atrocious or cruel."[2]  This evidence conclusively

12  demonstrates that the Board completely disregards the detailed

13  standards and criteria of §2402(c).  "Especially" means particularly,

14  or "to a distinctly greater extent or degree than is common."[3]  (EC §

15  451(e).)  By simple definition the term "especially" as contained in

16  section 2402(C)(1) cannot possibly apply in 100% of cases, yet that

17  is precisely how it has been applied by the Board.  As pointed out by

18  the Second District Court of Appeal, not every murder can be found to

19  be "atrocious, heinous, or callous" or the equivalent without "doing

20  _____
    [2] In a single case out of the 2690 that were examined Petitioner has conceded that
21  the Board did not invoke §2402(c)(1).  This Court finds that concession to be
    improvidently made and the result of over caution.  When announcing the decision at
22  the initial hearing of S. Fletcher (H-10330) on 4/6/06, the commissioner did begin
    by stating "I don't believe this offense is particularly aggravated..."  However
23  the commissioner proceeds to describe the crime as a drug deal to which Fletcher
    brought a gun so "we could say there was some measure of calculation in that."  The
    commissioner continued by observing that the reason someone would bring a gun to a
24  drug transaction was to make sure things went according to their plan "so I guess
    we can say that that represents calculation and perhaps it's aggravated to that
25  extent."  As is the Board's standard practice, by using the word 'calculated' from
    §2402(c)(1)(b) the Board was invoking that regulation.  Certainly if Mr. Fletcher
26  had brought a habeas petition Respondent's position would be that there is 'some
    evidence' supporting this.  The ambiguity created by the commissioner's initial
    statement was cleared up several pages later when he announces that "based upon the
27  crime coupled with ..." parole was denied for four years.  (See *In re Burns* (2005)
    136 Cal.App.4th 1318, 1326, holding §2402(c)(1) criteria are necessary for a multi-
28  year denial.)

                                     12

1  violence" to the requirements of due process.  (*In re Lawrence* (2007)

2  150 Cal.App.4th 1511, 1557.)  This is precisely what has occurred

3  here, where the evidence shows that the determinations of the Board

4  in this regard are made not on the basis of detailed guidelines and

5  individualized consideration, but rather through the use of all

6  encompassing catch phrases gleaned from the regulations.

7

8                          THE BOARD'S METHODS

9         Because it makes no effort to distinguish the applicability of

10  the criteria between one case and another, the Board is able to force

11  every case of murder into one or more of the categories contained in

12  §2402(c).

13        For example, if the inmate's actions result in an instant death

14  the Board finds that it was done in a "dispassionate and calculated

15  manner, such as an execution-style murder."  At the same time the

16  Board finds that a murder not resulting in near instant death shows a

17  "callous disregard for human suffering" without any further analysis

18  or articulation of facts which justify that conclusion.  If a knife

19  or blunt object was used, the victim was "abused, defiled, or

20  mutilated."  If a gun was used the murder was performed in a

21  "dispassionate and calculated manner, such as an execution-style

22  murder."  If bare hands were used to extinguish another human life

23  then the crime is "particularly heinous and atrocious."

24        Similarly, if several acts, spanning some amount of time, were

25  necessary for the murder the Board may deny parole because the inmate

26  had "opportunities to stop" but did not.  However if the murder was

27  _____
    [3] Princeton University World Net Dictionary (2006).

28

                                    13

1  accomplished quickly parole will be denied because it was done in a
2  dispassionate and calculated manner and the victim never had a chance
3  to defend themselves or flee.  If the crime occurred in public, or
4  with other people in the vicinity, it has been said that the inmate
5  "showed a callous disregard" or "lack of respect" for the
6  "community."  However if the crime occurs when the victim is found
7  alone it could be said that the inmate's actions were aggravated
8  because the victim was isolated and more vulnerable.
9       In this manner, under the Board's cursory approach, every murder
10  has been found to fit within the unsuitability criteria.  What this
11  reduces to is nothing less than a denial of parole for the very
12  reason the inmates are present before the Board - i.e, they committed
13  murder.  It is circular reasoning, or in fact no reasoning at all,
14  for the Board to begin each hearing by stating the inmate is before
15  them for parole consideration, having passed the minimum eligible
16  parole date based on a murder conviction, and for the Board to then
17  conclude that parole will be denied because the inmate committed acts
18  that amount to nothing more than the minimum necessary to convict
19  them of that crime.  As stated quite plainly by the Sixth District:
20  "A conviction for murder does not automatically render one unsuitable
21  for parole."  (Smith, supra, 114 Cal.App.4th at p. 366, citing
22  Rosenkrantz, supra, 29 Cal.4th at p. 683.)
23       In summary, when every single inmate is denied parole because
24  his or her crime qualifies as a §2402(c)(1) exception to the rule
25  that a parole date shall normally be set, then the exception has
26  clearly swallowed the rule and the rule is being illegally
27  interpreted and applied.  When every single life crime that the Board
28

                                    14

1   examines is "particularly egregious" and "especially heinous,

2   atrocious or cruel" it is obvious that the Board is operating without

3   any limits and with unfettered discretion.

