1  Emil Ekdahl
   C-79199 / 4N64U.
2  San Quentin, CA. 94974.



FILED

SEP 1 1 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

5                IN THE UNITED STATES DISTRICT COURT

6             FOR THE NORTHERN DISTRICT OF CALIFORNIA

7

8  EMIL JOSEPH EKDAHL III,        )    Case No. C-07-03642 SBA (PR)
                                  )
9                 Petitioner,)
                                  )    **MOTION OF JUDICIAL NOTICE**
10                                )
          Vs                      )
11                                )
                                  )
12 ROBERT AYERS, WARDEN           )
                                  )
13                Respondent.)
   _____)
14

15

16     To the Honorable SAUNDRA BROWN ARMSTONG, United States District

17 Judge in the above entitled case.

18

19     Petitioner hereby notifies the Court of a recently published

   case law by the California Supreme Court: In re Sandra Davis
20
   Lawrence
21
   Case Number: S154018.  The Lawrence case has direct bearing on
22
   petitioner's current pending above entitled case.  See Exhibit A.
23

24
   Thursday, August 28, 2008            _____,
25
                                        Emil Ekdahl, pro se...
26                                      C-79199 / 4N64U.
                                        San Quentin, CA. 94974.
27

28

Exhibit: A

Filed 8/21/08 (this opn. precedes companion case, S155872, also filed 8/21/08)

# IN THE SUPREME COURT OF CALIFORNIA

|  |  |  |
|---|---|---|
| In re SANDRA DAVIS LAWRENCE | ) ) ) ) ) | S154018 |
| on Habeas Corpus | ) ) ) ) | Ct.App. 2/7 B190874 Los Angeles County Super. Ct. No. A174924 |

In 1971, Sandra Davis Lawrence (petitioner) murdered her lover's wife, Rubye Williams. Petitioner fled the state, remaining a fugitive until 1982, when she voluntarily returned to California and surrendered to the authorities. Petitioner declined a plea offer that would have resulted in a two-year prison sentence. After the jury returned a guilty verdict on a charge of first degree murder, the trial court imposed a sentence of life imprisonment — the statutory penalty for murders committed prior to November 8, 1978 — and set a minimum eligible parole date of November 29, 1990.

In August 2005, after numerous hearings before the Board of Parole Hearings (the Board),[1] that entity for the fourth time found petitioner suitable for parole and set a parole date. In finding petitioner suitable for parole, the Board emphasized the presence of multiple statutory factors favoring suitability,

---

[1]    The Board of Parole Hearings replaced the Board of Prison Terms in July 2005. (Pen. Code, § 5075, subd. (a).)  For ease of reference, and because both entities have performed the same duties, we refer to both as "the Board."

1

including petitioner's exemplary record of rehabilitation, her acceptance of responsibility for the crime, her realistic parole plans, and her close ties to her family, who would offer her support in reintegrating into the community.

The Governor, however, as he had done previously, found that the gravity of the commitment offense indicated petitioner remained unsuitable for parole, and reversed the Board's decision. In an original petition for writ of habeas corpus filed in the Court of Appeal, Second Appellate District, petitioner challenged on several grounds the Governor's decision denying parole. Finding the Governor lacked "some evidence" upon which to conclude, consistently with state and federal constitutional standards, that petitioner's release on parole would represent an "unreasonable risk" of danger to the community, the Court of Appeal in a split decision issued a writ vacating the Governor's reversal and reinstating the Board's 2005 grant of a parole release to petitioner.

We granted review to consider the Attorney General's contention that the Court of Appeal improperly applied the highly deferential "some evidence" standard of review set forth in our decision in *In re Rosenkrantz* (2002) 29 Cal.4th 616 (*Rosenkrantz*) and later applied in *In re Dannenberg* (2005) 34 Cal.4th 1061 (*Dannenberg*). The Attorney General disputes the appellate court's view that in order to uphold the Governor's decision, there must be some evidence demonstrating that petitioner remains a current threat to public safety, rather than merely some evidence supporting the Governor's characterization of the commitment offense as particularly egregious. For the reasons set forth below, we conclude that because the core statutory determination entrusted to the Board and the Governor is whether the inmate poses a current threat to public safety, the standard of review properly is characterized as whether "some evidence" supports the conclusion that the inmate is unsuitable for parole because he or she currently is dangerous. Moreover, with regard to the aggravated circumstances of a

commitment offense, we conclude that to the extent our decisions in *Rosenkrantz* and *Dannenberg* have been read to imply that a particularly egregious commitment offense *always* will provide the requisite modicum of evidence supporting the Board's or the Governor's decision, this assumption is inconsistent with the statutory mandate that the Board and the Governor consider all relevant statutory factors when evaluating an inmate's suitability for parole, and inconsistent with the inmate's due process liberty interest in parole that we recognized in *Rosenkrantz*. (*Rosenkrantz, supra,* 29 Cal.4th at p. 664.) In some cases, such as this one, in which evidence of the inmate's rehabilitation and suitability for parole under the governing statutes and regulations is overwhelming, the only evidence related to unsuitability is the gravity of the commitment offense, and that offense is both temporally remote and mitigated by circumstances indicating the conduct is unlikely to recur, the immutable circumstance that the commitment offense involved aggravated conduct does not provide "some evidence" *inevitably* supporting the ultimate decision that the inmate remains a threat to public safety.

Applying the "some evidence" standard to the case presently before us, we agree with the Court of Appeal that the record fails to support the Governor's conclusion that petitioner remains a current danger to public safety. Accordingly, we affirm the judgment of the Court of Appeal rendered in favor of petitioner.[2]

———————————

[2]    In the companion case of *In re Shaputis* (Aug. 21, 2008, S155872) ___ Cal.4th ___ [pp. 22-26] filed concurrently with this opinion, the Court of Appeal also properly recognized that the relevant inquiry is whether some evidence supports the Governor's ultimate decision that the inmate poses a current risk to public safety. As we explain in *Shaputis,* however, our clarification that the "some evidence" standard of review focuses upon evidence supporting the core statutory determination of public safety does not alter our recognition in *Rosenkrantz* and *Dannenberg* that the decisions of both the Board and the

*(Footnote continued on next page.)*

# I

The facts underlying the commitment offense and the history of petitioner's parole hearings are not in dispute. The following summary is taken from the Court of Appeal's lengthy and thorough statement of the facts.

## A

Petitioner was born and raised in Birmingham, Alabama, the youngest of 12 children. Following her graduation from high school, she moved to Chicago, where she married and had two children. After her marriage dissolved due to her husband's infidelity and her own immaturity, petitioner relocated to Los Angeles, where several of her siblings resided. She took a position as a receptionist in her brother's dental office, where she met and began a romantic affair with Robert Williams, a married dentist employed by her brother. Williams's wife, the victim Rubye Williams, was aware of the affair. She frequently confronted both petitioner and her husband about the relationship in telephone calls and notes left on the front door of the apartment that Dr. Williams rented for petitioner.

Dr. Williams repeatedly told petitioner he would divorce his wife and marry her. When he failed to follow through with any of these promises, however, petitioner terminated the relationship in late 1970, ceasing all contact with Dr. Williams. On February 10, 1971, petitioner was celebrating her 24th birthday at a

---

*(Footnote continued from previous page.)*

Governor are entitled to deference. In *Shaputis*, the Court of Appeal impermissibly substituted its own evaluation of the record for that conducted by the Governor. Because, unlike the record before us in the present case, the record in *Shaputis* contains some evidence supporting the Governor's determination that the inmate poses a current threat to public safety, we reverse the judgment rendered by the Court of Appeal in his case. (*In re Shaputis*, ___ Cal.4th ___, ___ [p. 2].)

family party held at her brother's home, when Dr. Williams unexpectedly arrived, uninvited. He announced that he intended to leave his wife and return to petitioner. During the next few days, petitioner and Dr. Williams planned their romantic and professional future together, which was to include petitioner's obtaining certification as a dental assistant in order to assist Dr. Williams in the new dental practice he was then in the process of opening.

On February 13, 1971, however, Williams telephoned petitioner and told her he had changed his mind; he could not bear losing his children, and hence would remain with his wife. During the conversation, he mentioned Mrs. Williams would be helping him set up his new dental practice, and that she was at that time present at the new office waiting for the delivery of some equipment.

Petitioner was enraged with Dr. Williams, but as she subsequently recognized in therapy sessions with prison psychologists, she instead took out this anger on Mrs. Williams, perceiving her as an obstacle to the relationship. She drove to Dr. Williams's new dental office. Anticipating a possible confrontation with Mrs. Williams in light of previous highly charged encounters, she stopped at her sister's home to acquire a pistol and a potato peeler. When she arrived at the office, the two women argued and physically struggled, pushed, threw punches, and at one point wrestled on the floor. At some point, petitioner produced the firearm. She fired wildly at Mrs. Williams, wounding her in the hand, arm, leg, and neck, and then stabbed her repeatedly with the potato peeler. Mrs. Williams died as a result of the gunshot wounds.

Petitioner returned to her sister's home and replaced the pistol under the mattress. A few weeks later, petitioner's sister discovered the pistol had been fired. She contacted the police and reported the handgun had been used and not by her or anyone in her household. She also informed the police that petitioner

5

had told family members that petitioner had killed Mrs. Williams as a birthday present to herself.

The authorities did not immediately investigate petitioner's involvement in Mrs. Williams's death, and petitioner moved to Chicago, Illinois with her children. A few weeks later, petitioner's family telephoned to tell her that the Federal Bureau of Investigation had informed them there existed a fugitive warrant for her arrest, arising from the death of Mrs. Williams. Petitioner left her children with their father in Chicago and flew back to Los Angeles, but during the flight she decided against turning herself in. She instead fled by bus to Las Vegas, Nevada. In the ensuing years, she resided in Puerto Rico, New York, and Pennsylvania, and worked in various professions, including real estate, sales, and cosmetology. In 1982, some 11 years after the murder, petitioner voluntarily returned to Los Angeles, hired an attorney, and surrendered to the police. Thereafter, she pleaded not guilty and suggested that Dr. Williams may have committed the crime.

As reflected in the report prepared by the probation department after her subsequent conviction, petitioner rejected a plea offer that would have resulted in a two-year prison sentence. The case went to trial in 1983, and the jury returned a guilty verdict on the charge of first degree murder.

The probation department's report noted that petitioner had no prior criminal record as a juvenile or as an adult, but recommended the court deny probation based upon the seriousness of the offense. The report recounted the circumstances surrounding the murder and petitioner's subsequent flight, but stated: "Defendant presented herself as an intelligent, articulate, and thoughtful woman who stands convicted of a premeditated murder which occurred 12-and-a-half years ago. Defendant fled the jurisdiction of the court and has now surrendered herself to the court and has been found guilty by a jury of the crime. . . . [¶] . . . It is undoubtedly true that defendant is not now the same

6

person she was when the crime was committed and it is not expected that defendant would be involved in another similar crime. However, given that defendant has been convicted of first degree murder, probation does not appear to be an appropriate recommendation." The trial court imposed a sentence of life imprisonment — the standard statutory penalty for such offenses committed prior to November 8, 1978, and set a minimum parole eligibility date of November 29, 1990.[3]

## B

During the 23 years petitioner spent in prison serving her sentence on the present offense, she was free of serious discipline, except for two administrative violations for being late to work assignments, and several other instances of being counseled for administrative violations that did not result in discipline. Within a year of her incarceration, she was placed in Miller A Honor house, housing reserved for discipline-free inmates. She worked as a plumber for the prison and volunteered as a tennis coach for other inmates. She was a charter member of the Yes-I-Can tutorial program, a member of Toastmasters International and the Friends Outside parenting program, and a physical trainer for other inmates. Petitioner earned a bachelor's degree in computer science from the University of La Verne, and was described by prison staff as a "team player who interacts with everyone in a courteous manner."

Petitioner's psychological reports map the path of her rehabilitation. Her initial report, received in September 1984 shortly after her incarceration, concluded petitioner was narcissistic, lacked emotional insight, repressed her

---

3        Pursuant to Penal Code section 3046, persons sentenced to life imprisonment cannot be paroled during the first seven years of their confinement.

emotions, and avoided reality through excessive activity. The examining psychologist predicted these characteristics could lead to problems with other inmates and staff. He recommended greater altruistic involvement in activities benefiting others. The report also characterized petitioner as "explosive" and a "high flight risk if she loses her appeal."

By 1989, petitioner's psychological report provided a positive review of petitioner's health, intelligence, and overall psychological condition. Although the examining psychologist found she exhibited some indicia of an "avoidant personality disorder," he also reported that she has "much to offer any community." Significantly, the examining psychologist found petitioner no longer represented a danger to society.

The psychological assessment in August 1991 was less favorable, recommending intensive psychotherapy based upon a finding that petitioner exhibited features of three psychological disorders — borderline personality disorder, antisocial disorder, and avoidant personality disorder. In an addendum to this August report (dated October 3, 1991), the examining psychologist reported that petitioner had appealed and had requested a followup interview. Petitioner reportedly became angry during the interview, feeling the psychologist had been biased in his appraisals of her psychological condition. The examining psychologist concluded she might be "moderately psychopathic," possessing a narcissistic personality disorder with antisocial features. Nonetheless, he concluded she had made significant progress through psychotherapy and recommended she participate in once-a-week group therapy sessions.

Petitioner's November 1992 psychological evaluation reflected improvement. The examining psychologist reported petitioner had gained insight into the monstrous dimension of her crime. She also now comprehended her psychological motivation — that she killed Dr. Williams's wife in order to

retaliate against him. The examining psychologist assessed petitioner's violence potential at the time of the crime as greater than the average person's, but opined that this potential had substantially decreased.

The psychological report from 1994 repeated the positive findings in the earlier reports, and stated that petitioner "would not have surrendered [to the authorities] back in 1982, if the earlier narcissistic, antisocial or borderline personality disorder diagnoses had been correct." Positive psychological reports continued in subsequent years, although in July 1996, the psychological evaluation reported that petitioner received her first "disciplinary CDC 115" in January 1996 for allegedly stealing excess food from the kitchen. Although this troubled the examining psychologist, he found petitioner exhibited no indicia of any psychological disorder. The June 1997 evaluation reported that petitioner successfully had appealed the food-theft-related discipline from the previous year and hence her record remained discipline-free.

Psychological reports after 1997 disqualified petitioner from receiving any further psychotherapy, concluding she no longer tested as having any psychiatric or psychological disorder. In total, five psychologists conducting 12 separate evaluations since 1993 concluded that petitioner no longer represented a significant danger to public safety.

C

In late December 1993, the Board made the first of four positive recommendations that petitioner should be granted parole. Among its findings, the Board concluded that petitioner committed the crime as a result of significant stress, and had demonstrated motivation, growth, and a greater understanding of herself and the crime she committed. It also found a reduced probability of recidivism and that petitioner exhibited signs of remorse. The Board

acknowledged that the examining psychologists had concluded petitioner no longer represented a significant danger to public safety.

Employing a matrix applicable to first degree murderers who committed their crime prior to November 8, 1978 (Cal. Code Regs., tit. 15, § 2282, subd. (b)),[4] the Board assigned petitioner the maximum term available under that matrix, based upon the great violence involved in the murder she committed and upon her having evaded prosecution for more than 11 years. This yielded a term of 204 months, from which was deducted 40 months for her discipline-free 10 years at the institution. The result of this computation was a net term of 164 months (13 years 8 months) before she would be eligible for release. Accordingly, the proposed release date was set almost three and a half years in the future — for late July 1997.

