**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

EMIL JOSEPH WILHELM EKDAHL, III,

                   Petitioner,

v.

ROBERT AYERS, Warden,

                   Respondent.

_____

No. C 07-03642 SBA (PR)

**ORDER DENYING PETITION
FOR WRIT OF HABEAS
CORPUS ON ALL CLAIMS
AND ADDRESSING PENDING
MOTIONS**

(Docket nos. 17, 18, 19, 22, 23)

**INTRODUCTION**

      Petitioner Emil Joseph Wilhelm Ekdahl, a state prisoner incarcerated at San Quentin State Prison (SQSP) in San Quentin, California, filed this pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  The matter is now submitted for the Court's consideration of the merits of the petition.  For the reasons discussed below, the petition will be DENIED as to all claims.

**BACKGROUND**

      The Monterey County Superior Court sentenced Petitioner to a term of fifteen years to life in state prison for robbery and second degree murder.  (Resp't Ex. A.)  The present petition does not challenge Petitioner's underlying conviction.  Rather, it challenges the denial of his parole suitability by the Board of Parole Hearings (BPH) in 2005.

      On July 1, 2005, at Petitioner's seventh parole hearing, the BPH denied him parole.  (Resp't Ex. D, Subsequent Parole Cons. Hr'g Tr. at 20.)  During a preliminary parole hearing, Petitioner waived his right to an attorney and his right to be present.  (Id. at 3.)  At the parole hearing, the BPH denied parole based on the circumstances of Petitioner's commitment offense, his misconduct while incarcerated, his lack of participation in self-help programs, his unfavorable psychological reports, and the Monterey County District Attorney's opposition to parole.

      Petitioner sought habeas relief in state court.  On July 21, 2006, the Monterey County Superior Court issued an order directing the Respondent to file an informal response.  (Resp't Ex. F-1, Monterey County Super. Ct. July 21, 2006 Order at 7.)  On August 28, 2006, the superior court denied Petitioner's habeas claim, upon finding that the BPH had not abused its discretion in

**United States District Court**
For the Northern District of California

considering Petitioner's suitability for parole.  (Resp't Ex. F-2, Monterey County Super. Ct. Aug. 28, 2006 Order at 2.)  On October 16, 2006, the state appellate court denied Petitioner's habeas petition.  (Resp't Ex. G.)  The California Supreme Court summarily denied his state habeas petition on March 30, 2005.  (Resp't Ex. H.)

On July 16, 2007, Petitioner filed the instant petition (docket no. 1).  On September 5, 2007, the Court issued an order to show cause (docket no. 4).  On November 5, 2007, Respondent filed an Answer (docket no. 5).  On December 3, 2007, Petitioner filed a Traverse (docket no. 11).  Petitioner filed motions to expand the record, to conduct discovery and have an evidentiary hearing, for appointment of counsel, and for judicial notice (docket nos. 10, 12, 13, 14, 15).  On September 22, 2008, the Court denied those motions (docket no. 16).

On October 1, 2008, Petitioner filed a motion for the Court to take judicial notice of his change of parole plans (docket no. 17).  On October 8, 2008, Petitioner filed a motion for the Court to reconsider its denial of his requests for discovery and an evidentiary hearing (docket no. 18).  On October 27, 2008, Petitioner filed an request for judicial notice of "Carols Ortiz Order to Show Cause and Parole Matters Synopsis of Recent Court Cases" (docket no. 19).  On November 4, 2008, Petitioner filed a motion requesting discovery, an evidentiary hearing, and appointment of counsel (docket no. 22).  On November 17, 2008, Petitioner filed a "Motion Requesting Emergency or Expedited Stay of Petitioner's December 15, 2008 Parole Hearing" (docket no. 23).

The Court will proceed to consider the merits of Petitioner's due process claims relating to the BPH's 2005 parole denial.  The Court will also address his pending motions.

## STANDARD OF REVIEW

### I.    Legal Standard

Under the Antiterrorism and Effective Death Penalty Act (AEDPA), a district court may grant a petition challenging a state conviction or sentence on the basis of a claim that was "adjudicated on the merits" in state court only if the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on

**United States District Court**
For the Northern District of California

an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state court has "adjudicated" a petitioner's constitutional claim "on the merits" for purposes of § 2254(d) when it has decided the petitioner's right to post-conviction relief on the basis of the substance of the constitutional claim advanced, rather than denying the claim on the basis of a procedural or other rule precluding state court review on the merits. Lambert v. Blodgett, 393 F.3d 943, 969 (9th Cir. 2004). It is error for a federal court to review de novo a claim that was adjudicated on the merits in state court. See Price v. Vincent, 538 U.S. 634, 638-43 (2003).

The Ninth Circuit has applied section 2254(d) to a habeas petition from a state prisoner challenging the denial of parole. See Sass v. Cal. Bd. of Prison Terms, 461 F.3d 1123, 1126-27 (9th Cir. 2006); Rosas v. Nielsen, 428 F.3d 1229, 1232 (9th Cir. 2005) (per curiam); McQuillion v. Duncan, 306 F.3d 895, 901 (9th Cir. 2002) (assuming without deciding that AEDPA deferential standard of review under § 2254 applies to such decisions).

**A.    Section 2254(d)(1)**

Challenges to purely legal questions resolved by a state court are reviewed under § 2254(d)(1), under which a state prisoner may obtain habeas relief with respect to a claim adjudicated on the merits in state court only if the state court adjudication resulted in a decision that was "contrary to" or "involved an unreasonable application of" "clearly established Federal law, as determined by the Supreme Court of the United States." Williams v. Taylor, 529 U.S. 362, 402-04, 409 (2000). While the "contrary to" and "unreasonable application" clauses have independent meaning, see id. at 404-05, they often overlap, which may necessitate examining a petitioner's allegations against both standards, see Van Tran v. Lindsey, 212 F.3d 1143, 1149-50 (9th Cir. 2000), overruled on other grounds, Lockyer v. Andrade, 538 U.S. 63, 70-73 (2003).