4       Other examples of the failure to 'connect up' the facts of the

5   individual case with the criteria and the ultimate findings abound in

6   the decisions of the reviewing courts.  Some of the state cases to

7   have reversed Parole Board or Governor abuses of discretion in

8   denying parole include *In re Roderick, In re Cooper, In re Lawrence,*

9   *In re Barker, In re Gray, In re Lee, In re Elkins, In re Weider, In*

10  *re Scott, In re Deluna, In re Ernest Smith, In re Mark Smith,* and *In*

11  *re Capistran.*

12      When "the record provides no reasonable grounds to reject, or

13  even challenge, the findings and conclusions of the psychologist and

14  counselor concerning [the inmate's] dangerousness" the Board may not

15  do so.  (*In re Smith* (2003) 114 Cal.App.4th 343, 369.)

16      When an inmate, although only convicted of a second degree

17  murder, has been incarcerated for such time that, with custody

18  credits, he would have reached his MEPD if he had been convicted of a

19  first, the Board must point to evidence that his crime was aggravated

20  or exceptional even for a first degree murder if they are going to

21  use the crime as a basis for denying parole.  (*In re Weider* (2006)

22  145 Cal.App.4th 570, 582-583.)[4]

23  _____

24  [4]    This rule, rooted in Justice Moreno's concurrence in *Rosenkrantz, supra,* is
    particularly applicable in this case.  Petitioner was convicted of second degree,
    but acquitted of first degree, murder over 25 years ago.  (*People v. Criscione*

25  (1981) 125 Cal.App.3d 275.)  With his custody credits he is beyond the matrix even
    had he been convicted of a first.  In a currently pending habeas petition in which

26  he challenges his 2007 parole denial the first reason the Board gave was the crime
    itself and the presiding commissioner explained; "His actions go well beyond the
    minimum necessary for a conviction of murder in the second degree."  (Decision page

27  2 of 4/2/07 transcript.)  For the Board to penalize the Petitioner for the fact
    that he was acquitted of first degree is further proof of their willfulness and

28

1    A "petitioner's young age at the time of the offense" must be

2  considered.  (In re Elkins (2006) 144 Cal.App.4th 475, 500, quoting

3  Rosenkrantz v. Marshall (C.D.Cal. 2006) 444 F. Supp. 2d 1063, 1065,

4  1085: "The reliability of the facts of the crime as a predictor for

5  his dangerousness was diminished further by his young age of 18, just

6  barely an adult. The susceptibility of juveniles to immature and

7  irresponsible behavior means their irresponsible conduct is not as

8  morally reprehensible as that of an adult.' ")[5]

9    The Board's formulaic practice of stating §2402(c)(1) phrased in

10  a conclusory fashion, and then stating "this is derived from the

11  facts" without ever linking the two together, is insufficient.  (In

12  re Roderick, (2007) ____ Cal.App.4th ____ (A113370): "At minimum, the

13  Board is responsible for articulating the grounds for its findings

14  and for citing to evidence supporting those grounds."  (See also In

15  re Barker (2007) 151 Cal.App.4th 346, 371, disapproving

16  "conclusorily" announced findings.)

17    After two decades, mundane "crimes have little, if any,

18  predictive value for future criminality.  Simply from the passing of

19  time, [an inmate's] crimes almost 20 years ago have lost much of

20  their usefulness in foreseeing the likelihood of future offenses than

21  if he had committed them five or ten years ago."  (In re Lee (2006)

22  143 Cal.App.4th 1400, 1412.)  It should be noted that this rule

23  bias.  The jury had a reasonable doubt that Petitioner committed first degree

24  murder but under the Board's 'reasoning' and 'analysis' this puts him in a worse
      position than if they had not.  Had the jury convicted him of the greater offense

25  Petitioner has served so much time that he would already be having subsequent
      parole hearings on a first and the Board would not have been able to use the 'some

26  evidence' of first degree behavior against him.  As observed previously, the
      Board's position in this regard is "so ridiculous that simply to state it is to
      refute it."  (Weider, supra, 145 Cal.App.4th at p. 583.)