In March 1994, former Governor Pete Wilson reversed the Board's recommendation, providing two reasons for his decision. First, he stated "public safety" might require a lengthier incarceration. Second, he found the Board had given inadequate consideration to the "public interest in a punishment proportionate to the seriousness of the crime." These findings gave primary credence to the earlier psychological reports and tests reflecting various psychological disorders, as opposed to the more recent reports finding no current evidence that petitioner remained subject to those problems. The Governor's statement also asserted the base term should be longer.

In both 2000 and 2001, petitioner's parole hearings resulted in split decisions, with one commissioner voting against release. This required en banc

---

4    Unless otherwise indicated, all further unspecified statutory references are to the Penal Code, and all further undesignated references to Regulations are to title 15 of the California Code of Regulations.

consideration and each time, parole was denied.  In November 2002, the Board issued its second positive recommendation that petitioner be granted parole.

The reasons given at this time parallel the findings contained in the Board's favorable recommendation in 1993.  Additionally, there was further psychiatric evidence indicating that petitioner had taken responsibility for her crime and felt greater remorse, and that she would not be a danger to public safety.  By then, she also had a much longer record as a model inmate.  She was only a few credits short of a master's degree in business administration, held membership in the plumbers union, and had made major contributions to a number of educational and public service programs at the prison.  The Board calculated the appropriate period of incarceration as 216 months for the aggravated term and 12 more for use of a firearm.  From this, however, it deducted 64 months in postconviction credits for a net term of 152 months (12 years 8 months, in contrast to the 13 years 8 months calculated in 1993).  By this time, however, petitioner already had been imprisoned some 18 years — far longer than the net term of 152 months.

In April 2003, former Governor Gray Davis reversed petitioner's second positive parole recommendation.

In May 2004, the Board again recommended granting parole to petitioner. This time the net term was calculated at 130 months (10 years 9 months).  After reciting essentially the same list of findings as in the previous two parole recommendations, the Board highlighted that petitioner had no "115's" (that is, serious rules violations) in her nearly two decades at the prison.  Although she had received a few "128(a)'s" (administrative rules violations) for being late to work appointments or counseling sessions, the last of those had been received a decade earlier, in April 1993.  An April 2004 psychological evaluation once again had been favorable and reported petitioner was not a danger to public safety and understood the seriousness of her crime and what had led to it.  The Board

recommended as a condition of parole that petitioner be required to undergo drug counseling and monitoring for one year.

A month later, Governor Arnold Schwarzenegger reversed this third positive parole recommendation. He based his decision upon a finding that petitioner's release would pose an unreasonable risk of danger to public safety. His decision characterized the murder as a vicious crime committed for an "incredibly petty" reason, and found that this constituted "reason enough to pose an unreasonable risk to public safety."

In August 2005, the Board again recommended petitioner be paroled. The Board's report reflects that the panel heard testimony from petitioner, considered her prison record, read some 24 letters from petitioner's family and other supporters, studied the full statement issued by the Governor in reversing the May 2004 Board recommendation that petitioner be released, and considered arguments from a representative of the Los Angeles County District Attorney's Office opposing parole as well as from petitioner's attorney. The panel commended petitioner for her resilience after experiencing the disappointment of a gubernatorial reversal of her third parole-release-recommendation. It then recited a number of favorable developments subsequent to the Governor's action, including a laudatory note from a staff member describing petitioner as a "team player who interacts with everyone in a courteous manner." Another internal evaluation reflects her continued participation in a conflict transformation program. Other reports discuss activities that have further improved her employability, such as her participation in Toastmasters, a Women's First Job Fair, and other programs, as well as religious and charitable work.

Additional developments described in the Board's report include the circumstance that petitioner obtained her master's degree in business administration in June 2005. She also updated her computer skills and received

above-average evaluations in her "office services" assignment. The file also contained a letter from a lieutenant on the prison staff commending petitioner for her work as a physical fitness trainer during the previous five years, stating she is "a superb motivator and trainer." This was accompanied by a letter bearing the signatures of 78 physical fitness trainees praising petitioner for what she "has done for us in reference to getting some self-esteem, along with some know-how, along with mental strength and physical strength." This letter proceeds "to commend [petitioner] on being just one person that has to deal with hundreds of women with different personalities and attitudes, and still continues to get up each morning and encourage and teach us how to be just as strong. . . . I truly believe that if a person such as [petitioner] gives so much of herself to so many people, then the least we can do is give something back."

The Board's report also discussed numerous other letters written by persons outside the institution in support of petitioner's parole, which variously describe petitioner as a good student and a "remarkable woman." A letter from the coordinator of the Partnership for Reentry Program stated that petitioner had applied for and been accepted into the Los Angeles Archdiocese's Partnership for Reentry Program, a four-year program in which, upon release, a mentor and a team meet with the participant weekly. The coordinator expressed confidence that petitioner would succeed in the program and in reentry into society. Additional letters from various clergy and social workers who knew petitioner stated the writers' belief that petitioner would be a productive member of society if released from prison. With the sole exception of a pro forma argument from the District Attorney, no one spoke or wrote in opposition to a grant of parole.

After reviewing the evidence that became available following the Governor's reversal of the 2004 Board recommendation — as well as the earlier evidence relevant to her suitability — the panel announced its decision orally,

stating its reasons for concluding that petitioner was suitable for parole and would not pose any unreasonable risk of danger to society or a threat to public safety if released. Those reasons included the circumstances that petitioner has no juvenile record of assaulting others, nor any adult record other than the underlying offense; her exemplary record of participating in self-help, vocational, and educational programs while in prison, including her recent attainment of a master's degree in business administration; her leadership role among other inmates; and her realistic parole plans, which included a job offer and family support.

The Board concluded, as it had in prior recommendations, that petitioner should be granted parole. In reaching this conclusion, the Board found that the crime was committed as the result of stress, and that the possibility of recidivism was low because of petitioner's maturation, growth, greater understanding, and advancing age, and the absence of a history of significant violent crime. The Board also found that petitioner "understands the nature and magnitude of the offense, and accepts responsibility for her criminal behavior and has decided to change towards good citizenship." The Board further cited favorably the most recent psychological report, in which the examining psychologist explained that petitioner had demonstrated substantial insight and understanding into her life and the circumstances that led her to commit the crime, including her past relationships with predatory and pathological men, and that petitioner is "now able to look at her behavior and formulate a number of different options in order to avoid conflict and violence in other settings and situations." Consulting its matrix once again, the Board set the total period of confinement at 130 months — *less than half* of petitioner's actual incarceration at that time, which was nearly 24 years.

In mid-January 2006, the Governor again reversed the Board's decision. His statement recounted the circumstances of the crime and petitioner's

14

subsequent flight from the authorities. The Governor, while acknowledging that petitioner had surrendered voluntarily, discounted this circumstance by observing that at the time, petitioner denied any involvement in Mrs. Williams's murder and instead attempted to blame Dr. Williams.

The Governor observed that subsequent to her incarceration, petitioner had been counseled eight times for misconduct, including as recently as 2005, but acknowledged that she has not been subject to any disciplinary actions. He further acknowledged that petitioner had made additional efforts toward rehabilitation subsequent to the Governor's last statement. "She has, since my last reversal of the Board's decision to grant [petitioner] parole in 2004, earned a Master's degree in Business Administration. Prior to that, she earned her Bachelor's degree in Human Development and an Associate of Arts degree. She received vocational training in data processing, word processing, and plumbing and has worked within the institutional setting as a library porter, which is her current position, and as a plumber, fitness trainer, and food manager's clerk. [Petitioner] has continued to avail herself of self-help and therapy, including Conflict Transformation Skills, Pathways to Wholeness, an array of substance-abuse programs, Stress Management, and Anger Management. She has participated in charitable events, a job fair, Toastmasters, Friends Outside programs, and other activities. Moreover, she has established and maintained seemingly solid relationships with family and others and has made realistic parole plans in Los Angeles for housing in a residential program and employment at a local newspaper. These are all factors supportive of [petitioner's] parole suitability."

Nonetheless, the Governor again relied upon the circumstances of the offense to justify his reversal of the Board's decision: "[T]he murder perpetrated by [petitioner] demonstrated a shockingly vicious use of lethality and an exceptionally callous disregard for human suffering because after she shot Mrs.

15

Williams — four times — causing her to collapse to the floor, [petitioner] stabbed her repeatedly. And the gravity alone of this murder is a sufficient basis on which to conclude presently that [petitioner's] release from prison would pose an unreasonable public-safety risk." The Governor described petitioner's crime as "a cold, premeditated murder carried out in an especially cruel manner and committed for an incredibly petty reason."

Despite acknowledging petitioner's *recent* positive mental health evaluations, the Governor noted that *early* prison reports by mental health evaluators characterized petitioner as sociopathic, unstable, and moderately psychopathic. He also emphasized that for many years, petitioner denied killing Mrs. Williams, although "she since has admitted that she committed this crime. She says that she fully understands and is sorry for what she did." The Governor further observed that at both the 2004 and 2005 parole hearings, petitioner denied having brought the gun to the dental office with the intent to shoot the victim.

Regarding the Board's finding that that the "commitment of the crime was the result of stress and life, [petitioner] was spurned by a lover in favor of his wife," the Governor concluded that "there is evidence in the record that any stress under which [petitioner] was operating at the time was not of such level or significance to mitigate her murderous conduct." In this respect, he emphasized that as petitioner herself admitted at the 2005 Board hearing, "she returned the gun to her sister's home, even put it back under the mattress, right after murdering Mrs. Williams. . . . [J]ust after returning the gun, she proceeded to another sister's home and went to sleep on her couch before ultimately fleeing the state."

Although petitioner had been incarcerated nearly 24 years at the time of the Governor's review and had "made creditable gains" during that time, he concluded that "the factors weighing against [petitioner's] parole suitability presently outweigh the positive ones tending to support it. Accordingly, because I

continue to believe that her release from prison would pose an unreasonable risk of danger to society, I REVERSE the Board's 2005 decision to grant parole to [petitioner]."

In an original petition for writ of habeas corpus filed in the Court of Appeal, petitioner challenged on several grounds the latest decision of the Governor denying parole. In a split decision, the appellate court found that the Governor's decision "is not supported by some evidence rationally indicating [petitioner] presently represents an unreasonable risk to public safety if released on parole." The majority found that the commitment offense did not demonstrate a more "shockingly vicious use of lethality" or a more "exceptionally callous disregard for human suffering" than other premeditated first degree murders, or than the murders in other appellate cases in which courts had found no evidence supporting the Governor's decision. The majority also concluded that even if some evidence supported his characterization of the seriousness of the murder, the gravity of the commitment offense did not supply some evidence "rationally demonstrating [petitioner] represents an unreasonable danger to public safety at the present time."

The dissent criticized the majority for misapplying the deferential standard of review set forth in *Rosenkrantz, supra,* 29 Cal.4th 616, and for relying upon federal authority to consider the predictive value of the offense. The dissent concluded that, because the commitment offense involved facts beyond the minimum necessary for a conviction of first degree murder, the aggravated circumstances of the commitment offense supplied some evidence supporting the Governor's decision.

Accordingly, the Court of Appeal issued a writ vacating the Governor's reversal of the Board's decision, and reinstated the Board's 2005 grant of parole to petitioner. After we declined to issue a writ of supersedeas to stay the judgment

17

rendered by the Court of Appeal, petitioner was paroled on July 11, 2007. The Attorney General sought review in this court, which we granted on September 19, 2007.

## II

### A

The applicable statutes provide that the Board is the administrative agency within the executive branch that generally is authorized to grant parole and set release dates. (§§ 3040, 5075 et seq.)  The Board's parole decisions are governed by section 3041 and Title 15, section 2281[5] of the California Code of Regulations (Regs., § 2230 et seq.)  Pursuant to statute, the Board "shall normally set a parole release date" one year prior to the inmate's minimum eligible parole release date, and shall set the date "in a manner that will provide uniform terms for offenses of similar gravity and magnitude *in respect to their threat to the public . . . .*" (§ 3041, subd. (a), italics added.)  Subdivision (b) of section 3041 provides that a release date must be set "unless [the Board] determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the *public safety* requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting." (Italics added; see *Rosenkrantz, supra*, 29 Cal.4th at p. 654, fn. omitted.)

---

5     Because petitioner's murder was committed prior to November 8, 1978, title 15, section 2281 governs her parole suitability. Title 15, section 2402, which we discussed in *Rosenkrantz, supra*, 29 Cal.4th 616, as excerpted in substantial part below, provides parole consideration criteria and guidelines for murders committed on or after November 8, 1978. The two sections are identical.

Title 15, Section 2281 of the California Code of Regulations sets forth the factors to be considered by the Board in carrying out the mandate of the statute. The regulation is designed to guide the Board's assessment of whether the inmate poses "an unreasonable risk of danger to society if released from prison," and thus whether he or she is suitable for parole. (Regs., § 2281, subd. (a).)[6] The regulation also lists several circumstances relating to *unsuitability* for parole[7] — such as the heinous, atrocious, or cruel nature of the crime, or an unstable social

---

[6]    These factors include "the circumstances of the prisoner's: social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability." (Regs., § 2281, subd. (b).)

[7]    Unsuitability factors are: (1) a commitment offense carried out in an "especially heinous, atrocious or cruel manner"; (2) a "[p]revious [r]ecord of [v]iolence"; (3) "a history of unstable or tumultuous relationships with others"; (4) "[s]adistic [s]exual [o]ffenses"; (5) "a lengthy history of severe mental problems related to the offense"; and (6) "[t]he prisoner has engaged in serious misconduct in prison or jail." (Regs., § 2281, subd. (c)(1)-(6).) This subdivision further provides that "the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel." (Regs., § 2281, subd. (c).)
    Factors supporting a finding that the inmate committed the offense in an especially heinous, atrocious, or cruel manner include the following: (A) multiple victims were attacked, injured, or killed in the same or separate incidents; (B) the offense was carried out in a dispassionate and calculated manner, such as an execution-style murder; (C) the victim was abused, defiled, or mutilated during or after the offense; (D) the offense was carried out in a manner that demonstrates an exceptionally callous disregard for human suffering; and (E) the motive for the crime is inexplicable or very trivial in relation to the offense. (Regs., § 2281, subd. (c)(1).)

background; and *suitability* for parole — such as an inmate's rehabilitative efforts, demonstration of remorse, and the mitigating circumstances of the crime.[8] (Regs., § 2281, subd. (d).)  Finally, the regulation explains that the foregoing circumstances "are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel." (Regs., § 2281, subds. (c), (d).)  The Governor's power to review a decision of the Board is set forth in article V, section 8, subdivision (b) of the California Constitution.[9]

---

[8]    Suitability factors are: (1) the absence of a juvenile record; (2) "reasonably stable relationships with others"; (3) signs of remorse; (4) a crime committed "as the result of significant stress in [the prisoner's] life"; (5) battered woman syndrome; (6) the lack of "any significant history of violent crime"; (7) "[t]he prisoner's present age reduces the probability of recidivism"; (8) "[t]he prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release"; and (9) the inmate's "[i]nstitutional activities indicate an enhanced ability to function within the law upon release." (Regs., § 2281, subd. (d)(1)-(9).)