**1.    Clearly Established Federal Law**

"Clearly established federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412. "Section 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." Id. "A federal court may not

3

overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme] Court is, at best, ambiguous." <u>Mitchell v. Esparza</u>, 540 U.S. 12, 17 (2003). If there is no Supreme Court precedent that controls on the legal issue raised by a petitioner in state court, the state court's decision cannot be contrary to, or an unreasonable application of, clearly-established federal law. <u>See, e.g.</u>, <u>Stevenson v. Lewis</u>, 384 F.3d 1069, 1071 (9th Cir. 2004).

The fact Supreme Court law sets forth a fact-intensive inquiry to determine whether constitutional rights were violated "obviates neither the clarity of the rule nor the extent to which the rule must be seen as 'established'" by the Supreme Court. <u>Williams</u>, 529 U.S. at 391. There are, however, areas in which the Supreme Court has not established a clear or consistent path for courts to follow in determining whether a particular event violates a constitutional right; in such an area, it may be that only the general principle can be regarded as "clearly established." <u>Andrade</u>, 538 U.S. at 64-65. When only the general principle is clearly established, it is the only law amenable to the "contrary to" or "unreasonable application of" framework. <u>See id.</u> at 73.

Circuit decisions may still be relevant as persuasive authority to determine whether a particular state court holding is an "unreasonable application" of Supreme Court precedent or to assess what law is "clearly established." <u>Clark v. Murphy</u>, 331 F.3d 1062, 1070-71 (9th Cir.), <u>cert. denied</u>, 540 U.S. 968 (2003); <u>Duhaime v. Ducharme</u>, 200 F.3d 597, 600 (9th Cir. 1999).

### 2.    "Contrary to"

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." <u>Williams</u>, 529 U.S. at 413. A "run-of-the-mill state-court decision" that correctly identifies the controlling Supreme Court framework and applies it to the facts of a prisoner's case "would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." <u>Williams</u>, 529 U.S. at 406. Such a case should be analyzed under the "unreasonable application" prong of § 2254(d). <u>See</u> <u>Weighall v. Middle</u>, 215 F.3d 1058, 1062 (9th Cir. 2000).

4

**United States District Court**
For the Northern District of California

### 3.    **"Unreasonable Application"**

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 412-13.

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." Id. at 411; accord Middleton v. McNeil, 541 U.S. 433, 436 (2004) (per curiam) (challenge to state court's application of governing federal law must be not only erroneous, but objectively unreasonable); Woodford v. Visciotti, 537 U.S. 19, 25 (2002) (per curiam) ("unreasonable" application of law is not equivalent to "incorrect" application of law).

Evaluating whether a rule application was unreasonable requires considering the relevant rule's specificity; if a legal rule is specific, the range of reasonable judgment may be narrow; if it is more general, the state courts have more leeway. Yarborough v. Alvarado, 541 U.S. 652, 664 (2004). Whether the state court's decision was unreasonable must be assessed in light of the record that court had before it.  Holland v. Jackson, 542 U.S. 649, 651 (2004) (per curiam).

The objectively unreasonable standard is not a clear error standard.  Andrade, 538 U.S. at 75-76 (rejecting Van Tran's use of "clear error" standard); Clark, 331 F.3d at 1067-69 (acknowledging the overruling of Van Tran on this point).  After Andrade,

> [T]he writ may not issue simply because, in our determination, a state court's application of federal law was erroneous, clearly or otherwise.  While the "objectively unreasonable" standard is not self-explanatory, at a minimum it denotes a greater degree of deference to the state courts than [the Ninth Circuit] ha[s] previously afforded them.

Id.  In examining whether the state court decision was unreasonable, the inquiry may require analysis of the state court's method as well as its result.  Nunes v. Mueller, 350 F.3d 1045, 1054 (9th Cir. 2003).

### B.    **Section 2254(d)(2)**

A federal habeas court may grant a writ if it concludes a state court's adjudication of a claim

5

United States District Court

For the Northern District of California

"resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  An unreasonable determination of the facts occurs where the state court fails to consider and weigh highly probative, relevant evidence, central to petitioner's claim, that was properly presented and made part of the state court record.  <u>Taylor v. Maddox</u>, 366 F.3d 992, 1005 (9th Cir. 2004).  A district court must presume correct any determination of a factual issue made by a state court unless the petitioner rebuts the presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

### C.    <u>Exhaustion</u>

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court.  <u>See</u> 28 U.S.C. § 2254(b), (c).  Petitioner's state court remedies were exhausted as his claims were presented to and denied by the California Supreme Court.

### **FACTUAL BACKGROUND**

Although Petitioner is not challenging the validity of his underlying criminal conviction, the facts regarding the commitment offense were relied upon by the BPH to deny Petitioner parole in 2005.  The following facts regarding the circumstances surrounding the offense were taken from the Probation Officer's Report:

> On October 18, 1981, at approximately 10:50 p.m., Soledad Police responded to Pete's Shell (a service station and grocery store) on South Front Street regarding an armed robbery which had just occurred.  Arthur Sandoval (17) was located behind the station face down in a pool of blood; there was no pulse.  Victims Pamela Lewis (21) and Sal Montoya (19) stated that two subjects with ski masks entered the store, ordered them to lay on the floor, took $13 from the cash register and ran from the store. A short time later, they heard two shots . . . .

> . . . .

> The autopsy report indicates that Arthur Sandovol died from gunshot wounds to the head . . . .

. . . .