27  [5] This point is particularly significant in the case of Mike Ngo.  Mr. Ngo was only
      18 at the time of his crime.  The impetus behind the shooting was youth group or

28

16

1  applies with even more force when the Board is relying on any
2  criminality that occurred before the crime.  In that situation, just
3  as with the crime itself, the Board must explain why such old events
4  have any relevance and especially when the inmate has spent a decade
5  as a model prisoner.
6      Murders situationally related to intimate relationships are
7  unfortunately commonplace because emotions are strongest in such
8  domestic settings.  When a murder occurs because of "stress unlikely
9  to be reproduced in the future" this is a factor that affirmatively
10  points towards suitability.  (In re Lawrence (2007) 150 Cal.App.4th
11  1511 and cases cited therein.)
12      "The evidence must substantiate the ultimate conclusion that the
13  prisoner's release currently poses an unreasonable risk of danger to
14  the public.  It violates a prisoner's right to due process when the
15  Board or Governor attaches significance to evidence that forewarns no
16  danger to the public."  (In re Tripp (2007) 150 Cal.App.4th 306,
17  313.)
18      The Board "cannot rely on the fact that the killing could have
19  been avoided to show the killing was especially brutal."  (In re
20  Cooper (2007) 153 Cal.App.4th 1043, 1064.)
21      The Board's focus must be upon how the inmate "actually
22  committed his crimes" not the "incorporeal realm of legal
23  constructs."  (Lee, supra, 143 Cal.App.4th at p. 1413.)  This is
24  especially significant when the murder conviction is based on the
25  felony murder rule, provocative act doctrine, or accomplice liability
26  such that the inmate did not intend to kill or may not have even been
27  _____
gang rivalries, posturing, and threats which mature adults would not have been
28

17



1  the actual killer.

2      The Board has ample guidance before it in the decisions of the

3  various reviewing courts to constrain its abuse, but has failed to

4  avail itself of the opportunity to do so.

5

6              SEPARATION OF POWERS DOCTRINE

7      The evidence presented, as discussed above, has established a

8  void for vagueness "as applied" due process violation. That same

9  evidence also proves a separate but related Constitutional violation

10  -- an as applied separation of powers violation.

11      The separation of powers doctrine provides "that the legislative

12  power is the power to enact statutes, the executive power is the

13  power to execute or enforce statutes, and the judicial power is the

14  power to interpret statutes and to determine their

15  constitutionality." (*Lockyer v. City and County of San Francisco*

16  (2004) 33 Cal.4th 1055, 1068.) Because the evidence has proven the

17  Board is not executing/enforcing the legislature's statutes as

18  intended it is this Court's duty to intervene. The question here is

19  whether the Board is violating the separation of powers doctrine by

20  appropriating to itself absolute power over parole matters and

21  disregarding the limits and guidelines placed by the statute.[6]

22      "Government Code section 11342.2 provides: 'Whenever by the

23

24  _____

    caught up in.

    [6] "It is settled that Administrative regulations that violate acts of the

25  Legislature are void and no protestations that they are merely an exercise of

    administrative discretion can sanctify them. They must conform to the legislative

    will if we are to preserve an orderly system of government. Nor is the motivation

26  of the agency relevant: It is fundamental that an administrative agency may not

    usurp the legislative function, no matter how altruistic its motives are."

27  (*Agricultural Labor Relations Board v. Superior Court of Tulare County* (1976) 16

    Cal.3d 392, 419 quoting *Morris v. Williams* (1967) 67 Cal.2d 733, 737, and *City of

    San Joaquin v. State Bd. of Equalization* (1970) 9 Cal.App.3d 365, 374.)

28

                              18

1  express or implied terms of any statute a state agency has authority

2  to adopt regulations to implement, interpret, make specific or

3  otherwise carry out the provisions of the statute, no regulation

4  adopted is valid or effective unless consistent and not in conflict

5  with the statute and reasonably necessary to effectuate the purpose

6  of the statute.'  Administrative regulations that alter or amend the

7  statute or enlarge or impair its scope are void and courts not only

8  may, but it is their obligation to strike down such regulations."

9  (*Pulaski v. Occupational Safety & Health Stds. Bd.* (1999) 75

10  Cal.App.4th 1315, 1341, citations omitted.)

11      The vice of overbroad and vague regulations such as are at issue

12  here is that they can be manipulated, or 'interpreted,' by executive

13  agencies as a source of unfettered discretion to apply the law

14  without regard to the intend of the people as expressed by the

15  legislature's enabling statutes.  In short, agencies usurp unlimited

16  authority from vague regulations and become super-legislatures that

17  are unaccountable to the people.  As it has sometimes been framed and

18  addressed in the case law, a vague or all encompassing standard runs

19  the risk of 'violat[ing] the separation of powers doctrine by

20  'transforming every [executive decisionmaker] into a "mini-

21  legislature" with the power to determine on an ad hoc basis what

22  types of behavior [satisfy their jurisdiction].'"  (*People v. Ellison*

23  (1998) 68 Cal.App.4th 203, 211, quoting *People v. Superior Court*

24  (*Caswell*) (1988) 46 Cal.3d 381, 402.)