[9]    Article V, section 8, subdivision (b) of the California Constitution provides in full: "No decision of the parole authority of this State with respect to the granting, denial, revocation, or suspension of parole of a person sentenced to an indeterminate term upon conviction of murder shall become effective for a period of 30 days, during which the Governor may review the decision subject to procedures provided by statute. The Governor may only affirm, modify, or reverse the decision of the parole authority on the basis of the same factors which the parole authority is required to consider. The Governor shall report to the Legislature each parole decision affirmed, modified, or reversed, stating the pertinent facts and reasons for the action."

    The statutory procedures governing the Governor's review of a parole decision pursuant to California Constitution article V, section 8, subdivision (b), are set forth in Penal Code section 3041.2, which states: "(a)  During the 30 days following the granting, denial, revocation, or suspension by a parole authority of the parole of a person sentenced to an indeterminate prison term based upon a conviction of murder, the Governor, when reviewing the authority's decision pursuant to subdivision (b) of Section 8 of Article V of the Constitution, shall review materials provided by the parole authority.  [¶]  (b) If the Governor decides

*(Footnote continued on next page.)*

In *Rosenkrantz, supra*, 29 Cal.4th 616, we were presented with the threshold question of whether courts are authorized to review the merits of a Governor's decision affirming, reversing, or modifying a parole decision of the Board. We held that both the Board and the Governor must consider the statutory factors concerning parole suitability set forth by section 3041 and Board regulations (Regs., § 2230 et seq.), and that "because due process of law requires that a decision considering such factors be supported by some evidence in the record, the Governor's decision is subject to judicial review to ensure compliance with this constitutional mandate." (*Rosenkrantz, supra*, 29 Cal.4th at p. 664.)

"[T]he governing statute provides that the Board *must* grant parole *unless* it determines that *public safety* requires a lengthier period of incarceration for the individual because of the gravity of the offense underlying the conviction. (Pen. Code, § 3041, subd. (b).) And as set forth in the governing regulations, the Board *must* set a parole date for a prisoner unless it finds, in the exercise of its judgment after considering the circumstances enumerated in section 2402 of the regulations, that the prisoner is unsuitable for parole. Accordingly, parole applicants in this state have an expectation that they will be granted parole unless the Board finds, in the exercise of its discretion, that they are unsuitable for parole in light of the circumstances specified by statute and by regulation." (*Rosenkrantz, supra*, 29 Cal.4th at p. 654, italics added. See also *In re Smith* (2003) 114 Cal.App.4th 343, 366) ["parole is the rule, rather than the exception"].)

---

*(Footnote continued from previous page.)*

to reverse or modify a parole decision of a parole authority pursuant to subdivision (b) of Section 8 of Article V of the Constitution, he or she shall send a written statement to the inmate specifying the reasons for his or her decision."

Nonetheless, we emphasized in *Rosenkrantz* that the Board's " 'discretion in parole matters has been described as "great" [citation] and "almost unlimited" ' [citation]." (*Rosenkrantz, supra,* 29 Cal.4th at p. 655.) "Resolution of any conflicts in the evidence and the weight to be given the evidence are within the authority of the Board." (*Id.* at p. 656.) We further concluded that the broad discretion to be granted to the Board also exists with regard to decisions rendered by the Governor. (*Id.* at p. 677.) Although "the Governor's decision must be based upon the same factors that restrict the Board in rendering its parole decision" (*id.* at p. 660), the Governor undertakes an independent, de novo review of the inmate's suitability for parole. (*Ibid.*) Thus, the Governor has discretion to be "more stringent or cautious" in determining whether a defendant poses an unreasonable risk to public safety. (*Id.* at p. 686.) "[T]he precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion of the Governor. . . . It is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole. As long as the Governor's decision reflects *due consideration of the specified factors* as applied to the individual prisoner in accordance with applicable legal standards, the court's review is limited to ascertaining whether there is some evidence in the record that supports the Governor's decision." (*Id.* at p. 677, italics added.)

Although we emphasized that a court's review should be highly deferential, we rejected the Governor's contention that the judicial branch is authorized to review parole decisions only to ensure that all *procedural safeguards* have been satisfied, but not to consider the *merits* of a parole decision. (*Rosenkrantz, supra,* 29 Cal.4th at p. 657.) In doing so, we cautioned against a less stringent standard of review that would permit the Board to render a decision without any "basis in fact" and not supported by any evidence in the record simply because "the

decision, on its face, recited supposed facts corresponding to the specified factors and appeared reasonable." (*Id.* at p. 665.) Such a decision would be arbitrary and capricious and, because it affects a protected liberty interest, would violate established principles of due process of law. (*Ibid.*) Accordingly, " '[r]equiring a modicum of evidence to support a decision . . . will help to prevent arbitrary deprivations without threatening institutional interests or imposing undue administrative burdens.' " (*Id.* at p. 658, quoting *Superintendent v. Hill* (1985) 472 U.S. 445, 455 (*Hill*).)

We held that despite the broad authority granted to the Board and the Governor, and the limited nature of judicial review, a petitioner is entitled to a constitutionally adequate and meaningful review of a parole decision, because an inmate's due process right "cannot exist in any practical sense without a remedy against its abrogation." (*Rosenkrantz, supra,* 29 Cal.4th at p. 664.) Accordingly, the judiciary is empowered to review a decision by the Board or the Governor to ensure that the decision reflects "an individualized consideration of the specified criteria" and is not "arbitrary and capricious." (*Id.* at p. 677.)

Subsequently, in *Dannenberg, supra,* 34 Cal.4th 1061, we specifically rejected the petitioner's contention that the Board must schedule an indeterminate life inmate's release on parole, within the parameters of uniform terms for similar offenses, unless it finds the callousness and brutality of a particular inmate's offense, or other indicia of his or her dangerousness, so extreme that the case falls outside the uniform-term matrices set forth in the Board's regulations. Instead, in construing section 3041, we considered it "obvious" that the public-safety provision of subdivision (b) takes precedence over the "uniform terms" principle of subdivision (a). We recognized that the "statute expressly provides that the fixing of a 'uniform' parole release date shall occur unless the Board finds the indeterminate life inmate unsuitable on grounds of 'public safety.' "

(*Dannenberg, supra,* 34 Cal.4th at p. 1082, italics omitted.) Accordingly, emphasizing that the primary, overriding consideration for the Board is public safety, we affirmed the "some evidence" standard of review, but our decision did not specifically reconsider, limit, or amplify the contours of the standard of review recognized and outlined in *Rosenkrantz.*

In sum, the Penal Code and corresponding regulations establish that the fundamental consideration in parole decisions is public safety (§ 3041; Regs., §§ 2281, 2402), and our discussion in both *Rosenkrantz* and *Dannenberg* emphasized this point. Moreover, it is apparent from the foregoing discussion that the core determination of "public safety" under the statute and corresponding regulations involves an assessment of an inmate's *current* dangerousness. As noted above, a parole release decision authorizes the Board (and the Governor) to identify and weigh only the factors relevant to predicting "whether the inmate will be able to live in society without committing additional antisocial acts." (*Rosenkrantz, supra,* 29 Cal.4th at p. 655.) These factors are designed to guide an assessment of the inmate's threat to society, *if released,* and hence could not logically relate to anything but the threat *currently* posed by the inmate. (Regs., § 2281, subds. (c) & (d); *Rosenkrantz, supra,* 29 Cal.4th at p. 655.)

**B**

In the years since our decision in *Dannenberg, supra,* 34 Cal.4th 1061, courts have struggled to strike an appropriate balance between deference to the Board and the Governor, and meaningful review of parole decisions. A growing tension has emerged in the decisions regarding the precise contours of the "some evidence" standard of review. This conflict is rooted in the practical reality that in every published judicial opinion addressing the issue, the decision of the Board or the Governor to deny or reverse a grant of parole has been founded in part or in whole upon a finding that the inmate committed the offense in an "especially

heinous, atrocious or cruel manner,"[10] and in the growing recognition that in some instances, the circumstances of the underlying offense, remote in time and attenuated by post-conviction rehabilitation, bear little relationship to the determination we recognized in *Rosenkrantz* and *Dannenberg* as critical — whether the inmate *remains* a threat to public safety.   Accordingly, a conflict has emerged concerning the extent to which a determination of current dangerousness should guide a reviewing court's inquiry into the Governor's (or the Board's) decision and, more specifically, as to whether the aggravated circumstances of the commitment offense, standing alone, provide some evidence that the inmate remains a current threat to public safety.

In *Rosenkrantz, supra,* 29 Cal.4th 616, we held that "[t]he nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole." (*Id.* at p. 682.) We also observed, however, that a parole denial based upon the circumstances of the offense might deny due process under the California Constitution when "no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense.  Denial of parole under these circumstances would be

---

10    (Regs., §§ 2281, subd. (c)(1), 2402, subd. (c)(1); see *In re Bettencourt* (2007) 156 Cal.App.4th 780, 791 (*Bettencourt*); *In re Roderick* (2007) 154 Cal.App.4th 242, 260 (*Roderick*); *In re Gray* (2007) 151 Cal.App.4th 379, 396 (*Gray*); *In re Tripp* (2007) 150 Cal.App.4th 306, 316 (*Tripp*); *In re Barker* (2007) 151 Cal.App.4th 346, 361-362 (*Barker*); *In re Burns* (2006) 136 Cal.App.4th 1318, 1323 (*Burns*); *In re Andrade* (2006) 141 Cal.App.4th 807, 813 (*Andrade*); *In re Lee* (2006) 143 Cal.App.4th 1400, 1405 (*Lee*); *In re Weider* (2006) 145 Cal.App.4th 570, 581 (*Weider*); *In re Elkins* (2006) 144 Cal.App.4th 475, 486 (*Elkins*); *In re Scott* (2005) 133 Cal.App.4th 573, 587-588 (*Scott*); *In re DeLuna* (2005) 126 Cal.App.4th 585, 590 (*DeLuna*); *In re Honesto* (2005) 130 Cal.App.4th 81, 89 (*Honesto*); *In re Fuentes* (2005) 135 Cal.App.4th 152, 158 (*Fuentes*); *In re Lowe* (2005) 130 Cal.App.4th 1405, 1414-1415 (*Lowe*).)

inconsistent with the statutory requirement that a parole date normally shall be set 'in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public. . . .' (Pen. Code § 3041, subd. (a).) . . . [¶] 'Therefore, a life term offense or any other offenses underlying an indeterminate sentence must be particularly egregious to justify the denial of a parole date.' " (*Id.* at p. 683.)

In *Dannenberg*, we confirmed that "[w]hen the Board bases unsuitability on the circumstances of the commitment offense, it must cite 'some evidence' of aggravating facts *beyond the minimum elements of that offense.* (*Rosenkrantz, supra,* 29 Cal.4th 616, 658, 683.)" (*Dannenberg, supra,* 34 Cal.4th at pp. 1095-1096, fn. 16.) We also clarified that "[o]ur use of the phrase 'particularly egregious' " in *Rosenkrantz* did not mandate a proportionality review as a threshold inquiry in every case, but "conveyed only that the violence or viciousness of the inmate's crime must be more than *minimally necessary to convict him* of the offense for which he is confined." (*Dannenberg, supra,* 34 Cal.4th at p. 1095, quoting *Rosenkrantz, supra,* 29 Cal.4th at p. 683.)

In considering whether such evidence existed in petitioner Dannenberg's case, we recounted that the inmate had bludgeoned his wife with a pipe wrench and then either pushed his wife into a bathtub of water, or left her to drown in the tub despite awareness of her injuries. In light of these circumstances, we concluded "there clearly was 'some evidence' (*Rosenkrantz, supra,* 29 Cal.4th 616, 658) to support the Board's determination that Dannenberg's crime was 'especially callous and cruel,' showed 'an exceptionally callous disregard for human suffering,' and was disproportionate to the 'trivial' provocation. Accordingly, under *Rosenkrantz,* the Board could use the murder committed by Dannenberg as a basis to find him unsuitable, *for reasons of public safety,* to

receive a firm parole release date." (*Dannenberg, supra*, 34 Cal.4th at p. 1095, fn. omitted, italics added.)

Although we did not explicitly consider whether the aggravated circumstances of the commitment offense established that the inmate remained a current threat to public safety, it is apparent that in basing our conclusion that the inmate's due process rights were not violated upon the existence of evidence in the record establishing that the commitment offense was particularly egregious, we presumed that the evidence of egregiousness supported the ultimate determination that the inmate posed a threat to public safety, as opposed to merely providing support for the Board's or the Governor's conclusion that the crime was particularly aggravated. (*Dannenberg, supra*, 34 Cal.4th at p. 1095 [finding "some evidence" supported Board's determination that the petitioner's crime was particularly egregious, and concluding under *Rosenkrantz* that the Board could employ the murder committed by the petitioner as a basis for finding him unsuitable for parole "for reasons of public safety"]; *Rosenkrantz, supra*, 29 Cal.4th at p. 682 ["the decision of the Governor made clear that he independently found that petitioner poses a risk of danger based upon the nature of the offense and petitioner's conduct before he surrendered"].)

Applying the presumption that evidence of egregiousness supports the ultimate determination that an inmate poses a threat to public safety, some courts have concluded that a denial-of-parole decision must be affirmed if "some evidence" supports the Board's or the Governor's factual determination that the commitment offense was particularly aggravated, or that some other factor establishing unsuitability is present. (See *Bettencourt, supra*, 156 Cal.App.4th at p. 800; *Andrade, supra*, 141 Cal.App.4th at p. 819; *Burns, supra*, 136 Cal.App.4th at pp. 1327-1328; *Fuentes, supra*, 135 Cal.App.4th at pp. 162-163; *Honesto, supra*, 130 Cal.App.4th at p. 96; *Lowe, supra*, 130 Cal.App.4th at pp. 1427-1428;

27

*DeLuna, supra*, 126 Cal.App.4th at p. 593.) Under this approach, if some evidence supports a finding that the crime is especially heinous, atrocious, or cruel, and the record establishes that the Board or the Governor gave consideration to the factors required by law to be taken into account, the court will not weigh the balance of relevant factors differently, and will not independently assess whether an inmate poses an "unreasonable risk" to public safety.[11]   (Regs., § 2402, subd. (a).)

Conversely, an emerging majority of courts, concluding that an inquiry focused only upon the existence of unsuitability factors fails to provide the meaningful review guaranteed by the due process clause, define the "some evidence" standard by focusing upon those aspects of our earlier opinions in which we stated that the judicial inquiry is centered upon an evaluation of the evidence supporting the Board or the Governor's *decision*,[12] — *and that decision is whether or not an inmate continues to pose a threat to public safety.* (*Rosenkrantz, supra*, 29 Cal.4th at pp. 654 ["the governing statute provides that the Board must grant parole unless it determines that public safety requires a lengthier period of incarceration for the individual because of the gravity of the offense underlying the conviction"]; *Dannenberg, supra*, 34 Cal.4th at pp. 1083,

---

11    As discussed in part III, *post*, implicit in this approach is the assumption, gleaned from our application of the standard in *Rosenkrantz* and *Dannenberg*, that evidence establishing that a commitment offense was particularly egregious inherently assesses the threat currently posed by the inmate to public safety.

12    (*Rosenkrantz, supra*, 29 Cal.4th at p. 658 ["the court may inquire only whether some evidence in the record before the Board supports the *decision* to deny parole, based upon factors specified by statute and regulation"(italics added)]; *Hill, supra*, 472 U.S. at pp. 455-456 ["the relevant question is whether there is any evidence in the record that could support the *conclusion* reached by the decision maker."])