Joe Ekdahl (20) was arrested for this case on September 16, 1983.  After advisement of rights, Ekdahl stated that he and Steve Horning had been given pistols by Mark Horning.  They drove to Soledad, where Mark told him, "get out and go with Steve to do the job or I'll kick your ass."  He followed Steven into the store.  He stated that Steven ordered the victims to lie on the floor.  Two Mexican adults entered the store and they refused to lie on the floor.  They took the money from the register and ran from the store.  Ekdahl stated that he heard two shots as they were running from the store to the vehicle which was occupied by Mark Horning.  He mentioned that Mark Horning was angry because they had gotten so little money.

(Resp't Ex. B, Probation Officer's Report at 4-5.)

Petitioner was convicted of first degree felony murder.  (Resp't Ex. F-1 at 5.)  The trial court reduced his conviction to second degree felony murder, which carries a sentence of fifteen years to life.  (Id.)

## DISCUSSION

### I.      Subject Matter Jurisdiction

Respondent argues the petition should be dismissed for want of subject matter jurisdiction because Petitioner has no federally protected liberty interest in parole.  Respondent's argument is without merit.

Respondent relies on In re Dannenberg, 34 Cal. 4th 1061, cert. denied, 546 U.S. 844 (2005), as authority for his contention that the California statute does not create a liberty interest in parole. This argument has been rejected by the United States Court of Appeals for the Ninth Circuit.  See Sass, 461 F.3d at 1125 ("California inmates continue to have a liberty interest in parole after [In re Dannenberg].").

Accordingly, the Court has subject matter jurisdiction under 28 U.S.C. § 2254 to decide whether Petitioner's right to due process was violated by the BPH's denial of his parole suitability.

### II.     Due Process Claim

#### A.      Applicable Legal Standard

"In analyzing the procedural safeguards owed to an inmate under the Due Process clause, [a

United States District Court

For the Northern District of California

7

United States District Court

For the Northern District of California

court] must look at two distinct elements: (1) a deprivation of a constitutionally protected liberty or property interest, and (2) a denial of adequate procedural safeguards." Biggs v. Terhune, 334 F.3d 910, 913 (9th Cir. 2003). The second prong of this test is satisfied if (1) the inmate has been afforded an opportunity to be heard and, if denied parole, informed of the reasons underlying the decision and (2) "some evidence" supports the decision to grant or deny parole. See Sass, 461 F.3d at 1129 (adopting some evidence standard for disciplinary hearings outlined in Superintendent v. Hill, 472 U.S. 445, 454-55 (1985)).

"To determine whether the some evidence standard is met 'does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached'" by the parole board. Sass, 461 F.3d at 1128 (quoting Hill, 472 U.S. at 455-56). The "some evidence standard is minimal, and assures that 'the record is not so devoid of evidence that the findings of the . . . board were without support or otherwise arbitrary.'" Id. at 1129 (quoting Hill, 472 U.S. at 457). The some evidence standard of Hill is clearly established law in the parole context for purposes of § 2254(d). Id.

Three Ninth Circuit cases provide the guideposts for applying the Hill "some evidence" standard on this point: Biggs, Sass, and Irons v. Carey, 506 F.3d 951, 955 (9th Cir. 2007). Biggs explained that the value of the criminal offense fades over time as a predictor of parole suitability:

> The Parole Board's decision is one of 'equity' and requires a careful balancing and assessment of the factors considered . . . . A continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation.

Biggs, 334 F.3d at 916-17. Biggs upheld the initial denial of a parole release date based solely on the nature of the crime and the prisoner's conduct before incarceration, but cautioned that "[o]ver time . . . should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of Biggs's offense and prior conduct would raise serious questions involving his liberty interest in parole." Id. at 916. Next came Sass, which criticized the Biggs statements as improper and beyond the scope of the dispute before the court:

United States District Court

For the Northern District of California

"Under AEDPA it is not our function to speculate about how future parole hearings could proceed." Sass, 461 F.3d at 1129. Sass determined that the parole board is not precluded from relying on unchanging factors such as the circumstances of the commitment offense or the petitioner's pre-offense behavior in determining parole suitability. See id. (commitment offenses in combination with prior offenses provided some evidence to support denial of parole at subsequent parole consideration hearing). Sass also put to rest any idea from Biggs that the commitment crime and pre-offense behavior only support the initial denial of parole. Irons determined that due process was not violated by the use of the commitment offense and pre-offense criminality to deny parole for a prisoner sixteen years into his seventeen-to-life sentence. Irons emphasized that in all three cases (Irons, Sass and Biggs) in which the court had "held that a parole board's decision to deem a prisoner unsuitable for parole solely on the basis of his commitment offense comports with due process, the decision was made before the inmate had served the minimum number of years required by his sentence." Irons, 506 F.3d at 955. Interpreting this statement from Irons to suggest that the offense can only be relied on until the minimum number of years has been reached would suffer the same problem that Sass identified in Biggs: it is not the holding of the case. The dicta in Biggs and Irons are speculative and do not determine when a denial of parole based solely upon the commitment offense or pre-offense behavior violates due process. Neither logic nor Irons compel a decision that such reliance must cease when the prisoner reaches the minimum number of years in his sentence, such as the fifteenth year of a fifteen-to-life sentence.

The upshot of these three cases is that the BPT can look at immutable events, such as the nature of the conviction offense and pre-conviction criminality, to predict that a prisoner is not currently suitable for parole even after the initial denial (Sass), but the weight to be attributed to these immutable events should decrease over time as a predictor of future dangerousness as the years pass and the prisoner demonstrates favorable behavior (Biggs and Irons). Sass did not dispute the principle that, other things being equal, a murder committed fifty years ago is less probative of a prisoner's current dangerousness than one committed ten years ago. Not only does the passage of time in prison count for something, exemplary behavior and rehabilitation in prison count for

9

United States District Court

For the Northern District of California

1   something according to <u>Biggs</u> and <u>Irons</u>.  <u>Hill</u>'s standard might be quite low, but it does require that

2   the decision <u>not</u> be arbitrary, and reliance on only the facts of the crime might eventually make for

3   an arbitrary decision.