25      "It is concern about 'encroachment and aggrandizement,' the

26  [United States Supreme Court] reiterated, that has animated its

27  separation of powers jurisprudence.  'Accordingly, we have not

28

1   hesitated to strike down provisions of law that either accrete to a
2   single Branch powers more appropriately diffused among separate
3   Branches or that undermine the authority and independence of one or
4   another coordinate Branch.'" (Kasler v. Lockyer (2000) 23 Cal.4th
5   472, 493, quoting Mistretta v. United States (1989) 488 U.S. 361,
6   382.)  This articulation of the principle speaks directly to the
7   situation at hand.  The Board, by its enactment and interpretation of
8   Title 15, §2402, has appropriated to itself absolute power over
9   'lifer' matters.  Overreaching beyond the letter and spirit of the
10  Penal Code provisions, Title 15, §2402(c)(1) has been interpreted by
11  the Board to supply the power to declare every crime enough to deny
12  parole forever.  The fact that Title 15, §2402, has been invoked in
13  every case, but then sometime later not invoked, tends to show either
14  completely arbitrary and capricious behavior or that unwritten
15  standards are what really determine outcomes.  In either event, all
16  pretenses of taking guidance from, or being limited by, the
17  legislature's statutes have been abandoned.  "[I]t is an elementary
18  proposition that statutes control administrative interpretations."
19  (Ohio Casualty Ins. Co. v. Garamendi (2006) 137 Cal.App.4th 64, 78.)
20  Title 15 §2402 as applied, however, has no controls or limitations.
21       The PC § 3041(b) exception to the rule can only be invoked when
22  the "gravity of the current convicted offense or offenses, or the
23  timing and gravity of current or past convicted offense or offenses,
24  is such that consideration of the public safety requires a more
25  lengthy period of incarceration for this individual."  The word
26  "gravity" is a directive for comparison just as "more lengthy"
27  indicates a deviation from the norm.  While Dannenberg held there
28

1 does not need to be intra case comparison for the purposes of term
2 uniformity or proportionality, there necessarily has to be some sort
3 of comparison for the purposes of adhering to the legislative mandate
4 that parole is available.  The Board employs no meaningful yardstick
5 in measuring parole suitability.  This is a violation of the
6 separation of powers doctrine.  (People v. Wright (1982) 30 Cal.3d
7 705; 712-713.  And see Terhune v. Superior Court (1998) 65
8 Cal.App.4th 864, 872-873.  Compare Whitman v. Am. Trucking Ass'ns
9 (2001) 531 U.S. 457, 472, describing a delegation challenge as
10 existing when the legislature fails to lay down "an intelligible
11 principle to which the person or body authorized to act is directed
12 to conform.")

13

14 ### RESPONDENT'S POSITION

15 The Attorney General has suggested, without pointing to any
16 concrete examples, that it is possible that the Board, when invoking
17 the crime as a reason to deny parole, is not placing it within
18 §2402(c)(1) but instead using is as some sort of 'lesser factor'
19 which, only when combined with other unsuitability criteria, can
20 contribute to a valid parole denial.  The two problems with this
21 position are, first, there is no evidentiary support for this
22 assertion, and second, it would have no impact on the constitutional
23 infirmities outlined and proven above.

24 Even if Respondent had produced evidence that the Board was
25 utilizing the crime as a 'lesser factor' which needs others to fully
26 support a parole denial, the Board would then be admitting it was
27 denying parole, in part, for the very reason that the person is

28

1  before the panel and eligible for parole in the first place - the
2  commitment offense.  Respondent's argument suggests that a crime that
3  only qualified as the *Dannenberg* "minimum necessary" could still be
4  invoked as a reason for denying parole.  Respondent argues that when
5  the crime is invoked 'not in the *Dannenberg* sense,' there must be
6  other reasons for the parole denial and the crime alone would not be
7  enough in this context.  This position is inconsistent with the law
8  and fundamental logic.

9       A crime qualifies under *Dannenberg* when it is "particularly
10  egregious," or one where "no circumstances of the offense reasonably
11  could be considered more aggravated or violent than the minimum
12  necessary to sustain a conviction for that offense." (*Dannenberg*,
13  *supra*, 34 Cal.4th at pp. 1094-1095.)  These are the only two choices.
14  If a crime consists of only the bare elements then it is not
15  aggravated and it cannot, in and of itself, serve as a basis for
16  parole denials once the inmate becomes eligible for parole.  It is
17  the reason an inmate may be incarcerated initially for the equivalent
18  of 15 or 25 years, and then examined to determination rehabilitation
19  efforts when they come before the Board, but a crime that is no more
20  than the bare minimum cannot be factored into the equation pursuant
21  to PC § 3041(b) or any of the case law interpreting it.

22       In oral argument Respondent suggested a second way the
23  commitment offense can be used outside of §2402(c)(1).  If for
24  example a crime had its roots in gang allegiances or rivalries and
25  the inmate continued to associate with gangs while incarcerated, then
26  an aspect of the crime, even if the crime otherwise consisted of no
27  more than the minimum elements, could be combined with other behavior
28



1  to support a parole denial.  Similarly, if a crime was rooted in an

2  inmate's then existing drug addiction, and the Board was to point to

3  a recent 115 involving drugs, the evidence that the inmate's drug

4  issues had not been resolved would justify a parole denial even if

5  the crime itself was not aggravated.  A finding that the inmate is

6  not suitable for release under these circumstances, however, is not

7  based on the facts of the commitment offense as tending to show

8  unsuitability.  It is based on the conclusion that can be drawn about

9  Petitioner's lack of rehabilitation or change since the offense, and

10  thus, his present dangerousness.