1084, 1098 ["the suitability determination should focus upon the *public safety risk* posed by 'this individual' "; "the determination of suitability for parole involves a paramount assessment of *the public safety risk* posed by the particular offender, without regard to a comparative analysis of similar offenses committed by other persons"; some evidence "indicated exceptional callousness and cruelty with trivial provocation, and thus suggested [Dannenberg] *remains a danger to public safety*" (italics added)].)[13]

These cases emphasize that public safety is the overarching consideration for both the Board and the Governor, and interpret the *Rosenkrantz* "some evidence" test as "meaning that suitability determinations must have some basis in fact." (*Scott, supra,* 133 Cal.App.4th at p. 590, fn. 6.) Accordingly, these decisions conclude that the some evidence standard described in *Rosenkrantz* and *Dannenberg* poses not simply a question of whether some evidence supports the factors cited for denial, but instead, whether the evidence supports the core determination required by the statute before parole can be denied — that an inmate's release will unreasonably endanger public safety. (*Roderick, supra,* 154 Cal.App.4th at p. 263; *Gray, supra,* 151 Cal.App.4th at p. 410; *Barker, supra,* 151 Cal.App.4th at p. 366; *Tripp, supra,* 150 Cal.App.4th at p. 313; *Weider, supra,* 145 Cal.App.4th at p. 589; *Elkins, supra,* 144 Cal.App.4th at p. 499; *Lee, supra,* 143 Cal.App.4th at p. 1408; *Scott, supra,* 133 Cal.App.4th at p. 595.) As articulated in *Lee, supra,* 143 Cal.App.4th 1400, these decisions conclude that

---

13    (*Roderick, supra,* 154 Cal.App.4th at p. 263; *Gray, supra,* 151 Cal.App.4th at p. 410; *Barker, supra,* 151 Cal.App.4th at p. 366; *Tripp, supra,* 150 Cal.App.4th at p. 313; *Weider, supra,* 145 Cal.App.4th at p. 589; *Elkins, supra,* 144 Cal.App.4th at p. 499; *Lee, supra,* 143 Cal.App.4th at p. 1408; *Scott, supra,* 133 Cal.App.4th at p. 595.)

"[s]ome evidence of the existence of a particular factor does not necessarily equate to some evidence the parolee's release unreasonably endangers public safety." (*Id.* at p. 1409, fn. omitted.)

In most of the decisions discussed above, the courts have not explicitly recognized a conflict between the two alternative approaches. Several dissenting justices, however, including Justice Perluss in the present case, as well as the majority in several cases in which we have granted review (and which we have held pending resolution of the present case), have criticized the so-called current dangerousness approach as incompatible with our analysis in *Rosenkrantz* and *Dannenberg*. (E.g. *Roderick, supra*, 154 Cal.App.4th at pp. 311-312 (dis. opn. of Sepulveda, J.).) These justices view a standard of review focusing upon the ultimate statutory decision rather than the existence of an unsuitability factor as one that transmutes the deferential standard of review set forth in *Rosenkrantz* into one that impermissibly reweighs the evidence, recalibrates the relevant factors, and permits an independent determination whether the inmate continues to pose a risk to public safety.

We disagree with the view that a standard of review that focuses upon the existence of "some evidence" that an inmate poses a current threat to public safety — rather than merely some evidence of the existence of an unsuitability factor — is incompatible with either *Rosenkrantz* or *Dannenberg*. As set forth above, our previous cases recognize that the paramount consideration for both the Board and the Governor under the governing statutes is whether the inmate currently poses a threat to public safety and thus may not be released on parole. (*Dannenberg, supra*, 34 Cal.4th at pp. 1070-1071, 1079-1080, 1083-1084, 1091, 1094, 1098; *Rosenkrantz, supra*, 29 Cal.4th at pp. 653-654, 682-683.) We have held that to ensure that a Board's *decision* comports with due process, a court must consider whether "*some evidence in the record before the Board supports the*

*decision to deny parole*, based upon the factors specified by statute and regulation. If *the decision's consideration of the specified factors* is not supported by some evidence in the record and thus is devoid of a factual basis, the court should grant the prisoner's petition for writ of habeas corpus and should order the Board to vacate its decision denying parole and thereafter to proceed in accordance with due process of law." (*Rosenkrantz, supra*, 29 Cal.4th at p. 658, italics added.)

We also have emphasized that under the some evidence standard, a reviewing court reviews the *merits* of the Board's or the Governor's decision, and is not bound to affirm a parole decision merely because the Board or the Governor has adhered to all procedural safeguards.  We have remarked that "[a]s long as the Governor's decision reflects *due consideration of the specified factors* as applied to the individual prisoner in accordance with applicable legal standards, the court's review is limited to ascertaining whether there is some evidence in the record that supports the Governor's decision." (*Rosenkrantz, supra*, 29 Cal.4th at p. 677, italics added.)  This standard is unquestionably deferential, but certainly is not toothless, and "due consideration" of the specified factors requires more than rote recitation of the relevant factors with no reasoning establishing a rational nexus between those factors and the necessary basis for the ultimate decision — the determination of current dangerousness.  "It is well established that a policy of rejecting parole solely upon the basis of the type of offense, without individualized treatment and due consideration, deprives an inmate of due process of law." (*Id.* at p. 684.)

Indeed, our conclusion that current dangerousness (rather than the mere presence of a statutory unsuitability factor) is the focus of the parole decision is rooted in the governing statute.  We have observed that " '[t]he Board's authority to make an exception [to the requirement of setting a parole date] based on the gravity of a life term inmate's current or past offenses should not operate so as to

31

swallow the rule that parole is 'normally' to be granted.  Otherwise, the Board's

case-by-case rulings would destroy the proportionality contemplated by Penal

Code section 3041, subdivision (a), and also by the murder statutes, which provide

distinct terms of life without possibility of parole, 25 years to life, and 15 years to

life for various degrees and kinds of murder. (Pen. Code, § 190 et seq.)' "

(*Rosenkrantz*, *supra*, 29 Cal.4th p. 683.)  Consistent with this statutory regime, the

Board's regulations, establishing a matrix of factors for determining the suggested

base terms for life prisoners, contemplates that even those who committed

aggravated murder may be paroled after serving a sufficiently long term if the

Board determines that evidence of postconviction rehabilitation indicates they no

longer pose a threat to public safety.  (See, e.g., Regs., §§ 2282(b), 2403(b))

[formulating longer suggested base terms for first degree murderers who have no

prior relationship to their victim and who inflict trauma on their victims].)  Of

course, as we stated in *Dannenberg*, the statute does not contemplate that the goal

of uniformity will take precedence over the goal of public safety.  (See

*Dannenberg*, *supra*, 34 Cal.4th at p. 1087.)  But the statutory and regulatory

mandate to normally grant parole to life prisoners who have committed murder

means that, particularly after these prisoners have served their suggested base

terms, the underlying circumstances of the commitment offense alone rarely will

provide a valid basis for denying parole when there is strong evidence of

rehabilitation and no other evidence of current dangerousness.

In expressly rejecting a purely procedural standard of review in

*Rosenkrantz*, we recognized that in light of the constitutional liberty interest at

stake, judicial review must be sufficiently robust to reveal and remedy any evident

deprivation of constitutional rights.  If simply pointing to the existence of an

unsuitability factor and then acknowledging the existence of suitability factors

were sufficient to establish that a parole decision was not arbitrary, and that it was

supported by "some evidence," a reviewing court would be forced to affirm any denial-of-parole decision linked to the mere existence of certain facts in the record, even if those facts have no bearing on the paramount statutory inquiry. Such a standard, because it would leave potentially arbitrary decisions of the Board or the Governor intact, would be incompatible with our recognition that an inmate's right to due process "cannot exist in any practical sense without a remedy against its abrogation." (*Rosenkrantz, supra,* 29 Cal.4th. at p. 664; *In re Scott* (2004) 119 Cal.App.4th 871, 898 [observing that the deferential standard of review set forth in *Rosenkrantz*, although requiring courts to be "exceedingly deferential" to the Board's findings, "does not convert a court reviewing the denial of parole into a potted plant"].)

Accordingly, if we are to give meaning to the statute's directive that the Board *shall normally* set a parole release date (§ 3041, subd. (a)), a reviewing court's inquiry must extend beyond searching the record for some evidence that the commitment offense was particularly egregious and for a mere *acknowledgement* by the Board or the Governor that evidence favoring suitability exists. Instead, under the statute and the governing regulations, the circumstances of the commitment offense (or any of the other factors related to unsuitability) establish unsuitability if, and only if, those circumstances are probative to the determination that a prisoner remains a danger to the public. It is not the existence or nonexistence of suitability or unsuitability factors that forms the crux of the parole decision; the significant circumstance is how those factors interrelate to support a conclusion of current dangerousness to the public.

Accordingly, when a court reviews a decision of the Board or the Governor, the relevant inquiry is whether some evidence supports the *decision* of the Board or the Governor that the inmate constitutes a current threat to public safety, and not merely whether some evidence confirms the existence of certain

factual findings. (*Rosenkrantz, supra*, 29 Cal.4th at p. 658; *Dannenberg, supra*, 34 Cal.4th at p. 1071; *Lee, supra*, 143 Cal.App.4th at p. 1408, fn. omitted.)

Contrary to the Attorney General's contention, our recognition that judicial review contemplates an evaluation of the record for some evidence supporting the decision reached by the Board or the Governor does not impermissibly shift the ultimate discretionary decision of parole suitability from the executive branch to the judicial branch. In *Rosenkrantz, supra*, 29 Cal.4th 616, we expressly recognized that judicial review of a Governor's parole decision for adherence to both statutory and constitutional mandates was both (a) contemplated by the governing statutes and the California Constitution, and (b) integral to protecting an inmate's constitutional liberty interest in the setting of a parole date. (*Id.* at p. 664.) Our recognition today that the focus upon current dangerousness is the appropriate articulation of the "some evidence" standard does not alter the role assigned either to the executive or to the judiciary, but merely articulates the circumstance that the relevant consideration both for the executive decisionmakers and for reviewing courts is the core statutory determination of public safety. (*Id.* at p. 662.)

The Attorney General further asserts that the some evidence standard, focused upon current dangerousness, does not lend itself to appropriate judicial review, because a "predictive" determination regarding parole suitability is not subject to objective proof and thus is not amenable to review under the some evidence standard. We disagree. As explained above, as specified *by statute*, current dangerousness is the fundamental and overriding question for the Board and the Governor. In addition, and as further explained below, evidence in the record corresponding to both suitability and unsuitability factors — including the facts of the commitment offense, the specific efforts of the inmate toward rehabilitation, and, importantly, the inmate's attitude concerning his or her

commission of the crime, as well as the psychological assessments contained in the record — must, by statute, be considered and relied upon by both the Board and the Governor, whose decisions must be supported by some *evidence*, not merely by a hunch or intuition. By reviewing this evidence, a court may determine whether the facts relied upon by the Board or the Governor support the ultimate decision that the inmate remains a threat to public safety. A standard of review focusing upon the existence of some evidence supporting the determination required by statute does nothing more than ensure that the Board and the Governor have complied with the statutory mandate and have acted within their constitutional authority.

### III

The Attorney General contends that the aggravated circumstances of a commitment offense inherently assess current dangerousness, and that the existence of "some evidence" demonstrating that the offense was aggravated beyond the minimum elements of the offense therefore is sufficient to support the conclusion that an inmate is currently dangerous. Arguably, the manner in which we applied the some evidence standard in *Rosenkrantz* and *Dannenberg* implicitly endorsed the Attorney General's position. In each case, we evaluated the egregiousness of the commitment offense by considering whether the offense involved some act beyond the minimum required for conviction of the offense, and upon finding that the circumstances of the offense established egregiousness, we affirmed the Board's or the Governor's decision without specifically considering whether there existed a rational nexus between those egregious circumstances and the ultimate conclusion that the inmate remained a threat to public safety.

In light of the conflict among the Courts of Appeal discussed above, it is necessary to clarify the manner in which courts must apply the some evidence

35

standard. As we explain below, an inquiry into whether the offense is more aggravated than the minimum elements necessary to sustain a conviction was not intended by this court to be the exclusive measure of due process, and has proved in practice to be unworkable, leading to arbitrary results. Most importantly, the circumstance that the offense is aggravated does not, in every case, provide evidence that the inmate is a current threat to public safety. Indeed, it is not the circumstance that the crime is particularly egregious that makes a prisoner unsuitable for parole — it is the implication concerning future dangerousness that derives from the prisoner having committed that crime. Because the parole decision represents a prospective view — essentially a prediction concerning the future — and reflects an uncertain conclusion, rarely (if ever) will the existence of a single isolated fact in the record, evaluated in a vacuum, suffice to support or refute that decision.

Accordingly, we conclude that although the Board and the Governor may rely upon the aggravated circumstances of the commitment offense as a basis for a decision denying parole, the aggravated nature of the crime does not in and of itself provide some evidence of *current* dangerousness to the public unless the record also establishes that something in the prisoner's pre- or post-incarceration history, or his or her current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his or her commission of the commitment offense remain probative to the statutory determination of a continuing threat to public safety.

### A

Although we relied upon a "minimum elements" inquiry to determine whether the commitment offenses in *Rosenkrantz* and *Dannenberg* were particularly egregious, by doing so we did not intend to define the *exclusive* situation in which a decision relying solely upon the circumstances of the

36

commitment offense to justify a denial-of-parole decision might be found to be arbitrary or capricious. After all, we recognized that the fundamental purpose of judicial review is to permit courts to provide a remedy for arbitrary decisions. As noted above, we observed that a parole denial based upon the circumstances of the offense might, "*for example*," violate due process under the California Constitution "where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense. . . . [¶] 'Therefore, a life term offense or any other offenses underlying an indeterminate sentence must be particularly egregious to justify the denial of a parole date.' " (*Rosenkrantz, supra*, 29 Cal.4th at p. 683.) To the extent this language has been read to suggest that reliance solely upon the circumstances of the commitment offense would violate an inmate's due process rights *only* in those cases in which the circumstances of the crime are not particularly egregious, we emphasize that due process cannot, and should not, be so narrowly defined.

## B

Nonetheless, reading the minimum elements language as talismanic, Court of Appeal decisions have interpreted our cases as establishing this focus as the *sole* relevant consideration in determining whether an inmate's due process rights were violated by the Board's or the Governor's reliance upon the circumstances of the commitment offense. This preoccupation with minimum elements has created an irrational dichotomy between those appellate decisions that are premised upon the existence of "some evidence" of an unsuitability factor and those decisions premised upon the existence of "some evidence" of current dangerousness. Decisions in the first category uniformly have concluded that the circumstances of the underlying homicide were, in fact, particularly egregious and extended beyond the minimum elements necessary for conviction (and therefore, because the

statutory factor corresponding to the gravity of the offense applied, these decisions have affirmed the denial of parole.)[14]  Decisions in the second category have focused upon the existence of "some evidence" of current dangerousness, and, with a few exceptions,[15] have concluded that the underlying homicide was *not* particularly egregious and did *not* exceed the minimum elements required for conviction of that offense (thereby mandating reversal of the Board's or the Governor's action, because the record did not contain some evidence supporting a finding of current dangerousness).[16]

---

[14]    (See *Bettencourt, supra*, 156 Cal.App.4th at p. 807; *Burns, supra*, 136 Cal.App.4th at p. 1329; *Andrade, supra*, 141 Cal.App.4th at pp. 818-819; *Fuentes, supra*, 135 Cal.App.4th at p. 163; *Honesto, supra*, 130 Cal.App.4th at pp. 96-97; *Lowe, supra*, 130 Cal.App.4th at p. 1429.)