4          What little guidance has come from the Supreme Court suggests that judicial review should

5   be extremely deferential to the original decisionmaker in the parole context.  In addition to the very

6   low evidentiary standard that <u>Hill</u> imposes, other Supreme Court comments suggest that the

7   judiciary should be quite mindful of the subjective and predictive nature of a parole board's decision.

8   <u>See</u> <u>Greenholtz v. Inmates of Neb. Penal & Corr. Complex</u>, 442 U.S. 1, 13 (1979).

> No ideal, error-free way to make parole-release decisions has been developed; the
> whole question has been and will continue to be the subject of experimentation
> involving analysis of psychological factors combined with fact evaluation guided
> by the practical experience of the actual parole decisionmakers in predicting future
> behavior.  Our system of federalism encourages this state experimentation.

<u>Id.</u>

### B.        Parole for Murderers in California

       California uses indeterminate sentences for most non-capital murderers, with the term being
life imprisonment and parole eligibility after a certain minimum number of years.  A first degree
murder conviction yields a minimum term of twenty-five years to life and a second degree murder
conviction yields a minimum term of fifteen years to life imprisonment.  <u>See</u> <u>In re Dannenberg</u>, 34
Cal. 4th at 1078; Cal. Penal Code § 190.  The upshot of California's parole scheme described below
is that a release date normally must be set unless certain factors exist, but the "unless" qualifier is so
great that parole is a rarity rather than the norm for murderers.

       California Penal Code § 3041(a) states a BPH shall meet with an inmate one year before the
prisoner's minimum eligible release date and shall normally set a parole release date.  Penal Code
§ 3041(a).

> The release date shall be set in a manner that will provide uniform terms for offenses
> of similar gravity and magnitude in respect to their threat to the public, and that will
> comply with the sentencing rules that the Judicial Council may issue and any
> sentencing information relevant to the setting of parole release dates.

<u>Id.</u>

10

1    Significantly, this statute also provides:

2    The panel . . . shall set a release date unless it determines that the gravity of the
     current convicted offense or offenses, or the timing and gravity of current or past
3    convicted offense or offenses, is such that consideration of the public safety requires
     a more lengthy period of incarceration for this individual, and that a parole date,
4    therefore cannot be fixed at this meeting.

5    Id. § 3041(b).

6    One of the implementing regulations, Title 15 of the California Code of Regulations § 2401,

7    provides:

8    A parole date shall be denied if the prisoner is found unsuitable for parole under
     Section 2402(c).  A parole date shall be set if the prisoner is found suitable for parole
9    under Section 2402(d).  A parole date set under this article shall be set in a manner
     that provides uniform terms for offenses of similar gravity and magnitude with
10   respect to the threat to the public.

11   Cal. Code Regs. tit. 15, § 2401.

12   The regulation also provides:

13
14   The panel shall first determine whether the life prisoner is suitable for release on
     parole.  Regardless of the length of time served, a life prisoner shall be found
15   unsuitable for and denied parole if in the judgment of the panel the prisoner will pose
     an unreasonable risk of danger to society if released from prison.

16   Id. § 2402(a).  The panel may consider all relevant and reliable information available to it.

17   Id. § 2402(b).

18   The regulations contain a matrix of suggested base terms that is apparently the source of

19   many prisoners' dashed hopes.  The matrix provides three choices of suggested base terms for

20   several categories of crimes.  See Code Regs. tit. 15, § 2403.  For second degree murders, the matrix

21   of base terms ranges from a low of fifteen, sixteen or seventeen years, to a high of nineteen, twenty

22   or twenty-one years, depending on certain facts of the crime.[1]  Although the matrix is used to

23   establish a base term, this occurs only once the prisoner has been found suitable for parole.  See id.

24   ───────────────────────

25       [1] One axis of the matrix concerns the relationship between murderer and victim, and
26   the other axis of the matrix concerns the circumstances of the murder.  The choices on the axis
     for the relationship of murderer and victim are "participating victim," "prior relationship," and
27   "no prior relationship."  The choices on the axis for the circumstances of the murder are
     "indirect," "direct or victim contribution," or "severe trauma."  Each of the choices is further
28   defined in the matrix.  See Code Regs. tit. 15, § 2403(c).

United States District Court

For the Northern District of California

11

§ 2403(a).  Here, Petitioner has served about twenty-three years in prison.  However, he has not yet been found suitable for parole by the BPH.

The statutory scheme elevates a prisoner's suitability for parole above their expectancy in the early setting of a fixed date, designed to ensure term uniformity.  In re Dannenberg, 34 Cal. 4th at 1070-71.

> While subdivision (a) of section 3041 states that indeterminate life (i.e., life-maximum) sentences should "normally" receive "uniform" parole dates for similar crimes, subdivision (b) provides that this policy applies "*unless* [the Board] determines" that a release date cannot presently be set because the particular offender's crime and/or criminal history raises "*public safety*" concerns requiring further indefinite incarceration.  (Italics added.)  Nothing in the statute states or suggests that the Board must evaluate the case under standards of term uniformity before exercising its authority to deny a parole date on the grounds the particular offender's criminality presents a *continuing public danger*.