11      Respondent has not demonstrated any flaws in Petitioner's

12  methodology or analysis, nor provided any actual evidence of the

13  crime being invoked other than pursuant to §2402(c)(1).  Drawing

14  conclusions from the Board's direct statements, or its precise

15  recitations of the §2402(c)(1) language, logically indicates an

16  invocation of §2402(c)(1), and Respondent's suggestion otherwise is

17  insupportable.

18

19              THE QUESTION OF BIAS

20      Because the issue has been squarely presented, and strenuously

21  argued by Petitioners, this Court is obligated to rule on the charge

22  that the Board's actions prove an overriding bias and deliberate

23  corruption of their lawful duties.

24      In the discrimination and bias case of *USPS Bd. of Governors v.*

25  *Aikens* (1983) 460 U.S. 711, the United States Supreme Court

26  acknowledged "there will seldom be 'eyewitness' testimony as to the

27  [] mental processes" of the allegedly biased decisionmaker.  Instead,

28

1   an examination of other cases for trends or patterns can provide the

2   necessary circumstantial evidence. (See *Aikens, supra,* at footnote

3   2.) Reaffirming that such circumstantial evidence will be sufficient

4   the Court stated: "The law often obliges finders of fact to inquire

5   into a person's state of mind. As Lord Justice Bowen said in

6   treating this problem in an action for misrepresentation nearly a

7   century ago, 'The state of a man's mind is as much a fact as the

8   state of his digestion. It is true that it is very difficult to

9   prove what the state of a man's mind at a particular time is, but if

10   it can be ascertained it is as much a fact as anything else.'"

11   (*Aikens,* at pp. 716-717, quoting *Edgington v. Fitzmaurice* (1885) 29

12   Ch. Div. 459, 483.)[7]

13      The discovery in these cases was granted in part due to the

14   Petitioners' prima facie showing of bias and the necessity that it be

15   "adequately supported with evidence" if such evidence is available.

16   (*Ramirez, supra,* 94 Cal.App.4th at p. 564, fn. 5. See also *Nasha v.*

17   *City of Los Angeles* (2004) 125 Cal.App.4th 470, 483: "A party seeking

18   to show bias or prejudice on the part of an administrative decision

19   maker is required to prove the same 'with concrete facts.'" And see

20   *State Water Resources Control Bd. Cases* (2006) 136 Cal.App.4th 674,

21   841: "The challenge to the fairness of the adjudicator must set forth

22   concrete facts demonstrating bias or prejudice." See also *Hobson v.*

23

24   [7] As occurred in *Aikens, supra,* and as suggested in prior orders of this Court,
    Respondent should have provided direct evidence from the decisionmakers. While the

25   fact that a *Defendant* does not explain his or her actions cannot be held against
    him, (*Griffin v. California* (1965) 380 U.S. 609, *Doyle v. Ohio* (1976) 426 U.S.

26   610,) it is appropriate to give some weight to the consideration that the Board has
    failed to offer any direct evidence or explanation on its own behalf. While the

27   case of *Hornung v. Superior Court* (2000) 81 Cal.App.4th 1095 stands for the
    proposition that *Petitioner* may not inquire into the Board members mental
    processes, Respondent is not precluded from offering such direct evidence if they

28   were able to testify as to their good faith and conscientious efforts.

09/12/2007  11:08        PAGE  25/34

1   *Hansen* (1967) 269 F.Supp. 401, 502, the watershed Washington D.C.

2   school desegregation case in which the court determined from a

3   statistical and factual analysis that racial bias was influencing

4   policy.)

5       In the case of *People v. Adams* (2004) 115 Cal.App.4th 243, 255,

6   a similar claim of biased decision making was asserted and it was

7   rejected because, although the defendant clearly articulated it, "he

8   has not demonstrated it. Therefore, he has failed to bear his burden

9   of showing a constitutional violation as a demonstrable reality, not

10  mere speculation." In the present cases Petitioners have provided

11  overwhelming concrete evidence. It is difficult to believe that the

12  Board's universal application of §2402(c)(1) has been an inadvertent

13  mistake or oversight on their part. It is hard to credit the Board's

14  position that it does not know its own patterns and practices reveal

15  a complete lack of standards or constraints on their power.

16  Respondent's protestations ring hollow, and it seems a statistical

17  impossibility, that the Board's use of "detailed" criteria in such a

18  fashion that they are rendered meaningless is a result of good faith

19  efforts on their part. That <u>every</u> murder is "especially heinous,

20  atrocious or cruel," and can therefore be an exception to the rule

21  that a parole date should be set, does not seem to be an accident on

22  their part.