   The court in *DeLuna, supra*, 126 Cal.App.4th at page 600, found no evidence in the record supporting the existence of any of the multiple factors cited by the Board, except for the aggravated nature of the commitment offense.  The appellate court reversed the trial court's decision granting petitioner's habeas corpus petition, but did not affirm the Board's decision, instead ordering the trial court to remand the matter to the Board for a new hearing.  (*Ibid.*)

[15]    Two cases diverged from the pattern by applying the some-evidence-of-current-dangerousness approach and finding both that the crime involved more than the minimum elements, and that the circumstances of the crime continued to be predictive of current dangerousness.  In *Tripp, supra*, 150 Cal.App.4th at pages 314, 320, the court recognized the current dangerousness test, but concluded that the circumstances surrounding petitioner's commitment offense were particularly egregious, and could constitute some evidence if the Governor duly considered all other relevant factors.  In *In re Hyde* (2007) 154 Cal.App.4th 1200, 1215 (*Hyde*), the court analyzed the record for some evidence of current dangerousness, and also concluded that the circumstances of petitioner's numerous commitment offenses were both particularly egregious and provided evidence of his continuing threat to public safety.

[16]    (See *Roderick, supra*, 154 Cal.App.4th at p. 278; *Gray, supra*, 151 Cal.App.4th at p. 410; *Barker, supra*, 151 Cal.App.4th at pp. 377-378; *Weider, supra*, 145 Cal.App.4th at pp. 590-591; *Elkins, supra*, 144 Cal.App.4th at pp. 502-

*(Footnote continued on next page.)*

A review of these cases reveals that resort to a minimum elements inquiry has proved to lead to arbitrary results. For example, in *Bettencourt, supra*, 156 Cal.App.4th at page 800, the court found the commitment offense particularly aggravated where the petitioner and his friend beat and stabbed the victim with a screwdriver and a knife, and after the murder the petitioner cleaned the victim's apartment and dumped the body off a cliff. (See also *Burns, supra*, 136 Cal.App.4th at p. 1327 [crime found particularly aggravated where the petitioner confronted the victim, his ex-girlfriend, in a dark and isolated area and shot her in the head with a stolen gun; the victim died several hours later; and after the shooting, the petitioner went to his dorm room where he watched television].)[17]

---

*(Footnote continued from previous page.)*

503; *Lee, supra*, 143 Cal.App.4th at pp. 1414-1415; *Scott, supra*, 133 Cal.App.4th at pp. 603-604.)

[17]    (See also *Andrade, supra*, 141 Cal.App.4th at p. 819 [crime found particularly aggravated where during an altercation between the petitioner and another man, the petitioner's adversary cut his neck with a knife; the petitioner left the scene, returned with a shotgun, and shot two bystanders, one of whom was believed by the petitioner to have stabbed him; the petitioner fired three shots, killing one victim and injuring the second]; *Fuentes, supra*, 135 Cal.App.4th at pp. 162-163 [crime found particularly aggravated where the petitioner and his acquaintance had an altercation with two men; during the altercation, either the petitioner or his acquaintance pulled a knife and stabbed one of the men once in the face and once in the chest; after the stabbing, the petitioner fled the scene]; *Honesto, supra*, 130 Cal.App.4th at p. 96 [crime found particularly aggravated where the petitioner and two co-conspirators planned to kidnap, rob, and possibly kill the victim, who was the head clerk at a grocery store and once had refused to cash a check for one of the men; the men confronted the victim at his home with firearms and forced him to drive to the store; during the drive, the petitioner shot the victim with a shotgun, causing a collision; victim died several hours later]; *Lowe, supra*, 130 Cal.App.4th at pp. 1427-1428 [crime found particularly aggravated where the petitioner and the victim had a sexual relationship; after the relationship deteriorated, the petitioner purchased a gun and fired five shots at the victim's head and chest while he was asleep; after the murder, the petitioner

*(Footnote continued on next page.)*

In contrast, in *Barker, supra,* 151 Cal.App.4th at pages 377-378, the court found the commitment offense was *not* particularly aggravated where the petitioner and his accomplice planned to kill the accomplice's parents for money. After the accomplice shot the parents, the petitioner killed the accomplice's 76-year-old grandfather by striking him on the head with a chisel several times and then shooting him twice in the head. Following the murders, the petitioner and his accomplice ransacked the house to make the crime look like a burglary. (See also *Elkins, supra,* 144 Cal.App.4th at p. 502 [crime found not particularly aggravated where the petitioner, a drug dealer, owed the victim money; after drinking alcoholic beverages and consuming cocaine, the petitioner planned to rob the victim of money and drugs; the petitioner killed victim by repeatedly beating him over the head with a baseball bat while he was sleeping; after the murder, the petitioner dumped the body in a remote area, burglarized victim's storage area and his girlfriend's house, and left the state].)[18]

---

*(Footnote continued from previous page.)*

covered the body in sheets and blankets, leaving it on the bed for two months; the petitioner later placed the body in a coffin, which he used as a nightstand; after learning that the police discovered the body, the petitioner fled].)

[18]    (See also *Weider, supra,* 145 Cal.App.4th at p. 587 [crime found not particularly aggravated where after the petitioner's wife moved in with the victim, the petitioner confronted wife and victim in a bar with a gun, intending to kill himself; after a struggle over the gun, the petitioner shot at the victim, killing him and wounding two patrons]; *Lee, supra,* 143 Cal.App.4th at p. 1413 [crime found not particularly aggravated where after a buyer repeatedly failed to make promised periodic payments to the petitioner, the petitioner confronted him with a gun, shooting at him five times until the gun jammed; the buyer, hit twice, survived the shooting, but one of the bullets killed the buyer's wife]; *Scott, supra,* 133 Cal.App.4th at p. 601 [crime found not particularly aggravated where victim was the lover of the petitioner's wife; the petitioner approached victim while he was watching fireworks with the petitioner's wife and son, shot the victim twice in the head and thigh, and left the scene].)

Furthermore, as the Attorney General points out, undue focus upon minimum elements has led many courts that also properly focus upon some evidence of current dangerousness — including the Court of Appeal majority in the present case — to compare the facts under review with the circumstances of other murders in other cases as a means of considering whether the underlying crime is particularly egregious in comparison with others, and whether the evidence supports the conclusion that the petitioner poses a threat to public safety. (See, e.g., *Gray, supra,* 151 Cal.App.4th at pp. 405-410; *Weider, supra,* 145 Cal.App.4th at pp. 588-589; *Elkins, supra,* 144 Cal.App.4th at pp. 500-502; *Lee, supra,* 143 Cal.App.4th at pp. 1410-1412; *Scott, supra,* 133 Cal.App.4th at p. 598.)

Focus upon whether a petitioner's crime was "particularly egregious" in comparison to other murders in other cases is not called for by the statutes, which contemplate an individualized assessment of an inmate's suitability for parole, nor is it a proper method of assessing whether "some evidence" supports the Governor's conclusion that a particular inmate represents an unreasonable threat to public safety. The circumstance that some inmates who committed murders were or were not adjudged to be threats to public safety has a minimal bearing upon whether any *other* inmate poses such a threat. Moreover, comparative analysis is incompatible with our decision in *Dannenberg.* In *Dannenberg, supra,* 34 Cal.4th 1061, we held that nothing in section 3041 suggests that the Board's members must vote in favor of parole *unless* the inmate's offense is substantially more serious than most others of the same class. (34 Cal.4th at pp. 1083-1084, 1095.) In other words, we recognized that the statute does not require the Board to compare the inmate's actual period of confinement with that of other individuals serving life terms for similar crimes. (*Id.* at pp. 1070-1071.) Rather, the statutory

41

suitability determination is individualized, and focuses upon the public safety risk posed by the particular offender. (*Ibid.*)

### C

Reiterating the contention that the statutory factors inherently assess unsuitability for parole, and thus that no additional inquiry regarding current dangerousness is required, the Attorney General contends that if it is determined that a crime involves an act beyond the minimum necessary for conviction of that offense, some evidence necessarily supports the Governor's decision, and that if the record establishes the Governor has considered all other relevant statutory factors, a court must affirm the Governor's decision. To address the arbitrary results that in practice have resulted from resort to a minimum elements inquiry, the Attorney General suggests we disavow the trend toward comparative analysis and instead resurrect a pure minimum-elements inquiry that determines whether a crime is particularly egregious, by determining whether "the violence or viciousness of the inmate's crime [was] more than minimally necessary to convict [defendant] of the offense for which he [or she is] confined." (*Dannenberg, supra*, 34 Cal.4th at p. 1095, italics omitted.)

A survey of the appellate court decisions reveals, however, that the minimum elements inquiry is unworkable in practice, not merely because it has led courts to engage in comparative analysis or to characterize clearly aggravated conduct as not particularly egregious, but also because it has become evident that there are few, if any, murders that could *not* be characterized as either particularly aggravated, or as involving some act beyond the minimum required for conviction of the offense. Accordingly, because it also is apparent that the gravity of the offense is the sole or primary determinative factor in each of these cases, a strict minimum elements inquiry would mandate upholding in every case the denial of parole, regardless of whether other evidence in the record clearly attenuates the

predictive value of the offense, and without any consideration of whether the gravity of the offense continues to provide some evidence that the inmate remains a threat to public safety many years after commission of his or her offense. Similarly, the unexceptional nature of the commitment offense will not inevitably reflect a *lack* of current dangerousness without due consideration of the inmate's post-conviction actions and progress toward rehabilitation.

More importantly, the minimum elements inquiry, which assesses only the gravity of the commitment offense, fails to provide a workable standard for judicial review, because it is now apparent that the aggravated nature of the commitment offense does not, in every case, provide some evidence that the inmate remains a current threat to public safety. (*Roderick, supra,* 154 Cal.App.4th at p. 277 [although record indicated the petitioner had a long criminal history, court required the Board to hold a new hearing, noting inmate's age and "the immutability of [his] past criminal history and its diminishing predictive value for future conduct"]; *Elkins, supra,* 144 Cal.App.4th at pp. 498-499 [recognizing that the predictive value of the commitment offense may be very questionable after a long period of time, and concluding that "[g]iven the lapse of 26 years and the exemplary rehabilitative gains made by [the petitioner] over that time, continued reliance on these aggravating facts of the crime no longer amounts to 'some evidence' supporting denial of parole"]; *Lee, supra,* 143 Cal.App.4th at p. 1412 [court concluded that the petitioner's crimes had "little, if any, predictive value for future criminality," because the crimes committed 20 years ago had "lost much of their usefulness in [predicting] the likelihood of future offenses"]; *Scott, supra,* 133 Cal.App.4th at p. 595 [the "predictive value of the commitment offense may be very questionable after a long period of time"]; see also *Tripp, supra,* 150 Cal.App.4th at p. 319 ["[e]stablishing that the commitment offense involved some elements more than minimally necessary to sustain a conviction is a step on the

path of evaluating a prisoner's current dangerousness, but it is not the final step under the regulations."].)

An evaluation of the circumstances of the crime in isolation allows a fact finder or reviewing court to determine whether a commitment offense was particularly egregious — a designation that we have seen applied in nearly every murder case considered by the Board or the Governor — and to conclude that the prisoner was a danger to the public *at or around the time of his or her commission of the offense.* Absent affirmative evidence of a change in the prisoner's demeanor and mental state, the circumstances of the commitment offense may continue to be probative of the prisoner's dangerousness for some time in the future. At some point, however, when there is affirmative evidence, based upon the prisoner's subsequent behavior and current mental state, that the prisoner, if released, would not currently be dangerous, his or her past offense may no longer realistically constitute a reliable or accurate indicator of the prisoner's current dangerousness.

As we recognized in *Rosenkrantz, supra,* 29 Cal.4th 616, when evaluating whether an inmate continues to pose a threat to public safety, both the Board and the Governor must consider all relevant statutory factors, including those that relate to post-conviction conduct and rehabilitation. (*Id.,* at p. 2655 [noting that the Board " 'cannot, consistently with its obligation, ignore postconviction factors unless directed to do so by the Legislature,' " and that " '[a]lthough a prisoner is not entitled to have his term fixed at less than maximum or to receive parole, he is entitled to have his application for these benefits "duly considered" based upon an individualized consideration of all relevant factors' "].) Indeed, in directing the Board to consider the statutory factors relevant to suitability, many of which relate to postconviction conduct and rehabilitation, the Legislature explicitly recognized that the inmate's threat to public safety could be minimized over time by changes in attitude, acceptance of responsibility, and a commitment to living within the

strictures of the law. In other words, contrary to the Attorney General's contention that if the circumstances of the commitment offense are egregious, those circumstances will provide some evidence of current dangerousness *in perpetuity*, it is evident that the Legislature considered the passage of time — and the attendant changes in a prisoner's maturity, understanding, and mental state — to be highly probative to the determination of current dangerousness.

The minimum elements test, because it functionally removes consideration of relevant suitability factors and fails to assess *current* dangerousness, substantially undermines the rehabilitative goals of the governing statutes.[19]

---

[19]    Although we have not previously emphasized the rehabilitative aspects of the governing statutory requirements and the underlying legislative intent that the Board and the Governor consider an inmate's rehabilitation when evaluating parole suitability, an examination of the regulatory factors favoring suitability (quoted, *ante*, fn. 8) establishes that in determining whether further incarceration is necessary to protect the public, the Board (and the Governor) must consider, among other factors, whether the inmate exhibits signs of remorse, has made realistic plans for release or has developed marketable skills that can be put to use upon release, and whether the inmate's institutional activities reflect an enhanced ability to function within the law upon release. (Regs. § 2281, subd. (d)(3), (8) & (9).) Moreover, the Board must consider the inmate's past and present mental state and past and present attitude toward his or her crime. (Regs. § 2281, subd. (b).) These suitability factors clearly establish that the statutes contemplate the consideration of an inmate's rehabilitation as an integral element of a parole suitability determination, and that a determination of the current threat posed by an inmate necessarily involves consideration of the inmate's postconviction conduct and mental state as it relates to his or her *current* ability to function within the law if released from prison.

Additionally, the regulatory emphasis on institutional behavior, and the specific proviso that "serious misconduct in prison or jail" is an indicator of unsuitability for parole (Regs., §§ 2042, subd. (c), 2281, subd. (c).), suggest that the possibility of parole acts as an incentive — encouraging good behavior and discouraging misconduct by confined prisoners. Failure to consider a prisoner's postconviction behavior when evaluating suitability for parole would undermine the practical institutional benefits of this regulatory incentive.

45

Moreover, because the minimum elements test would mandate affirmance in every parole-denial case in which the crime is aggravated, and we have determined that there are few, if any, cases in which the underlying offense is not aggravated in some way, the minimum elements inquiry has proved to be incompatible with our earlier recognition that the "some evidence" standard of review contemplates review of a parole decision on the merits in order to prevent arbitrary and capricious decision-making. (*Rosenkrantz, supra*, 29 Cal.4th at p. 655.)[20]

Accordingly, as we held in *Dannenberg*, the determination whether an inmate poses a current danger is not dependent upon whether his or her commitment offense is more or less egregious than other, similar crimes. (*Dannenberg, supra*, 34 Cal.4th at pp. 1083-1084, 1095.) Nor is it dependent solely upon whether the circumstances of the offense exhibit viciousness above the minimum elements required for conviction of that offense. Rather, the relevant inquiry is whether the circumstances of the commitment offense, when considered in light of other facts in the record, are such that they continue to be predictive of current dangerousness many years after commission of the offense.