Id. at 1070 (emphasis and brackets in original).  Indeed, the very regulation that includes the matrix states that "[t]he panel shall set a base term for each life prisoner *who is found suitable for parole*." Code Regs. tit. 15, § 2403(a) (emphasis added).  "[T]he Board, exercising its traditional broad discretion, may protect public safety *in each discrete case* by considering the dangerous implications of a life-maximum prisoner's crime individually."  In re Dannenberg, 34 Cal. 4th at 1071 (emphasis in original).  The California Supreme Court's determination of state law is binding in this federal habeas action.  See Hicks v. Feiock, 485 U.S. 624, 629 (1988); Sandstrom v. Montana, 442 U.S. 510, 516-17 (1979).

The California Supreme Court has also determined the facts of the crime alone can support a sentence longer than the statutory minimum, even if everything else about the prisoner is laudable.

> While the Board must point to factors beyond the minimum elements of the crime for which the inmate was committed, it need engage in no further comparative analysis before concluding that the particular facts of the offense make it unsafe, at that time, to fix a date for the prisoner's release.

In re Dannenberg, 34 Cal. 4th at 1071; see also In re Rosenkrantz, 29 Cal. 4th 616, 682-83 (2002) ("The nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole" but might violate due process "where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense.").

C.     **Analysis**

1.     **Opportunity to Be Heard and Reasons for Denial**

Having stated that California inmates still maintain a liberty interest in parole, the Court analyzes the second prong of the Biggs test.  Under this prong, the first question pertains to whether Petitioner was given an opportunity to be heard and whether he was given reasons for the parole denial.  See Biggs, 334 F.3d at 913; Sass, 461 F.3d at 1126; Greenholtz, 442 U.S. at 16.

Petitioner waived his right to participate in his parole hearing.  (Resp't Ex. D at 2.)  The BPH held a preliminary hearing on July 1, 2005 regarding Petitioner's desire to waive his right to an attorney and his right to be present at his parole hearing.  (Id. at 1.)  Petitioner spoke with Ed Albord, an attorney, who was present during the preliminary hearing, about waiving his rights.  (Id.)  At the preliminary hearing, Mr. Albord testified that Petitioner was able to waive his rights:

> Presiding Commissioner Lee:  We are all here because I have a document that indicates that Mr. Ekdahl wishes to waive attorney and waive his presence. Generally, that is absolutely right.  He can do whatever he chooses to do.  However, I can do so only if he is able to waive his rights.  Counsel, you've had an opportunity to speak with Mr. Ekdahl.  Do you believe he can waive his rights in regards to this hearing and his representation by counsel?
>
> Attorney Albord:  I read his file.  I attempted to discuss with Mr. Ekdahl and we spoke (indiscernible) and then [sic] did not want the participation.  He did convey to me that he wanted to waive.

(Id. at 2.)

Petitioner also testified that he was aware of his rights and wanted to waive them:

> Presiding Commissioner Lee:  . . . I just wanted to make sure that this was a situation that you were doing it -- of that you are fully understanding of what you were going to do, so I will not violate your rights.  If you wish to waive your hearing, you absolutely have that right to waive your attorney.  I just want to verify on the record that you know what you're doing, that this (indiscernible).  So at this time, sir, understand that all the reasons (indiscernible) 115 and at this point in time you don't want to sit through this and that you don't want an attorney to represent you; is that correct?

13

**United States District Court**
For the Northern District of California

1

2

3

Inmate Ekdahl:  It isn't because of the 115, but yes, I do want to waive my right --
waive my right to attend the hearing.  I want to waive my right to a [sic] attorney.

4

(Id. at 3.)

5

6

7

8

9

The record shows that Petitioner waived his right to counsel and his right to be present at his

parole hearing.  During the parole hearing on July 1, 2005, the BPH laid out detailed reasons for

denying Petitioner parole, which are discussed further below.  Therefore, the Court finds that the

BPH satisfied the requirements for due process under this prong.

10

### 2.    **"Some Evidence" Standard**

11

12

13

14

15

16

17

18

19

20

21

22

23

The next question is whether there was some evidence to support the BPH's decision to deny

parole.  What little guidance has come from the Supreme Court suggests that the "some evidence"

standard is extremely deferential to the original decision-maker.  See Hill, 472 U.S. at 454 (An

examination of the entire record is not required nor is an independent assessment of the credibility of

witnesses or weighing of the evidence; the relevant question is whether there is any evidence in the

record that could support the conclusion reached by the decision-maker.).  Moreover, the Supreme

Court's comments suggest that the judiciary should be quite mindful of the subjective and predictive

nature of a parole board's decision.  See Greenholtz, 442 U.S. at 13 ("No ideal, error-free way to

make parole-release decisions has been developed; the whole question has been and will continue to

be the subject of experimentation involving analysis of psychological factors combined with fact

evaluation guided by the practical experience of the actual parole decisionmakers in predicting future

behavior.").

24

25

26

27

Title 15 of the California Code of Regulations § 2402 sets forth the circumstances that tend to

show unsuitability for parole release.  Section 2402(c)(1) provides the nature of a commitment

offense may justify denial if the "prisoner committed the offense in an especially heinous, atrocious

or cruel manner."  Code Regs., tit. 15 § 2402(c)(1).  The factors considered include:

28

(A)  Multiple victims were attacked, injured or killed in the same or separate incidents;

14

United States District Court

For the Northern District of California

(B)  The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder;

(C)  The victim was abused, defiled or mutilated during or after the offense;

(D)  The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering; and

(E)  The motive for the crime is inexplicable or very trivial in relation to the offense.

Id.

Further, Penal Code § 3042(f)(3) states that the Board must consider the statements and recommendations made by the district attorney's office, the investigating law enforcement agency, and the victims or their next of kin who have requested to speak.  See In re Dannenberg, 34 Cal. 4th at 1085.