23      Although no court has thus far agreed with the accusation that

24  the Board approaches its duties with a predetermination and a bias,

25  no court has previously been presented the comprehensive evidence

26  outlined herein. While this Court does not turn a blind eye to the

27  reasonable conclusion that the Board's unconstitutional practices are

28

25

92.d          1628-080-888          puɐᴚng qoɔɐſ          ɐϱɛ:ɐᴚ ᴚ0 ᴚ0 dɘS



1  willful, there is another possibility.  The pattern of errors
2  demonstrated by the discovery in this case, and the continuously
3  growing body of Court of Appeal opinions finding consistent and
4  persistent abuse of discretion, may instead be caused by the fact
5  that the Board is simply overworked and substantively untrained.  The
6  impossibility of the blanket applicability of §2402(c)(1) may be only
7  the result of sloppy preparation and inadvertent carelessness.
8      The Board must first be given an opportunity to comply with the
9  necessary remedy provided by this court before it is possible to
10 enter a finding of conscious bias and illegal sub rosa policy.  To do
11 otherwise would ignore the complexities and magnitude of the largely
12 discretionary duties with which that Board is vested.
13
14                          CONCLUSION
15     The conclusive nature of the proof in this case, and the
16 suggestion of institutional bias do not preclude formulation of an
17 remedy which will guarantee adequate restrictions on, and guidance
18 for, the Board's exercise of discretion in making parole suitability
19 determinations.  The Board can be made to lawfully perform its duties
20 if given explicit instructions.
21     As noted supra, a reason the proof in this case irrefutably
22 establishes constitutional violations is because the Board does not,
23 in actual fact, operate within the limiting construction of the
24 regulations.  The Board's expansive interpretation allows it to
25 operate without any true standards.  Although numerous rulings of
26 both state and federal courts of appeal have invalidated the Board's
27 application of the §2402(c) criteria to particular facts, the Board
28

09/12/2007 11:00     PAGE 27/34

1 does not take guidance from these binding precedents and ignores them

2 for all other purposes. In the most recent of these cases, *In re*

3 *Roderick*, (2007) ___ Cal.App.4th ___ (A113370) the First District

4 held four of five §2402 factors "found" by the Board to be

5 unsupported by any evidence. At footnote 14 the court took the time

6 to criticize the Board for its repeated use of a "stock phrase"

7 "generically across the state." The court also clarified that "at

8 minimum, the Board is responsible for articulating the grounds for

9 its findings and for citing to evidence supporting those grounds."

10    There is nothing in the evidence presented that would allow any

11 conclusion but that, without intervention of the Courts, the Board

12 will ignore the lessons of these rulings in the future and continue

13 to employ its formulaic approach of citing a criteria from

14 §2402(c)(1), repeating the facts of the crime, but never

15 demonstrating a logical connection between the two. This is the

16 core problem with the Board's methodology -- they provide no

17 explanation or rationale for the findings regarding the crime itself.

18 This practice results in violence to the requirements of due

19 process and individualized consideration which are paramount to the

20 appropriate exercise of its broad discretion.

21    The only solution is one that compels the Board to identify the

22 logical connection between the facts upon which it relies and the

23 specific criteria found to apply in the individual case. For

24 example, the Board often finds that an inmate's motive is "trivial"

25 without ever suggesting why, on these facts, that motive is not just

26 as trivial as the motive behind any other murder. What motive is not

27 trivial? By any definition "trivial" is a word of comparison and

28

p.25    858-360-6791    Jacob Burland    Sep 07 07 11:40a

1  only has meaning when there can be examples that are not "trivial."

2      Similarly, although the Sixth District made it plain four years

3  ago that "all [] murders by definition involve some callousness," (In

4  re Smith (2003) 114 Cal.App.4th 343, 345,) the Board has continued to

5  deny countless paroles labeling the crime "callous" without ever

6  suggesting what crime would not qualify as "callous" and without

7  consistently explaining why the individual case before it

8  demonstrates "exceptional" callousness.

9      Respondent has consistently refused to suggest what possible

10 instances of murder would not fit the Board's amorphous application

11 of the §2402 criteria.  Citing Dannenberg, Respondent insists such

12 comparative analysis is unnecessary.  Respondent fundamentally

13 misunderstands the Dannenberg holding.

14     The PC § 3041(b) exception to the rule can only be invoked when

15 the "gravity of the current convicted offense or offenses, or the

16 timing and gravity of current or past convicted offense or offenses,

17 is such that consideration of the public safety requires a more

18 lengthy period of incarceration for this individual."  The word

19 "gravity" is a directive for comparison just as "more lengthy"

20 indicates a deviation from the norm.  While Dannenberg held there

21 does not need to be intra case comparison for the purposes of term

22 uniformity or proportionality, there necessarily has to be some sort

23 of comparison for the purposes of adhering to the legislative mandate

24 that parole is available.  This is implicit in §2402 because the

25 qualifier "especially," in "especially heinous atrocious or cruel,"

26 requires that some form of comparison be made.  While the original

27 drafters of §2402 seemed to have recognized this fact, the ongoing

28

1  conduct of the Board has completely ignored it, and this is the

2  essence of the due process violation Petitioners have asserted.