---

[20]     As the United States Court of Appeals for the Ninth Circuit cogently observed in *Biggs v. Terhune*: "To insure that a state-created parole scheme serves the public interest purposes of rehabilitation and deterrence, the Parole Board must be cognizant not only of the factors required by state statute to be considered, but also the concepts embodied in the Constitution requiring due process of law. [¶]. . . [¶]We must be ever cognizant that '[d]ue [p]rocess is not a mechanical instrument. It is not a yardstick. It is a process. It is a delicate process of adjustment inescapably involving the exercise of judgment by those whom the Constitution entrusted with the unfolding of the process.' [Citations.] A continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." (*Biggs v. Terhune* (9th Cir. 2003) 334 F.3d 910, 916-917.)

This inquiry is, by necessity and by statutory mandate, an individualized one, and cannot be undertaken simply by examining the circumstances of the crime in isolation, without consideration of the passage of time or the attendant changes in the inmate's psychological or mental attitude. (*Rosenkrantz, supra,* 29 Cal.4th at p. 682 ["although the state expects prisoners to behave well in prison, the absence of serious misconduct in prison and participation in institutional activities that indicate an enhanced ability to function within the law upon release are factors that must be considered *on an individual basis* by the Governor in determining parole suitability"]; see also *In re Minnis* (1972) 7 Cal. 3d 639, 645; *Irons v. Carey* (9th Cir. 2007) 505 F.3d 846, 854 ["in some cases, indefinite detention based solely upon an inmate's commitment offense, regardless of the extent of his rehabilitation, will at some point violate due process, given the liberty interest in parole that flows from the relevant California statutes"].)

In sum, the Board or the Governor may base a denial-of-parole decision upon the circumstances of the offense, or upon other immutable facts such as an inmate's criminal history, but some evidence will support such reliance *only* if those facts support the ultimate conclusion that an inmate *continues* to pose an unreasonable risk to public safety. (Regs., § 2281, subd. (a).) Accordingly, the relevant inquiry for a reviewing court is not merely whether an inmate's crime was especially callous, or shockingly vicious or lethal, but whether the identified facts are *probative* to the central issue of *current* dangerousness when considered in light of the full record before the Board or the Governor.

## IV

Turning now to the facts of the present case, we observe that the Governor concluded that the murder of Rubye Williams "demonstrated a shockingly vicious use of lethality and an exceptionally callous disregard for human suffering because after she shot Mrs. Williams — four times — causing her to collapse to the floor,

[petitioner] stabbed her repeatedly. . . . She made it a point to arm herself, not with one weapon but with two, and show up at a location where she knew she would find her victim. . . . This was a cold, premeditated murder carried out in an especially cruel manner and committed for an incredibly petty reason. According to the appellate decision, [petitioner] told a relative that the killing was a 'birthday present' to herself. [Petitioner's] birthday was two days before the murder." Although the Governor alluded to other possible grounds for denying petitioner's parole, he expressly relied only upon the nature of petitioner's commitment offense to justify petitioner's continued confinement, because "the gravity alone of this murder is a sufficient basis on which to conclude presently that [petitioner's] release from prison would pose an unreasonable public-safety risk."

Before evaluating the Governor's reliance upon the gravity of the commitment offense, we first consider his discussion of facts not related to the circumstances of the commitment offense. Although his statement does not directly rely upon a lack of remorse to justify denial of parole, the Governor suggested that petitioner continued to pose a threat to public safety because she was not remorseful and because she continued to attempt to justify the victim's murder. As support, the Governor pointed to quotations excerpted from the proceedings at petitioner's 2002 and 2005 Board hearings, such as petitioner's observation at the latter hearing that " 'I always viewed [Mrs. Williams] as the obstacle in my fantasy romance. That she was the one that was keeping me from having what I wanted. So in my mind, it was natural for me to confront her as though she would disappear . . . .' [Petitioner also] said that she saw Mrs. Williams as her 'problem.' "

We agree with the Court of Appeal majority that it is evident from the full context of petitioner's statements that she merely was explaining her state of mind at the time of the homicide, not justifying it. "To the contrary, these and like

statements were made in the course of condemning her own behavior on that

occasion and expressing deep remorse for what she had done and why she had

done it."[21]  Additionally, as the Court of Appeal recognized and as the record

amply demonstrates, petitioner consistently, repeatedly, and articulately has

expressed deep remorse for her crime as reflected in a decade's worth of

psychological assessments and transcripts of suitability hearings that were before

the Board.[22]  Accordingly, the Governor's conclusion that petitioner showed

---

21    Later at the hearing, in answer to the question why she took out her rage on Mrs. Williams instead of Dr. Williams, who had chosen to remain with his wife, petitioner explained: "Because women blame women when not getting what they want. They don't blame men. And a 24-year-old distraught, betrayed woman looked for the easiest probably person to take out any frustration on. I wanted him, so in my 24-year-old [mind], she was my problem — he wasn't my problem. So it's irrational, it's unfounded, it's unfair, and I understand that now. She was not the person to blame for my rage. I just took it out on her because it was — it was just probably the easiest thing to do to confront her instead of Robert."

22    As the Court of Appeal majority noted, at the 2005 hearing — after discussing the commission of the crime and petitioner's flight from prosecution two months later — she was asked whether there was anything else she had to say about the crime itself. Petitioner responded: "I would like to let you know, you know, that I'm totally, totally aware of what I did. I take full responsibility for what I did. . . . And I made that first step back into reality to come and let you know that I do understand that I did something horrible, and I'm willing to suffer the consequences for what I did. And I lived here for 21 ½ years suffering those consequences, and have grown and gotten stronger behind it. So I come to you today, apologizing as I do on a daily basis when it comes up in my mind — apologize to [Rubye] Williams, knowing that I took her life. She was not my victim. She was the object of my rage. She was the object of my disgust with everything that had happened to my life, and my unfulfillment in my life up to that point. And it was an irrational act that I committed against her, her family, and [that] stone knife that I threw in that river that morning, how it affected so many people. I understand that. And I have stood strong here for 21 years letting everyone know that I was willing to make a change, and I worked every day to make a change and to let anybody and everybody know that nothing like that could happen in my life again, and anybody's life that comes within my contact,

*(Footnote continued on next page.)*

insufficient remorse is not supported by any evidence; rather, it is clearly contradicted by abundant evidence in the record. (*Rosenkrantz, supra*, 29 Cal.4th at p. 681 [upholding the Governor's decision but finding "no evidence supporting the Governor's additional determination that petitioner has continued . . . to avoid responsibility for his crime by lying about pertinent events or by improperly attempting to portray himself as a victim"].)

Although again the following circumstance is not expressly advanced as a ground for reversing the Board's grant of parole, there is an implication in the Governor's statement that petitioner has serious psychiatric problems and therefore her release would pose an unreasonable risk of danger to the public. Specifically, his statement recites the negative language found in several *early* psychiatric evaluations. "[Petitioner] was categorized in early prison reports by mental-health evaluators as sociopathic, unstable and moderately psychopathic. Subsequent mental-health evaluations have been more favorable and include low risk assessments."

Here, too, we agree with the Court of Appeal majority that the Governor's conclusion is not supported by any evidence. Rather, the positive psychological assessments of petitioner in every evaluation conducted during the last 15 years have undermined the evidentiary value of these dated reports setting forth stale psychological assessments. Moreover, in the negative psychological assessments

---

*(Footnote continued from previous page.)*

because my life is an open book where anybody could see how they can [be] involved in situations that [lead] to much damage to people and society. So I just want to apologize to [Rubye] and her children for doing that to her, as well as to my children and my family, and to the community at large. I can't take it back. All I've done is try to work to improve myself and improve my surroundings. And that's all I can do today."

cited by the Governor, the treating psychologists recommended petitioner should undergo specific forms of therapy — which she did for many years, resulting in successive positive evaluations. Indeed, several consistent psychiatric evaluations have found petitioner no longer suffers from any psychiatric problems, and since 1997 the annual psychological evaluations have recommended that petitioner not participate in therapy of any kind because she does not suffer from any psychiatric condition. As we stated above, the passage of time is highly probative to the determination before us, and reliance upon outdated psychological reports — clearly contradicted by petitioner's successful participation in years of intensive therapy, a long series of reports declaring petitioner to be free of psychological problems and no longer a threat to public safety, and petitioner's own insight into her participation in this crime — does not supply some evidence justifying the Governor's conclusion that petitioner continues to pose a threat to public safety.

The Governor also stated that "[s]ince her incarceration, while [petitioner] has been counseled eight times for misconduct, including as recently as 2005, she has avoided any disciplinary actions." Again, it is unclear whether the Governor directly relied upon this circumstance to justify his reversal of the Board's parole decision, but in any event the record indicates that petitioner was counseled when she was late to a class or other appointment. Nothing in the record supports a conclusion that petitioner poses a threat to public safety because she was occasionally late to appointments or job assignments during her almost 24 years of incarceration.[23]

_____

23    As noted in his statement quoted above, the Governor also relied upon petitioner's flight from California and her fugitive status for 11 years following the murder, as well as her denial of involvement in the crime when she finally returned to California in 1982, as relevant to his action vacating the Board's parole decision. Petitioner, however, voluntarily ended her fugitive status more than 25

*(Footnote continued on next page.)*

The sole remaining ground supporting the Governor's decision is the gravity of petitioner's commitment offense. Under the standard of review recognized above, we must determine whether some evidence in the record supports the Governor's conclusion that petitioner poses an unreasonable public safety risk because of the gravity of her commitment offense. The facts cited by the Governor — the use of multiple weapons, the premeditated nature of the offense, the cruelty attendant to the murder, as well as the petty motive attributed to petitioner — undoubtedly supply some evidence supporting the Governor's conclusion that the commitment offense was carried out in an "especially heinous, atrocious or cruel manner." (Regs., § 2281, subd. (c)(1).) As noted above, however, few murders do not involve attendant facts that support such a conclusion. As further noted above, the mere existence of a regulatory factor establishing unsuitability does not necessarily constitute "some evidence" that the parolee's release unreasonably endangers public safety. (*Lee, supra,* 143 Cal.App.4th at p. 1408.) Accordingly, even as we acknowledge that some evidence in the record supports the Governor's conclusion regarding the gravity of the commitment offense, we conclude there does not exist some evidence supporting the conclusion that petitioner *continues* to pose a threat to public safety.

In the present case, the Board found, as it had after three previous parole hearings resulting in a grant of parole, that petitioner's record exhibited all the

---

(*Footnote continued from previous page.*)

years ago, when surrendering to the authorities in 1982. From at least 1992, she also has taken responsibility for the murder of Mrs. Williams. Accordingly, these circumstances, even if the Governor relied upon them, would fail to establish that petitioner *currently* remains a danger to public safety.

factors listed in the regulations indicating suitability for release on parole, except for the factor applicable only to battered spouses. The Board noted petitioner's long-standing involvement in self-help, vocational, and educational programs, her insight into the circumstances of the offense, her acceptance of responsibility and remorse, and her realistic parole plans, which included a job offer and family support. Regarding the commitment offense, the Board found petitioner had committed the murder while under the stress of an emotional love triangle. The Board found no evidence establishing the existence of any other statutory factor relevant to an inmate's unsuitability for parole. Petitioner had no prior criminal record or history of violent crimes or assaultive behavior. There also was no evidence of sadistic sexual acts or an unstable social history. Although earlier psychological reports were mixed or negative, petitioner's psychological examinations for the most recent 15 years were uniformly positive, finding her to be psychologically sound and to pose no unusual danger to public safety should she be released. Finally, petitioner was free of "serious misconduct" during her more than two decades of incarceration, and exhibited exemplary efforts toward rehabilitative programming.

The commitment offense occurred 36 years ago when petitioner, who is now 61 years of age, was 24 and, as the Board found, under significant emotional stress as a result of her love affair with the victim's husband. Although the Governor's statement sought to diminish the emotional stress factor by suggesting that, even if genuine, it still does not reduce petitioner's culpability for the murder, the existence of emotional stress as a mitigating factor favoring suitability is not dependent upon a degree of stress that would fully negate culpability for the murder. Indeed, if facts *fully* negated culpability, the inmate would not have been convicted of murder. In the present case, there is no doubt petitioner is culpable for the premeditated murder of Rubye Williams, despite the emotional stress she

53

was experiencing at the time. The Governor, however, was reviewing petitioner's twelfth parole suitability hearing and the fourth grant of parole by the Board. Psychological evaluations of petitioner conducted during the last 15 years, as well as the conclusion of four panels of the Board authorizing parole, have emphasized that petitioner committed this crime while she was experiencing an unusual amount of stress arising from circumstances not likely to recur, and that for this reason (as well as her prior crime-free life, her age, and her record of rehabilitation) there was a low risk she would commit another violent act if released. The Governor's conclusion regarding culpability does not negate this reasonable evaluation of the evidence, nor does it provide some evidence that petitioner remains a threat to public safety.

Moreover, other factors establishing suitability, which the Governor considered but did not find dispositive in making his final evaluation, strongly support our view that the Governor's ultimate conclusion is not supported by some evidence. Petitioner was incarcerated for nearly 24 years and during that period had an exemplary record of conduct. She participated in many years of rehabilitative programming specifically tailored to address the circumstances that led to her commission of the crime, including anger management programs as well as extensive psychological counseling, leading to substantial insight on her part into both the behavior that led to the murder and her own responsibility for the crime. Petitioner repeatedly expressed remorse for the crime, and had been adjudged by numerous psychologists and by the Board as not representing any danger to public safety if released from prison.

In light of petitioner's extraordinary rehabilitative efforts specifically tailored to address the circumstances that led to her criminality, her insight into her past criminal behavior, her expressions of remorse, her realistic parole plans, the support of her family, and numerous institutional reports justifying parole, as well

as the favorable discretionary decisions of the Board at successive hearings —
decisions reversed by the Governor based solely upon the immutable
circumstances of the offense — we conclude that the unchanging factor of the
gravity of petitioner's commitment offense had no predictive value regarding her
*current* threat to public safety, and thus provides no support for the Governor's
conclusion that petitioner is unsuitable for parole at the present time.

Our deferential standard of review requires us to credit the Governor's
findings if they are supported by a modicum of evidence. (*Rosenkrantz, supra*, 29
Cal.4th at p. 658.) This does not mean, however, that evidence suggesting a
commitment offense was "especially heinous" or "particularly egregious" will
eternally provide adequate support for a decision that an inmate is unsuitable for
parole. As set forth above, the Legislature specifically contemplated both that the
Board "shall normally" grant a parole date, and that the passage of time and the
related changes in a prisoner's mental attitude and demeanor are probative to the
determination of current dangerousness. When, as here, all of the information in a
postconviction record supports the determination that the inmate is rehabilitated
and no longer poses a danger to public safety, and the Governor has neither
disputed the petitioner's rehabilitative gains nor, importantly, related the
commitment offense to current circumstances or suggested that any further
rehabilitation might change the ultimate decision that petitioner remains a danger,
mere recitation of the circumstances of the commitment offense, absent
articulation of a rational nexus between those facts and current dangerousness,
fails to provide the required "modicum of evidence" of unsuitability.