At the 2005 parole suitability hearing, the BPH found that Petitioner was "not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison."  (Resp't Ex. D at 15.)  The BPH found Petitioner unsuitable for parole based on his commitment offense:

The Panel has reviewed all information received from the public and relied on the following circumstances in concluding prisoner is not suitable for parole and would pose an unreasonable risk to danger to society and a threat to public safety if released from prison.  The offense was carried out in a cruel and callous manner.  Multiple victims were robbed and one person killed.  Offense was carried out in a dispassionate manner or that the crime was inexplicable and very trivial in relationship to the offense.

Id.

The BPH also considered Petitioner's misconduct during incarceration and two unfavorable psychological reports:

The other reason for the denial at this point in time is his institutional behavior.  Prior programming has only been limited while incarcerated.  He has not sufficiently participated in programs.  He has failed to demonstrate evidence of positive change.

15

United States District Court
For the Northern District of California

Misconduct while incarcerated include[s] recently a 115, April 29th, year 2004 as well as five recent 128s, starting with chrono 2003 which is his last parole date. He had a 115 on July 2000 -- excuse me, a 128 [on] July 2003; April of 2004; another one in April 2004; in June 2004 . . . and finally a recent January 2005. The psychological report from a Dr. Louis PhD indicates that there are concerns. One of the major concerns that the doctor had was in regard to his AA 12-step program. Basically the doctor indicates that under impressions, assessment of (indiscernible) 2003 details a risk of dangerousness. Under Dr. Bencichs, B-E-N-C-I-C-H-S, reports, "If the state absolutely asks for drug and alcohol (indiscernible) finds potential comparted to average lifer. However, his capacity (indiscernible) social status were he released was compromised since he is no longer availing himself for (indiscernible) of weekly support of 12-step meeting. This makes it more likely that he will relapse.

(Id. at 16-17.)

The BPH also relied on a letter from the Monterey County District Attorney opposing Petitioner's parole and Petitioner's unviable parole plans. The BPH found that:

The prisoner continues to need therapy programming and self-help in order (indiscernible) discuss the (indiscernible) cope and stress in a nondestructive manner as well as to gather greater insight into the crime. In review of the prisoner's social history and lack of program participation, there's no occasion that the prisoner would behave differently if paroled. Prisoner should be commended for the fact that he is attempting -- prisoner is commended by the Commission to the fact that he realized that he was unsuitable and has not attempted to mitigate his numerous violations while incarcerated, and for that reason, we will take that into account during the deliberations regarding the amount of denial. These factors, however, do not outweigh the factors of unsuitability.

(Id. at 17.)

The state court upheld the BPH's parole denial in a thorough and reasoned opinion. In his state habeas petition, Petitioner made several claims that the BPH's decision was not based on "some evidence." Each claim was addressed by the state court.

In finding "some evidence" to support the BPH's finding of parole unsuitability, the state court stated:

16

United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11

> The 2005 Board found Petitioner unsuitable for parole based upon the commitment offense, his institutional behavior (lack of sufficient program participation, failure to demonstrate evidence of positive change, recent receipt of one CDC-115 and five CDC-128s), his somewhat unfavorable psychological report, and the objection of the Monterey County District Attorney.  The court has reviewed the hearing transcripts, the psychological reports, and the correspondence from the District Attorney and finds there is "some evidence" in the record to support the Board's finding.  The Board did not premise its determination on the commitment offense alone.  Rather, it determined that given Petitioner's social history, past and current depression, and his reluctance to discuss his feelings concerning the crime, he would substantially benefit from attending institutional programs, including AA.  The rehabilitative goals of the correctional system are met when inmates participate in programs that will better enable them to adjust to life beyond the prison walls.  The Board acted within its discretion in finding Petitioner unsuitable for parole because, considering all relevant and reliable information available to the Board, it found that releasing Petitioner at this time would jeopardize the public safety.

12    (Resp't Ex. F-1 at 2-3.)

13
14    In response to Petitioner's claim that the BPH's reliance upon unreliable evidence resulted in a

15    hearing and decision which was arbitrary and capricious in nature, the state court found:

16
17
18
19
20

> The Board posited that "the inmate actually got worse after the incident, never turned anyone in.  This theory indicates that maybe he had more participation in the crime than he alleges."  [Citation omitted.]  Petitioner contends that by engaging in speculation, or as he puts it, "a secret theory," the Board was in essence conducting a kangaroo court.  [Citation omitted.]  However, there is no evidence before the Court that the Board based its finding of unsuitability on mere speculation.  Accordingly, this claim must fail.

21
22    (Id. at 4.)

23    Petitioner also claims that the BPH improperly used static factors to deny parole suitability.

24    The state court held that after an individualized analysis, the BPH gave sufficient reasons on the

25    record for denying parole:

26
27
28

> The court has reviewed the hearing transcripts, the psychological reports, and the correspondence from the District Attorney and finds there is "some evidence" in the record to support the Board's finding.  The Board did not premise its determination on the commitment offense alone.  Rather, it determined that given the Petitioner's social

17

United States District Court

For the Northern District of California

1   history, past and current depression, and his reluctance to discuss his feelings

2   concerning the crime, he would substantially benefit from attending institutional

3   programs, including AA.  The rehabilitative goals of the correctional system are met

    when inmates participate in programs that will better enable them to adjust to life

4   beyond prison walls.  The Board acted within its discretion in finding Petitioner

5   unsuitable for parole because, considering all relevant and reliable information

    available to the Board, it found that releasing Petitioner at this time would jeopardize

6   public safety.

7   (Id. at 2-3.)

8

9       Finally, Petitioner claims that the BPH improperly denied him parole based on his program

10  participation.  The state court stated:

11      The Board found that Petitioner would benefit from participa[tion] in therapy

12      sessions for the purpose of dealing with stress in a non-destructive manner.