3      As noted in his dissent in the recent case of *In re Roderick,*

4  *supra,* Justice Sepulveda would have deferred to the Board's

5  'exercise' of discretion because "Board members have both training

6  and vast experience in this field.  They conduct literally thousands

7  of parole suitability hearings each year.  The Board therefore has

8  the opportunity to evaluate the egregiousness of the facts of a great

9  number of commitment offenses. ...   The Board's training and

10  experience in evaluating these circumstances far exceeds that of

11  most, if not all, judges."  The evidence in this case, however,

12  suggests a flaw in granting such deference.  Since the Board

13  continues to place every murder in the category of offenses "tending

14  to show unsuitability," something is certainly wrong.  Since the

15  Board's vast experience is undeniable, the problem must be in the

16  Board's training and understanding of the distinguishing features of

17  the guidelines and criteria.  Although Justice Sepulveda presumes

18  that Board members receive substantive training, there is no evidence

19  before this court to suggest that it does, and substantial

20  circumstantial evidence to suggest that it does not.

21      In the vast numbers of Santa Clara County cases reviewed by this

22  Court, the Board's formulaic decisions regarding the commitment

23  offense do not contain any explanation or thoughtful reasoning.

24  Instead, the Board's conclusionary invocation of words from

25  §2402(c)(1) is linked to a repetition of the facts from the Board

26  report by the stock phrase: "These conclusions are drawn from the

27  statement of facts wherein ...."  Thereafter the inmate files a habeas

28

29

1  corpus petition and Respondent, after requesting an extension of

2  time, files a boilerplate reply asserting the Board's power is

3  "great" and "almost unlimited" and thus any "modicum" of evidence

4  suffices.  Respondent does not cite or distinguish the expanding body

5  of case law that is often directly on point as to specific findings

6  made.  Thereafter, if the writ is granted, the Board is directed to

7  conduct a new hearing "in compliance with due process" and that order

8  is appealed by Respondent.  On appeal the order is usually upheld

9  with modifications and in the end, after countless hours of attorney

10  and judicial time, the Board conducts a new two hour hearing at which

11  they abuse their discretion and violate due process in some different

12  way.

13        This system is malfunctioning and must be repaired.  The

14  solution must begin with the source of the problem.  The Board must

15  make efforts to comply with due process in the first instance.  The

16  case law published over the last five years provides ample and

17  sufficient guidelines and must be followed.  Although the Board

18  methods suggest it believes this to be optional, it is not.

19

20                            THE REMEDY

21        Thus; it is the order of this Court that the Board develop,

22  submit for approval, and then institute a training policy for its

23  members based on the current and expanding body of published state,

24  and federal, case law reviewing parole suitability decisions, and

25  specifically the application of §2402 criteria.  In addition to

26  developing guidelines and further criteria for the substantive

27  application of §2402 the Board must develop rules, policies and

28

09/12/2007 11:00

1  procedures to ensure that the substantive guidelines are followed.

2  This Court finds its authority to impose this remedy to flow

3  from the fundamental principles of judicial review announced over two

4  centuries ago in *Marbury v. Madison* (1803) 5 U.S. (1 Cranch) 137.

5  Citing that landmark case, the California Supreme Court has

6  recognized "Under time-honored principles of the common law, these

7  incidents of the parole applicant's right to 'due consideration'

8  cannot exist in any practical sense unless there also exists a remedy

9  against their abrogation." (*In re Sturm* (1974) 11 Cal.3d 258, 268.)

10  In *Strum* the court directed that the Board modify its rules and

11  procedures so that thereafter "The Authority will be required [,]

12  commencing with the finality of this opinion, to support all its

13  denials of parole with a written, definitive statement of its reasons

14  therefor and to communicate such statement to the inmate concerned."

15  (*Sturm* at p. 273.)

16  Similarly, in the case of *Minnis, supra*, the California Supreme

17  Court held the Board's policy of categorically denying parole to drug

18  dealers was illegal. Based on its analysis the court there was

19  clearly prepared to order that Board to modify its rules and

20  procedures however such was unnecessary because the Board

21  "voluntarily rescinded" the illegal policy. While the remedy in this

22  case is of greater scope than that necessary in either *Strum* or

23  *Minnis, supra*, so too has been the showing of a systematic abuse of

24  discretion and distortion of process.

25  The most recent case to address the court's roles and duties in

26  overseeing the parole suitability process has been *In re Rosenkrantz,*

27  *supra*, 29 Cal.4th 616. In that case the court explained that

28

31

09/12/2007  11:00                                                        PAGE  32/34

1  judicial review of a Governor's parole determination comports with,

2  and indeed furthers, separation of powers principles because the

3  courts are not exercising "complete power" over the executive branch

4  and do not "defeat or materially impair" the appropriate exercise or

5  scope of executive duties.  (*Rosenkrantz* at p. 662.)  Citing *Strum,*

6  *supra,* the court reaffirmed that a life term inmate's "due process

7  rights cannot exist in any practical sense without a remedy against

8  its abrogation." (*Rosenkrantz* at p. 664.)