Accordingly, under the circumstances of the present case — in which the
record is replete with evidence establishing petitioner's rehabilitation, insight,
remorse, and psychological health, and devoid of any evidence supporting a
finding that she continues to pose a threat to public safety — petitioner's due

process and statutory rights were violated by the Governor's reliance upon the immutable and unchangeable circumstances of her commitment offense in reversing the Board's decision to grant parole. Contrary to the assertion of the dissent, the Governor's action vacating the Board's grant of parole to petitioner runs contrary to both his statutory and his constitutional obligations. As set forth in detail above, both the governing statutes and constitutional due process principles require the Governor to base his decision to set aside a grant of parole on "some evidence" of current dangerousness. The evidence relied upon by the Governor in this case — the egregiousness of the commitment offense — does not provide "some evidence" that petitioner remains a current threat to public safety. Accordingly, the Governor's decision is not supported by "some evidence" of current dangerousness and is properly set aside by this court.

We emphasize that our recognition that a proper review of a parole decision must focus upon "some evidence" of current dangerousness, does not alter our recognition in *Rosenkrantz* and *Dannenberg* that the purpose of the parole statutes is to guarantee that the decision makers fully have addressed the public safety implications of releasing on parole any inmate serving a maximum term of life imprisonment. The relevant determination for the Board and the Governor is, and always has been, an individualized assessment of the continuing danger and risk to public safety posed by the inmate. If the Board determines, based upon an evaluation of each of the statutory factors as required by statute, that an inmate remains a danger, it can, and must, decline to set a parole date. The same holds true for the Governor's decision to set aside a decision of the Board. Notably, despite the conclusion we reach in the present case, we reiterate our recognition in *Dannenberg* that pursuant to section 3041, subdivision (b), the Board has the express power and duty, in an individual case, to decline to fix a firm release date, and thus to continue the inmate's indeterminate status within his or her life

maximum sentence, if it finds that the circumstances of the inmate's crime or criminal history *continue* to reflect that the prisoner presents a risk to public safety. (*Dannenberg, supra*, 34 Cal.4th at pp. 1083-1084, 1095.)

Our conclusion that petitioner's conviction offense does not reliably predict, 36 years after commission of the offense and following 24 years of incarceration and demonstrated rehabilitation, that petitioner currently poses a danger to society, does not alter our affirmation that certain conviction offenses may be so "heinous, atrocious or cruel" that an inmate's due process rights would not be violated if he or she were to be denied parole on the basis that the gravity of the conviction offense establishes current dangerousness. In some cases, such as those in which the inmate has failed to make efforts toward rehabilitation, has continued to engage in criminal conduct postincarceration, or has shown a lack of insight or remorse, the aggravated circumstances of the commitment offense may well continue to provide "some evidence" of current dangerousness even decades after commission of the offense.

Indeed, as established in the companion case of *In re Shaputis, supra*, ___ Cal.4th___, ___[pp. 22-26], filed concurrently with this opinion, the Governor does not act arbitrarily or capriciously in reversing a grant of parole when evidence in the record supports the conclusion that the circumstances of the crime continue to be predictive of current dangerousness despite an inmate's discipline-free record during incarceration. As explained in detail in that case, where the record also contains evidence demonstrating that the inmate lacks insight into his or her commitment offense or previous acts of violence, even after rehabilitative programming tailored to addressing the issues that led to commission of the offense, the aggravated circumstances of the crime reliably may continue to predict current dangerousness even after many years of incarceration. (See also

*Hyde, supra,* 154 Cal.App.4th at p. 1215; *Tripp, supra,* 150 Cal.App.4th at pp. 314, 320.)

Finally, it should be noted that our recognition that the proper articulation of the some evidence standard focuses upon the inmate's current dangerousness should not produce a wave of reversals of decisions denying parole. In the overwhelming majority of post-*Rosenkrantz/Dannenberg* appellate decisions that have applied the strict minimum elements inquiry, the affirmance of a denial-of-parole determination was not founded solely upon the conclusion that the circumstances of the commitment offense were more than what was minimally required to obtain a conviction of that offense, but rather upon the presence of *other additional* statutory factors establishing unsuitability. (*Bettencourt, supra,* 156 Cal.App.4th at p. 807 [unsuitability based upon criminal history, social history, institutional behavior, psychological evaluations, and behavior at the parole hearing]; *Burns, supra,* 136 Cal.App.4th at p. 1328 [unsuitability based upon history of unstable or tumultuous relationships with others, and psychological evaluations]; *Fuentes, supra,* 135 Cal.App.4th at p. 163 [unsuitability based upon criminal history as evidence of inmate's repetitive and recidivist nature]; *Honesto, supra,* 130 Cal.App.4th at p. 97 [unsuitability based upon unstable social history, inadequate participation in prison programs, and inadequate parole plans].)[24]

---

[24]    Although the majority of appellate opinions applying the strict minimum elements test have affirmed the decision to deny parole, only one — *Andrade, supra,* 141 Cal.App.4th 807 — based its determination *solely* upon the Governor's findings regarding the gravity of the commitment offense. (*Id.* at pp. 818-819.). That conclusion elicited a dissent by Justice Pollak, who contended that the Board's conclusion could not be sustained based solely upon the circumstances of the commitment offense, because there was no evidence in the record establishing that the petitioner would " 'pose an unreasonable risk of danger to society if

*(Footnote continued on next page.)*

# V

For the reasons discussed above, the judgment of the Court of Appeal is affirmed.

GEORGE, C. J.

WE CONCUR:

KENNARD, J.
WERDEGAR, J.
MORENO, J.

---

*(Footnote continued from previous page.)*

released from prison.' " (*Andrade, supra*, 141 Cal.App.4th at p. 819 (dis. opn. of Pollak, J..)

## CONCURRING OPINION BY MORENO, J.

I concur in the majority opinion. I write separately to explain this concurrence in light of my dissent in *In Re Dannenberg* (2005) 34 Cal.4th 1061, 1100 (dis. opn. of Moreno, J.). In that case, the majority held that a denial of parole was justified if there is some evidence that the particular circumstances of the prisoner's underlying offense beyond the "minimum elements" indicated exceptional callousness and cruelty. (*Id.* at p. 1098.) I found the minimum elements test to be both unworkable and not consistent with the statutory mandate to normally grant parole to life prisoners. (*Id.* at pp. 1101-1104 (dis. opn. of Moreno, J.).) I would have instead required an inquiry into whether the commitment offense was particularly egregious as measured by the Board of Parole Hearings' (Board) own matrices for determining the seriousness of the commitment offense. (*Id.* at pp. 1106-1107; see Pen. Code, § 3041, subd. (a); Cal. Code Regs., tit. 15, § 2403.)

After observing the courts of appeal grappling with the parole suitability issue since *Dannenberg* was decided, I now agree with the majority opinion that neither a minimum elements test nor some other sort of metric for determining the gravity of the commitment offense is workable or called for by the statutory scheme. As the majority rightly recognizes, the seriousness of the commitment defense as determined by the Board's own matrix of factors is used primarily to calculate the prisoner's base term and release date. (Maj. opn., *ante*, at p. 32; see

Pen. Code, § 3041, subd. (a).)  In order to deny parole outright, as opposed to merely delay the release date, the gravity of the commitment offense must be linked to a prisoner's current dangerousness (Pen. Code, § 3041, subd. (b)), and the other factors that go into a determination of current dangerousness must be taken into account.  The majority opinion appropriately reconciles Penal Code section 3041, subdivision (a) with subdivision (b) by recognizing that a parole date shall normally be granted except when some evidence of current dangerousness, after considering the totality of the circumstances, justifies denial of parole.  The majority opinion therefore properly balances the statutory mandate to normally grant parole to life prisoners with the statutory mandate to protect the public, and also properly balances the need for judicial deference in reviewing executive decisions with the judicial obligation to ensure the executive complies with statutory and due process mandates.

MORENO, J.

2

## DISSENTING OPINION BY CHIN, J.

I dissent.

The Governor carefully considered whether petitioner, Sandra Davis Lawrence, is suitable for parole. He issued a reasoned report that assessed petitioner's case individually. The report considered the relevant factors — both those supporting parole and those weighing against parole. It recognized the progress petitioner has made over the years that weighs in favor of parole. Nevertheless, balancing these factors, the Governor concluded "that her release from prison would pose an unreasonable risk of danger to society" and reversed the finding of the Board of Parole Hearings (Board) that she was suitable for parole.

The majority cites to no factual misstatements in this report. It agrees that evidence supports every fact cited. It identifies nothing the Governor did that was incorrect or contrary to his constitutional and statutory obligations. Rather, the majority simply substitutes its own judgment in place of the Governor's considered judgment that petitioner is not suitable for parole.

The awesome responsibility of deciding whether to release a convicted murderer on parole — an act that inherently runs the risk of recidivism, i.e., the risk that the inmate will again kill an innocent person — lies with the executive branch, not the judicial branch. We made this clear in *In re Rosenkrantz* (2002) 29 Cal.4th 616 (*Rosenkrantz*) and later in *In re Dannenberg* (2005) 34 Cal.4th 1061

1

(*Dannenberg*).[1]  In those cases, we held both that the executive branch may deny parole based on the seriousness of the crime (as long as the executive branch has considered all relevant factors, and the seriousness determination is based on an individualized assessment of the specific case), and that the judicial branch will overturn the executive branch's decision only if no evidence supports it.  These holdings were consistent with, indeed compelled by, the applicable statute.  (Pen. Code, § 3041, subd. (b) (section 3041(b)).)

Today, the majority departs dramatically from these basic legal standards.  I cannot agree; accordingly, I dissent.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Petitioner was convicted of first degree murder.  Because the Governor's three-page report denying parole states the underlying facts, I attach it as an appendix to this opinion and adopt by reference its factual recitation.  (See appen., *post*.)  I see no need to repeat those facts, as the report speaks for itself.[2]

---

[1]     I dissented in *Rosenkrantz* on the basis that permitting the Governor to overturn the Board's findings violated the constitutional proscription against ex post facto laws.  (*Rosenkrantz, supra*, 29 Cal.4th at pp. 690-696.)  At this point, I accept the majority's holding as the law of California.  I agreed, and still agree, with the rest of the *Rosenkrantz* opinion.  (See *id*. at p. 696, fn. 6.)

[2]     Cryptically, the third sentence of the majority opinion states: "Petitioner declined a plea offer that would have resulted in a two-year prison sentence."  (Maj. opn., *ante*, at p. 1; see also *id*. at p. 6 [reiterating the fact in reviewing the procedural history].)  Readers will naturally assume that a fact mentioned in the opinion's opening paragraph has some relevance to the case, and that the opinion will again refer to it in discussing the legal standard and its application.  But the majority never mentions this fact again and never explains its relevance.  In fact, except to the extent it shows that petitioner utterly failed to accept any personal responsibility for her actions, that petitioner turned down a plea offer is irrelevant.  The record does not reveal why the prosecutor apparently offered petitioner a good deal.  The offer might simply have reflected the difficulty of prosecuting a 12-year-old crime.  (Petitioner had been a fugitive from justice for 11 years.)

*(Footnote continued on next page.)*

Petitioner is now eligible for parole, and has been for some time. Over the years the Board, or its predecessor, the Board of Prison Terms, has found petitioner suitable for parole several times. Three different Governors, Pete Wilson, Gray Davis, and Arnold Schwarzenegger, have overturned these determinations, most recently Governor Schwarzenegger in January 2006. Petitioner filed a petition for writ of habeas corpus in the Court of Appeal asking that court to overturn the Governor's January 2006 determination. Over Presiding Justice Perluss's dissent, the majority did so and ordered petitioner's release on parole. We granted review.

## II. DISCUSSION

The applicable law is not as complex as the majority opinion makes it appear. We settled the legal standard in *Rosenkrantz, supra,* 29 Cal.4th 616, and *Dannenberg, supra,* 34 Cal.4th 1061.

The Board determines whether persons sentenced to an indeterminate term, such as convicted murderers, are suitable for parole. (Pen. Code, § 3041.) The Board "shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting." (§ 3041(b).) Under this statute, "the Board, exercising its traditional broad discretion, may protect public safety *in each discrete case* by considering the dangerous implications of a life-maximum prisoner's crime individually." (*Dannenberg, supra,* 34 Cal.4th at p.

---

*(Footnote continued from previous page.)*

What is relevant here is that petitioner went to trial and the jury convicted her of *first degree murder.*

1071.) In making this determination, the Board must consider various criteria established by regulation. (*Rosenkrantz, supra*, 29 Cal.4th at pp. 653-654.)

In murder cases such as this one, the Governor has the power to reverse the Board's decision, while considering the same criteria. (Cal. Const., art. V, § 8, subd. (b); Pen. Code, § 3041.2; see *Rosenkrantz, supra*, 29 Cal.4th at pp. 625-626, 660.) The Board's parole decision and the Governor's decision reviewing the Board are subject to the same standard of judicial review. (*Rosenkrantz, supra*, 29 Cal.4th at p. 626.) (Because the Board and the Governor must consider the same criteria, and their actions are subject to the same standard of judicial review, I will sometimes describe the entity that denied parole generally as the executive branch or the parole authority rather than specifically either the Board or the Governor.)

The executive branch, not the judicial branch, makes the parole decision, although it may not simply deny parole to all convicted murderers. (*Rosenkrantz, supra*, 29 Cal.4th at pp. 655, 683-684.) Accordingly, as we explained in *Rosenkrantz*, "the precise manner in which the specified factors relevant to parole suitability are considered and balanced lies *within the discretion of the Governor*, but the decision must reflect an individualized consideration of the specified criteria and cannot be arbitrary or capricious. *It is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole.* As long as the Governor's decision reflects due consideration of the specified factors as applied to the individual prisoner in accordance with applicable legal standards, *the court's review is limited to ascertaining whether there is some evidence in the record that supports the Governor's decision.*" (*Rosenkrantz, supra*, 29 Cal.4th at p. 677, italics added.) This "some evidence" standard is "extremely deferential" (*id.* at p. 665) and requires "[o]nly a modicum of evidence." (*Id.* at p.677; see also *id.* at p. 679.)

4

Applying this standard in this case is not difficult. Readers may review the attached report and judge for themselves whether the Governor acted arbitrarily or capriciously, failed to engage in an individualized assessment of petitioner's case, failed to consider the factors supporting as well as those weighing against parole, failed to do anything else he should have done, or did anything he should not have done. In fact, he did *exactly* what he was supposed to do. He fulfilled his statutory and constitutional obligations precisely. His conclusion that petitioner remains too dangerous to release into society was not arbitrary or capricious. It was based on an individualized assessment of all the relevant factors, both those supporting and those weighing against parole. His factual recitation was accurate and everything he stated, including his conclusions, was supported by far more than a modicum of evidence. As Presiding Justice Perluss stated in dissent in the Court of Appeal, whether petitioner is suitable for parole "may be a close question," but whether some evidence supports the Governor's decision is not close.

When a person is paroled, that person is released into the general society, to interact with many vulnerable people who may be unaware of the person's background. The parole decision thus involves the inherent risk of recidivism which, in the case of a convicted murderer, means the risk that an innocent person may die. Parole must be granted in proper cases, but the decision is an awesome responsibility, one entrusted to the executive branch. In deciding whether to grant or deny parole, i.e., whether to release the person into society, it is entirely appropriate for the executive branch to examine the facts of the crime (and here, surrounding circumstances) and, exercising its broad discretion, conclude that those facts are so horrendous, and so frightening, that it is not yet willing to take a chance and approve parole. The statute makes this clear. It permits the parole authority to deny parole if "it determines that the gravity of the current convicted

offense or offenses . . . is such that consideration of the public safety requires a more lengthy period of incarceration . . . ." (§ 3041(b).) In *Rosenkrantz*, we interpreted this statute to mean what it says: "The nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole." (*Rosenkrantz, supra,* 29 Cal.4th at p. 682; see also *Dannenberg, supra,* 34 Cal.4th at p. 1094 [reiterating this point].)