        Petitioner notes that in his psychological evaluation, Dr. Lewis recommended

13      therapy for the limited purpose of treating Petitioner's depression.  Petitioner does

14      not contend that it was Dr. Lewis' obligation to consider each type of therapy

        available to Petitioner in the institutional setting and make a recommendation as to

15      which type of available therapy Petitioner would either avail himself of, or reject at

16      all costs.  The evaluation is one of the factors considered by the Board, but not the

        sole factor, in determining whether an inmate is suitable for parole.  It was well

17      within the discretion of the Board to determine, based on all of the evidence before

        it, that Petitioner would be better able to adjust to life "on the outside" by

18      participating in therapeutic sessions.  The Court will not disturb this finding.

19

20  (Id. at 4-5.)

21      The state court thoroughly reviewed Petitioner's "some evidence" claim as well as the BPH's

22  reasons for finding Petitioner unsuitable for parole.  The BPH identified fact-specific reasons to

23  support its conclusion that Petitioner was unsuitable for parole.  Contrary to Petitioner's arguments,

24  the record shows that the BPH's findings were supported by some evidence.  The BPH conducted a

25  thorough review and consideration of Petitioner's individual factors tending to show unsuitability and

26  suitability for parole.

27

28      The Ninth Circuit's evolving guidance in Biggs, Sass and Irons suggests that the Board can

18

United States District Court

For the Northern District of California

continue to evaluate static factors, including the nature of the commitment offense, in deciding whether to grant parole.  See Sass, 461 F.3d at 1129.  The weight to be attributed to these immutable events, however, should decrease as a predictor of future dangerousness as the years pass and the prisoner demonstrates favorable behavior.  See Biggs, 334 F.3d at 916-17; Irons, 505 F.3d at 851.  Should Petitioner continue to follow the Board's advice by attending self-help programming and maintaining a positive disciplinary record, continued parole denials based on Petitioner's commitment offense alone could eventually give rise to a due process violation.

Having reviewed the facts of the crime as recited by the BPH and the other reasons stated for finding Petitioner ineligible for parole, the Court finds that there was some evidence in the record to support the state court upholding the BPH's decision.  See Hill, 472 U.S. at 455-56.  The Court concludes that the state court's decision was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding, 28 U.S.C. § 2254(d)(2), nor was it contrary to, or an unreasonable application of, clearly established federal law, id. § 2254(d)(1).

### 3.   **Other Arguments**

Petitioner makes three additional arguments:  (1) the BPH violated his free exercise of religion when they required him to attend Alcoholics Anonymous (AA) meetings; (2) the BPH denied him his due process rights by failing to notify his trial attorney of the date of the parole suitability hearing; (3) he was illegally sentenced to second degree felony murder, and is entitled to receive a first degree felony murder sentence, which carries the potential penalty of death; and (4) Penal Code section 3001 is unconstitutional as it applies to Petitioner and his parole plans.  The Court finds that these arguments must fail.

### a.   **Free Exercise of Religion**

Petitioner claims that the BPH violated his due process rights and right to freedom of religion by requiring him to attend AA.  The state court found that Petitioner stated a prima facie case for relief as to his due process claim:

19

**United States District Court**
For the Northern District of California

In Petitioner's view, the institution is forcing him to "convert to the AA religion." [Citation omitted.] Petitioner lost faith in God, experienced an "Evolutionary Social Darwinism enlightenment and became a[n] Evolutionist believing only in science." [Citation omitted.] Upon making this change, Petitioner stopped attending AA classes because he deems the programs to be religious in nature, in that "they require a belief in a higher power than mankind." [Citation omitted.] He maintains that the Board's requirement that all lifers attend AA programs is arbitrary (because the institution does not offer non-religious alcohol abstinence courses), imposes religion, and is in violation of Petitioner's rights under the ADA (Petitioner's health problems prevent him from working all day and attending AA classes in the evenings).

Under the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), a government agency is prohibited from imposing a substantial burden on an inmate's exercise of religion unless it furthers a compelling governmental interest and is the least restrictive means of doing so. Here, the Board has indicated that Petitioner's attendance at AA is more or less of a prerequisite to a finding of parole suitability. However, Petitioner has failed to demonstrate that his Evolutionist beliefs are, in fact, religious beliefs protected by the RLUIPA.

Nor has Petitioner demonstrated that the Board's requirement that he attend AA programs violates his rights under the ADA. To prevail on this claim, Petitioner must demonstrate that prison officials failed to provide "reasonable accommodations" with respect to his attendance at AA programs because of his disability. [Citations omitted.] Petitioner has failed to make this showing.

Petitioner has a better argument that the actions of prison officials are arbitrary and capricious, in that only religious-based alcohol abstinence courses are offered by the facility, and attendance is, in effect, mandatory. Petitioner appears to have stated a prima facie case for relief on the grounds of due process . . . .

(Resp't Ex. F-1 at 3-4.)

The state court sought an informal response from Respondent as to whether other programs were available at SQSP. (Id.) On August 28, 2006, the state court issued a second order finding that Petitioner's due process rights were not violated, because he could participate in a variety of self-help programs. (Resp't Ex. F-2 at 1.) The state court found:

It appears from the record that Petitioner does have a variety of self-help programs available to him in the institution. At his parole suitability hearing, it was determined that Petitioner would benefit from attending self-help programs, and that through his

20

attendance, he would be demonstrating his commitment to rehabilitation and suitability for parole.

(Id.)

This Court finds the state court's decision to deny Petitioner's claim relating to his due process right to free exercise of religion was objectively reasonable.

**b.   Board's Failure to Notify Counsel of Hearing Date**

The state court found that Petitioner failed to demonstrate any harm resulting from the Board's failure to notify his trial attorney about his parole suitability hearing on July 1, 2005.  The court stated "Petitioner admits that he waived his right to have counsel appear at the hearing.  Accordingly, Petitioner has failed to demonstrate any harm resulting from such failure, and has failed to state a claim for relief on this ground."  (Resp't Ex. F-1 at 4.)