9      The *Rosenkrantz* court also put forth what it believed was an

10  extreme example but which, unfortunately, has been shown to exist in

11  this case.  The court stated: "In the present context, for example,

12  judicial review could prevent a Governor from usurping the

13  legislative power, in the event a Governor failed to observe the

14  constitutionally specified limitations upon the parole review

15  authority imposed by the voters and the Legislature." This is

16  exactly what the evidence in this case has proven. As noted above

17  the Board has arrogated to itself absolute authority, despite

18  legislative limitations and presumptions, through the mechanism of a

19  vague and all inclusive, and thus truly meaningless, application of

20  standards.  The remedy this Court is imposing is narrowly tailored to

21  redress this constitutional violation.

22      The consequence of the Board's actions (of giving § 2402(c)(1)

23  such a broadly all encompassing and universal application) is that

24  they have unwittingly invalidated the basis of the California Supreme

25  Court's holding in *Dannenberg*.  The reason the four justice majority

26  in *Dannenberg* upheld the Board's standard operating procedures in the

27  face of the Court of Appeal and dissent position is because "the

28

1  Board must apply detailed standards when evaluating whether an

2  individual inmate is unsuitable for parole on public safety grounds."

3  (*Dannenberg* at p. 1096, footnote 16.  See also page 1080: "the

4  regulations do set detailed standards and criteria for determining

5  whether a murderer with an indeterminate life sentence is suitable

6  for parole.")  However, Petitioners in these cases have proven that

7  there are no "detailed standards" at all.  Instead the Board has

8  systematically reduced the "detailed standards" to empty words.  The

9  remedy this Court orders, that there truly be "detailed standards,"

10  requires the promulgation of further rules and procedures to

11  constrain and guide the Board's powers.  This remedy differs in

12  specifics, but not in kind, from what courts have previously imposed

13  and have always had the power to impose.

14    The Board must fashion a training program and further rules,

15  standards and regulations based on the opinions and decisions of the

16  state and federal court cases which provide a limiting construction

17  to the criteria which are applied.[8]  The Board must also make

18  provisions for the continuing education of its commissioners as new

19  case law is published and becomes binding authority.  This Court will

20  not, at this point, outline the requirements and lessons to be taken

21  from the above cases.  It is the Board's duty, in the first instance

22  to undertake this task.  The training program, and associated rules

23  and regulations, shall be served and submitted to this Court, in

24

25  [8]While the showing and analysis in this case was limited to § 2402(c)(1), the
   conclusions that the evidence compelled, that the Board has been carelessly
   distorting and misapplying the regulations, is not so limited.  Accordingly, the
26  training program that is necessary for the Board can not reasonably be limited to
   just § 2402(c)(1).  Thus, to the extent case law recognizes, clarifies and
   establishes remedies for other due process violations they must also be
27  incorporated into the necessary rules and training the Board is required to abide
   by.

28

33

writing, within 90 days.  Counsel for Petitioners, and any other
interested parties, may submit briefs or comments within 30 days
thereafter.  After receipt and review of the materials this Court
will finalize the training program, and associated rules, and the
Petitioners in these cases shall receive a new hearing before a Board
that does not operate with the unfettered discretion and caprice
demonstrated by the evidence here presented.

### ORDER

For the above reasons the habeas corpus petition is granted and
it is hereby ordered that Petitioner be provide a new hearing which
shall comply with due process as outlined above.  Respondent shall
provide weekly updates to this Court on the progress of its
development of the new rules and regulations outlined above.

DATED: _Aug 30_, 2007    _Linda R. Condron_
                          LINDA R. CONDRON
                          JUDGE OF THE SUPERIOR COURT

cc:  Petitioner's Attorney (Jacob Burland)
     Attorney General (Denise Yates, Scott Mather)

# DECLARATION OF SERVICE BY MAIL

I, ___*EMIL EKDAHL*___, the undersigned, declare:

Printed Name of Declarant

I am over the age of 18 years, a citizen of the United States of America, and am not a party to the cause within. My residence address is:

CDC No. *C-79199*   Housing *3N67-U*

San Quentin State Prison
San Quentin, CA 94974

On ___*January 16*___, *2008*, I served the following document(s):

Month/Day         Year

*Petitioner "EKDAHL'S" Motion For this Court to Judicial Notice w/*
*attached Exhibits: A + B*

on the parties and at the addresses described below by placing the pleadings in a sealed envelope, with postage fully prepaid, and presented said item(s) to Corrections Department staff for mailing in the United States Mail as per the rules and regulations governing outgoing legal mail at San Quentin State Prison.

U.S. District Court For The
Northern District of California
1301 Clay St., #400 S.
Oakland, CA. 94612-5212.

I swear under penalty of perjury that the foregoing is true of my own personal knowledge. Executed on this __16__ day of __*January*__, *2008*, at San Quentin, CA, County of Marin.

_____
Signature of declarant