Petitioner committed a particularly vicious and premeditated first degree murder, shooting her lover's wife multiple times, then repeatedly stabbing the victim after she collapsed to the floor. She did this as a "birthday present" to herself because she was disappointed that her lover would not leave the victim for her. On her way to confront the victim, she stopped to arm herself with a pistol and a potato peeler. (See appen., *post.*)

Moreover, other facts support the denial of parole. As Presiding Justice Perluss explained in dissent, petitioner remained a fugitive for 11 years after the cold-blooded killing. "During that time she lived in several different cities under various assumed names and with related false identity papers (including, it appears, Social Security numbers and passports)." When she surrendered, she still denied involvement in the murder and tried to blame her former lover. "Testifying on her own behalf at trial in August 1983, [petitioner] denied killing Mrs. Williams, insisted she did not want to marry Dr. Williams and asserted it was ' "no big thing" ' when he ended their relationship. . . . [¶] [Petitioner's] flight from California and her fugitive status for 11 years following the murder of Mrs. Williams, as well as her denial of involvement in the crime when she finally returned to California in 1982, were also identified by the Governor in explaining his reasons for reversing the Board's parole decision." Presiding Justice Perluss also explained that, "[a]lthough observing that more recent mental health evaluations of [petitioner] were favorable and included low risk assessments, in

reversing the Board's parole decision the Governor noted [petitioner] had been identified in early evaluations as 'sociopathic, unstable, and moderately psychopathic.' "

All this provides ample evidence supporting the Governor's denial of parole. It is true that the facts of the crime, petitioner's fugitive status, and the early psychological evaluations do not change, and hence these factors do not grow stronger over time. It is also true that the facts supporting parole may be dynamic and may grow stronger over time. They appear to have done so here. At some point, the parole authority might conclude that the facts supporting parole have increased sufficiently to finally outweigh the immutable facts of the crime and the other circumstances supporting denial of parole. When that occurs, the parole authority may exercise its authority to grant parole notwithstanding the horrendous facts of the crime. *But this weighing process is for the executive branch to perform, not the judicial branch.* Nothing in the statute or our previous cases permits the judiciary to engage in its own weighing process and to conclude that the evidence supporting parole outweighs the evidence supporting denial of parole and, on that basis, grant parole.

Certainly, as both the Governor and Presiding Justice Perluss noted, the record contains evidence that would support a grant of parole. Obviously, the majority would weigh the competing factors differently than the Governor and would reach a different decision than he did. But this circumstance is "irrelevant" and cannot negate the evidence that supports the Governor's decision. (*Rosenkrantz, supra,* 29 Cal.4th at p. 677.) "In short," as Presiding Justice Perluss stated in dissent, "there is no doubt that [petitioner] is a strong candidate for release on parole or that the Board's decision to release her was a reasonable one. But that . . . is simply not the question we are to address."

I agree with the majority that the "some evidence" test asks whether evidence supports the conclusion that the inmate is unsuitable for parole because he or she *currently* is dangerous. (Maj. opn., *ante*, at pp. 2-3.) But, as section 3041(b) and our cases make clear, the facts of the crime *can* alone justify the conclusion that the inmate is currently dangerous. If, as here, some evidence supports the Governor's determination that the facts of the crime (and the other individualized facts the Governor cited) show petitioner is dangerous, that should end the inquiry. As Presiding Justice Perluss correctly explained, "if a factor is properly part of the evaluation of a prisoner's suitability for parole [such as, here, the facts of the crime, petitioner's lengthy fugitive status, and her early unfavorable mental health evaluations], . . . and if the existence of that factor is supported by some evidence, to hold the same evidence does not support the ultimate conclusion concerning parole suitability is possible only if the court decides the probative (or predictive) value of that factor is outweighed by other indicia of suitability. It is precisely that determination the electorate entrusted to the Governor's discretion, not the courts', when it adopted article V, section 8, subdivision (b), of the California Constitution."

I also agree that "the relevant inquiry is whether the circumstances of the commitment offense, when considered in light of other facts in the record, are such that they continue to be predictive of current dangerousness many years after commission of the offense. This inquiry is, by necessity and by statutory mandate, an individualized one, and cannot be undertaken simply by examining the circumstances of the crime in isolation, without consideration of the passage of time or the attendant changes in the inmate's psychological or mental attitude." (Maj. opn., *ante*, at pp. 46-47.) This inquiry is *exactly* what the Governor undertook. No one can read the Governor's report and reasonably conclude he simply examined the crime in isolation without considering the passage of time

and changes in petitioner's psychological or mental attitude. The only thing the Governor did wrong, according to the majority, was to assess the predictive value of the circumstances of the crime and the post-crime factors he cited differently than the courts would later do. But making that assessment is for the executive branch to do, not the courts.

To try to justify its conclusion, the majority appears to create a new test for courts to apply when reviewing the executive branch's decision to deny parole: "Accordingly, we conclude that although the Board and the Governor may rely upon the aggravated circumstances of the commitment offense as a basis for a decision denying parole, the aggravated nature of the crime does not in and of itself provide some evidence of *current* dangerousness to the public unless the record also establishes that something in the prisoner's pre- or postincarceration history, or his or her current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his or her commission of the commitment offense remain probative to the statutory determination of a continuing threat to public safety." (Maj. opn., *ante*, at p. 36.)

This language distorts *Rosenkrantz* and *Dannenberg* beyond recognition. Apparently, under the new test, the *courts* decide whether the circumstances of the crime (and presumably the other circumstances weighing against parole) "continue to be predictive of current dangerousness." (Maj. opn., *ante*, at p. 46.) But nothing in Penal Code section 3041 or *Rosenkrantz* or *Dannenberg* supports such a conclusion. Rather, it is for the parole authority, not the courts, to decide, while exercising its "traditional broad discretion" (*Dannenberg, supra*, 34 Cal.4th at p. 1071), when, if ever, the commitment offense loses its predictive value on the issue of current dangerousness. This point is particularly crucial, for permitting the courts to decide whether the facts of the crime continue to be predictive of current dangerousness also permits those courts to ignore the deferential "some

9

evidence" standard of review.  A court merely has to decide, contrary to the considered judgment of the parole authority, that the crime no longer has a predictive value — as the majority has done in this case — then it can ignore the evidence supporting the executive branch's decision and substitute its own judgment.  The majority's new test renders the "highly deferential" standard of review of *Rosenkrantz* and *Dannenberg* a phantom.  In effect, the standard now is independent review.

By this convoluted method, the majority has created a new scheme in which a court may effectively grant parole whenever it wishes, contrary to California Constitution, article V, section 8, subdivision (b), Penal Code section 3041, *Rosenkrantz*, *supra*, 29 Cal.4th 616, and *Dannenberg*, *supra*, 34 Cal.4th 1061.  I cannot agree.  Some evidence, indeed, much evidence, supports the Governor's well-reasoned, individualized decision.  The judicial branch must defer to this executive branch decision, for that is the branch entrusted with making parole decisions.

I would reverse the judgment of the Court of Appeal and deny the petition for writ of habeas corpus.

CHIN, J.

WE CONCUR:

BAXTER, J.
CORRIGAN, J.

10

APPENDIX

# INDETERMINATE SENTENCE PAROLE RELEASE REVIEW
(Penal Code Section 3041.2)

**SANDRA LAWRENCE, W-19366**
**FIRST-DEGREE MURDER**

AFFIRM:       _____

MODIFY:      _____

REVERSE:     _____ X _____

On the morning of February 15, 1971, Sandra Lawrence murdered Rubye Williams by shooting and stabbing her multiple times.

Ms. Lawrence and the victim's husband started an affair several months before the murder. Mrs. Williams knew about the affair and threatened to leave Mr. Williams if he did not break it off. At some point, the affair ended.

On the morning of the murder, Mr. Williams telephoned Ms. Lawrence and mentioned that his wife was at his dental practice waiting for deliveries. After the call, Ms. Lawrence went to her sister's home, let herself inside, and took a gun without permission that was kept under a mattress. Ms. Lawrence then went to Mr. Williams's office. Following a confrontation at the office with the victim, Ms. Lawrence pulled out the gun and began shooting—striking Mrs. Williams in the arm, hand, neck, and leg. As Mrs. Williams lay on the floor, Ms. Lawrence stabbed her multiple times. After leaving the scene, Ms. Lawrence returned the gun to her sister's home and went home to bed. Mrs. Williams's dead body was found by Mr. Williams.

Two months later, Ms. Lawrence fled the state. For more than 11 years, she lived in different states and Puerto Rico using various aliases. Although she eventually returned to California and surrendered to authorities, she denied any involvement in Mrs. Williams's murder and instead tried to blame Mr. Williams. Despite her not-guilty plea, she was convicted by a jury of first-degree murder and sentenced to an indeterminate life term in prison. The judgment was affirmed on appeal.

At the time of the murder, Ms. Lawrence was 24 years old and had no previous criminal record. Since her incarceration, while Ms. Lawrence has been counseled eight times for misconduct, including as recently as 2005, she has avoided any disciplinary actions. She also has worked to enhance her ability to function within the law upon release. She has, since my last reversal of the Board's decision to grant Ms. Lawrence parole in 2004, earned a Master's degree in Business Administration. Prior to that, she earned her Bachelor's degree in Human Development and an Associate of Arts degree. She received vocational training in data processing, word processing, and plumbing and has worked within the institutional setting as a library porter, which is her current position, and as a plumber, fitness trainer, and food manager's clerk. Ms. Lawrence has continued to avail herself of self-help and therapy, including Conflict Transformation Skills,

Sandra Lawrence, W-19366
First-Degree Murder
Page 2

Pathways to Wholeness, an array of substance-abuse programs, Stress Management, and Anger
Management. She has participated in charitable events, a job fair, Toastmasters, Friends Outside
programs, and other activities. Moreover, she has established and maintained seemingly solid
relationships with family and others and has made realistic parole plans in Los Angeles for
housing in a residential program and employment at a local newspaper. These are all factors
supportive of Ms. Lawrence's parole suitability.

But as stated in my 2004 decision, the murder perpetrated by Ms. Lawrence demonstrated a
shockingly vicious use of lethality and an exceptionally callous disregard for human suffering
because after she shot Mrs. Williams—four times—causing her to collapse to the floor,
Ms. Lawrence stabbed her repeatedly. And the gravity alone of this murder is a sufficient basis
on which to conclude presently that Ms. Lawrence's release from prison would pose an
unreasonable public-safety risk. She made it a point to arm herself, not with one weapon but
with two, and show up at a location where she knew she would find her victim. She told the
2002 Board that she did this because "I always viewed [Mrs. Williams] as the obstacle in my
fantasy romance. That she was the one that was keeping me from having what I wanted. So in
my mind, it was natural for me to confront her as though she would disappear … ."
Ms. Lawrence made similar comments to the 2005 Board and said that she saw Mrs. Williams as
her "problem." This was a cold, premeditated murder carried out in an especially cruel manner
and committed for an incredibly petty reason. According to the appellate decision,
Ms. Lawrence told a relative that the killing was a "birthday present" to herself. Ms. Lawrence's
birthday was two days before the murder.

Ms. Lawrence was categorized in early prison reports by mental-health evaluators as sociopathic,
unstable, and moderately psychopathic. Subsequent mental-health evaluations have been more
favorable and include low risk assessments. For many years, Ms. Lawrence denied killing
Mrs. Williams, but since has admitted that she committed this crime. She says that she fully
understands and is sorry for what she did. At the 2004 parole hearing, Ms. Lawrence said that
she "wasn't shooting at [the victim]" and she "didn't even know the gun was loaded." She told
the 2005 Board that she brought the gun with her for protection, and that she had no intent to
physically harm Mrs. Williams when she went into the dental office. She maintained at the 2005
hearing that, even though she was only two feet from Mrs. Williams when she fired the gun, she
did not intend to kill her" and stabbing Mrs. Williams afterwards, with the metal peeler that "had
about a two-inch blade," was the result of "just [being] in a fit of rage—not to break skin, not to
hurt her."

The 2005 Board concluded that the "commitment of the crime was of the result of stress and life,
was spurned by a lover in favor of his wife … ." Regardless of whether this is accurate, there is
evidence in the record that any stress under which Ms. Lawrence was operating at the time was
not of such level or significance to mitigate her murderous conduct. Ms. Lawrence told the 2005
Board that she "had lost all reasonability" and that, after the attack, "I [knew] I had injured Mrs.
Williams, and it frightened me to death at that point, that I had injured her and she wasn't
moving. I wasn't in a state of mind to know whether she had a pulse or she was still alive. I was
in such an emotional state at that point." Yet, as Ms. Lawrence herself admitted to the 2005
Board, she returned the gun to her sister's home, even put it back under the mattress, right after

Sandra Lawrence, W-19366
First-Degree Murder
Page 3

murdering Mrs. Williams. The Commissioner noted the rationality of this behavior.
Ms. Lawrence additionally told the 2005 Board about how, just after the returning the gun, she
proceeded to another sister's home and "went to sleep on her couch" before ultimately fleeing
the state.

Ms. Lawrence has been incarcerated nearly 24 years now and has made creditable gains during
this time. But after carefully considering the very same factors the Board is required to consider,
I find the factors weighing against Ms. Lawrence's parole suitability presently outweigh the
positive ones tending to support it. Accordingly, because I continue to believe that her release
from prison would pose an unreasonable risk of danger to society, I REVERSE the Board's 2005
decision to grant parole to Ms. Lawrence.

Decision Date: 1 | 11 | 06

ARNOLD SCHWARZENEGGER
Governor, State of California

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** In re Lawrence on Habeas Corpus

---

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 150 Cal.App.4th 1511
**Rehearing Granted**

---

**Opinion No.** S154018
**Date Filed:** August 21, 2008

---

**Court:**
**County:**
**Judge:**

---

**Attorneys for Appellant:**

Carrie L. Hempel, Michael J. Brennan and Heidi L. Rummel for Petitioner Sandra Davis Lawrence.

Munger, Tolles & Olson, Blanca F. Young and Hailyn J. Chen for Stanford Criminal Justice Center as Amicus Curiae on behalf of Petitioner Sandra Davis Lawrence.

Sean Kennedy, Federal Defender (Central District), Daniel Broderick, Federal Defender (Eastern District) and Monica Knox, Assistant Federal Defender, as Amici Curiae on behalf of Petitioner Sandra Davis Lawrence.

---

**Attorneys for Respondent:**

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Mary Jo Graves and Dane R. Gillette, Chief Assistant Attorneys General, Julie L. Garland, Assistant Attorney General, J. Conrad Schroeder, Jennifer A. Neill, Gregory J. Marcot and Anya M. Binsacca, Deputy Attorneys General, for Respondent State of California.

John R. Poyner, District Attorney (Colusa); Bonnie M. Dumanis, District Attorney (San Diego); Albert C. Locher, Assistant District Attorney (Sacramento); Richard J. Sachs, Deputy District Attorney (San Diego); and W. Scott Thorpe for California District Attorneys Association as Amicus Curiae on behalf of Respondent State of California.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Carrie L. Hempel
USC Post Conviction Justice Project
University of Southern California
699 Exposition Boulevard
Los Angeles, CA  90089-0071
(213) 740-2586

Julie L. Garland
Assistant Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-704
(415) 703-5713