The Court finds the state court's reasoning for denying Petitioner's claim that the Board failed to notify his trial attorney about his parole hearing on July 1, 2005 was objectively reasonable.

**c.   Improper Sentence**

In finding Petitioner's sentence proper, the state court stated:

Petitioner was convicted of 1st degree felony murder, which carries the potential penalty of death, but the trial court reduced the conviction to 2nd degree felony murder, which carries a term of 15 years to life.  Pen. Code sec. 190(a).  In Petitioner's view, a position supported by a news article attached to the petition [citation omitted], inmates on Death Row are more likely to be released from incarceration than inmates sentenced to a term of life imprisonment.

The trial court relied upon the decision in People v. Dillon, (1983) 34 Cal.3d 441 in determining that the conviction should be reduced . . . .

. . . .

As Dillon explains, the Legislature is accorded the broadest discretion possible in enacting penal statutes and setting the punishment for criminal acts, but its authority is circumscribed by the constitutional provision prohibition cruel and unusual

United States District Court
For the Northern District of California

punishment.  The final judgment as to whether the punishment set by the Legislature exceeds constitutional limits is left to the judiciary.  In that determination, a court examines the nature of the offense and offender, and the totality of the circumstances, including motive and extent to the defendant's involvement.  Here, Petitioner, an impressionable 17 year old boy with low self esteem, was coerced into joining two larger, intimidating men in their plan to rob a convenience store . . . .  After carefully reviewing and considering all the evidence presented at trial, it may well be that the trial judge and jury felt similarly unsettled with imposing punishment for first degree murder, with the potential that Petitioner would be put to death for his role in the offense.  In finding that the statutory punishment was sufficiently disproportionate to the crime that Petitioner's constitutional protection from cruel and unusual punishment was implicated, the court acted well within its jurisdiction to reduce the punishment to fit the crime.

(Id. at 5-6.)

The Court finds the state court's reasoning for denying Petitioner's claim relating to his sentence was objectively reasonable.

### d.      Constitutionality of Penal Code Section 3001

Petitioner claims that the application of Penal Code section 3001 is unconstitutional, as it requires him to secure parole in his county of commitment.  The Court construes this claim as an objection to the BPH's finding that Petitioner's parole plans were not viable.  The state court denied such a claim:

Petitioner concludes that the Board's requirement that he find suitable parole plans within Monterey County is unjust, in that Petitioner lacks family in the area. Petitioner has not been able to submit a viable parole plan because he lacks a job commitment from a Monterey County employer, and does not have a residence to parole to.  He explains from a financial standpoint, he lacks the resources to create a viable parole plan within the County, but that the Board refuses to allow him to parole closer to family members.  However, the Board has made specific suggestions concerning where and how Petitioner might seek employment and housing, and Petitioner has failed to allege that he followed these suggestions, to no avail. Petitioner has not stated a cause of action as to this claim.  Moreover, after Petitioner does create a viable parole plan and is released on parole, he will be able to request an interstate transfer, or a transfer to another county within the state.

(Id. at 6-7.)

22

The Court finds the state court's reasoning for denying Petitioner's claim relating to his parole plans was objectively reasonable.

### 4.    Summary of Other Arguments

In sum, the Court concludes that the state court's decision to deny Petitioner's other arguments, as stated above, was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding, 28 U.S.C. § 2254(d)(2), nor was it contrary to, or an unreasonable application of, clearly established federal law, id. § 2254(d)(1).  Accordingly, Petitioner's remaining claims are DENIED.

### CONCLUSION

For the foregoing reasons,

1.    The instant petition for a writ of habeas corpus is DENIED as to all claims.

2.    Petitioner's requests for judicial notice (docket nos. 17, 19) are GRANTED.  However, the Court's decision to deny Petitioner's federal habeas petition is not affected by these documents.

3.    Petitioner's motion for reconsideration of the Court's September 22, 2008 Order denying his requests for discovery and an evidentiary hearing (docket no. 18) is DENIED.  Petitioner is again attempting to discover evidence that he made no attempt to discover in his state court proceedings.  Therefore, Petitioner presents no grounds that warrant reconsideration.

4.    Petitioner's requests for discovery and an evidentiary hearing (docket no. 22) are DENIED.   At issue in his motion is his BPH "secret theory" claim, which has no bearing on his due process claims and does not affect the Court's decision to deny his habeas petition.

5.    Petitioner's motion for appointment of counsel (docket no. 22) is DENIED.

6.    Petitioner's "Motion Requesting Emergency or Expedited Stay of Petitioner's December 15, 2008 Parole Hearing" (docket no. 23) is DENIED.

7.    The Clerk of the Court shall enter judgment in accordance with this Order, terminate all pending motions, and close the file.

1    8.    This Order terminates Docket nos. 17, 18, 19, 22 and 23.

2    IT IS SO ORDERED.

3

4    DATED:  12/112/08                    SAUNDRA BROWN ARMSTRONG

5                                          United States District Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA


EMIL JOSEPH WILHELM EKDAHL III,

Case Number: CV07-03642 SBA

        Plaintiff,

**CERTIFICATE OF SERVICE**

  v.

AYERS et al,

        Defendant.

_____/

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on December 12, 2008, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.


Emil J.W. Ekdahl C-79199

San Quentin State Prison

1 Main Street

San Quentin,  CA  94974


Dated: December 12, 2008

Richard W. Wieking, Clerk

By: LISA R CLARK, Deputy Clerk

United States District Court

For the Northern District of California

P:\PRO-SE\SBA\HC.07\Ekdahl3642.denyHC.frm